# EXHIBIT "A"

5/2/23, 3:40 PM                                    Case Detail - Public - Broward County Clerk of Courts



**BRENDA D. FORMAN**
CLERK OF THE COURTS
browardclerk.org ■ BROWARD COUNTY, FLORIDA

| |

Menu ☰

**Is your court hearing being held via Zoom? Learn more about Remote Court Hearings by Zoom (/GeneralInformation/Miscellaneous#RemoteHearingsbyZoom)**

# Case Detail - Public

 Print

## Douglas Chertok Plaintiff vs. SRS ACQUIOM, INC, et al Defendant

**Broward County Case Number:** CACE23011273
**State Reporting Number:** 062023CA011273AXXXCE
**Court Type:** Civil
**Case Type:** Other - Business Transaction
**Incident Date:** N/A
**Filing Date:** 03/23/2023
**Court Location:** Central Courthouse
**Case Status:** Pending
**Magistrate Id / Name:** N/A
**Judge ID / Name:** Bidwill, Martin J.

### ➖ Party(ies)                                                    Total: 3

| Party Type | Party Name | ❓ Address | ❓ Attorneys / Address ★ Denotes Lead Attorney |
|---|---|---|---|
| Plaintiff | **Chertok, Douglas** | | |
| Defendant | **SRS ACQUIOM, INC** | | |

Case Detail - Public - Broward County Clerk of Courts

| Party Type | Party Name | ❓ Address | ❓ Attorneys / Address ★ Denotes Lead Attorney |
|---|---|---|---|
| Defendant | **WEWORK COMPANIES LLC** | | |

**— Disposition(s)**                                                        Total: 0

| Date | Statistical Closure(s) | | |
|---|---|---|---|
| Date | Disposition(s) | View | Page(s) |

**— Collection(s)**                                                          Total: 0

| There is no Collection information available for this case. |
|---|

**— Event(s) & Document(s)**                                                 Total: 13

| Date | Description | Additional Text | View | Pages |
|---|---|---|---|---|
| 05/02/2023 | **Opposition** | | 📄 | 3 |
| 05/01/2023 | **Motion for Extension of Time** | | 📄 | 2 |
| 04/30/2023 | **Motion for Default** | | 📄 | 4 |
| 04/06/2023 | **Summons Served-Posted** | 04/06/23 Party: *Defendant* SRS ACQUIOM, INC | 📄 | 1 |
| 04/06/2023 | **Summons Served-Posted** | 04/06/23 Party: *Defendant* WEWORK COMPANIES LLC | 📄 | 1 |
| 03/30/2023 | **Not of Intent to Serve Subpoenas Under Rule 1.351** | SUMMONS | 📄 | 1 |
| 03/30/2023 | **Not of Intent to Serve Subpoenas Under Rule 1.351** | SUMMONS | 📄 | 1 |

| Date | Description | Additional Text | View | Pages |
|------|-------------|-----------------|------|-------|
| 03/30/2023 | **eSummons Issuance** | SRS ACQUIOM, INC | 📄 | 1 |
| 03/30/2023 | **eSummons Issuance** | WEWORK COMPANIES LLC | 📄 | 1 |
| 03/23/2023 | **Per AOSC20-23 Amd12, Case is determined General** | | | |
| 03/23/2023 | **Civil Cover Sheet** | Amount: $100,001.00 | 📄 | 3 |
| 03/23/2023 | **Complaint (eFiled)** | | 📄 | 25 |
| 03/23/2023 | **Exhibits** | | 📄 | 64 |

### ➖ Hearing(s)

Total: 0

There is no Disposition information available for this case.

### ➖ Related Case(s)

Total: 0

There is no related case information available for this case.

## Brenda D. Forman

## Clerk of Court

Broward County
17th Judicial Circuit

MORE ABOUT THE CLERK (/ABOUTUS/ABOUTTHEOFFICE#ABOUTTHECLERK) ›

 (https://www.facebook.com/browardclerkofcourts/)

## Connect with Us ⌃

COURTHOUSE LOCATIONS (/ABOUTUS/HOURSANDLOCATIONS#COURTHOUSELOCATIONS) ›

5/2/23, 3:40 PM                                    Case Detail - Public - Broward County Clerk of Courts

| CONTACT US (/ABOUTUS/ABOUTTHEOFFICE#CONTACTUS) | > |
|---|---|
| DISCLAIMER AGREEMENT (/GENERALINFORMATION/MISCELLANEOUS#DISCLAIMERAGREEMENT) | > |
| CLERK DIRECTORY (/ABOUTUS/HOURSANDLOCATIONS#CLERKDIRECTORY) | > |
| TELL US WHAT YOU THINK (/MISCELLANEOUS/CLERKSURVEYS) | > |

## Accessibility & Support

| ADA NOTICE (/GENERALINFORMATION/MISCELLANEOUS#ADA) | &#9855; |
|---|---|
| PRINT | 🖶 |
| FREQUENTLY ASKED QUESTIONS (HTTPS://WWW.BROWARDCLERK.ORG//WEB2/CASESEARCHECA/FREQUENTQUESTIONS/) | > |
| GLOSSARY OF TERMS (HTTPS://WWW.BROWARDCLERK.ORG//WEB2/CASESEARCHECA/GLOSSARY/) | > |

## Main Courthouse Location

201 SE 6th Street

Fort Lauderdale
Florida, US 33301
Phone: (954) 831-6565

PUBLIC RECORDS CUSTODIAN (/GENERALINFORMATION/MISCELLANEOUS#PUBLICRECORDSCUSTODIAN) > *PURSUANT TO 119.12(2), F.S.*

PUBLIC ACCESS TO JUDICIAL RECORDS (/GENERALINFORMATION/MISCELLANEOUS#JUDICIALRECORDRULE) > *PURSUANT TO RULE 2.420*

Under Florida law, email addresses are public records. If you do not want your email address released in response to a public records request, do not send electronic mail to this entity.
Instead, contact this office by phone or in writing.
© 2023 - All rights reserved

Case Number: CACE-23-011273 Division: 05

Filing # 169536285 E-Filed 03/23/2023 11:39:14 PM

**FORM 1.997.    CIVIL COVER SHEET**

The civil cover sheet and the information contained in it neither replace nor supplement the filing and service of pleadings or other documents as required by law. This form must be filed by the plaintiff or petitioner with the Clerk of Court for the purpose of reporting uniform data pursuant to section 25.075, Florida Statutes. (See instructions for completion.)

**I.    CASE STYLE**

IN THE CIRCUIT/COUNTY COURT OF THE SEVENTEENTH   JUDICIAL CIRCUIT, IN AND FOR BROWARD   COUNTY, FLORIDA

Douglas Chertok
Plaintiff

Case # _____
Judge _____

vs.

SRS ACQUIOM, INC, WEWORK COMPANIES LLC
Defendant

**II.    AMOUNT OF CLAIM**

Please indicate the estimated amount of the claim, rounded to the nearest dollar. The estimated amount of the claim is requested for data collection and clerical processing purposes only. The amount of the claim shall not be used for any other purpose.

☐ $8,000 or less
☐ $8,001 - $30,000
☐ $30,001- $50,000
☐ $50,001- $75,000
☐ $75,001 - $100,000
☒ over $100,000.00

**III.    TYPE OF CASE**    (If the case fits more than one type of case,   select the most definitive category.) If the most descriptive label is a subcategory (is indented under a broader category), place an x on both the main category and subcategory lines.

- 1 -

## CIRCUIT CIVIL

☐ Condominium
☒ Contracts and indebtedness
☐ Eminent domain
☐ Auto negligence
☐ Negligence—other
    ☐ Business governance
    ☐ Business torts
    ☐ Environmental/Toxic tort
    ☐ Third party indemnification
    ☐ Construction defect
    ☐ Mass tort
    ☐ Negligent security
    ☐ Nursing home negligence
    ☐ Premises liability—commercial
    ☐ Premises liability—residential
☐ Products liability
☐ Real Property/Mortgage foreclosure
    ☐ Commercial foreclosure
    ☐ Homestead residential foreclosure
    ☐ Non-homestead residential foreclosure
    ☐ Other real property actions

☐Professional malpractice
    ☐ Malpractice—business
    ☐ Malpractice—medical
    ☐ Malpractice—other professional
☐ Other
    ☐ Antitrust/Trade regulation
    ☐ Business transactions
    ☐ Constitutional challenge—statute or ordinance
    ☐ Constitutional challenge—proposed amendment
    ☐ Corporate trusts
    ☐ Discrimination—employment or other
    ☐ Insurance claims
    ☐ Intellectual property
    ☐ Libel/Slander
    ☐ Shareholder derivative action
    ☐ Securities litigation
    ☐ Trade secrets
    ☐ Trust litigation

## COUNTY CIVIL

☐ Small Claims up to $8,000
☐ Civil
☐ Real property/Mortgage foreclosure

- 2 -

☐ Replevins
☐ Evictions
    ☐ Residential Evictions
    ☐ Non-residential Evictions
☐ Other civil (non-monetary)

## COMPLEX BUSINESS COURT

This action is appropriate for assignment to Complex Business Court as delineated and mandated by the Administrative Order.  Yes ☐ No ☒

**IV.**    **REMEDIES SOUGHT** (check all that apply):
☒ Monetary;
☐ Nonmonetary declaratory or injunctive relief;
☒ Punitive

**V.**    **NUMBER OF CAUSES OF ACTION:** [   ]
(Specify)

  7

**VI.**    **IS THIS CASE A CLASS ACTION LAWSUIT?**
    ☐ yes
    ☒ no

**VII.**    **HAS NOTICE OF ANY KNOWN RELATED CASE BEEN FILED?**
    ☒ no
    ☐ yes If "yes," list all related cases by name, case number, and court.

**VIII.**    **IS JURY TRIAL DEMANDED IN COMPLAINT?**
    ☒ yes
    ☐ no

**IX.**    **DOES THIS CASE INVOLVE ALLEGATIONS OF SEXUAL ABUSE?**
    ☐ yes
    ☒ no

I CERTIFY that the information I have provided in this cover sheet is accurate to the best of my knowledge and belief, and that I have read and will comply with the requirements of Florida Rule of Judicial Administration 2.425.

Signature: s/ Douglas Chertok              Fla. Bar #
            Attorney or party                     (Bar # if attorney)

Douglas Chertok                 03/23/2023
(type or print name)           Date

Case Number: CACE-23-011273 Division: 05

Filing # 169536285 E-Filed 03/23/2023 11:39:14 PM

SEVENTEENTH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORDIA

DOUGLAS CHERTOK

     Plaintiff,

        v.                           Case No. _____

SRS ACQUIOM, INC. a Delaware
corporation; and WEWORK COMPANIES LLC,    **COMPLAINT**
a Delaware limited liability company           **JURY TRIAL DEMANDED**

     Defendants.

-----------------------------------------------/

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

This is an action brought by Plaintiff Douglas Chertok ("Chertok" or "Plaintiff"), an

individual, against Defendants SRS ACQUIOM, INC. a Delaware corporation ("SRS"); and

WeWork Companies LLC, a Delaware limited liability company ("WeWork"; and collectively,

"Defendants") for wrongful escheatment, conversion, breach of duty of care, breach of fiduciary

duty, breach of contract, breach of covenant of good faith and fair dealing, or alternatively, unjust

enrichment, to recover merger consideration, interest, and other relief in an amount of no less than

approximately $257,500 owed to Plaintiff, and punitive damages in an amount of no less than

$5,000,000.

## <u>NATURE OF THE ACTION</u>

1.        Plaintiff brings this action to recover at least $257,500 in merger consideration

(the "Merger Consideration"), unpaid dividends (the "**<u>Dividends</u>**," collectively with the Merger

Consideration, the "**<u>Funds</u>**"), plus accrued pre-judgment interest, from Defendants. Defendants

initially unlawfully withheld the Funds from Plaintiffs for approximately five years (from 2018

until the present) after the closing of a merger (the "**<u>Merger</u>**") by and among, *inter alia*, Conductor,

1

*** FILED: BROWARD COUNTY, FL  BRENDA D. FORMAN,  CLERK 03/23/2023 11:39:12 PM.****

Inc., a Delaware corporation ("**Conductor**"), WeWork Companies Inc., a Delaware corporation

("WeWork Inc."), Paddington Merger Subsidiary II LLC, a New York limited liability company,

and SRS, and then subsequently wrongfully escheated the Funds to the State of Florida before the

end of Florida's five-year dormancy period for unclaimed funds and, *inter alia*, without conducting

the proper diligence as required by Florida Statute 717.

2.           Plaintiff, a stockholder of Conductor, owns 37,500 shares of common stock (the

"**Conductor Shares**") (a copy of the stock certificate is attached hereto as **Exhibit A**),  but did not

consent to the Merger.   The Merger closed on or about March 23, 2018 (the "**Closing**" or "**Closed**").

According to documents that Plaintiff received from SRS, the stockholder representative for the

Merger, Plaintiffs have been entitled to payment of the Merger Consideration since the Closing in

2018.    Since the Closing, however, Defendants retained the Merger Consideration owed to

Plaintiff, and improperly refused to release the  Merger  Consideration (or other Funds) to  Plaintiff.

Among  other  things,  Defendants unlawfully demanded that Plaintiff provide releases of liability

before paying the Merger Consideration.

3.           Specifically, Defendants' unlawful withholding of the Merger Consideration

materially breached WeWork's obligations (as, on information and belief, successor to Conductor

and WeWork Inc.) under the Fourth Amended and Restated Certificate of Incorporation filed by

Conductor on October 26, 2017 (the "Conductor Certificate") (a copy of the Conductor Certificate

is attached hereto as **Exhibit B**), which obligated WeWork Inc. (or its affiliates) and SRS to pay

Plaintiff the Merger Consideration in 2018 when the Merger Closing occurred.  Instead of paying

the Merger Consideration, WeWork (or its affiliates) and SRS required a pre-condition that

Plaintiff execute a Proxy and Joinder Agreement ("Joinder Agreement") (a copy of the Joinder

Agreement is attached hereto as **Exhibit C**), and a Merger Agreement Joinder ("Merger Agreement

Joinder") (a copy of the Merger Agreement Joinder is attached hereto as **Exhibit D**), that were

required under the merger agreement by and among, *inter alia*, WeWork Inc., Conductor, Paddington II and SRS (the "Merger Agreement") (SRS refused to furnish a copy of the Merger Agreement to Plaintiff) – and required Plaintiff to execute such documents without any additional consideration contrary to Delaware legal precedent that does not permit such conduct.

4.        The Merger Agreement Joinder contained releases of all claims against (among others) WeWork Inc., Conductor, SRS, and their respective Affiliates (as defined therein). Plaintiffs were neither parties to the Merger Agreement, nor consented to the Merger Agreement nor the Merger.  Accordingly, Plaintiffs had no duty to sign the Joinder Agreement or the Merger Agreement Joinder, or to provide releases.  Moreover, the Conductor Certificate – that governs the relationship between Conductor and its stockholders (including Plaintiff) -- did not require an executed Joinder Agreement, Merger Agreement Joinder or releases.  In addition, on information and belief, WeWork Inc. and SRS and their affiliates, intentionally flouted Delaware law by imposing the unlawful pre-condition of requiring releases knowing that Delaware legal precedent does not support such conduct.

5.        As recently as February 2023, Plaintiff and SRS exchanged email regarding the Funds (a copy of the emails are attached hereto as **Exhibit E**).  SRS claimed that it is holding $161,732 of the Funds for Plaintiff.  Although, on information and belief, SRS possessed Plaintiff's name and address since 2018, and could have sent Plaintiff checks at any time over the last five years, SRS instead intentionally withheld the Funds.  Moreover, during the course of those email exchanges, and before Florida's five-year dormancy period for the escheatment of unclaimed funds arose, SRS stated that on February 10, 2023 that SRS escheated the Funds to the State of Florida's unclaimed property Division (a copy of that email is also attached hereto as **Exhibit E**). Accordingly, Plaintiff seeks the Funds based upon seven alternative theories: (i) wrongful escheatment; (ii) conversion; (iii) breach of duty of care, (iv) breach of fiduciary duty, (v) breach

3

of contract based upon the Conductor Certificate and specific performance of the Conductor Certificate, (vi) breach of covenant of good faith and fair dealing, or, in the alternative, or (vii) SRS' unjust enrichment at the expense of Plaintiff.

## THE PARTIES

6.        Plaintiff, Douglas M. Chertok is an individual residing in Broward County, Florida.

7.        Defendant SRS ACQUIOM, INC. is a Delaware corporation.

8.        Defendant WeWork Companies LLC is a Delaware limited liability company.

## JURISDICTION

9.        This Court has subject matter jurisdiction over this Complaint pursuant to the Florida Constitution, art.V, §5(b); because Defendants wrongful conduct occurred in Florida; the matter in controversy exceeds $15,000; and Florida Statute 717.1242 ("It is and has been the intent of the Legislature that, pursuant to s. 717.124, the department [of financial services] determines the merits of claims for property paid or delivered to the department under this chapter."). Venue is proper in Broward County, Florida because the causes of action t against Plaintiff accrued in Broward County, Florida pursuant to Florida Statute 47.051.

10.       This Court has personal jurisdiction over Defendants pursuant to Florida Statute 48.193, because Defendants' tortious acts occurred within Florida; Defendants' breach a contract (*i.e.* Conductor's Certificate) within the State of Florida; and Defendants caused injury to Plaintiff within the State of Florida, *by inter alia*, prematurely escheating the Funds to the State of Florida. In addition, after the Merger Closed, Conductor merged with and into WeWork Inc., whose assets, on information and belief, were thereafter acquired by WeWork, and thus, acquired all assets and assumed all liabilities of Conductor under Delaware law.

4

## FACTS

### Background

11.         Chertok acquired the Conductor Shares on or about November 19, 2010. *See* Exhibit A.

12.         The releases that SRS later demanded from Plaintiff would have  impacted adversely, among other things, Plaintiff's right to the accrued interest based on Defendants' failure to provide the Funds to Plaintiff after the Merger's Closing,  and Plaintiff's ability to demand such interest.

### The Funds and Plaintiff's Illness

13.         In or about September 2017, Plaintiff was diagnosed and treated for pancreatic cancer, spent about six months in various hospitals, and underwent approximately 30 surgical procedures, including a Whipple surgery – a 9-hour surgical procedure in which numerous organs were removed.  Following those surgeries, Plaintiff underwent an extensive recovery period, which numerous follow-up medical procedures, that lasted approximately three years.  Accordingly, any statute of limitations for the claims herein should be tolled.

14.         On or about March 5, 2018, WeWork, Conductor, SRS and others signed the Merger Agreement, which provided, *inter alia,* that WeWork would acquire Conductor for about $114 million in cash.

15.         According to an email from SRS to Plaintiff, dated February 22, 2023 ("SRS Payment Amount Email"), an SRS representative stated that SRS is holding $161,737.23 of Merger Consideration for the Plaintiff.  See Exhibit E.  Because SRS withheld information from Plaintiff, Plaintiff does not know if that amount is accurate or was reduced by any escrow holdback

or other deductions pursuant to the Merger Agreement. Because Plaintiff is entitled to the Merger

Consideration and all Funds under the Conductor Certificate, no escrow holdback or other

deductions should have reduced the amount of Merger Consideration or Funds that Defendants owe

Plaintiff.

16.        Article IV, Section 3(d), (f), (g), (i) and Section D (2) of the Conductor Certificate

provides that:

> (a)  "any...merger of the Company" "shall be considered a 'Liquidation
>        Event'";
>
> (b)  "In the event of any Liquidation Event, the assets of the Company shall
>        be distributed as provided in Section 3 of Article IV(C) hereof.";
>
> (a)  "The Company shall not have the power to effect a Liquidation Event
>        unless the agreement or plan of merger or consolidation for such
>        transaction (the "Merger Agreement") provides that the consideration
>        payable to the stockholders of the Company shall be allocated among the
>        holders of capital stock of the Company in accordance with this Section
>        3";
>
> (b)  "In the event of a Liquidation Event pursuant to Subsection 3(f)(i)" "the
>        consideration payable to the stockholders of the Company 'shall be]...";
>        and
>
> (c)  "After the payment of the full preferential amounts required by
>        subsections (b) and (c) of this Section 3, the remaining Proceeds
>        available for distribution to stockholders shall be distributed ratably to
>        the holders of the Common Stock."

17.        Accordingly, pursuant to the Conductor Certificate and the SRS Payment

Amount Email, Plaintiff is entitled to at least $161,737.23, plus any additional merger

consideration contemplated by the Conductor Certificate or the Merger Agreement.

18.        In addition, pursuant to Article IV, Section 4 (2) of the Conductor Certificate, the

holders of shares of Common Stock shall be entitled to receive such dividends as may be declared

by the Board. Accordingly, Plaintiff is entitled to the payment of the Dividends, if declared by the

Board.

6

19.         Pursuant to the Conductor Certificate, Conductor was obligated to pay the Merger Consideration and Dividends to Conductor's stockholders upon the closing of a merger.

**Defendants' Payment Obligations**

20.         Plaintiff was a not party to the Merger Agreement, and did not consent to the Merger Agreement or the Merger.

21.         After the Merger Agreement was executed, SRS sent an e-mail to Plaintiff attaching the Joinder Agreement and Merger Agreement Joinder, and required that Plaintiff execute both documents, *inter alia*. As a pre-condition to receiving the Merger Consideration or any other Funds.

22.         The Conductor Certificate provides that upon the closing of a merger, Conductor is obligated to pay Conductor's common stockholders the Merger Consideration.  Likewise, the Delaware General Corporate Law ("DGCL") is presumed to be incorporated into every certificate of incorporation of a Delaware corporation, and the DGCL obligates Conductor to pay Conductor's common stockholders the Merger Consideration.

23.         At the time of the Merger's Closing, Conductor was obligated to pay Plaintiff the Funds *pursuant to the Conductor Certificate* (not the Merger Agreement). *See Mehta v. Smurfit-Stone Container Corp.*, 2014 WL 5438534, at *4 (Del. Ch. Oct. 20, 2014) (obligating an acquiring company to pay merger consideration to non-consenting target company stockholders *pursuant to the target company's charter*).  Conductor, WeWork Inc. and Defendants intentionally flouted Delaware law by improperly withholding the Merger Consideration from Plaintiff in the amount of at least $161,737 since the Merger's Closing.   In light of the fact that the Conductor Certificate does not limit or eliminate the payment of interest, Conductor owes interest to Plaintiff with respect to the amounts improperly withheld from Plaintiff. *See id.* (acquiring corporation is

7

liable for "an award of pre- and post-judgment interest running from [the date merger consideration is due] until the date of payment [of the merger consideration]").

24.     In addition, pursuant to the Conductor Certificate, Conductor owes Plaintiffs any dividend payments declared by the Board, if such payments were declared by the Board. In light of the fact that the Conductor Certificate does not limit or eliminate the payment of interest, Defendants owe interest to Plaintiff with respect to the Dividends improperly withheld from Plaintiff. As of the date of this Complaint, neither Conductor nor Defendants have paid the Merger Consideration, the Dividends, or interest to Plaintiff in breach of Conductor's and Defendants' payment obligations under the Conductor Certificate and under Delaware law.

25.     As noted above, shortly before the Merger's Closing, Chertok was diagnosed and treated for pancreatic cancer, and spent several years thereafter recovering.

**The Releases**

26.     Notwithstanding Conductor, WeWork Inc. and Defendants' unconditional obligation to pay the Funds to Plaintiffs after the Merger Closed *pursuant to the Conductor Certificate*, Conductor, WeWork Inc. and Defendants' unlawfully withheld the Funds from Plaintiff for nearly five-years because such parties repeatedly conditioned the payment of the Merger Consideration upon Plaintiff's execution of the Merger Agreement Joinder containing releases, the Joinder Agreement and other documents.

27.     Specifically, at various times after the Merger Closed, SRS repeatedly required Plaintiff to sign the Merger Agreement Joinder containing releases and the Joinder Agreement, that, on information and belief, were required by the Merger Agreement. Plaintiff, however, is neither a party to the Merger Agreement, nor did he consent to the Merger Agreement or the Merger. Accordingly, Plaintiff has no obligations under the Merger Agreement, and any purported obligations imposed upon Plaintiff as non-party, non-consenting stockholders – for example, the

8

execution of the Merger Agreement Joinder – are unenforceable by Conductor, WeWork Inc. or Defendants.

28.     Upon information and belief, SRS had knowledge that its demand for a release as a pre-condition to payment of the Funds to Plaintiff was in conflict with Delaware law. SRS seemingly knew that Delaware law prohibits an acquiring corporation from requiring releases from selling corporation's stockholders without furnishing additional consideration in exchange for the release. *Cigna Health & Life v. Audax Health Sols., Inc.,* 107 A.3d 1082, 1091 (Del. Ch. 2014).

29.     Specifically, when SRS sent Plaintiff an e-mail containing the Merger Agreement Joinder and Joinder Agreement and asked Plaintiff to execute them in order to receive the Funds, the Merger Agreement Joinder contained releases of all claims against WeWork Inc., Conductor, SRS, and other entities, and their affiliates, respective directors, officers, and agents. SRS did not offer Plaintiff any consideration in exchange for these releases.

30.     Plaintiff did not agree to the Merger Agreement Joinder, the releases, or the Joinder Agreement, and SRS continued to unlawfully withhold the Funds.

**SRS Unlawfully and Prematurely Escheated the Merger Consideration to the State of Florida**

31.     Notably, beginning in 2020, Plaintiff was diagnosed and needed to undergo additional treatments and hospitalization in connection with his pancreatic cancer. These treatments and hospitalization occurred in 2020 through 2023, and included a second round of surgery in March 2023. Accordingly, any statute of limitations for the claims herein should be tolled.

32.     In emails between Plaintiff and SRS as recently as February 2023, SRS, as the Conductor stockholders' representative under the Merger Agreement, confirmed that it continued to hold $161,737 of the Merger Consideration for Plaintiff.

9

33.         Plaintiff advised SRS that SRS may resolve this dispute by sending Plaintiff the Funds, accrued interest on the Funds, and documents that evidence calculations of the amount of the Funds.  SRS, however, did not send the Funds or the information that Plaintiff requested.

34.         Then, without notice, on February 22, 2023, an SRS representative emailed Plaintiff and stated: "the funds were escheated [by SRS] to the state of Florida less than 2 weeks ago [on February 10, 2023]. Therefore, you [*i.e.* Plaintiff] will have to wait for a period of time for the state [of Florida] to receive the funds and document/process in their system.  Again, moving forward you [i.e. Plaintiff] will need to work with the State of Florida to resolve this matter and not SRS Acquiom as we no longer hold your payment." See Exhibit E.

35.         Notably, SRS escheated the foregoing funds to the State of Florida without: (a) waiting for the State of Florida's five-year dormancy period to expire pursuant to Florida Statute 717; or (b) performing any of the requirements required by Florida Statute 717, including, *inter alia*, sending Plaintiff (the owner of such funds) the requisite notice prior to escheatment, and conducting the required due diligence.  Moreover, SRS escheated such funds without any lawful reason or cause.

36.         In addition, on information and belief, on or about February 10, 2023, SRS filed an unclaimed property report with the Florida Department of Financial Services (Unclaimed Property Division) in the amount of about $161,737.23, and transmitted those funds to the Florida Department of Financial Services (Unclaimed Property Division).  These acts were also done in violation of Florida Statute 717.

37.         On information and belief, based on the February 2023 emails from SRS' representatives, SRS intentionally, willfully and unlawfully escheated the foregoing funds to the State of Florida to purposefully delay Plaintiff's access and use of such funds.  There can be no

10

other explanation for SRS' sudden escheatment of the Funds during SRS' ongoing communications with Plaintiff. *See* Exhibit E.

38.        As of the date of this Complaint, Defendants still have not paid any of the Funds to Plaintiff.

## COUNT I

### (Wrongful Escheatment Against Defendant SRS)

39.        Plaintiff repeats and re-alleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

40.        In emails between Plaintiff and SRS as recently as February 2023, SRS, as the Conductor stockholders' representative under the Merger Agreement, confirmed that it continued to hold $161,737 of the Merger Consideration for Plaintiff.

41.        Plaintiff advised SRS that SRS may resolve this dispute by sending Plaintiff the Funds, and accrued interest on the Funds. SRS, however, did not send the Funds to Plaintiff.

42.        Then, without notice, on February 22, 2023, an SRS representative emailed Plaintiff and stated: "the funds were escheated [by SRS] to the state of Florida less than 2 weeks ago [on February 10, 2023]. Therefore, you [*i.e.* Plaintiff] will have to wait for a period of time for the state [of Florida] to receive the funds and document/process in their system.  Again, moving forward you [i.e. Plaintiff] will need to work with the State of Florida to resolve this matter and not SRS Acquiom as we no longer hold your payment." See Exhibit E.

43.        Notably, SRS escheated the foregoing funds to the State of Florida without: (a) waiting for the State of Florida's five-year dormancy period to expire pursuant to Florida Statute 717; or (b) performing any of the requirements required by Florida Statute 717, including, *inter alia*, sending Plaintiff (the owner of such funds) the requisite notice prior to escheatment, and

11

conducting the required due diligence.  Moreover, SRS escheated such funds without any lawful reason or cause.

44.          In addition, on information and belief, on or about February 10, 2023, SRS filed an unclaimed property report with the Florida Department of Financial Services (Unclaimed Property Division) in the amount of about $161,737.23, and transmitted those funds to the Florida Department of Financial Services (Unclaimed Property Division).  These acts were also done in violation of Florida Statute 717.

45.          On information and belief, SRS intentionally and unlawfully escheated the foregoing funds to the State of Florida to purposefully delay Plaintiff's access and use of such funds.

46.          Accordingly, SRS' escheatment of the $161,732 portion of the Funds constitutes a wrongful escheatment in violation of Florida Statute 717, and is subject to the fines and penalties therein.

47.          Because of SRS' wrongful escheatment, Plaintiff has been damaged both by the inability to access the escheated portion ($161,732) of the Funds, and the time value of such money due to Plaintiff's inability to access and use such funds, or any of the Funds.

## COUNT II

### (Conversion Against Defendants)

48.          Plaintiff repeats and re-alleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

49.          Plaintiff owns 37,500 shares of common stock of Conductor.  SRS stated those shares were converted into at least $161,732 in cash that belongs to Plaintiff, and was held by SRS from at least 2018 to 2023.  Because Defendants have not provided Plaintiff with the documentation

12

to calculate his Conductor Shares, Plaintiff cannot calculate the true value and worth of his Conductor Shares, and Plaintiff's Merger Consideration may be worth more than such $161,732 amount. Moreover, based on the Conductor Certificate, Plaintiff's Conductor Shares are also entitled to any escrow or holdbacks from the Merger and Merger Agreement that are not specified in the Conductor Certificate, any Dividends declared by the Conductor Board, and pre-judgment interest on all such amounts pursuant to Delaware law.

50.         Pursuant to the Conductor Certificate, Plaintiff actually had the right to possess and control the foregoing cash amounts, and all of the Funds, since the Merger Closed in 2018.

51.         Defendant SRS did, and Defendant WeWork may have from time to time, actually assumed control over the foregoing cash amounts, and all of the Funds, since the Merger Closed in 2018, that the Plaintiff had a right to control and possess.  Defendants thereby interfered with the Plaintiff's Funds in a manner that infringed on the Plaintiff's rights.

52.         Accordingly, Plaintiff was damaged in an amount of at least $161,732, plus the full amount of all unpaid Funds, and all pre-judgment and accrued interest on all Funds from the date when the Merger Closed and Plaintiff was entitled to the Funds, to the date of Defendants' payment of the Funds, pursuant to Delaware law.

## COUNT III

### (Breach of Duty of Care Against Defendants)

53.         Plaintiff repeats and re-alleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

54.         SRS, as the stockholders' representative under the Merger and Merger Agreement, owed a duty to Conductor's stockholders, including Plaintiff, to fulfill its responsibilities under the Conductor Certificate and the Merger Agreement, that included ensuring

13

Plaintiff received its Merger Consideration and Dividends upon the Closing of the Merger. WeWork, on information and belief, as the entity that acquired the assets of WeWork Inc., and assumed its liabilities (including liabilities under the Conductor Certificate that it assumed), owed a duty to Conductor's stockholders, including Plaintiff, to fulfill its responsibilities under the Conductor Certificate and the Merger Agreement, that included ensuring Plaintiff received its Merger Consideration and Dividends upon the Closing of the Merger.

55.     Defendants breached their duty of care to Plaintiff by failing to provide the Merger Consideration and Dividends to Plaintiff after the Closing of the Merger pursuant to the Conductor Certificate, as required by Delaware law, to prevent injuries to Plaintiff by depriving Plaintiff access and control of the Funds.

56.     Defendants breaches of their duty of care to Plaintiff directly caused Plaintiff's injury by withholding the Funds from Plaintiff from 2018 to 2023.  Defendant SRS further breached its duty of care to Plaintiff by wrongfully escheating the Funds to the State of Florida in violation of Florida Statute 717.  Plaintiff's injuries would not have happened had Defendants followed Delaware law by paying Plaintiff the Funds when the Merger Closed, and upheld their duties to Plaintiff.

57.     As a result of the foregoing breaches of duty of care by Defendants, Plaintiff was damaged in an amount of at least $161,732, plus the full amount of all unpaid Funds, and all pre-judgment and accrued interest on all Funds from the date when the Merger Closed and Plaintiff was entitled to the Funds, to the date of Defendants' payment of the Funds, pursuant to Delaware law.

## COUNT IV

**(Breach of Fiduciary Duty Against Defendants)**

58.        Plaintiff repeats and re-alleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

59.        SRS, as the stockholders' representative under the Merger and Merger Agreement, owed a fiduciary duty to Conductor's stockholders, including Plaintiff, to fulfill its responsibilities under the Conductor Certificate and the Merger Agreement, that included ensuring Plaintiff received its Merger Consideration and Dividends upon the Closing of the Merger. WeWork, on information and belief, as the entity that acquired the assets of WeWork Inc., and assumed its liabilities (including liabilities under the Conductor Certificate that it assumed), owed a fiduciary duty to Conductor's stockholders, including Plaintiff, to fulfill its responsibilities under the Conductor Certificate and the Merger Agreement, that included ensuring Plaintiff received its Merger Consideration and Dividends upon the Closing of the Merger.

60.        Defendants breached their fiduciary duties to Plaintiff by: (a) failing to provide the Merger Consideration and Dividends to Plaintiff after the Closing of the Merger pursuant to the Conductor Certificate, as required by Delaware law, to prevent injuries to Plaintiff by depriving Plaintiff access and control of the Funds; and (b) intentionally and wrongfully escheating the Funds to the State of Florida in violation of Florida Statute 717.

61.        Defendants' breaches of their fiduciary duties to Plaintiff directly caused Plaintiff's injury by withholding the Funds from Plaintiff from 2018 to 2023.  Defendant SRS further breached its fiduciary duty to Plaintiff by wrongfully and intentionally escheating the Funds to the State of Florida in violation of Florida Statute 717.  Plaintiff's injuries would not have

15

happened had Defendants followed Delaware law by paying Plaintiff the Funds when the Merger Closed, and upheld their duties to Plaintiff.

62.         As a result of the foregoing breaches of fiduciary duties by Defendants, Plaintiff was damaged in an amount of at least $161,732, plus the full amount of all unpaid Funds, and all pre-judgment and accrued interest on all Funds from the date when the Merger Closed and Plaintiff was entitled to the Funds, to the date of Defendants' payment of the Funds, pursuant to Delaware law.

63.         In addition, Plaintiff seek punitive damages in an amount of not less than $5,000,000 to punish the Defendant SRS for their intentionally wrongful escheatment of the Funds to the State of Florida in violation of Florida Statute 717; to prevent SRS from engaging in the same conduct at any point in the future; and to deter the same type of unlawful actions by others. Punitive damages are especially appropriate here because SRS' business includes serving as a stockholders' representative for hundreds, if not thousands, of similar mergers, and therefore SRS is likely to be in a similar situation in the future. In addition, SRS is one of a relatively small number of entities who serve as stockholders' representative in mergers within the U.S., and therefore punitive damages will send a clear message to this industry not to replicate such unlawful practices.

## COUNT V

### (Breach of Contract of the Conductor Certificate and Specific Performance Against Defendants)

64.         Plaintiff repeats and re-alleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

16

65.     Plaintiff seeks the relief of specific performance against Defendants for breach of contract based upon the Conductor Certificate because Defendants refused to pay the Funds to Plaintiff for almost five years, thereby denying Plaintiff of the Funds.

66.     The Conductor Certificate (which is a contract between Conductor and its stockholders) provides that upon closing a merger, Conductor's "remaining Proceeds available for distribution to stockholders shall be distributed ratably to the holders of the Common Stock."

67.     According to the SRS Payment Amount Email, the Conductor Certificate, and Delaware law, Plaintiff is entitled to at least $161,732 for Plaintiff's Conductor Shares, any Dividends declared by Conductor's board of directors, any additional payments pursuant to the terms of the Merger Agreement, and accrued interest thereon from the date of the Merger Closing to the date of payment.

68.     Under the Conductor Certificate, Conductor, WeWork Inc. and Defendants were obligated to pay the Merger Consideration and Dividends to Plaintiff no later than when the Merger Closed.

69.     Under Delaware law, Defendants are also obligated to pay Plaintiff pre-judgment interest running from the date that the Merger Consideration and Dividends should have been paid to the date of payment.  The payment of interest is not limited or eliminated by any provision of the Conductor Certificate.

70.     To date, Defendants have not paid any portion of the Merger Consideration as required by the Conductor Certificate and Delaware law, or any accrued interest.

71.     In addition, the Conductor Certificate provides that Conductor may issue dividends as declared by the Board.

72.     Plaintiff, therefore, is entitled to any dividends issued by Conductor.

17

73.       The Conductor Certificate obligates Conductor to pay the Dividends to Conductor's stockholders upon closing a merger.

74.       Under Delaware law, Conductor is also obligated to pay Plaintiff pre-judgment interest running from the date that the Dividends should have been paid to the date of payment. The payment of interest is not limited or eliminated by any provision of the Conductor Certificate.

75.       To date, neither Conductor, WeWork nor Defendants have paid the Dividends to Plaintiff as required by the Conductor Certificate and Delaware law, or any accrued interest.

76.       Defendants breached the Conductor Certificate by withholding the Funds from Plaintiff for almost five years after Conductor's and Defendants' obligation to pay Plaintiff the Funds commenced, by requiring that Plaintiff execute the Merger Agreement Joinder (that contained releases) prior to paying Plaintiff the Funds, and by wrongfully and intentionally escheating the Funds to the State of Florida in violation of Florida Statute 717. Accordingly, this Court should direct Defendants (a) to specifically perform its payment obligations under the Conductor Certificate, and (b) to pay Plaintiff an amount to be determined at trial, but no less than approximately $161,732, plus pre-judgment interest and costs.

77.       In addition, Plaintiff seek punitive damages in an amount of not less than $5,000,000 to punish the Defendant SRS for their intentionally wrongful escheatment of the Funds to the State of Florida in violation of Florida Statute 717, and to prevent Defendant SRS from engaging in the same conduct at any point in the future.  Punitive damages are especially appropriate here because Defendant SRS' business includes serving as a stockholders' representative for hundreds, if not thousands, of similar mergers, and therefore SRS is likely to be in a similar situation in the future.

18

## COUNT VI

**(Breach of the Covenant of Good Faith and Fair Dealing Against Defendant)**

78.        Plaintiff repeats and re-alleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

79.        Plaintiff owns Conductor Shares in an amount of 37,500 shares of common stock. Exhibit A.

80.        Plaintiff seeks the relief of specific performance against Defendants for breach of the covenant of good faith and fair dealing based upon the Conductor Certificate because Defendants refused to pay the Funds to Plaintiff for almost five years, thereby denying Plaintiff of the Funds.

81.        The Conductor Certificate (which is a contract between Conductor and its stockholders) provides that upon closing a merger, Conductor's "remaining Proceeds available for distribution to stockholders shall be distributed ratably to the holders of the Common Stock."

82.        According to the SRS Payment Amount Email, the Conductor Certificate, and Delaware law, Plaintiff is entitled to at least $161,732 for Plaintiff's Conductor Shares, any Dividends declared by Conductor's board of directors, any additional payments pursuant to the terms of the Merger Agreement, and accrued interest thereon from the date of the Merger Closing to the date of payment.

83.        Under the Conductor Certificate, Conductor, WeWork Inc. and Defendants were obligated to pay the Merger Consideration and Dividends to Plaintiff no later than when the Merger Closed.

84.        Under Delaware law, Defendants are also obligated to pay Plaintiff pre-judgment interest running from the date that the Merger Consideration and Dividends should have been paid

19

to the date of payment. The payment of interest is not limited or eliminated by any provision of the Conductor Certificate.

85.      To date, Defendants have not paid any portion of the Merger Consideration as required by the Conductor Certificate and Delaware law, or any accrued interest.

86.      In addition, the Conductor Certificate provides that Conductor may issue dividends as declared by the Board.

87.      Plaintiff, therefore, is entitled to any dividends issued by Conductor.

88.      The Conductor Certificate obligates Conductor to pay the Dividends to Conductor's stockholders upon closing a merger.

89.      Under Delaware law, Conductor is also obligated to pay Plaintiff pre-judgment interest running from the date that the Dividends should have been paid to the date of payment. The payment of interest is not limited or eliminated by any provision of the Conductor Certificate.

90.      To date, neither Conductor, WeWork nor Defendants have paid the Dividends to Plaintiff as required by the Conductor Certificate and Delaware law, or any accrued interest.

91.      Defendants breached the Conductor Certificate and the covenant of good faith and fair dealing by withholding the Funds from Plaintiff for almost five years after Conductor's and Defendants' obligation to pay Plaintiff the Funds commenced, by requiring that Plaintiff execute the Merger Agreement Joinder (that contained releases) prior to paying Plaintiff the Funds, and by wrongfully escheating the Funds to the State of Florida in violation of Florida Statute 717. Accordingly, this Court should direct Defendants (a) to specifically perform its payment obligations under the Conductor Certificate, and (b) to pay Plaintiff an amount to be determined at trial, but no less than approximately $161,732, plus pre-judgment interest and costs.

**ALTERNATIVE RELIEF**

**COUNT VII**
**(Unjust Enrichment Against Defendant SRS)**

92.        Plaintiff repeats and re-alleges the allegations set forth in all prior paragraphs of this Complaint with the same force and effect as if set forth fully herein.

93.        The doctrine of unjust enrichment is based upon the retention of money of another against the fundamental principles of justice or equity and good conscience. Under unjust enrichment, courts look for the following elements: (a) an enrichment, (b) an impoverishment, (c) a relation between the enrichment and impoverishment, (d) the absence of justification, and (e) the absence of a remedy provided by law.

94.        Regarding elements (a) through (c) above, from the Merger's Closing through February 10, 2023, SRS's representative confirmed that SRS held $161,732 of the Funds for Plaintiff. By holding such portion of Plaintiff's Funds without any restrictions on SRS's use of such monies, SRS has been enriched, Plaintiff has been impoverished, and there is a direct relation between the enrichment and impoverishment. Moreover, SRS' withholding of Plaintiff's money contradicts fundamental principles of equity and good conscience.

95.        Regarding element (d) above, SRS had no justification for retaining this money. From 2018 to 2023, SRS improperly conditioned the payment of the Funds to Plaintiff upon Plaintiff executing the Merger Agreement Joinder pursuant to the Merger Agreement. This Merger Agreement Joinder released all claims against, among others, Conductor, WeWork Inc., SRS, their affiliates, and their directors, officers, and agents. Plaintiff, however, neither was a party to the Merger Agreement, nor consented to the Merger Agreement or the Merger. Plaintiff, therefore, has no obligations under the Merger Agreement, and, thus, is not bound by the requirements in the Merger Agreement to execute the Merger Agreement Joinder or to provide releases. Moreover,

the Conductor Certificate does not require stockholders to execute the Merger Agreement Joinder or to provide releases. Accordingly, SRS has no justification for retaining the Funds and was unjustly enriched by its wrongful conduct.

96.        Regarding element (e) above, Plaintiff is alleging this Court II in the alternative to Count I, and if this Court denies the relief respectfully required in Count I of this Complaint, then Plaintiff will continue to have no available remedy at law to recover the Funds.

97.        In sum, SRS has been unjustly enriched at the expense of Plaintiff in an amount to be proven at trial, but no less than approximately $161,732, plus pre-judgment interest and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment and relief against Defendants as follows:

a.        A decision (i) holding that SRS wrongfully escheated the Funds belonging to the Plaintiff, or a portion thereof, to the State of Florida in violation of Florida Statute 717; (ii) ordering that SRS pay all fines, penalties and interest under Florida Statute 717; and (iii) ordering that SRS obtain the Funds from the State of Florida and pay such Funds to Plaintiff plus fines, penalties and interest under Florida Statute 717 or otherwise;

b.        A decision (i) holding that Defendants wrongfully converted Plaintiff's Funds by actually assuming control over Plaintiff's Funds, since the Merger Closed in 2018, that the Plaintiff had a right to control and possess, and thereby interfering with the Plaintiff's Funds in a manner that infringed on the Plaintiff's rights; and (ii) ordering that Defendants pay all of the Funds to Plaintiff (including an amount of at least $161,732), and all pre-judgment and accrued interest on such Funds from the date when the Merger Closed and Plaintiff was entitled to the Funds, to the date of Defendants' payment of the Funds, pursuant to Delaware law;

c.        A decision (i) holding Defendants owed a duty of care to Plaintiffs, and breached their duty of care to Plaintiff by failing to provide the Merger Consideration and Dividends to

22

Plaintiff after the Closing of the Merger pursuant to the Conductor Certificate, as required by Delaware law; (ii) holding Defendants breaches of their duty of care to Plaintiff directly caused Plaintiff's injury by withholding the Funds from Plaintiff from 2018 to 2023; (iii) ordering that Defendants pay all of the Funds to Plaintiff (including an amount of at least $161,732), and all pre-judgment and accrued interest on such Funds from the date when the Merger Closed and Plaintiff was entitled to the Funds, to the date of Defendants' payment of the Funds, pursuant to Delaware law;

d.        A decision (i) holding Defendants owed fiduciary duties to Plaintiffs, and breached their fiduciary duties to Plaintiff by failing to provide the Merger Consideration and Dividends to Plaintiff after the Closing of the Merger pursuant to the Conductor Certificate, as required by Delaware law; (ii) holding Defendants breaches of their fiduciary duties to Plaintiff directly caused Plaintiff's injury by withholding the Funds from Plaintiff from 2018 to 2023; (iii) ordering that Defendants pay all of the Funds to Plaintiff (including an amount of at least $161,732), and all pre-judgment and accrued interest on such Funds from the date when the Merger Closed and Plaintiff was entitled to the Funds, to the date of Defendants' payment of the Funds, pursuant to Delaware law, and (iv) ordering that Defendants pay punitive damages in an amount of not less than $5,000,000 to punish the Defendant SRS for their intentionally wrongful escheatment of the Funds to the State of Florida in violation of Florida Statute 717;

e.        A decision (i) holding that Defendants breached the Conductor Certificate by withholding the Funds from Plaintiff for almost five years after Defendants' obligation to pay Plaintiff the Funds commenced, by requiring that Plaintiff execute the Merger Agreement Joinder (that contained releases) prior to paying Plaintiff the Funds, and by intentionally and wrongfully escheating the Funds to the State of Florida in violation of Florida Statute 717, and (ii) ordering that Defendants specifically perform their payment obligations under the Conductor Certificate,

pay the Funds to Plaintiff, and pay punitive damages in an amount of not less than $5,000,000 to punish Defendant SRS for their intentionally wrongful escheatment of the Funds to the State of Florida in violation of Florida Statute 717;

f.        A decision (i) holding that Defendants breached the Conductor Certificate and the covenant of good faith and fair dealing by withholding the Funds from Plaintiff for almost five years after Defendants' obligation to pay Plaintiff the Funds commenced, by requiring that Plaintiff execute the Merger Agreement Joinder (that contained releases) prior to paying Plaintiff the Funds, and by wrongfully escheating the Funds to the State of Florida in violation of Florida Statute 717, and (ii) ordering that Defendants specifically perform their payment obligations under the Conductor Certificate and pay the Funds to Plaintiff;

g.        In the alternative, a decision (i) holding that SRS was unjustly enriched at the expense of Plaintiff, and (ii) ordering that SRS pay the Funds to Plaintiff;

h.        In any event, an order directing Defendants to pay to Plaintiff an amount to be determined at trial, but no less than approximately $161,732, plus pre-judgment interest and costs;

i.        An order awarding Plaintiff their costs and expenses, which includes reasonable attorney's fees and costs, incurred by Plaintiff in this action; and

j.        the granting to Plaintiff of such other and further relief as this Court deems just, proper, and equitable.

*/s/ Douglas Chertok*
*Douglas Chertok*
4250 Galt Ocean Drive, Suite 10H
Ft. Lauderdale, Florida 33308
Tel: (917) 215-5214; dchertok@gmail.com

Dated: March 22, 2023

## **SCHEDULE OF EXHIBITS**

EXHIBIT A – Plaintiff's Stock Certificate of Conductor, Inc. for 37,500 shares of common stock

EXHIBIT B - Fourth Amended and Restated Certificate of Incorporation filed by Conductor on October 26, 2017

EXHIBIT C - Joinder Agreement

EXHIBIT D - Merger Agreement Joinder

EXHIBIT E – Emails between Plaintiff and Defendant SRS Acquiom, Inc.

Case Number: CACE-23-011273 Division: 05
Filing # 169536285 E-Filed 03/23/2023 11:39:14 PM

# **EXHIBIT A**



**C-23**

INCORPORATED UNDER THE LAWS OF THE STATE OF DELAWARE

See Restrictive Legend(s) on Reverse

**CONDUCTOR, INC.**

Common Stock
Par Value $0.001 Per Share

See Reverse for
Certain Definitions

**\*\*37,500\*\***

272893

**This is to Certify that** _Douglas M. Chertok_ **is the owner of**

\*\*Thirty Seven Thousand Five Hundred\*\*

_fully paid and non-assessable shares of the above Corporation transferable only on the books of the Corporation by the holder hereof in person or by duly authorized Attorney upon surrender of this Certificate properly endorsed._

**Witness,** _the seal of the Corporation and the signatures of its duly authorized officers._

**Dated** November 19, 2010

Secretary or Treasurer

President or Chief Executive Officer

The following abbreviations, when used in the inscription on the face of this certificate, shall be construed as though they were written out in full according to applicable laws or regulations:

| TEN COM | - as tenants in common | UNIF TRANSFERS MIN ACT-..............Custodian ............ |
|---------|------------------------|-----------------------------------------------------------|
| | | (Cust) (Minor) |
| TEN ENT | - as tenants by the entireties | under Uniform Transfers to Minors |
| | | Act.......................................... |
| JT TEN | - as joint tenants with right of | (State) |
| | survivorship and not as tenants | |
| | in common | |
| | Additional abbreviations may also be used though not in the above list | |

*For value received_____ hereby sell, assign and transfer unto*

**PLEASE INSERT SOCIAL SECURITY OR OTHER**
**IDENTIFYING NUMBER OF ASSIGNEE**

_____

(PLEASE PRINT OR TYPEWRITE NAME AND ADDRESS INCLUDING POSTAL ZIP CODE OF ASSIGNEE)

*Shares*

*represented by the within Certificate, and do hereby irrevocably constitute and appoint*

*_____ Attorney*

*to transfer the said Shares on the books of the within named Corporation with full power of substitution in the premises.*

*Dated_____*

*In presence of*

NOTICE: THE SIGNATURE TO THIS ASSIGNMENT MUST CORRESPOND WITH THE NAME AS WRITTEN UPON THE FACE OF THE CERTIFICATE IN EVERY PARTICULAR WITHOUT ALTERATION OR ENLARGEMENT OR ANY CHANGE WHATEVER.

THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A VOTING AGREEMENT WHICH PLACES CERTAIN RESTRICTIONS ON THE VOTING OF THE SECURITIES REPRESENTED HEREBY. ANY PERSON ACCEPTING ANY INTEREST IN SUCH SHARES SHALL BE DEEMED TO AGREE TO AND SHALL BECOME BOUND BY ALL THE PROVISIONS OF SUCH AGREEMENT. A COPY OF SUCH VOTING AGREEMENT WILL BE FURNISHED TO THE RECORD HOLDER OF THIS CERTIFICATE WITHOUT CHARGE UPON WRITTEN REQUEST TO THE COMPANY AT ITS PRINCIPAL PLACE OF BUSINESS.

THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, AND MAY NOT BE SOLD, PLEDGED, OR OTHERWISE TRANSFERRED WITHOUT AN EFFECTIVE REGISTRATION THEREOF UNDER SUCH ACT OR AN OPINION OF COUNSEL, SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT SUCH REGISTRATION IS NOT REQUIRED.

THE COMPANY IS AUTHORIZED TO ISSUE MORE THAN ONE CLASS OR SERIES OF STOCK. A COPY OF THE PREFERENCES, POWERS, QUALIFICATIONS AND RIGHTS OF EACH CLASS AND SERIES WILL BE FURNISHED BY THE COMPANY UPON WRITTEN REQUEST AND WITHOUT CHARGE.

Douglas M. Chertok
4250 Galt Ocean Drive
#10H
Ft. Lauderdale, FL 33308
917-215-5214

September 13, 2018

SRS Acquiom Clearinghouse LLC
1614 15th St
Suite 210
Denver CO 80202
303 222 2080

Re:   Conductor, Inc. Stock Certificate #C-23 for 37,500 shares of Common
Stock, Par Value $0.001 Per Share, Issued to Douglas M. Chertok
("*Conductor Stock Certificate*")

Dear SRS Acquiom Clearinghouse LLC,

In connection, with the acquisition of Conductor, Inc., a Delaware corporation by WeWork Companies Inc., a Delaware corporation, attached please find the captioned *Conductor Stock Certificate* issued to the undersigned.

Please confirm your receipt.

Thank you,

*Douglas M. Chertok*

Douglas M. Chertok

Encl. *Conductor Stock Certificate*

# **EXHIBIT B**

State of Delaware
Secretary of State
Division of Corporations
Delivered 01:19 PM 10/26/2017
FILED 01:19 PM 10/26/2017
SR 20176801120 - File Number 3886885

**FOURTH AMENDED AND RESTATED CERTIFICATE OF INCORPORATION**

**OF**

**CONDUCTOR, INC.**

**(PURSUANT TO SECTIONS 242 AND 245 OF THE**
**GENERAL CORPORATION LAW OF THE STATE OF DELAWARE)**

CONDUCTOR, INC. (the "Company"), a corporation organized and existing under and by virtue of the provisions of the General Corporation Law of the State of Delaware (the "DGCL"),

**DOES HEREBY CERTIFY:**

FIRST: That the name of the Company is Conductor, Inc. and that the Company was originally incorporated pursuant to the DGCL on December 22, 2006 under the name LinkExperts, Inc.

SECOND: That the Company's Board of Directors (the "Board of Directors") duly adopted resolutions proposing to amend and restate the Third Amended and Restated Certificate of Incorporation of the Company, as amended, declaring said amendment and restatement to be advisable and in the best interests of the Company and its stockholders, and authorizing the appropriate officers of the Company to solicit the consent of the stockholders therefor, which resolution setting forth the proposed amendment and restatement is as follows:

RESOLVED, that the Third Amended and Restated Certificate of Incorporation of the Company be amended and restated in its entirety as follows:

## ARTICLE I

The name of the Company is Conductor, Inc.

## ARTICLE II

The address of the registered office of the Company in the State of Delaware is 251 Little Falls Drive, City of Wilmington 19808, County of New Castle. The name of the Company's registered agent at said address is Corporation Service Company.

## ARTICLE III

The purpose of the Company is to engage in any lawful act or activity for which a corporation may be organized under the DGCL.

## ARTICLE IV

**A.**     The Company is authorized to issue two classes of stock to be designated, respectively, "Common Stock" and "Preferred Stock".  The total number of shares which the Company is authorized to issue is fifty two million seven hundred seventy four thousand one hundred eighty nine (52,774,189) shares, thirty two million (32,000,000) shares of which shall be Common Stock (the "Common Stock") and twenty million seven hundred seventy four thousand one hundred eighty nine (20,774,189) shares of which shall be Preferred Stock (the "Preferred Stock"), of which two million seven hundred twenty three thousand eight hundred twenty (2,723,820) shares are designated "Series A Preferred Stock", four million two hundred thirteen thousand nine hundred forty (4,213,940) shares are designated "Series B Preferred Stock", five million two hundred eighty two thousand three hundred ninety four (5,282,394) shares are designated as "Series C Preferred Stock", six million eight hundred twenty nine thousand eight hundred ninety seven (6,829,897) shares are designated as "Series D Preferred Stock" and one million seven hundred twenty four thousand one hundred thirty eight (1,724,138) shares are designated as "Series D-1 Preferred Stock".  The Preferred Stock shall have a par value of one tenth of one cent ($0.001) per share and the Common Stock shall have a par value of one tenth of one cent ($0.001) per share.

**B.**     The number of authorized shares of Common Stock may be increased or decreased (but not below the number of shares of Common Stock then outstanding) by the affirmative vote of the holders of a majority of the stock of the Company (voting together on an as-if-converted basis), irrespective of the provisions of Section 242(b) of the DGCL.

**C.     Rights, Preferences and Restrictions of Preferred Stock**.  The rights, preferences, privileges, restrictions and other matters relating to the Preferred Stock are set forth in this Article IV(C).

1.     **DIVIDEND RIGHTS.**

(a)     So long as any shares of Preferred Stock are outstanding, the Company shall not pay or declare any dividend, whether in cash or property, or make any other distribution on the Common Stock, or purchase, redeem or otherwise acquire for value any shares of Common Stock until a like amount on the Preferred Stock (on an as-converted basis) shall have been paid or declared and set apart, except for:

(i)     acquisitions of Common Stock by the Company at cost (or the lesser of cost or fair market value) upon termination of services to the Company, pursuant to agreements which permit the Company to make such repurchases; or

(ii)     acquisitions of Common Stock in exercise of the Company's right of first refusal to repurchase such shares, in each case pursuant to the Company's Bylaws, current terms of agreements in effect as of the date of filing of this Fourth Amended and Restated Certificate of Incorporation, or, subject to Section 2(b) hereof,

agreements entered into after the date of filing this Fourth Amended and Restated Certificate of Incorporation that are approved by the Board of Directors.

        **(b)**    The provisions of Section 1(a) shall not apply to a dividend payable in Common Stock, or any repurchase of any outstanding securities of the Company that is approved by the Board of Directors, including the affirmative vote of a majority of the Preferred Directors (as defined below).

        **2.**    **VOTING RIGHTS.**

        **(a)**    **General Rights.**  Each holder of shares of the Preferred Stock shall be entitled to the number of votes equal to the number of shares of Common Stock into which such shares of Preferred Stock could be converted (pursuant to Section 4 hereof) immediately after the close of business on the record date fixed for such meeting or the effective date of such written consent and shall have voting rights and powers equal to the voting rights and powers of the Common Stock and shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws of the Company.  Except as otherwise provided herein or as required by law and as provided in Section 2(c) below with respect to the election of directors by the separate class vote of the holders of Common Stock, the Preferred Stock shall vote together with the Common Stock at any annual or special meeting of the stockholders and not as a separate class, and may act by written consent in the same manner as the Common Stock.

        **(b)**    **Separate Vote of Preferred Stock.**

        **(i)**    For so long as at least 2,050,000 shares of Preferred Stock (subject to adjustment for any stock split, reverse stock split or other similar event affecting the Preferred Stock after the filing date hereof) remain outstanding, in addition to any other vote or consent required herein or by law, the vote or written consent of the holders of at least sixty percent (60%) of the outstanding Preferred Stock (voting together on an as-if-converted basis) shall be necessary for effecting or validating the following actions (whether by merger, consolidation, recapitalization or otherwise) and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect:

        **(A)**    Any authorization, designation or issuance, whether by reclassification or otherwise, of any new class or series of stock or any other securities convertible into, or exercisable for, equity securities of the Company ranking on a parity with or senior to the Preferred Stock with respect to right of redemption, priority of liquidation, voting, dividends or any other right (any transaction in which such securities are issued, a "Subsequent Financing");

        **(B)**    Any recapitalization or reorganization of the Company, or the reclassification of any of the Company's securities, that adversely affects the Preferred Stock in any manner;

        **(C)**    Any action that results in the payment or declaration or setting aside of a dividend or distribution on any shares of capital stock of the Company;

(D)     Any redemption, retirement, acquisition or repurchase directly or indirectly of capital stock of the Company that is junior or *pari passu* with the Preferred Stock (excluding (x) acquisitions of Common Stock by the Company at the lesser of cost or fair market value pursuant to either (1) agreements which permit the Company to repurchase such shares upon termination of services to the Company, or (2) the exercise of the Company's right of first refusal upon a proposed transfer (provided that such first refusal rights were pursuant to the Company's Bylaws, terms of agreements that were in effect as of the date of filing of this Fourth Amended and Restated Certificate of Incorporation or are hereafter approved by the Board of Directors) and (y) the redemption of the Preferred Stock pursuant to Section 5);

(E)     Any significant change in the business of the Company as conducted on the filing date of this Fourth Amended and Restated Certificate of Incorporation;

(F)     Any agreement by the Company or its stockholders regarding an exclusive license to any material intellectual property rights of the Company;

(G)     Any acquisition of all or substantially all of the assets, properties or capital stock of another entity;

(H)     The incurrence by the Company of indebtedness, or the guarantee by the Company of indebtedness of other parties, in excess of $2,000,000 in the aggregate;

(I)     Any increase or decrease in the authorized number of members of the Board of Directors, other than an increase in the authorized number of members of the Board of Directors by one number in connection with a Subsequent Financing;

(J)     Any loan or extension of credit to any officer, employee, or director of the Company or any subsidiary of the Company, other than in the ordinary course of business;

(K)     The election or appointment of a new chief executive officer;

(L)     Any amendment, alteration, restatement, waiver or repeal of any provision of this Fourth Amended and Restated Certificate of Incorporation or the Bylaws of the Company, that alters or changes in any manner the voting or other powers, preferences, or other special rights or privileges, or restrictions of the Preferred Stock (including without limitation, any amendment to this Fourth Amended and Restated Certificate of Incorporation that changes the authorized number of shares of any series of Preferred Stock); or

(M)     The consummation of any Liquidation Event (as defined herein) if the holders of Preferred Stock receive an amount per share at the time of such event in cash and/or marketable securities (i.e., securities that are freely transferable, not subject to contractual or other restrictions, and are traded on a nationally recognized securities exchange)

4

equal to or less than two (2) times the Series D-1 Original Issue Price (subject to adjustment for any stock split, reverse stock split or other similar event affecting the Preferred Stock after the filing date hereof).

        **(ii)**     For so long as at least 680,000 shares of Series D Preferred Stock (subject to adjustment for any stock split, reverse stock split or other similar event affecting the Series D Preferred Stock after the filing date hereof) remain outstanding, in addition to any other vote or consent required herein or by law, the Company shall not authorize or designate, whether by reclassification or otherwise, any new class or series of stock or any other securities convertible into, or exercisable for, equity securities of the Company ranking on a parity with or senior to the Series D Preferred Stock with respect to right of redemption, priority of liquidation, voting, dividends or any other right without the vote or written consent of the holders of a majority of the Series D Preferred Stock (voting as a separate class), and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect.

        **(iii)**     For so long as at least 172,000 shares of Series D-1 Preferred Stock (subject to adjustment for any stock split, reverse stock split or other similar event affecting the Series D-1 Preferred Stock after the filing date hereof) remain outstanding, in addition to any other vote or consent required herein or by law, the Company shall not authorize or designate, whether by reclassification or otherwise, any new class or series of stock or any other securities convertible into, or exercisable for, equity securities of the Company ranking on a parity with or senior to the Series D-1 Preferred Stock with respect to right of redemption, priority of liquidation, voting, dividends or any other right without the vote or written consent of the holders of a majority of the Series D-1 Preferred Stock (voting as a separate class), and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect.

        **(iv)**     For so long as at least ten percent (10%) of the shares of a series of Preferred Stock outstanding as of the date of filing of this Fourth Amended and Restated Certificate of Incorporation remain outstanding, in addition to any other vote or consent required herein or by law, the Company shall not (whether by merger, consolidation, recapitalization or otherwise) without the vote or written consent of the holders of a majority of the outstanding shares of such series of Preferred Stock (voting as a separate class) and any such act or transaction entered into without such consent or vote shall be null and void *ab initio*, and of no force or effect:

        **(A)**     amend, alter, restate, waive or repeal any provision of this Fourth Amended and Restated Certificate of Incorporation or the Company's Bylaws, in any manner that alters or changes the voting or other powers, preferences, or other special rights or privileges, or restrictions of such series of Preferred Stock; or

        **(B)**     recapitalize or reorganize the Company, or reclassify any of the Company's securities;

in the case of either (A) or (B) so as to affect such series of Preferred Stock adversely but without so affecting all Preferred Stock.

      **(c)**    **Election of Board of Directors.**

      **(i)**    For so long as at least 2,050,000 shares of Preferred Stock remain outstanding (subject to adjustment for any stock split, reverse stock split or other similar event affecting the Preferred Stock after the filing date hereof):

      **(A)**    the holders of Series A Preferred Stock, voting as a separate class, shall be entitled to elect one (1) member of the Board of Directors (the "Series A Director") at each meeting or pursuant to each consent of the Company's stockholders for the election of directors, and to remove from office such director and to fill any vacancy caused by the resignation, death or removal of such director;

      **(B)**    the holders of Series B Preferred Stock, voting as a separate class, shall be entitled to elect one (1) member of the Board of Directors (the "Series B Director") at each meeting or pursuant to each consent of the Company's stockholders for the election of directors, and to remove from office such director and to fill any vacancy caused by the resignation, death or removal of such director;

      **(C)**    the holders of Series C Preferred Stock, voting as a separate class, shall be entitled to elect one (1) member of the Board of Directors (the "Series C Director") at each meeting or pursuant to each consent of the Company's stockholders for the election of directors, and to remove from office such director and to fill any vacancy caused by the resignation, death or removal of such director;

      **(D)**    the holders of Series D Preferred Stock, voting as a separate class, shall be entitled to elect one (1) member of the Board of Directors (the "Series D Director" and together with the Series A Director, the Series B Director and the Series C Director, the "Preferred Directors") at each meeting or pursuant to each consent of the Company's stockholders for the election of directors, and to remove from office such director and to fill any vacancy caused by the resignation, death or removal of such director;

      **(E)**    the holders of Common Stock, voting as a separate class, shall be entitled to elect two (2) members of the Board of Directors at each meeting or pursuant to each consent of the Company's stockholders for the election of directors, and to remove from office such director and to fill any vacancy caused by the resignation, death or removal of such director; and

      **(F)**    the holders of Common Stock and Preferred Stock, each voting as a separate class, shall be entitled to mutually elect any remaining members of the Board of Directors at each meeting or pursuant to each consent of the Company's stockholders for the election of directors, and to remove from office such directors and to fill any vacancy caused by the resignation, death or removal of such directors.

(ii)      Notwithstanding the provisions of Section 223(a)(1) and 223(a)(2) of the DGCL, any vacancy, including newly created directorships resulting from any increase in the authorized number of directors or amendment of this Fourth Amended and Restated Certificate of Incorporation, and vacancies created by removal or resignation of a director, may be filled by a majority of the directors then in office, though less than a quorum, or by a sole remaining director, and the directors so chosen shall hold office until the next annual election and until their successors are duly elected and shall qualify, unless sooner displaced; *provided, however,* that where such vacancy occurs among the directors elected by the holders of a class or series of stock, the holders of shares of such class or series may override the Board of Directors' action to fill such vacancy by (A) voting for their own designee to fill such vacancy at a meeting of the Company's stockholders or (B) written consent, if the consenting stockholders hold a sufficient number of shares of such class necessary to elect their designee at a meeting of the stockholders. Any director may be removed during his or her term of office, either with or without cause, by, and only by, the affirmative vote of the holders of the shares of the class or series of stock entitled to elect such director or directors, given either at a special meeting of such stockholders duly called for that purpose or pursuant to a written consent of stockholders, and any vacancy thereby created may be filled by the holders of that class or series of stock represented at the meeting or pursuant to written consent.

3.     LIQUIDATION RIGHTS.

(a)     The "Series A Original Issue Price" shall mean $1.096 per share for each share of Series A Preferred Stock, the "Series B Original Issue Price" shall mean $2.530 per share for each share of Series B Preferred Stock, the "Series C Original Issue Price" shall mean $3.8777 per share for each share of Series C Preferred Stock, the "Series D Original Issue Price" shall mean $3.88 per share for each share of Series D Preferred Stock and the  "Series D-1 Original Issue Price" shall mean $4.06 per share for each share of Series D-1 Preferred Stock (each as adjusted for any stock dividends, combinations, splits, recapitalizations and the like with respect to such shares after the filing date hereof) (each, an "Original Issue Price").

(b)     In the event of any Liquidation Event (as defined below), whether voluntary or involuntary, the holders of Series D Preferred Stock and Series D-1 Preferred Stock, on a *pari passu* basis, shall be entitled to be paid out of the proceeds or assets of the Company legally available for distribution to its stockholders (the "Proceeds"), prior and in preference to any distribution to the holders of Series A Preferred Stock, Series B Preferred Stock, Series C Preferred Stock (together, the "Junior Preferred Stock") or Common Stock by reason of their ownership thereof, an amount per share equal to the Series D Original Issue Price or Series D-1 Original Issue Price, as applicable, plus all declared and unpaid dividends on such share (as adjusted for any stock dividends, combinations, splits, recapitalizations and the like with respect to such shares after the filing date hereof).  If, upon the occurrence of such Liquidation Event, the Proceeds thus distributed among the holders of Series D Preferred Stock and Series D-1 Preferred Stock shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then the entire Proceeds legally available for distribution shall be distributed among the holders of Series D Preferred Stock and Series D-1 Preferred Stock, as applicable, at the time outstanding, ratably in proportion to the full preferential amounts that each such holder is otherwise entitled to receive under this subsection (b).

(c)      After the payment of the full preferential amount required by subsection (b) of this Section 3, if Proceeds remain, the holders of Junior Preferred Stock shall be entitled to be paid out of the Proceeds, prior and in preference to any distribution to the holders of Common Stock by reason of their ownership thereof, an amount per share equal to the applicable Original Issue Price plus all declared and unpaid dividends on such share (as adjusted for any stock dividends, combinations, splits, recapitalizations and the like with respect to such shares after the filing date hereof). If, upon the occurrence of such Liquidation Event, the Proceeds thus distributed among the holders of Junior Preferred Stock shall be insufficient to permit the payment to such holders of the full aforesaid preferential amounts, then the entire remaining Proceeds legally available for distribution shall be distributed among the holders of Junior Preferred Stock at the time outstanding, ratably in proportion to the full preferential amounts that each such holder is otherwise entitled to receive under this subsection (c).

(d)      After the payment of the full preferential amounts required by subsections (b) and (c) of this Section 3, the remaining Proceeds available for distribution to stockholders shall be distributed ratably to the holders of the Common Stock.

(e)      Notwithstanding the above, for purposes of determining the amount each holder of shares of Preferred Stock is entitled to receive with respect to a Liquidation Event, each such holder of shares of a series of Preferred Stock shall be deemed to have converted (regardless of whether such holder actually converted) such holder's shares of such series into shares of Common Stock immediately prior to the Liquidation Event if, as a result of an actual conversion, such holder would receive, in the aggregate, an amount greater than the amount that would be distributed to such holder if such holder did not convert such series of Preferred Stock into shares of Common Stock. If any such holder shall be deemed to have converted shares of Preferred Stock into Common Stock pursuant to this paragraph, then such holder shall not be entitled to receive any distribution that would otherwise be made to holders of Preferred Stock that have not converted (or have not been deemed to have converted) into shares of Common Stock.

(f)      The following events shall be considered a "Liquidation Event" under this Section 3 unless the holders of at least sixty percent (60%) of the Preferred Stock then outstanding (voting together on an as-if-converted basis) elect to not treat such event as a Liquidation Event:

(i)      (A) any consolidation or merger of the Company with or into any other corporation or other entity or person, or any other corporate reorganization, in which the stockholders of the Company immediately prior to such consolidation, merger or reorganization, own less than fifty percent (50%) of the voting power of the surviving entity immediately after such consolidation, merger or reorganization; or (B) any transaction or series of related transactions to which the Company is a party in which in excess of fifty percent (50%) of the Company's voting power is transferred, excluding any consolidation or merger effected exclusively to change the domicile of the Company (each, an "Acquisition");

(ii)      a sale, lease or other disposition of all or substantially all of the assets or technology of the Company (an "Asset Transfer"); or

(iii)    a liquidation, dissolution or winding up of the Company, excluding any transaction effected exclusively to change the domicile of the Company.

(g)    In any Liquidation Event, if the consideration received by Company is other than cash, its value will be deemed its fair market value as determined in good faith by the Board of Directors.  Any securities shall be valued as follows:

(i)    Securities not subject to investment letter or other similar restrictions on free marketability covered by subsection (g)(ii) below:

(A)    If traded on a securities exchange, the value shall be deemed to be the average of the closing prices of the securities on such quotation system over the thirty (30) day period ending three (3) days prior to the closing;

(B)    If actively traded over-the-counter, the value shall be deemed to be the average of the closing bid or sale prices (whichever is applicable) over the thirty (30) day period ending three (3) days prior to the closing; and

(C)    If there is no active public market, the value shall be the fair market value thereof, as determined by the Board of Directors.

(ii)    The method of valuation of securities subject to investment letter or other restrictions on free marketability (other than restrictions arising solely by virtue of a stockholder's status as an affiliate or former affiliate) shall be to make an appropriate discount from the market value determined as above in (i) (A), (B) or (C) to reflect the approximate fair market value thereof, as determined by the Board of Directors.

(iii)    The foregoing methods for valuing non-cash consideration to be distributed in connection with a Liquidation Event shall, upon approval by the stockholders of the definitive agreements governing a Liquidation Event, be superseded by any determination of such value set forth in the definitive agreements governing such Liquidation Event.

(h)    The Company shall not have the power to effect a Liquidation Event unless the agreement or plan of merger or consolidation for such transaction (the "Merger Agreement") provides that the consideration payable to the stockholders of the Company shall be allocated among the holders of capital stock of the Company in accordance with this Section 3. In the event of a Liquidation Event referred, if the Company does not effect a dissolution of the Company under the DGCL within ninety (90) days after such Liquidation Event, then (i) the Company shall send a written notice to each holder of Preferred Stock no later than the ninetieth (90th) day after the Liquidation Event advising such holders of their right (and the requirements to be met to secure such right) pursuant to the terms of the following clause; (ii) to require the redemption of such shares of Preferred Stock, and (iii) if the holders of at least sixty percent (60%) of the then outstanding shares of Preferred Stock (voting together on an as-if-converted basis) so request in a written instrument delivered to the Company not later than one hundred twenty (120) days after such Liquidation Event, the Company shall use the consideration received by the Company for such Liquidation Event (net of any retained liabilities associated

9

with the assets sold or technology licensed, as determined in good faith by the Board of Directors of the Company), together with any other assets of the Company available for distribution to its stockholders, all to the extent permitted by Delaware law governing distributions to stockholders (the "Net Proceeds"), on the one hundred fiftieth (150th) day after such Liquidation Event, to redeem all outstanding shares of Preferred Stock at a price per share equal to the amounts the holders of such shares of Preferred Stock would be entitled to receive in accordance with this Section 3. Notwithstanding the foregoing, in the event of a redemption pursuant to the preceding sentence, if the Net Proceeds are not sufficient to redeem all outstanding shares of Preferred Stock, the Company shall ratably redeem each holder's shares of Preferred Stock to the fullest extent of such Net Proceeds, and shall redeem the remaining shares as soon as it may lawfully do so under Delaware law governing distributions to stockholders. The provisions of subsections (b) and (c) of Section 5 shall apply, with such necessary changes in the details thereof as are necessitated by the context, to the redemption of the Preferred Stock pursuant to this Subsection 3(h). Prior to the distribution or redemption provided for in this Subsection 3(h), the Company shall not expend or dissipate the Proceeds received for such Liquidation Event, except to discharge expenses incurred in connection with such Liquidation Event.

   **(i)** In the event of a Liquidation Event pursuant to Subsection 3(f)(i), if any portion of the consideration payable to the stockholders of the Company is payable only upon satisfaction of contingencies (the "Additional Consideration"), the Merger Agreement shall provide that (a) the portion of such consideration that is not Additional Consideration (such portion, the "Initial Consideration") shall be allocated among the holders of capital stock of the Company in accordance with this Section 3 as if the Initial Consideration were the only consideration payable in connection with such Liquidation Event; and (b) any Additional Consideration which becomes payable to the stockholders of the Company upon satisfaction of such contingencies shall be allocated among the holders of capital stock of the Company in accordance with this Section 3 after taking into account the previous payment of the Initial Consideration as part of the same transaction. For the purposes of this Subsection 3(i), consideration placed into escrow or retained as holdback to be available for satisfaction of indemnification or similar obligations in connection with such Liquidation Event shall be deemed to be Additional Consideration.

   **4.** **CONVERSION RIGHTS.**

   The holders of the Preferred Stock shall have the following rights with respect to the conversion of the Preferred Stock into shares of Common Stock (the "Conversion Rights"):

   **(a)** **Optional Conversion**. Subject to and in compliance with the provisions of this Section 4, any shares of Preferred Stock may, at the option of the holder, be converted at any time into fully-paid and nonassessable shares of Common Stock. The number of shares of Common Stock to which a holder of Preferred Stock shall be entitled upon conversion shall be the product obtained by multiplying the applicable "Conversion Rate" then in effect for such series (determined as provided in Section 4(b)) by the number of shares of Preferred Stock being converted.

(b)     **Conversion Rate**.  The Conversion Rate in effect at any time for conversion of the Preferred Stock shall be the quotient obtained by dividing the applicable Original Issue Price for such series of Preferred Stock by the applicable "Conversion Price", calculated as provided in Section 4(c).

(c)     **Conversion Price**.  The Conversion Price per share for each series of Preferred Stock shall initially be the Original Issue Price applicable to such series.  Such initial Conversion Price shall be adjusted from time to time in accordance with this Section 4.  All references to the Conversion Price herein shall mean the Conversion Price as so adjusted.

(d)     **Mechanics of Conversion**.  Each holder of Preferred Stock who desires to convert the same into shares of Common Stock pursuant to this Section 4 shall surrender the certificate or certificates therefor, duly endorsed, at the office of the Company or any transfer agent for the Preferred Stock, and shall give written notice to the Company at such office that such holder elects to convert the same.  Such notice shall state the number of shares of Preferred Stock being converted.  Thereupon, the Company shall promptly issue and deliver at such office to such holder a certificate or certificates for the number of shares of Common Stock to which such holder is entitled and shall promptly pay, (i) in cash or, to the extent sufficient funds are not then legally available therefor, in additional shares of Common Stock (at the Conversion Rate then in effect for such series), any declared and unpaid dividends on the shares of Preferred Stock being converted, and (ii) in cash (at the Conversion Rate then in effect for such series) the value of any fractional share of Common Stock otherwise issuable to any holder of Preferred Stock; *provided*, that if such conversion is an automatic conversion pursuant to Section 4(l), the holder thereof shall have the option to receive any declared but unpaid dividends on the shares of Preferred Stock being converted in cash or additional shares of Common Stock (at the Conversion Rate then in effect for such series).  Such conversion shall be deemed to have been made at the close of business on the date of such surrender of the certificates representing the shares of Preferred Stock to be converted, and the person entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder of such shares of Common Stock on such date.

(e)     **Adjustment for Stock Splits and Combinations**.  If at any time or from time to time after the date that the first share of Series D-1 Preferred Stock is issued (the "Original Issue Date") the Company effects a subdivision of the outstanding Common Stock without a corresponding subdivision of the Preferred Stock, the Conversion Price for each series of Preferred Stock in effect immediately before that subdivision shall be proportionately decreased.  Conversely, if at any time or from time to time after the Original Issue Date the Company combines the outstanding shares of Common Stock into a smaller number of shares without a corresponding combination of the Preferred Stock, the Conversion Price for each series of Preferred Stock in effect immediately before the combination shall be proportionately increased.  Any adjustment under this Section 4(e) shall become effective at the close of business on the date the subdivision or combination becomes effective.

(f)     **Adjustment for Common Stock Dividends and Distributions**.  If at any time or from time to time after the Original Issue Date the Company pays a dividend or other distribution in additional shares of Common Stock, the Conversion Price that is then in

effect for each series of Preferred Stock shall be decreased as of the time of such issuance, as provided below:

(i)     The Conversion Price in effect for each series of Preferred Stock shall be adjusted by multiplying the Conversion Price then in effect for such series of Preferred Stock by a fraction equal to:

(A)     the numerator of which is the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance, and

(B)     the denominator of which is the total number of shares of Common Stock issued and outstanding immediately prior to the time of such issuance plus the number of shares of Common Stock issuable in payment of such dividend or distribution;

(ii)     If the Company fixes a record date to determine which holders of Common Stock are entitled to receive such dividend or other distribution, the Conversion Price for each series of Preferred Stock shall be fixed as of the close of business on such record date and the number of shares of Common Stock shall be calculated immediately prior to the close of business on such record date; and

(iii)     If such record date is fixed and such dividend is not fully paid or if such distribution is not fully made on the date fixed therefor, the Conversion Price for each series of Preferred Stock shall be recomputed accordingly as of the close of business on such record date and thereafter the Conversion Price for each series of Preferred Stock shall be adjusted pursuant to this Section 4(f) to reflect the actual payment of such dividend or distribution.

(g)     **Adjustment for Reclassification, Exchange and Substitution**. If at any time or from time to time after the Original Issue Date, the Common Stock issuable upon the conversion of the Preferred Stock is changed into the same or a different number of shares of any class or classes of stock, whether by recapitalization, reclassification or otherwise (other than an Acquisition or Asset Transfer as defined in Section 3 or a subdivision or combination of shares or stock dividend or a reorganization, merger, consolidation or sale of assets provided for elsewhere in this Section 4), in any such event each holder of Preferred Stock shall then have the right to convert such stock into the kind and amount of stock and other securities and property receivable upon such recapitalization, reclassification or other change by holders of the maximum number of shares of Common Stock into which such shares of Preferred Stock could have been converted immediately prior to such recapitalization, reclassification or change, all subject to further adjustment as provided herein or with respect to such other securities or property by the terms thereof.

(h)     **Reorganizations, Mergers or Consolidations**. If at any time or from time to time after the Original Issue Date, there is a capital reorganization of the Common Stock or the merger or consolidation of the Company with or into another corporation or another entity or person (other than an Acquisition or Asset Transfer as defined in Section 3 or a

12

recapitalization, subdivision, combination, reclassification, exchange or substitution of shares provided for elsewhere in this Section 4), as a part of such capital reorganization, provision shall be made so that the holders of the Preferred Stock shall thereafter be entitled to receive upon conversion of the Preferred Stock the number of shares of stock or other securities or property of the Company to which a holder of the number of shares of Common Stock deliverable upon conversion would have been entitled on such capital reorganization, subject to adjustment in respect of such stock or securities by the terms thereof. In any such case, appropriate adjustment shall be made in the application of the provisions of this Section 4 with respect to the rights of the holders of Preferred Stock after the capital reorganization to the end that the provisions of this Section 4 (including adjustment of the Conversion Price then in effect for each series of Preferred Stock and the number of shares issuable upon conversion of each series of Preferred Stock) shall be applicable after that event and be as nearly equivalent as practicable.

### (i)   Issuance of Shares Below Conversion Price.

(i)     If at any time or from time to time after the Original Issue Date, the Company issues or sells, or is deemed by the express provisions of this Section 4(i) to have issued or sold, Additional Shares of Common Stock (as defined below), other than as a dividend or other distribution on any class of stock that causes an adjustment as set forth in Section 4(f) above, and other than a subdivision or combination of shares of Common Stock as provided in Section 4(e) above, for an Effective Price (as defined below) less than the then effective Conversion Price applicable to a series of Preferred Stock, then and in each such case, the then existing Conversion Price for such series shall be reduced, as of the opening of business on the date of such issue or sale, to a price determined by multiplying the Conversion Price for such series in effect immediately prior to such issuance or sale by a fraction equal to:

(A)     The numerator of which shall be (x) the number of shares of Common Stock Outstanding (as defined below) immediately prior to such issue or sale, plus (y) the number of shares of Common Stock which the Aggregate Consideration received (as defined below) by the Company for the total number of Additional Shares of Common Stock so issued would purchase at such Conversion Price, and

(B)     The denominator of which shall be the number of shares of Common Stock Outstanding (as defined below) immediately prior to such issue or sale plus the total number of Additional Shares of Common Stock so issued.

For the purposes of the preceding sentence, the term "Common Stock Outstanding" shall mean the sum of (A) the number of shares of Common Stock then outstanding, (B) the number of shares of Common Stock into which the then outstanding shares of Preferred Stock could be converted if fully converted on the day immediately preceding the given date, and (C) the number of shares of Common Stock which could be obtained through the exercise or conversion of all other rights, options and convertible securities outstanding on the day immediately preceding the given date.

(ii)     No adjustment shall be made to the Conversion Price for the Preferred Stock in an amount less than one cent per share. Any adjustment otherwise

13

required by this Section 4(i) that is not required to be made due to the preceding sentence shall be included in any subsequent adjustment to such Conversion Price.

           **(iii)**     For the purpose of making any adjustment required under this Section 4(i), the aggregate consideration received by the Company for any issue or sale of securities (the "Aggregate Consideration") shall be defined as: (A) to the extent it consists of cash, be computed at the net amount of cash received by the Company after deduction of any underwriting or similar commissions, compensation or concessions paid or allowed by the Company in connection with such issue or sale but without deduction of any expenses payable by the Company, (B) to the extent it consists of property other than cash, be computed at the fair value of that property as determined in good faith by the Board of Directors, and (C) if Additional Shares of Common Stock, Convertible Securities (as defined below) or rights or options to purchase either Additional Shares of Common Stock or Convertible Securities are issued or sold together with other stock or securities or other assets of the Company for a consideration which covers both, be computed as the portion of the consideration so received that may be reasonably determined in good faith by the Board of Directors to be allocable to such Additional Shares of Common Stock, Convertible Securities or rights or options.

           **(iv)**     For the purpose of the adjustment required under this Section 4(i), if the Company issues or sells (x) stock or other securities convertible into, Additional Shares of Common Stock (such convertible stock or securities being herein referred to as "Convertible Securities") or (y) rights or options for the purchase of Additional Shares of Common Stock or Convertible Securities and if the Effective Price of such Additional Shares of Common Stock is less than the Conversion Price for a series of Preferred Stock, in each case the Company shall be deemed to have issued at the time of the issuance of such rights or options or Convertible Securities the maximum number of Additional Shares of Common Stock issuable upon exercise or conversion thereof and to have received as consideration for the issuance of such shares an amount equal to the total amount of the consideration, if any, received by the Company for the issuance of such rights or options or Convertible Securities and:

           **(A)**     In the case of such rights or options, the minimum amounts of consideration, if any, payable to the Company upon the exercise of such rights or options.

           **(B)**     In the case of Convertible Securities, the minimum amounts of consideration, if any, payable to the Company upon the conversion thereof (other than by cancellation of liabilities or obligations evidenced by such Convertible Securities); *provided* that if the minimum amounts of such consideration cannot be ascertained, but are a function of antidilution or similar protective clauses, the Company shall be deemed to have received the minimum amounts of consideration without reference to such clauses.

           **(C)**     If the minimum amount of consideration payable to the Company upon the exercise or conversion of rights, options or Convertible Securities is reduced over time or on the occurrence or non-occurrence of specified events other than by reason of antidilution adjustments, the Effective Price shall be recalculated using the figure to which such minimum amount of consideration is reduced; *provided further,* that if the minimum

amount of consideration payable to the Company upon the exercise or conversion of such rights, options or Convertible Securities is subsequently increased, the Effective Price shall be again recalculated using the increased minimum amount of consideration payable to the Company upon the exercise or conversion of such rights, options or Convertible Securities.

**(D)** No further adjustment of the Conversion Price for a series of Preferred Stock, as adjusted upon the issuance of such rights, options or Convertible Securities, shall be made as a result of the actual issuance of Additional Shares of Common Stock or the exercise of any such rights or options or the conversion of any such Convertible Securities. If any such rights or options or the conversion privilege represented by any such Convertible Securities shall expire without having been exercised, the Conversion Price as adjusted upon the issuance of such rights, options or Convertible Securities shall be readjusted to the Conversion Price which would have been in effect had an adjustment been made on the basis that the only Additional Shares of Common Stock so issued were the Additional Shares of Common Stock, if any, actually issued or sold on the exercise of such rights or options or rights of conversion of such Convertible Securities, and such Additional Shares of Common Stock, if any, were issued or sold for the consideration actually received by the Company upon such exercise, plus the consideration, if any, actually received by the Company for the granting of all such rights or options, whether or not exercised, plus the consideration received for issuing or selling the Convertible Securities actually converted, plus the consideration, if any, actually received by the Company (other than by cancellation of liabilities or obligations evidenced by such Convertible Securities) on the conversion of such Convertible Securities, *provided* that such readjustment shall not apply to prior conversions of Preferred Stock.

**(v)** For the purpose of making any adjustment to the Conversion Price the Preferred Stock required under this Section 4(i), "Additional Shares of Common Stock" shall mean all shares of Common Stock issued by the Company or deemed to be issued pursuant to this Section 4(i) (including shares of Common Stock subsequently reacquired or retired by the Company), other than:

**(A)** shares of Common Stock and/or options, warrants or other Common Stock purchase rights and the Common Stock issued pursuant to such options, warrants or other rights after the Original Issue Date to employees, officers or directors of, or consultants or advisors to the Company or any subsidiary pursuant to stock purchase or stock option plans or other arrangements that are in effect as of the filing of this Fourth Amended and Restated Certificate of Incorporation or future plans or arrangements approved by the Board of Directors, including the affirmative vote of a majority of the Preferred Directors;

**(B)** shares of Common Stock issued pursuant to the exercise of options, warrants or convertible securities outstanding as of the Original Issue Date;

**(C)** shares of Common Stock and/or options, warrants or other Common Stock purchase rights, and the Common Stock issued pursuant to such options, warrants or other rights issued for consideration other than cash pursuant to a merger, consolidation, acquisition, strategic alliance or similar business combination approved by the Board of Directors, including the affirmative vote of a majority of the Preferred Directors;

15

**(D)**   shares of Common Stock issued in connection with any stock split, stock dividend or recapitalization by the Company;

**(E)**   shares of Common Stock issued upon conversion of the Preferred Stock;

**(F)**   Common Stock issued or deemed issued as a result of a decrease in the Conversion Price of any series of Preferred Stock resulting from the operation of Section 4(i);

**(G)**   shares of Common Stock issued pursuant to any equipment loan or leasing arrangement, real property leasing arrangement or debt financing from a bank or similar financial institution approved by the Board of Directors (provided that any such issuance is not substantially for equity financing purposes), including the affirmative vote of a majority of the Preferred Directors;

**(H)**   shares of Common Stock issued by the Company pursuant to an underwritten public offering;

**(I)**   shares of Common Stock issued to third-party service providers in exchange for or as partial consideration for services rendered to the Company, which issuances are approved by the Board of Directors, including the affirmative vote of a majority of the Preferred Directors; and

**(J)**   shares of equity securities of the Company issued in connection with strategic transactions involving the Company and other entities, including (i) joint ventures, manufacturing, marketing or distribution arrangements or (ii) technology transfer or development arrangements; *provided,* that the issuance of shares therein has been approved by the Board of Directors, including the affirmative vote of a majority of the Preferred Directors.

References to Common Stock in the subsections of this clause (v) above shall mean all shares of Common Stock issued by the Company or deemed to be issued pursuant to this Section 4(i). The "Effective Price" of Additional Shares of Common Stock shall mean the quotient determined by dividing the total number of Additional Shares of Common Stock issued or sold, or deemed to have been issued or sold by the Company under this Section 4(i), into the Aggregate Consideration received, or deemed to have been received by the Company for such issue under this Section 4(i), for such Additional Shares of Common Stock.

**(j)**   **Certificate of Adjustment**.  In each case of an adjustment or readjustment of the Conversion Price of the Preferred Stock for the number of shares of Common Stock or other securities issuable upon conversion of the Preferred Stock, if the Preferred Stock is then convertible pursuant to this Section 4, the Company, at its expense, shall compute such adjustment or readjustment in accordance with the provisions hereof and prepare a certificate showing such adjustment or readjustment, and shall mail such certificate, by first class mail, postage prepaid, to each registered holder of Preferred Stock at the holder's address as shown in

16

the Company's books.  The certificate shall set forth such adjustment or readjustment, showing in detail the facts upon which such adjustment or readjustment is based, including a statement of (i) the consideration received or deemed to be received by the Company for any Additional Shares of Common Stock issued or sold or deemed to have been issued or sold, (ii) the Conversion Price at the time in effect for the Preferred Stock, (iii) the number of Additional Shares of Common Stock, and (iv) the type and amount, if any, of other property which at the time would be received upon conversion of the Preferred Stock.

(k)    **Notices of Record Date**.  Upon (i) any taking by the Company of a record of the holders of any class of securities for the purpose of determining the holders thereof who are entitled to receive any dividend or other distribution, or (ii) any Liquidation Event, the Company shall mail to each holder of Preferred Stock at least ten (10) days prior to the record date specified therein (or such shorter period approved by the holders of two-thirds of the outstanding Preferred Stock, voting together as a single class and on an as-converted basis) a notice specifying (A) the date on which any such record is to be taken for the purpose of such dividend or distribution and a description of such dividend or distribution, (B) the date on which any such Liquidation Event is expected to become effective, and (C) the date, if any, that is to be fixed as to when the holders of record of Common Stock (or other securities) shall be entitled to exchange their shares of Common Stock (or other securities) for securities or other property deliverable upon such Liquidation Event.

(l)    **Automatic Conversion**.

(i)    Each share of Preferred Stock shall automatically be converted into shares of Common Stock, based on the then-effective Conversion Price applicable to each series of Preferred Stock, (A) at any time upon the affirmative election of the holders of at least sixty percent (60%) of the outstanding shares of the Preferred Stock (voting together on an as-if-converted basis) (which affirmative election must include the holders of a majority of the Series D Preferred Stock and the Series D-1 Preferred Stock, voting together on an as-if-converted basis), or (B) immediately upon the closing of a firmly underwritten public offering pursuant to an effective registration statement under the Securities Act of 1933, as amended, covering the offer and sale of Common Stock for the account of the Company in which (i) the public offering price per share is not less than three (3) times the Series D-1 Original Issue Price (subject to adjustment for any stock split, reverse stock split or other similar event affecting the Preferred Stock after the filing date hereof) and (ii) the gross cash proceeds to the Company (before underwriting discounts, commissions and fees) are at least $75,000,000.  Upon such automatic conversion, any declared and unpaid dividends shall be paid in accordance with the provisions of Section 4(d).

(ii)    Upon the occurrence of either of the events specified in Section 4(l)(i) above, the outstanding shares of Preferred Stock shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such shares are surrendered to the Company or its transfer agent; *provided, however*, that the Company shall not be obligated to issue certificates evidencing the shares of Common Stock issuable upon such conversion unless the certificates evidencing such shares of Preferred Stock are either delivered to the Company or its transfer agent as provided below, or the holder

notifies the Company or its transfer agent that such certificates have been lost, stolen or destroyed and executes an agreement satisfactory to the Company to indemnify the Company from any loss incurred by it in connection with such certificates. Upon the occurrence of such automatic conversion of the Preferred Stock, the holders of Preferred Stock shall surrender the certificates representing such shares at the office of the Company or any transfer agent for the Preferred Stock. Thereupon, there shall be issued and delivered to such holder promptly at such office and in its name as shown on such surrendered certificate or certificates, a certificate or certificates for the number of shares of Common Stock into which the shares of Preferred Stock surrendered were convertible on the date on which such automatic conversion occurred, and any declared and unpaid dividends shall be paid in accordance with the provisions of Section 4(d).

(m)     **Fractional Shares.**  No fractional shares of Common Stock shall be issued upon conversion of Preferred Stock. All shares of Common Stock (including fractions thereof) issuable upon conversion of more than one share of Preferred Stock by a holder thereof shall be aggregated for purposes of determining whether the conversion would result in the issuance of any fractional share. If, after the aforementioned aggregation, the conversion would result in the issuance of any fractional share, the Company shall, in lieu of issuing any fractional share, pay cash equal to the product of such fraction multiplied by the Common Stock's fair market value (as determined by the Board of Directors) on the date of conversion.

(n)     **Reservation of Stock Issuable Upon Conversion**.  The Company shall at all times reserve and keep available out of its authorized but unissued shares of Common Stock, solely for the purpose of effecting the conversion of the shares of the Preferred Stock, such number of its shares of Common Stock as shall from time to time be sufficient to effect the conversion of all outstanding shares of the Preferred Stock. If at any time the number of authorized but unissued shares of Common Stock shall not be sufficient to effect the conversion of all then outstanding shares of the Preferred Stock, the Company will take such corporate action as may, in the opinion of its counsel, be necessary to increase its authorized but unissued shares of Common Stock to such number of shares as shall be sufficient for such purpose.

(o)     **Notices**.  Any notice required by the provisions of this Section 4 shall be in writing and shall be deemed effectively given: (i) upon personal delivery to the party to be notified, (ii) when sent by confirmed electronic mail or facsimile if sent during normal business hours of the recipient; if not, then on the next business day, (iii) five (5) days after having been sent by registered or certified mail, return receipt requested, postage prepaid, or (iv) one (1) day after deposit with a nationally recognized overnight courier, specifying next day delivery, with verification of receipt. All notices shall be addressed to each holder of record at the address of such holder appearing on the books of the Company.

(p)     **Payment of Taxes.**  The Company will pay all taxes (other than taxes based upon income) and other governmental charges that may be imposed with respect to the issue or delivery of shares of Common Stock upon conversion of shares of Preferred Stock, excluding any tax or other charge imposed in connection with any transfer involved in the issue and delivery of shares of Common Stock in a name other than that in which the shares of Preferred Stock so converted were registered.

(q)     **No Dilution or Impairment**.  Without the consent of the holders of then outstanding Preferred Stock as required under Section 2(b), the Company shall not amend this Fourth Amended and Restated Certificate of Incorporation or participate in any reorganization, transfer of assets, consolidation, merger, dissolution, issue or sale of securities or take any other voluntary action, for the purpose of avoiding or seeking to avoid the observance or performance of any of the terms to be observed or performed hereunder by the Company, but shall at all times in good faith assist in carrying out all such action as may be reasonably necessary or appropriate in order to protect the Conversion Rights of the holders of the Preferred Stock against dilution or other impairment.

(r)     **Waiver of Adjustment to Conversion Price**.  Notwithstanding anything herein to the contrary, any downward adjustment of the Conversion Price of any series of Preferred Stock may be waived, either prospectively or retroactively and either generally or in a particular instance, by the consent or vote of the holders of at least two-thirds of the outstanding shares of such series of Preferred Stock.  Any such waiver shall bind all future holders of shares of such series of Preferred Stock.

5.      REDEMPTION.

(a)     The Company shall be obligated to redeem the Preferred Stock as follows:

(i)     At any time on or after January 2, 2021, (X) the holders of a majority of the then outstanding shares of Series D Preferred Stock and Series D-1 Preferred Stock, on an as-if-converted basis, may, by written notice to the Company, require the Company, to the extent it may lawfully do so, to redeem the shares of Series D Preferred Stock and Series D-1 Preferred Stock on a *pari passu* basis (the "Series D Preferred Redemption Right") and (Y) the holders of at least eighty percent (80%) of the then outstanding shares of Junior Preferred Stock (voting together on an as-if-converted basis) may, by written notice to the Company (with a copy to the holders of the Series D Preferred Stock and Series D-1 Preferred Stock), require the Company, to the extent it may lawfully do so, to redeem the shares of Junior Preferred Stock (the "Junior Preferred Redemption Right"); *provided* that if the Junior Preferred Redemption Right is exercised prior to the Series D Preferred Redemption Right, then the holders of Series D Preferred Stock and Series D-1 Preferred Stock will be entitled to exercise such Series D Preferred Redemption Right.  The Company shall redeem the outstanding shares of Series D Preferred Stock and Series D-1 Preferred Stock, or Junior Preferred Stock, as applicable, in three (3) equal annual installments, with the first installment due no earlier than one year anniversary of the date the applicable written redemption notice is delivered to the Company (the "Anniversary Date") and no later than ninety (90) days after the Anniversary Date (the "First Redemption Date"), and the subsequent two payments due on the first two anniversaries of the First Redemption Date (each, a "Subsequent Redemption Date" and together with the First Redemption Date, the "Redemption Dates"); *provided*, that any amounts due after the First Redemption Date may be paid without penalty at any time on or after the First Redemption Date and prior to the applicable Subsequent Redemption Date.  The Company shall effect such redemptions on the applicable Redemption Date (or earlier) by paying in cash, in exchange for

each share of Preferred Stock to be redeemed, the greater of (A) the sum of the applicable Original Issue Price of such share of Preferred Stock plus all declared but unpaid dividends on such share (as adjusted for any stock dividends, combinations, splits, recapitalizations and the like after the filing date hereof) plus an amount equal to ten percent (10%) per annum from the date of issuance of such share, compounding semi-annually until the date that such share is redeemed, on the applicable Original Issue Price of such share of Preferred Stock and (B) the Fair Market Value (as defined below) of such share of Preferred Stock plus an amount equal to (I) ten percent (10%) per annum from the First Redemption Date or (II) if the Company fails to timely make payment of the first installment, ten percent (10%) per annum from the Anniversary Date, compounding semi-annually until the date that such share is redeemed, on the Fair Market Value of such share. The total amount to be paid for the Series D Preferred Stock and the Series D-1 Preferred Stock, or Junior Preferred Stock, as applicable, is hereinafter referred to as the "Redemption Price". The number of shares of Series D Preferred Stock and Series D-1 Preferred Stock, or Junior Preferred Stock, as applicable, that the Company shall be required to redeem on any one Redemption Date shall be equal to the amount determined by dividing (1) the aggregate number of shares of Series D-1 Preferred Stock and Series D Preferred Stock, or Junior Preferred Stock, as applicable, outstanding immediately prior to such Redemption Date by (2) the number of remaining Redemption Dates (including the Redemption Date to which such calculation applies). Shares subject to redemption pursuant to this Section 5(a) shall be redeemed from each holder of Series D Preferred Stock and Series D-1 Preferred Stock, or Junior Preferred Stock, as applicable, on a pro rata basis (subject to the proviso in Section 5(a)(iii)).

(ii)    For purposes of this Section 5, the "Fair Market Value" shall mean the fair market value of the applicable share of Preferred Stock as of the Anniversary Date as determined by an appraiser (the "Appraiser") who is a senior member of the American Society of Appraisers experienced in the appraisal of software companies or a nationally recognized investment banker who is a FINRA member and is experienced in the appraisal of software companies and who is acceptable to the holders of a majority of the then outstanding shares of Series D Preferred Stock (with respect to the Fair Market Value of the Series D Preferred Stock) and Series D-1 Preferred Stock (with respect to the Fair Market Value of the Series D-1 Preferred Stock), on an as-if-converted basis, or at least eighty percent (80%) of the then outstanding shares of Junior Preferred Stock (voting together on an as-converted basis) (with respect to the Fair Market Value of the Junior Preferred Stock). The Fair Market Value shall be calculated by the Appraiser as if all capital stock of the Company were being sold to an unaffiliated third party in an arms-length transaction for cash only (without the stockholders being under any compulsion to sell their shares of capital stock), without deduction for illiquidity, minority interest, lack of control or any other similar consideration, and all proceeds of such sale were being distributed to the stockholders of the Company in accordance with the preferences, priorities and relative rights and privileges set forth in this Fourth Amended and Restated Certificate of Incorporation. The fees of the Appraiser shall be paid by the Company. The Fair Market Value pursuant to this subsection 5(a)(ii) shall be determined within sixty (60) days of the Anniversary Date.

(iii)    At least thirty (30) days but no more than sixty (60) days prior to the applicable Redemption Date, the Company shall send a notice (a "Redemption

Notice") to all holders of Series D Preferred Stock and Series D-1 Preferred Stock, or Junior Preferred Stock, as applicable, to be redeemed setting forth (A) the applicable Redemption Price for the shares to be redeemed; and (B) the place at which such holders may obtain payment of the applicable Redemption Price upon surrender of their share certificates. If the Company does not have sufficient funds legally available to redeem all shares to be redeemed on the applicable Redemption Date (including, if applicable, those to be redeemed at the option of the Company), then it shall redeem such shares pro rata (based on the portion of the applicable aggregate Redemption Price payable to them) to the extent possible and shall redeem the remaining shares to be redeemed as soon as sufficient funds are legally available; *provided*, that if any shares of Series D Preferred Stock, Series D-1 Preferred Stock and Junior Preferred Stock are to be redeemed pursuant to the terms of this Section 5, then the Series D Preferred Stock  and the Series D-1 Preferred Stock shall be redeemed, on a *pari passu* basis, prior to and in preference to the Junior Preferred Stock.

(b)  On or prior to the applicable Redemption Date, the Company shall deposit the applicable Redemption Price of all shares to be redeemed with a bank or trust company having aggregate capital and surplus in excess of $100,000,000, as a trust fund, with irrevocable instructions and authority to the bank or trust company to pay, on and after such applicable Redemption Date, the applicable Redemption Price of the shares to their respective holders upon the surrender of their share certificates. Any moneys deposited by the Company pursuant to this Section 5(b) for the redemption of shares thereafter converted into shares of Common Stock pursuant to Section 4 hereof no later than the fifth (5th) day preceding the applicable Redemption Date shall be returned to the Company forthwith upon such conversion. The balance of any funds deposited by the Company pursuant to this Section 5(b) remaining unclaimed at the expiration of one (1) year following such applicable Redemption Date shall be returned to the Company promptly upon its written request.

(c)  On or after such applicable Redemption Date, each holder of shares of Preferred Stock to be redeemed shall surrender such holder's certificates representing such shares to the Company in the manner and at the place designated in the Redemption Notice, and thereupon the applicable Redemption Price of such shares shall be payable to the order of the person whose name appears on such certificate or certificates as the owner thereof and each surrendered certificate shall be canceled. In the event less than all the shares represented by such certificates are redeemed, a new certificate shall be issued representing the unredeemed shares. From and after such applicable Redemption Date, unless there shall have been a default in payment of the applicable Redemption Price or the Company is unable to pay the applicable Redemption Price due to not having sufficient legally available funds, all rights of the holder of such shares as a holder of Series D Preferred Stock, Series D-1 Preferred Stock or Junior Preferred Stock, as applicable (except the right to receive the applicable Redemption Price without interest upon surrender of their certificates), shall cease and terminate with respect to such shares; *provided* that in the event that shares of Series D Preferred Stock, Series D-1 Preferred Stock or Junior Preferred Stock, as applicable, are not redeemed due to a default in payment by the Company or because the Company does not have sufficient legally available funds, such shares of Series D Preferred Stock, Series D-1 Preferred Stock or Junior Preferred

Stock, as applicable, shall remain outstanding and shall be entitled to all of the rights and preferences provided herein.

(d)     At any time prior to the Anniversary Date, (i) the holders of a majority of the then outstanding shares of Series D Preferred Stock and Series D-1 Preferred Stock (with respect to the redemption of the Series D Preferred Stock and the Series D-1 Preferred Stock), on an as-if-converted basis, or (ii) the holders of at least eighty percent (80%) of the then outstanding shares of Junior Preferred Stock (voting together on an as-if-converted basis) (with respect to the redemption of the Junior Preferred Stock) may, by written notice to the Company, withdraw their redemption request.  Such holders shall thereafter have the rights set forth in this <u>Section 5</u> to initiate a new redemption request at any time following the date which is six (6) months after the date the notice of withdrawal was delivered to the Company.

(e)     In the event of a call for redemption of any shares of Preferred Stock, the Conversion Rights (as defined in Section 4) for such Preferred Stock shall terminate as to the shares designated for redemption at the close of business on the fifth (5th) day preceding the applicable Redemption Date, unless default is made in payment of the applicable Redemption Price.

**D.     Common Stock.**   The rights, preferences, privileges, restrictions and other matters relating to the Common Stock are set forth in this Article IV(D).

**1.     DIVIDEND RIGHTS.**   Subject to the prior rights of holders of all classes of stock at the time outstanding having prior rights as to dividends, the holders of Common Stock shall be entitled to receive, when, as and if declared by the Board of Directors, out of the assets of the Company legally available therefore, any dividends as may be declared from time to time by the Board of Directors.

**2.     LIQUIDATION RIGHTS.**   In the event of any Liquidation Event, the assets of the Company shall be distributed as provided in Section 3 of Article IV(C) hereof.

**3.     REDEMPTION.**   The Common Stock is not redeemable at the option of the holder.

**4.     VOTING RIGHTS.**   Each holder of shares of Common Stock shall be entitled to one vote for each such share, and shall be entitled to notice of any stockholders' meeting in accordance with the Bylaws of the Company.

## ARTICLE V

**A.**     The liability of the directors of the Company for monetary damages shall be eliminated to the fullest extent under applicable law.

**B.**     Any repeal or modification of this Article V shall only be prospective and shall not affect the rights under this Article V in effect at the time of the alleged occurrence of any action or omission to act giving rise to liability.

C.      The Company renounces any interest or expectancy of the Company in, or in being offered an opportunity to participate in, any Excluded Opportunity.  An "Excluded Opportunity" is any matter, transaction or interest that is presented to, or acquired, created or developed by, or which otherwise comes into the possession of, (i) any director of the Company who is not an employee of the Company or any of its subsidiaries, or (ii) any holder of Preferred Stock, any affiliate of any such holder or any partner, member, director, stockholder, employee or agent of any such holder or of any affiliate of any such holder, other than someone who is an employee of the Company or any of its subsidiaries (collectively, "Covered Persons"), unless such matter, transaction or interest is presented to, or acquired, created or developed by, or otherwise comes into the possession of, a Covered Person expressly and solely in such Covered Person's capacity as a director of the Company.

## ARTICLE VI

For the management of the business and for the conduct of the affairs of the Company, and in further definition, limitation and regulation of the powers of the Company, of its directors and of its stockholders or any class thereof, as the case may be, it is further *provided* that:

A.      The management of the business and the conduct of the affairs of the Company shall be vested in its Board of Directors.  The number of directors which shall constitute the whole Board of Directors shall be fixed by the Board of Directors in the manner provided in the Bylaws, subject to any restrictions which may be set forth in this Fourth Amended and Restated Certificate of Incorporation.

B.      Subject to any vote of the holders of any class or series of stock required by this Fourth Amended and Restated Certificate of Incorporation, the Board of Directors is expressly empowered to adopt, amend or repeal the Bylaws of the Company.  The stockholders shall also have the power to adopt, amend or repeal the Bylaws of the Company; *provided however*, that, in addition to any vote of the holders of any class or series of stock of the Company required by law or by this Fourth Amended and Restated Certificate of Incorporation, the affirmative vote of the holders of at least a majority of the voting power of all of the then-outstanding shares of the capital stock of the Company entitled to vote generally in the election of directors, voting together as a single class, shall be required to adopt, amend or repeal any provision of the Bylaws of the Company.

C.      The directors of the Company need not be elected by written ballot unless the Bylaws so provide.

## ARTICLE VII

Subject to any vote of the holders of any class or series of stock required by this Fourth Amended and Restated Certificate of Incorporation, the Company reserves the right to amend, alter, change or repeal any provision contained in this Fourth Amended and Restated Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred upon the stockholders herein are granted subject to this reservation.

## ARTICLE VIII

The Company shall indemnify (i) its directors and officers, whether serving the Company or at its request, any other entity, to the full extent required or permitted by the DGCL now or hereafter in force, including the advance of expenses under the procedures and to the full extent permitted by law, and (ii) other employees and agents to such extent as shall be expressly authorized by the Board of Directors or the Bylaws of the Company and as permitted by law. The foregoing rights of indemnification shall not be exclusive of any other rights to which those seeking indemnification may be entitled. The Board of Directors may take such action as is necessary to carry out these indemnification provisions and, except as provided in any agreement to which the Company is a party or in any amendment to this Fourth Amended and Restated Certificate of Incorporation, is expressly empowered to adopt, approve and amend from time to time such Bylaws of the Company, resolutions or contracts implementing such provisions or such further indemnification arrangements as may be permitted by law. No amendment of this Fourth Amended and Restated Certificate of Incorporation or repeal of any of its provisions shall limit or eliminate the right to indemnification provided under this Article VIII with respect to any acts or omissions occurring prior to such amendment or repeal.

THIRD: The foregoing amendment and restatement was approved by the holders of the requisite number of shares of said corporation in accordance with Section 228 of the DGCL.

FOURTH: That said Fourth Amended and Restated Certificate of Incorporation, which amends, restates and integrates and further amends the provisions of the Company's Third Amended and Restated Certificate of Incorporation, has been duly adopted in accordance with Sections 242 and 245 of the DGCL.

*(Remainder of page intentionally left blank)*

**IN WITNESS WHEREOF,** this Fourth Amended and Restated Certificate of Incorporation has been executed by a duly authorized officer of the Company on this 26th day of October, 2017.

/s/Seth Besmertnik
_____
**SETH BESMERTNIK**
Chief Executive Officer

# **EXHIBIT C**

EXECUTION VERSION

<u>NOTE TO CONDUCTOR, INC. STOCKHOLDER</u>:

**PLEASE READ, SIGN AND DATE THIS AGREEMENT ON THE SIGNATURE PAGE (INCLUDING THE CONSENT OF SPOUSE ATTACHED AS <u>EXHIBIT A</u>, IF APPLICABLE) AND RETURN TO SRS ACQUIOM CLEARINGHOUSE LLC, AT THE ADDRESS ON THE LAST PAGE**

## <u>PROXY AND JOINDER AGREEMENT</u>

This PROXY AND JOINDER AGREEMENT (this "<u>Agreement</u>"), dated as of the date appearing on the signature page hereto, is entered into between WeWork Companies Inc., a Delaware corporation ("<u>Parent</u>"), WE Holdings LLC, a Delaware limited liability company ("<u>WH</u>"), Adam Neumann ("<u>AN</u>") and the undersigned stockholder of Parent (the "<u>Holder</u>").

The Holder expects to acquire in connection with the Merger Agreement shares of capital stock of Parent as set forth in the Merger Agreement (collectively, the "<u>Acquired Shares</u>").

This Agreement is being entered into in exchange for the willingness of Parent and certain of its affiliates to enter into that certain Agreement and Plan of Merger, dated on or around the date hereof, by and among Parent, Paddington Merger Subsidiary I Inc., a Delaware corporation and a direct wholly owned subsidiary of Parent, Paddington Merger Subsidiary II LLC, a New York limited liability company and a direct wholly owned subsidiary of Parent, Conductor, Inc., a Delaware corporation (the "<u>Company</u>"), and the Stockholder Representative party thereto (as amended from time to time, the "<u>Merger Agreement</u>"), pursuant to which the Holder expects to receive the Acquired Shares as part of his, her or its applicable Total Consideration (as defined in the Merger Agreement), as well as the right to receive certain shares of capital stock of Parent, if any, that may be distributed to the Holder as a Future Payment (as defined in the Merger Agreement), payable thereunder, and for other good and valuable consideration, the sufficiency of which is hereby acknowledged and agreed (collectively, the "<u>Consideration</u>").

In consideration of the mutual promises, covenants and consideration set forth herein, the parties hereto agree as follows:

1.     <u>Irrevocable Proxy and Power of Attorney</u>.

(a)     The Holder hereby constitutes and appoints as proxy of such Holder and hereby grants a power of attorney to each of WH, any designee of WH, AN and any other Chief Executive Officer, Chief Financial Officer, Treasurer, Secretary or Assistant Secretary of Parent (each with full power of substitution, each a "<u>Designee</u>"), and hereby grants each Designee full power and authority in the name of, and for and on behalf of, the Holder with respect to any matters submitted to the holders of Parent's capital stock for consent or vote, and hereby authorizes each Designee to represent and to vote all of the Acquired Shares and shares of capital stock or other securities of Parent which the Holder hereafter acquires or as to which the Holder otherwise exercises voting or dispositive authority (together, all such shares referred to in this sentence and any securities of Parent issued with respect to, upon conversion of, or in exchange or substitution of such shares, the "<u>Shares</u>") in any such matter; provided, however, that the proxy and power of attorney granted hereunder shall not be applicable to any vote, waiver, approval or other consent under (i) the Merger Agreement, (ii) any Other Transaction Agreement, (iii) that certain Seventh Amended and Restated Stockholders' Agreement, to be entered into as of the Effective Time (as defined in the Merger Agreement), by and among Parent and certain of its stockholders, as may be amended and/or restated from time to time (the "<u>Stockholders' Agreement</u>") or (iv) that certain Seventh Amended and Restated Registration Rights Agreement, to be entered into as of the Effective Time, by and

among the Company, the Holder and certain other parties thereto, as may be amended and/or restated from time to time (the "Registration Rights Agreement") and except as otherwise provided by the terms of each of the Merger Agreement, the Stockholders' Agreement and the Registration Rights Agreement. The proxy and power of attorney granted pursuant to the immediately preceding sentence (i) is given in exchange for the Consideration and, as such, is each coupled with an interest and shall be irrevocable unless and until the earliest to occur of (A) a Deemed Liquidation Event (as defined in Parent's Restated Certificate of Incorporation (as may be amended and/or restated from time to time, the "Charter") or other liquidation, dissolution or winding up of Parent, (B) a breach of this Section 1(a) by Designee, or (C) a Designee terminates this Section 1 in writing (the earliest such time, the "Termination Time") and (ii) shall not be effective in connection with a stockholder vote, waiver, approval or other consent (1) pursuant to Section 280G(b)(5) of the Internal Revenue Code of 1986, as amended, or Section 242(b)(2) of the Delaware General Corporation Law, solely to the extent that such vote relates to any alteration or change in the powers, preferences or special rights of the Shares so as to affect such Shares adversely, or (2) afforded to the Acquisition Preferred Stock, or any series thereof, voting separately as a class or series, as applicable, in the Charter or Parent's Certificate of Designations, Rights And Preferences of Series AP-1 Acquisition Preferred Stock.

(b)     The Holder hereby revokes any and all previous proxies or powers of attorney, if any, with respect to any of the Shares and shall not hereafter, unless and until the Termination Time, purport to grant any other proxy or power of attorney with respect to any of the Shares, deposit any of the Shares into a voting trust or enter into any agreement (other than this Agreement, the Merger Agreement, the Stockholders' Agreement or the Registration Rights Agreement), arrangement or understanding with any person or entity, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Shares, in each case, with respect to any of the matters set forth herein.

(c)     If any of the Shares owned (whether beneficially or of record) by such Holder constitute community property under applicable law, this Agreement has been duly authorized, executed and delivered by, and constitutes the valid and binding agreement of, such Holder's spouse by such spouse's execution of the Consent of Spouse attached hereto as Exhibit A.

2.     Joinder to the Stockholders' Agreement. The Holder hereby (i) agrees that the Shares, and any other shares of capital stock or securities required by the Stockholders' Agreement to be bound thereby, shall be bound by and subject to the terms of the Stockholders' Agreement, a copy of which is attached hereto as Exhibit B, and (ii) adopts and agrees to be bound by, and subject to the terms of, the Stockholders' Agreement as a Shareholder thereunder, and shall, upon effectiveness of this Agreement, be deemed a Shareholder for all purposes under the Stockholders' Agreement.

3.     Joinder to the Registration Rights Agreement. The Holder hereby (i) agrees that the Acquired Shares shall be bound by and subject to the terms of the Registration Rights Agreement, a copy of which is attached hereto as Exhibit C, and (ii) adopts and agrees to be bound by, and subject to the terms of, the Registration Rights Agreement as a Stockholder thereunder, and shall, upon effectiveness of this Agreement, be deemed a Stockholder for all purposes under the Registration Rights Agreement.

4.     Covenant. Parent hereby covenants and agrees that, between the date hereof and the Effective Time, there shall be no amendment or modification to the Stockholders' Agreement or the Registration Rights Agreement that would be detrimental to the Holder.

5.     Miscellaneous.

(a)     Severability. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the

2

remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

(b)     Waiver. Any provision for the benefit of Parent contained in this Agreement may be waived, either generally or in any particular instance, by the Board of Directors of Parent.

(c)     Binding Effect. Except for the covenant in Section 4, which shall be effective as of the date hereof, this Agreement shall be effective upon the Effective Time, shall have no force or effect until the Effective Time and shall be null and void if the Merger Agreement is terminated pursuant to its terms. Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any party without the prior written consent of the other parties, and any such assignment without such prior written consent shall be null and void; provided, however, that, following the Effective Time, Parent shall be permitted to assign or delegate its rights, interests and obligations under this Agreement to an affiliate of Parent without the prior written consent of any other party. This Agreement shall be binding upon, and shall be enforceable by and inure to the benefit of, the parties and their respective successors and assigns. Nothing in this Agreement is intended to or shall confer upon any person or entity (other than the parties) any right, benefit or remedy of any nature whatsoever.

(d)     Notice. All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt by other than automatic means, whether electronic or otherwise), (b) when sent by email (with written confirmation of transmission) or (c) one (1) business day following the day sent by an internationally recognized overnight courier (with written confirmation of receipt), in each case, at the following addresses and email addresses (or to such other address or email address as a party may have specified by notice given to the other party pursuant to this provision):

If to Parent, WH or AN to:

WeWork Companies Inc.
115 West 18th Street, 4th floor
New York, New York 10011
Attention: Law Department
E-mail: legal@wework.com

If to the Holder, to such Holder's address and other contact information on the signature page hereto.

(e)     Entire Agreement; Counterparts. This Agreement constitutes the entire agreement between the parties, and supersedes all prior agreements and understandings, both written and oral, among or between any of the parties with respect to the subject matter hereof. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile or other electronic transmission shall be effective as delivery of an original counterpart hereof.

(f)     Amendment. This Agreement may be amended, supplemented or changed only by a written instrument signed by each party hereto.

(g)     Governing Law. This Agreement shall be construed, interpreted and enforced in accordance with the internal laws of the State of Delaware without regard to any applicable conflicts of laws.

*(Signature Page Follows)*

<u>NOTE TO CONDUCTOR, INC. STOCKHOLDER:</u>

**PLEASE READ, SIGN AND DATE THIS AGREEMENT ON THE SIGNATURE PAGE BELOW**

**(INCLUDING THE CONSENT OF SPOUSE ATTACHED AS <u>EXHIBIT A</u>, IF APPLICABLE) AND**

**RETURN TO SRS ACQUIOM CLEARINGHOUSE LLC, AT THE ADDRESS ON THE LAST PAGE**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date appearing below.

**HOLDER (INDIVIDUAL):**                   **HOLDER (ENTITY):**

*If you are an individual, please print your name and sign below.*

*If you are signing on behalf of an entity, please print the name of the entity and sign below indicating your title.*

_____
Name of Individual (please print)

_____
Name of Entity (please print)

_____
Signature

_____
Signature

Date: _____

By: _____
          Name of Individual (please print)

Title: _____

Date: _____

<u>Address for Notices:</u>

<u>With a copy, which shall not constitute notice, to:</u>

*[Signature Page to Proxy and Stockholders' Agreement Joinder]*

**PARENT:**

**WeWork Companies Inc.**

By: _____

Name: _____

Title: _____


**DESIGNEES:**

**We Holdings LLC**

By: _____

Name: _____

Title: _____


**Adam Neumann**

_____

*[Signature Page to Proxy and Stockholders' Agreement Joinder]*

## EXHIBIT A

### Consent of Spouse

__ **I am married.**

__ **I am not married.**


*If the Holder is married __and__ a resident of a community property state (Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington and Wisconsin or has elected to be part of the community property system in a state or territory where such election is optional), please complete this Consent of Spouse.*

I _____, spouse of _____, have read and approve the foregoing Proxy and Stockholders' Agreement Joinder (the "**Agreement**").  In consideration of the terms and conditions as set forth in the Agreement, I hereby appoint my spouse as my attorney-in-fact with respect to the exercise of any rights and obligations under the Agreement, and agree to be bound by the provisions of the Agreement insofar as I may have any rights or obligations in the Agreement under the laws relating to marital or community property in effect in the state of our residence as of the date of the Agreement.


Date_____

Signature of Spouse_____

Printed Name of Spouse_____

**EXHIBIT B**

Seventh Amended and Restated Stockholders' Agreement

(see attached)

## EXHIBIT C

**Seventh Amended and Restated Registration Rights Agreement**

(see attached)

**Return Instructions**

Please return this Proxy and Stockholders' Agreement Joinder _**only**_ to SRS Acquiom Clearinghouse LLC at the address below. The method of delivery is at your option and your risk, but it is recommended that documents be delivered via a registered method.

***By Mail to***

SRS Acquiom Clearinghouse LLC
1614 15th St., Suite 210
Denver, CO 80202

For additional information please contact at 303-222-2080 or support@srsacquiom.com.

By: _____

Name: _____

Date: _____

## EXHIBIT D

EXECUTION VERSION

**NOTE TO CONDUCTOR, INC. STOCKHOLDER:**

**PLEASE READ, SIGN AND DATE THIS AGREEMENT ON THE SIGNATURE PAGE**

**(INCLUDING THE CONSENT OF SPOUSE ATTACHED AS <u>EXHIBIT B</u>, IF APPLICABLE) AND**

**RETURN TO SRS ACQUIOM CLEARINGHOUSE LLC, AT THE ADDRESS ON THE LAST PAGE**

## MERGER AGREEMENT JOINDER

This MERGER AGREEMENT JOINDER (this "<u>Agreement</u>"), dated as of the date appearing on the signature page hereto, is entered into individually, severally and not jointly, by and among WeWork Companies Inc., a Delaware corporation ("<u>Parent</u>"), Conductor, Inc., a Delaware corporation (the "<u>Company</u>"), and each of the Company Stockholders (as defined in the Merger Agreement (as defined below)) party hereto. Capitalized terms used but not otherwise defined in this Agreement shall have the respective meanings assigned to such terms in the Merger Agreement.

## RECITALS

WHEREAS, Parent, Paddington Merger Subsidiary I Inc., a Delaware corporation and a direct wholly owned subsidiary of Parent ("<u>Merger Sub I</u>"), Paddington Merger Subsidiary II LLC, a New York limited liability company and a direct wholly owned subsidiary of Parent ("<u>Merger Sub II</u>"), the Company and the Stockholder Representative party thereto have entered into an Agreement and Plan of Merger, dated as of March 5, 2018 (as amended from time to time, the "<u>Merger Agreement</u>"), which provides, among other things, for (i) first, the merger of Merger Sub I with and into the Company in accordance with the terms of the Merger Agreement and the DGCL, upon consummation of which Merger Sub I will cease to exist and the Company shall become a wholly owned subsidiary of Parent (the "<u>First Merger</u>"), and (ii) second, as part of the same overall transaction, the merger of the Company, as the surviving entity of the First Merger, with and into Merger Sub II, upon consummation of which the Company will cease to exist (collectively or in seriatim with the First Merger, as appropriate, the "<u>Merger</u>");

WHEREAS, each Company Stockholder is a holder of shares of Company Stock;

WHEREAS, as a condition and inducement to the willingness of Parent, Merger Sub I and Merger Sub II to consummate the Merger, the parties hereto desire to enter into this Agreement; and

WHEREAS, each of the parties hereto desires to enter into this Agreement in order to establish certain binding rights and obligations between themselves, including those relating to post-Closing adjustments and indemnification for certain Losses that may be suffered by an Indemnified Person in connection with the Merger Agreement;

NOW, THEREFORE, in consideration of the promises, covenants and agreements contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be bound hereby, hereby agree as follows:

## SECTION 1. BINDING TERMS OF MERGER AGREEMENT

1.1      Each undersigned Company Stockholder hereby adopts and agrees to be bound by, and subject to the terms of, the Merger Agreement applicable to the Company Stockholders as if such Company Stockholder was a party thereto, including <u>Section 2.1</u> (Conversion of Capital Stock), <u>Section 2.3</u> (Future Payments), <u>Section 2.7</u> (Holdback Amount), <u>Section 2.8</u> (Exchange Procedures; Other Matters), <u>Section 2.9</u> (Investor Questionnaire and Accredited Investor Determination), <u>Section 2.14</u>

(Closing Adjustments), <u>Section 2.15</u> (Allocation Schedules), <u>Section 5.6</u> (Publicity; Confidentiality), <u>Section 5.8</u> (Treatment of Company Equity Awards), <u>Section 5.12</u> (Proprietary Information), <u>ARTICLE VIII</u> (Indemnification) and <u>ARTICLE X</u> (Stockholder Representative) of the Merger Agreement, subject to and in accordance with the provisions and limitations therein.

1.2     Each undersigned Company Stockholder further understands that, pursuant to the Merger Agreement, a portion of the Merger Consideration payable to such Company Stockholder with respect to such Company Stockholder's shares of Company Stock will be withheld from such Company Stockholder as part of the Holdback Amount to secure the post-Closing purchase price adjustment obligations of the Company Stockholder under <u>Section 2.14</u> (Closing Adjustments) of the Merger Agreement and the indemnification obligations of the Company Stockholder under <u>ARTICLE VIII</u> (Indemnification) of the Merger Agreement.

1.3     Each undersigned Company Stockholder hereby (a) irrevocably appoints, authorizes and empowers Shareholder Representative Services LLC, a Colorado limited liability company, upon and by virtue of the approval and adoption of the Merger Agreement or by accepting any consideration payable under the Merger Agreement, as the representative, exclusive agent and attorney-in-fact for the benefit of the Company Stockholders and as the Stockholder Representative for all purposes under the Merger Agreement, to exercise all or any of the powers, authority and discretion conferred on the Stockholder Representative under the Merger Agreement, (b) ratifies the execution and delivery of the Merger Agreement by the Stockholder Representative on such Company Stockholder's behalf and (c) agrees to, and to be bound by and comply with, all of such Company Stockholder's obligations, if any, with respect to any expenses of the Stockholder Representative as set forth in the Merger Agreement.

1.4     Each undersigned Company Stockholder hereby (a) irrevocably approves the effect of the Merger on Company Stock described in <u>Section 2.1</u> (Conversion of Capital Stock) of the Merger Agreement, with the consideration payable to such Company Stockholder to be set forth on the Final Allocation Schedule (as may be adjusted under the Merger Agreement), and irrevocably accepts such consideration in lieu of any other consideration that might be claimed by such Company Stockholder pursuant to the Company's Organizational Documents, (b) irrevocably waives and releases all rights or claims that such Company Stockholder might have or assert in respect of such consideration pursuant to the Company's Organizational Documents and (c) agrees that the sole right that such Company Stockholder shall have in respect of such Company Stockholder's ownership interest in Company Stock held by such Stockholder, if any, shall be such Company Stockholder's right to receive payment for such Company Stockholder's shares of Company Stock in accordance with, and subject to, the terms and conditions of the Merger Agreement.

1.5     **Termination of Agreements**. Each undersigned Company Stockholder acknowledges and agrees that to the extent such Company Stockholder is a party to any Contract listed or described on <u>Exhibit A</u> by and among the Company and the other parties thereto, such Company Stockholder consents and agrees to the termination of such Contract effective as of the Effective Time and agrees that any rights and obligations such Company Stockholder may have under such Contract shall terminate upon the Effective Time without any further liability on the part of any of the Company, Parent, Merger Sub I, Merger Sub II, the First Step Surviving Entity or the Surviving Entity, and such Company Stockholder agrees that it will take no action with regard to pursuing any claim pursuant to such Contract.

## SECTION 2. RELEASE.

2.1     Effective as of the Closing, each Company Stockholder hereby (a) waives any and all rights of indemnification, contribution and other similar rights against the Company, the First Step Surviving Entity and the Surviving Entity (other than any indemnification rights that a Company

2

Stockholder may have under the Organizational Documents of the Company or any indemnification agreement between such Company Stockholder (or, in the case of a Company Stockholder that is a private investment fund, its Representatives) and the Company) arising out of the representations, warranties, covenants and agreements contained in the Merger Agreement and/or out of the negotiation, execution or performance of the Merger Agreement, and agrees that any claim of Parent, whether for indemnity or otherwise, may be asserted directly against the Company Stockholders or any Company Stockholder (solely to the extent, and subject to the limitations, provided in the Merger Agreement), without any need for any claim against, or joinder of, any other Company Stockholder, and (b) irrevocably and unconditionally waives, releases and forever discharges, with prejudice, Parent, Merger Sub I, Merger Sub II, the Acquired Entities, the First Step Surviving Entity, the Surviving Entity and each of their respective Affiliates from any and all charges, Claims, counterclaims, set-offs, defenses, acts and omissions, decrees, judgments, duties, penalties, sanctions, rights (including rights of indemnification, contribution and other similar rights, from whatever source, whether under Contract, applicable Law or otherwise), causes of action, protests, suits, disputes, orders, obligations, Indebtedness, demands, proceedings, Contracts, agreements, promises, Liabilities, controversies, costs, interests, expenses, fees (including attorneys' fees), Losses or damages of any kind, arising by any means (including subrogation, assignment, reimbursement, operation of law or otherwise), whether liquidated or unliquidated, apparent or unapparent, absolute or contingent, express or implied, fixed or variable, known or unknown, suspected or unsuspected, accrued or not accrued, foreseen or unforeseen, or mature or unmature, and whether derivative, joint, several or secondary, whether based on or arising out of state, federal, local, foreign, statutory, regulatory, common, or other Law, rule or regulation of any kind, related or with respect to, in connection with, or arising out of, directly or indirectly, any event, fact, matter, transaction, statement or representation, condition, circumstance, occurrence, act or omission that was in existence (or that occurred or failed to occur) at or prior to the Closing related to or in any way connected with, directly or indirectly, Parent, Merger Sub I, Merger Sub II, the First Step Surviving Entity, the Surviving Entity, the Acquired Entities or any of their respective Affiliates or shares of Company Stock that the Company Stockholders may own or have owned relating to the Company in their capacity as a service provider or as an equity holder; provided that this Section shall not be construed as releasing any Company Stockholder's rights under the Merger Agreement or any agreement instrument, certificate or document delivered pursuant thereto. The foregoing release shall not cover (i) Claims arising from the rights of any Company Stockholder under the Merger Agreement or any agreement, certificate or document delivered pursuant thereto; (ii) any rights to indemnification, advancement of expenses, reimbursement, contribution and exculpation by the Acquired Entities (including the Surviving Entity) for acts and omissions by the Company Stockholder or its Representative(s) in his or her capacity as a director, officer or Representative of any Acquired Entity occurring prior to the Effective Time, to the extent provided in (A) the Company Charter or the Company's bylaws, (B) liability insurance policies, (C) any indemnification agreement between the Company Stockholder (or, in the case of a Company Stockholder that is a private investment fund, its Representatives) and any Acquired Entity and (D) as otherwise set forth in the Merger Agreement; (iii) the Company's existing formal written employee benefit plans, (iv) if the Company Stockholder is or was an employee, consultant or other service provider of the Company, (A) rights to accrued but unpaid wages, salaries or other cash compensation due to the Company Stockholder that remain unpaid as of the Closing, (B) rights to reimbursements for expenses incurred and documented prior to the Closing and consistent with the Company's reimbursement policies, (C) unreimbursed claims under employee health and welfare plans, consistent with terms of coverage related thereto, and (D) the Company Stockholder's entitlement to continuation coverage benefits or any other similar benefits required to be provided by Law and (v) any written Contract not arising out of or related to the Merger Agreement or the negotiation, execution, performance or subject matter hereof or the transactions contemplated hereby between any Company Stockholder or its Affiliates and Parent or its Affiliates entered into prior to the Effective Time or any tort claim by any Company Stockholder or its Affiliates against Parent or its Affiliates which claim accrued prior to the Effective Time. The Company Stockholder further acknowledges and agrees that neither such Company Stockholder nor his, her or its

Affiliates shall have any right of contribution, indemnification or right of advancement from Parent, Merger Sub I, Merger Sub II, the Acquired Entities, the First Step Surviving Entity, the Surviving Entity or any of their respective Affiliates with respect to any Losses claimed by any of such Persons against such Company Stockholder or any Affiliate thereof in their capacities as an Indemnifying Party pursuant to Article VIII of the Merger Agreement.

## SECTION 3. REPRESENTATIONS AND WARRANTIES OF THE COMPANY STOCKHOLDERS

Each undersigned Company Stockholder hereby represents and warrants to Parent and the Company as follows:

3.1     **Authority Relative to this Agreement**. The Company Stockholder has full power and authority to execute and deliver this Agreement, to perform its obligations hereunder and to consummate the transactions contemplated hereby. The execution and delivery by the Company Stockholder of this Agreement and the consummation by the Company Stockholder of the transactions contemplated hereby have been duly and validly authorized by all necessary action of the Company Stockholder, and no other action is required to authorize the execution, delivery and performance of this Agreement and the consummation by the Company Stockholder of the transactions contemplated hereby. This Agreement has been duly and validly executed and delivered by the Company Stockholder and, assuming the due authorization, execution and delivery hereof by Parent and the Company, constitutes or will constitute, as applicable, a legal, valid and binding obligation of the Company Stockholder enforceable against such Company Stockholder in accordance with its terms, subject to bankruptcy, insolvency, reorganization or similar laws of general application affecting the rights and remedies of creditors, and to general equity principles.

3.2     **Ownership of Securities**. Such Company Stockholder has and, as of immediately prior to the Effective Time, will have, good title to, and full power and authority to sell, assign and transfer, all shares of Company Stock and Company Options, as applicable, listed on such Company Stockholder's signature page hereto, free and clear of all Liens, and not subject to any adverse claims. The Company Stockholder does not own, beneficially or of record, any Company Stock or Company Options other than the Company Stock and Company Options listed on Company Stockholder's signature page hereto. If any of the shares of Company Stock or Company Options owned (whether beneficially or of record) by such Company Stockholder constitute community property under applicable Law, this Agreement has been duly authorized, executed and delivered by, and constitutes the valid and binding agreement of, such Company Stockholder's spouse by such spouse's execution of the Consent of Spouse attached hereto as Exhibit B.

3.3     **Material Inducement**. The undersigned Company Stockholder acknowledges that (a) this Agreement is intended to be a material inducement for Parent, Merger Sub I and Merger Sub II to, and (b) Parent, Merger Sub I and Merger Sub II will be relying on such Company Stockholder's execution and delivery to the Company of this Agreement, and such Company Stockholder's agreement to be bound by the terms hereof, in determining whether to, in each case, proceed to consummate the Merger, and accordingly, that once delivered to the Company and Parent this Agreement shall be irrevocable.

## SECTION 4. MISCELLANEOUS

4.1     **Notices**. All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt by other than automatic means, whether electronic or otherwise), (b) when sent by email (with written

confirmation of transmission) or (c) one (1) Business Day following the day sent by an internationally recognized overnight courier (with written confirmation of receipt), in each case, at the following addresses and email addresses (or to such other address or email address as a party may have specified by notice given to the other party pursuant to this provision):

        If to Parent:

> WeWork Companies Inc.
> 115 West 18th Street, 4th floor
> New York, New York 10011
> Attention: Law Department
> E-mail: legal@wework.com

       If to the Company:

> Conductor, Inc.
> 2 Park Ave, New York, NY 10016
> Email: seth@conductor.com
> Attention: Seth Besmertnik

        If to a Company Stockholder party hereto, to the Stockholder Representative pursuant to the notice provisions set forth in the Merger Agreement.

    4.2    **Entire Agreement; Counterparts.** This Agreement, the Merger Agreement and the Other Transaction Agreements constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among or between any of the parties with respect to the subject matter hereof and thereof. If there is a conflict between any provision of this Agreement and a provision in the Merger Agreement, each of this Agreement and the Merger Agreement is to be interpreted and construed, if possible, so as to avoid or minimize such conflict, but to the extent, and only to the extent, of such conflict, the provision of the Merger Agreement shall control unless specifically provided otherwise. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile or other electronic transmission shall be effective as delivery of an original counterpart hereof.

    4.3    **Amendments.** This Agreement may be amended, supplemented or changed only by a written instrument signed by each of the Company Stockholders party hereto, the Company and Parent (and the Stockholder Representative is not authorized to provide such consent on behalf of the Company Stockholders).

    4.4    **Further Assurances; Post-Closing Cooperation.** At any time or from time to time after the date hereof, each undersigned Company Stockholder shall execute and deliver to Parent, the Company or the Surviving Entity such other documents and instruments, provide such materials and information and take such other actions as such party may reasonably request to consummate the transactions contemplated by this Agreement and the Merger Agreement and otherwise to cause the other parties to fulfill their respective obligations under this Agreement and the Merger Agreement and the transactions contemplated hereby and thereby.

    4.5    **Assignability; Third Party Rights.** Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any party without the prior written consent of the other parties, and any

such assignment without such prior written consent shall be null and void; provided, however, that Parent shall be permitted to assign or delegate its rights, interests and obligations under this Agreement to an Affiliate of Parent without the prior written consent of any other Party. This Agreement shall be binding upon, and shall be enforceable by and inure to the benefit of, the parties and their respective successors and assigns. Except for Merger Sub I, Merger Sub II and the Stockholder Representative, whom the parties hereto expressly acknowledge are each a third party beneficiary to this Agreement with full rights of enforcement, nothing in this Agreement is intended to or shall confer upon any Person (other than the parties) any right, benefit or remedy of any nature whatsoever.

      4.6    **Headings**. The headings contained herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

      4.7    **Severability**. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

      4.8    **Applicable Law; Jurisdiction; WAIVER OF JURY TRIAL**. This Agreement, and all Claims and causes of action (whether in contract or in tort or otherwise, or whether at law (including at common law or by statute) or in equity) that may be based on, arise out of or relate to this Agreement or the negotiation, execution, performance or subject matter hereof, shall be construed in accordance with and governed by the Laws of the State of Delaware applicable to agreements made and to be performed solely therein, without giving effect to principles of conflicts of law. In any action among or between any of the Parties arising out of or relating to this Agreement, each Party (a) irrevocably and unconditionally consents and submits to the exclusive jurisdiction and venue of the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, in the State courts of New York located in New York County, (b) agrees that all Claims in respect of such action or proceeding shall be heard and determined exclusively in accordance with clause (a) of this Section 4.8, (c) waives any objection to laying venue in any such action or proceeding in such courts, (d) waives any objection that any such court is an inconvenient forum or does not have jurisdiction over any Party and (e) agrees that service of process upon such Party in any such action shall be effective if such process is given as a notice in accordance with Section 4.1. **EACH PARTY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.**

      4.9    **Remedies; Specific Performance**.

      (a)    Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred by this Agreement, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy.

      (b)    The parties acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that monetary damages, even if available, would not be an adequate remedy therefor. It is accordingly agreed that, at any time prior to the termination of this Agreement pursuant to Section 4.10, the parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the performance of terms and provisions of this Agreement, including the right of a party to cause each other party to consummate the transactions contemplated by this Agreement, in any court referred to in Section 4.8, without proof of actual damages (and each party waives any requirement for the securing or posting of any bond in connection with such remedy), this

being in addition to any other remedy to which they are entitled at law or in equity. The parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to Law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy for any such breach.

4.10    **Termination**. This Agreement shall terminate upon any termination prior to the Effective Time of the Merger Agreement in accordance with its terms, except the Company Stockholder shall continue to be bound by the provisions of the Merger Agreement that survive any such termination as set forth in Section 7.2 of the Merger Agreement.

*[Signature Page Follows]*

**NOTE TO CONDUCTOR, INC. STOCKHOLDER:**

**PLEASE READ, SIGN AND DATE THIS AGREEMENT ON THE SIGNATURE PAGE BELOW (INCLUDING THE CONSENT OF SPOUSE ATTACHED AS <u>EXHIBIT B</u>, IF APPLICABLE) AND RETURN TO SRS ACQUIOM CLEARINGHOUSE LLC, AT THE ADDRESS ON THE LAST PAGE**

IN WITNESS WHEREOF, the parties hereto have duly executed this Agreement as of the date appearing below.

| **COMPANY STOCKHOLDER (INDIVIDUAL):** | **COMPANY STOCKHOLDER (ENTITY):** |
|---|---|
| *If you are an individual, please print your name and sign below.* | *If you are signing on behalf of an entity, please print the name of the entity and sign below indicating your title.* |

_____
Name of Individual (please print)

_____
Signature

Date: _____


_____
Name of Entity (please print)

_____
Signature

By: _____
      Name of Individual (please print)

Title: _____

Date: _____

| **SECURITY OWNERSHIP:** <br> (please fill in number of shares held) | |
|---|---|
| Common Stock: _____ | Company Options: _____ |
| Series A Preferred Stock: _____ | Series B Preferred Stock: _____ |
| Series C Preferred Stock: _____ | Series D Preferred Stock: _____ |
| Series D-1 Preferred Stock: | Company Warrants: |

*[Signature Page to Merger Agreement Joinder]*

**PARENT:**

**WeWork Companies Inc.**

By: _____

Name: _____

Title: _____

**COMPANY:**

**Conductor, Inc.**

By: _____

Name: _____

Title: _____

*[Signature Page to Merger Agreement Joinder]*

## EXHIBIT A

1. Management Rights Letter from the Company to FirstMark dated December 26, 2006.
2. Management Rights Letters from the Company to Matrix Partners VIII, L.P. dated November 19, 2008, October 3, 2012 and January 8, 2015.
3. Management Rights Letter from the Company to Catalyst Investors QP III, L.P. dated January 8, 2015.
4. Board of Director Letter Agreement dated July 31, 2015 by and between the Company and Christopher Lien.
5. Series A Preferred Stock Purchase Agreement by and among the Company and the person and entities listed on Exhibit A thereto, dated as of December 26, 2006.
6. Series B Preferred Stock Purchase Agreement by and among the Company and the persons and entities listed on Exhibit A thereto, dated as of November 19, 2008.
7. Series C Preferred Stock Purchase Agreement by and among the Company and the persons and entities listed on Exhibit A thereto, dated as of October 3, 2012.
8. Series D Preferred Stock Purchase Agreement by and among the Company and the persons and entities listed on Exhibit A thereto, dated as of January 2, 2015.
9. Series D-1 Preferred Stock Purchase Agreement by and among the Company and the persons and entities listed on Exhibit A thereto, dated as of October 26, 2017.
10. Fourth Amended and Restated Investor Rights Agreement by and among the Company and the investors party thereto, dated as of October 26, 2017.
11. Fourth Amended and Restated Voting Agreement, by and among the Company and the stockholders party thereto, dated as of October 26, 2017.
12. Fourth Amended and Restated Right of First Refusal and Co-Sale Agreement, by and among the Company and the stockholders party thereto, dated as of October 26, 2017.
13. Common Stock Repurchase Agreement between the Company and Seth Besmertnik, dated as of May 3, 2011.
14. Employee Common Stock Repurchase Agreements between the Company and Seth Besmertnik, Vishal Berry, Kathleen Evans and Brian Fage, each dated as of December 20, 2017.

**EXHIBIT B**

**Consent of Spouse**

\_\_ **I am married**

\_\_ **I am not married**

*If the Company Stockholder is married <u>and</u> a resident of a community property state (Arizona, California, Idaho, Louisiana, Nevada, New Mexico, Texas, Washington and Wisconsin or has elected to be part of the community property system in a state or territory where such election is optional), please complete this Consent of Spouse.*

I _____, spouse of _____, have read and approve the foregoing Merger Agreement Joinder (the "**Agreement**") and the written consent of the stockholders of the Company (the "**Consent**"). In consideration of the terms and conditions as set forth in the Agreement and the matters set forth in the Consent, I hereby appoint my spouse as my attorney-in-fact with respect to the exercise of any rights and obligations under the Agreement and the Consent, and agree to be bound by the provisions of the Agreement and the Consent insofar as I may have any rights or obligations in the Agreement or in the Consent under the laws relating to marital or community property in effect in the state of our residence as of the date of the Agreement or the Consent.

Date_____

Signature of Spouse_____

Printed Name of Spouse_____

**Return Instructions**

Please return this Merger Agreement Joinder, along with the related (i) Stockholder Letter of Transmittal, with the certificate(s) and (ii) the Proxy and Stockholders' Agreement Joinder (if receiving Parent Stock as consideration), to be exchanged for your consideration payable under the Merger Agreement *only* to SRS Acquiom Clearinghouse LLC at the address below. The method of delivery is at your option and your risk, but it is recommended that documents be delivered via a registered method, insured for 2% of the value of your shares of Company Stock.

*By Mail to*

SRS Acquiom Clearinghouse LLC
1614 15th St., Suite 210
Denver, CO 80202

For additional information please contact at 303-222-2080 or support@srsacquiom.com.

By: _____

Name: _____

Date: _____

# **EXHIBIT E**

 Gmail

Doug Chertok <dchertok@gmail.com>

**Re: Conductor we work - chertok [ATTN Brandon]**

Valerie Palmer <vpalmer@srsacquiom.com>
To: Doug Chertok <dchertok@gmail.com>
Cc: SRS Acquiom <cases.772390.48349687_79463423_980228.1c94c135e2@772390.email.netsuite.com>

Wed, Feb 22, 2023 at 6:06 PM

Hello Doug, Her name is Lindsey, anyone who answers when you call the number I previously provided will be able to connect you to her.

Kindly note I will be unavailable the rest of the day.

Thanks!

**Valerie Palmer**
Associate, Institutional Client Relations

O 720.543.8559

vpalmer@srsacquiom.com

 SRS ACQUIOM° ELEVATE YOUR GAIN

srsacquiom.com

This email, along with any attachments, is intended for the named recipient(s) and may contain confidential or proprietary information. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by email and delete the original message, including any attachments.

**From:** Doug Chertok <dchertok@gmail.com>
**Sent:** Wednesday, February 22, 2023 4:02 PM
**To:** Valerie Palmer <vpalmer@srsacquiom.com>
**Cc:** SRS Acquiom <cases.772390.48349687_79463423_980228.1c94c135e2@772390.email.netsuite.com>
**Subject:** Re: Conductor we work - chertok [ATTN Brandon]

Hi Valerie,

What is the name and contact information of "the Directing Manager who oversees this process" at SRS that you described below?

Thank you,
Doug

On Wed, Feb 22, 2023 at 4:32 PM Valerie Palmer <vpalmer@srsacquiom.com> wrote:
Any further questions or concerns around this can be presented by calling SRS# 415-263-9018.

You are welcomed to escalate this matter to the Directing Manager who oversees this process.

Thanks again,
Valerie

**Valerie Palmer**
Associate, Institutional Client Relations

O 720.543.8559

vpalmer@srsacquiom.com

 SRS ACQUIOM° ELEVATE YOUR GAIN

srsacquiom.com

This email, along with any attachments, is intended for the named recipient(s) and may contain confidential or proprietary information. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by email and delete the original message, including any attachments.

**From:** Valerie Palmer <vpalmer@srsacquiom.com>
**Sent:** Wednesday, February 22, 2023 2:28 PM
**To:** Doug Chertok <dchertok@gmail.com>
**Cc:** SRS Acquiom <cases.772390.48349687_79463423_980228.1c94c135e2@772390.email.netsuite.com>
**Subject:** Re: Conductor we work - chertok [ATTN Brandon]

Hi Doug,

Funds escheated on 2.10.23.

SRS does not have a contact or person to provide.

Thanks!

**Valerie Palmer**
Associate, Institutional Client Relations

O 720.543.8559

vpalmer@srsacquiom.com

 **SRSACQUIOM**  ELEVATE YOUR GAIN

srsacquiom.com

This email, along with any attachments, is intended for the named recipient(s) and may contain confidential or proprietary information. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by email and delete the original message, including any attachments.

---

**From:** Doug Chertok <dchertok@gmail.com>
**Sent:** Wednesday, February 22, 2023 2:26 PM
**To:** Valerie Palmer <vpalmer@srsacquiom.com>
**Cc:** SRS Acquiom <cases.772390.48349687_79463423_980228.1c94c135e2@772390.email.netsuite.com>
**Subject:** Re: Conductor we work - chertok [ATTN Brandon]

Hi Valerie,

Thank you for your emails.

A few questions:

1. What date did SRS escheat the funds to the State of Florida?

2. What is the name of the person that SRS provided to the State of Florida as the owner of the funds?

3. Based on your emails below, I thought that you are an attorney for SRS.  Please let me know the name and contact information for SRS's attorney.

Thank you,
Doug

On Wed, Feb 22, 2023 at 4:03 PM Valerie Palmer <vpalmer@srsacquiom.com> wrote:
Apologies for the quick 2nd email, Doug, however the funds were escheated to the state of Florida less than 2 weeks ago.

Therefore, you will have to wait for a period of time for the state to receive the funds and document/process in their system.

Again, moving forward you will need to work with the State of Florida to resolve this matter and not SRS Acquiom as we no longer hold your payment.

**Valerie Palmer**
Associate, Institutional Client Relations

O 720.543.8559

vpalmer@srsacquiom.com

 **SRSACQUIOM**  ELEVATE YOUR GAIN

srsacquiom.com

This email, along with any attachments, is intended for the named recipient(s) and may contain confidential or proprietary information. If you are not an intended recipient, you may not review, copy or distribute this message. If you have received this communication in error, please notify us immediately by email and delete the original message, including any attachments.

**From:** Valerie Palmer <vpalmer@shareholderrep.com>
**Sent:** Wednesday, February 22, 2023 1:53 PM
**To:** Doug Chertok <dchertok@gmail.com>
**Cc:** SRS Acquiom <cases.772390.48349687_79463423_980228.1c94c135e2@772390.email.netsuite.com>
**Subject:** Re: Conductor we work - chertok [ATTN Brandon]

Yes, it is unfortunate. I am certain there was likely a reason we did not connect successfully in March of 2018.

I am not a licensed attorney nor can provide any guidance around the laws, however, I believe you can research the 2011 Florida Statute 717.117 which discusses in detail the Report of unclaimed property.

Moving forward you will need to work with the State of Florida to resolve this matter and not SRS Acquiom as we no longer hold your payment.

Feel free to inquire using this link: https://myfloridacfo.com/division/unclaimedproperty/home

I show the amount that was instructed for you for this transaction was in the amount of 161,737.23.

Thanks!

---

**From:** Doug Chertok <dchertok@gmail.com>
**Sent:** Wednesday, February 22, 2023 1:39 PM
**To:** Valerie Palmer <vpalmer@shareholderrep.com>; SRS Acquiom <cases.772390.48349687_79463423_980228.1c94c135e2@772390.email.netsuite.com>
**Subject:** Re: Conductor we work - chertok [ATTN Brandon]

Hi Valerie and Brandon,

That's unfortunate.

First, please advise what "laws of Escheatment apply" as you note below.

Second, as we requested several times below, please provide the following:

1. Please advise what the legally-required minimum documentation SRS will accept to issue payment.

2. Please also advise what the total amount of payment SRS is prepared to make.  Please note that under the Delaware law I provided, SRS is required to pay interest.

Thank you,
Doug

---

On Wed, Feb 22, 2023 at 1:04 PM Valerie Palmer <vpalmer@shareholderrep.com> wrote:
No problem, Doug, and apologies for any inconvenience.

When monies exchange hands documentation is necessary for a host of reasons, some of which include tax reporting, prevention of anti-fraud, suspicious activity, and other requirements set by the Buyer.

I believe that so much time has passed since the rest of the holder base was paid in this transaction which closed 3.22.18, that the laws of Escheatment apply. SRS is not able to hold on to client funds indefinitely.

Therefore, at this point, I will connect you back with my colleague Brandon (copied) who can confirm with our Payment Support Team what options remain.

Thanks!
Valerie

---

**From:** Doug Chertok <dchertok@gmail.com>
**Sent:** Wednesday, February 22, 2023 10:51 AM
**To:** Valerie Palmer <vpalmer@shareholderrep.com>
**Cc:** SRS Acquiom <cases.772390.48349687_79463423_980228.1c94c135e2@772390.email.netsuite.com>
**Subject:** Re: Conductor we work - chertok

Hi Valerie,

That's unfortunate.

Per our requests below, please provide the following:

1. Please advise what the legally-required minimum documentation SRS will accept to issue payment.

2. Please also advise what the total amount of payment SRS is prepared to make.  Please note that under the Delaware law I provided, SRS is required to pay interest.

Thank you,
Doug

On Wed, Feb 22, 2023 at 8:05 AM Valerie Palmer <vpalmer@shareholderrep.com> wrote:
No problem, Doug, I agree we have a discord.

We have procedures that are required for payment and counsel for the Buyer, WeWork Companies Inc., shares in this position.

I apologize for this inconvenience.

---

**From:** Doug Chertok <dchertok@gmail.com>
**Sent:** Saturday, February 18, 2023 8:27 AM
**To:** Valerie Palmer <vpalmer@shareholderrep.com>
**Cc:** SRS Acquiom <cases.772390.48349687_79463423_980228.1c94c135e2@772390.email.netsuite.com>
**Subject:** Re: Conductor we work - chertok

You don't often get email from dchertok@gmail.com. Learn why this is important

Thanks for your email, Valerie.

Unfortunately, we will not sign the documents that you previously provided.  Such documents are not required under Delaware law as established in the case I provided.  If you would like additional cases that hold the same, please let me know.

Please advise what the legally-required minimum documentation SRS will accept to issue payment.

Please also advise what the total amount of payment SRS is prepared to make.  Please note that under the Delaware law I provided, SRS is required to pay interest.

Feel free to let me know what questions you may still have.

Thank you,
Doug

On Wed, Jan 18, 2023 at 1:10 PM Valerie Palmer <vpalmer@shareholderrep.com> wrote:
Thanks for your email, Doug.

Unfortunately, we will not be able to issue payment without the requisite documents.

Feel free to let me know what questions you may still have.

Thanks again!
Valerie

**From:** Doug Chertok <dchertok@gmail.com>
**Sent:** Wednesday, January 18, 2023 11:07 AM
**To:** SRS Acquiom <cases.772390.48349687_79463423_980228.1c94c135e2@772390.email.netsuite.com>
**Cc:** Valerie Palmer <vpalmer@shareholderrep.com>
**Subject:** Re: Conductor we work - chertok

You don't often get email from dchertok@gmail.com. Learn why this is important

Hi Brandon,

Please read:

Mehta v. Smurfit-Stone Container Corp.
C.A. No. 6891-VCL (Del. Ch. Oct. 20, 2014)

Thank you

On Wed, Jan 18, 2023 at 12:06 PM SRS Acquiom <support@srsacquiom.com> wrote:

Hello Doug,

Upon reviewing this internally, we are not seeing any exceptions to signing the Acquiom Financial requisite documents that was directed by Buy-side at the closing to receive payment in 2018.

Unfortunately, unless you can provide supporting documentation that indicates otherwise, SRS will be unable to make payment of funds. SRSA has an obligation to report this payment and without the requisite documents I am not sure we can proceed, and it could risk escheatment.

Please let us know if you have any further questions.

Warm Regards,

Brandon

**Client Services Team**
SRS Acquiom

303.222.2080
support@srsacquiom.com
**SRSACQUIOM** ELEVATE YOUR GAIN

srsacquiom.com

We do not provide legal, financial or tax advice, and nothing in this message is intended to be used for such purpose. You must consult your own legal, investment, and tax advisor for such advice.

This email, along with any attachments, is considered confidential and may be legally privileged, legally protected work product, and/or subject to a common interest or joint defense agreement with the intended recipient. This email may contain the impressions, conclusions, opinions, research, or theories of an attorney or a non-attorney acting on an attorney's behalf or in anticipation of litigation. This email is intended only for the addressee. If you have received this transmission in error, you are on notice of its status. Please notify us immediately by reply email and then delete or destroy any electronic and paper copies of this message. Please do not copy this email, use it for any purposes, or disclose its contents to any other person. Thank you.

---

**From:** Douglas M. Chertok <dchertok@gmail.com>
**Sent:** 1/13/2023 11:39 am GMT-07:00
**To:** Brandon Dana (Support@srsacquiom.com)
**Subject:** Re: Conductor we work - chertok

Hi Brandon,

Thank you for confirming receipt of the documents.

Please note that Delaware shareholders are not required to sign these documents under Delaware law, nor are they required to provide releases, proxies or the other information in the 2 PDFs that you sent.

As such, I do not intend to sign either of these documents.

I look forward to receiving the merger consideration, without any escrow or other adjustments, plus interest accrued from the date that the merger closed.

Thank you

On Fri, Jan 13, 2023 at 1:20 PM SRS Acquiom <support@srsacquiom.com> wrote:

> Hello Douglas,
>
> Thank you for the documents!
>
> I forgot to add that we are also needing these two documents attached below.
>
> Warm Regards,
>
> Brandon
>
> Client Services Team
> SRS Acquiom
>
> 303.222.2080
> support@srsacquiom.com
> **SRSACQUIOM** ELEVATE YOUR GAIN
>
> srsacquiom.com

We do not provide legal, financial or tax advice, and nothing in this message is intended to be used for such purpose. You must consult your own legal, investment, and tax advisor for such advice.

This email, along with any attachments, is considered confidential and may be legally privileged, legally protected work product, and/or subject to a common interest or joint defense agreement with the intended recipient. This email may contain the impressions, conclusions, opinions, research, or theories of an attorney or a non-attorney acting on an attorney's behalf or in anticipation of litigation. This email is intended only for the addressee. If you have received this transmission in error, you are on notice of its status. Please notify us immediately by reply email and then delete or destroy any electronic and paper copies of this message. Please do not copy this email, use it for any purposes, or disclose its contents to any other person. Thank you.

---

**From:** Douglas M. Chertok <dchertok@gmail.com>
**Sent:** 1/13/2023 9:50 am GMT-07:00
**To:** Brandon Dana (Support@srsacquiom.com)
**Subject:** Re: Conductor we work - chertok

Doug Chertok has sent you an email via **Gmail confidential mode:**

M Re: Conductor we work - chertok

This message was sent on Jan 13, 2023 at 8:49:59 AM PST
You can open it by clicking the link below. This link will only work for cases.772390.48349687_79338203_980228.7dec9678ad@772390.email.netsuite.com.

View the email

Gmail confidential mode gives you more control over the messages you send. The sender may have chosen to set an expiration time, disable printing or forwarding, or track access to this message. Learn more

Gmail: Email by Google
Use is subject to the Google Privacy Policy
Google LLC, 1600 Amphitheatre Parkway, Mountain View, CA 94043, USA
You have received this message because someone sent you an email via Gmail confidential mode.

Google

Filing # 170032455 E-Filed 03/30/2023 04:19:15 PM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

DOUGLAS CHERTOK,

  Plaintiff,                      CASE NO. CACE-23-011273 Division: 05

v.

SRS ACQUIOM, INC., a Delaware

corporation, and WEWORK COMPANIES

LLC, a Delaware limited liability company

     Defendant.                ./

## SUMMONS

THE STATE OF FLORIDA

To Each Sheriff of the State:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint

in the above-styled case upon the Defendant:

SRS ACQUIOM, INC.
c/o CORPORATION SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808

      The Defendant is hereby required to serve written defenses to said Complaint on Plaintiff,

whose name and address is:

Douglas Chertok
4250 Galt Ocean Drive, Suite 10H
Fort Lauderdale, FL 33308

within 20 days after service of this Summons on that Defendant, exclusive of the day of service,

and to file the original of the defenses with the Clerk of this Court either before service on

Plaintiff or immediately thereafter.  If a Defendant fails to do so, a default will be entered

against that Defendant for the relief demanded in the Complaint.

      DATED on _____      APR 05 2023

**BRENDA D. FORMAN**

Filing # 170032455 E-Filed 03/30/2023 04:19:15 PM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

DOUGLAS CHERTOK,

  Plaintiff,                        CASE NO. CACE-23-011273 Division: 05

v.

SRS ACQUIOM, INC., a Delaware
corporation, and WEWORK COMPANIES
LLC, a Delaware limited liability company

      Defendant.                    ./

## SUMMONS

THE STATE OF FLORIDA

To Each Sheriff of the State:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint

in the above-styled case upon the Defendant:

WEWORK COMPANIES LLC
c/o CORPORATION SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808

      The Defendant is hereby required to serve written defenses to said Complaint on Plaintiff,

whose name and address is:

Douglas Chertok
4250 Galt Ocean Drive, Suite 10H
Fort Lauderdale, FL 33308

within 20 days after service of this Summons on that Defendant, exclusive of the day of service,

and to file the original of the defenses with the Clerk of this Court either before service on

Plaintiff or immediately thereafter. If a Defendant fails to do so, a default will be entered

against that Defendant for the relief demanded in the Complaint.

      DATED on      APR 05 2023

**BRENDA D. FORMAN**

Filing # 169980754 E-Filed 03/30/2023 10:44:00 AM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

DOUGLAS CHERTOK,

   Plaintiff,                  CASE NO. CACE-23-011273 Division: 05

v.

SRS ACQUIOM, INC., a Delaware

corporation, and WEWORK COMPANIES

LLC, a Delaware limited liability company

    Defendant.                  ./

## SUMMONS

THE STATE OF FLORIDA

To Each Sheriff of the State:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint

in the above-styled case upon the Defendant:

WEWORK COMPANIES LLC
c/o CORPORATION SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808

      The Defendant is hereby required to serve written defenses to said Complaint on Plaintiff,
whose name and address is:

Douglas Chertok
4250 Galt Ocean Drive, Suite 10H
Fort Lauderdale, FL 33308

within 20 days after service of this Summons on that Defendant, exclusive of the day of service,

and to file the original of the defenses with the Clerk of this Court either before service on

Plaintiff or immediately thereafter. If a Defendant fails to do so, a default will be entered

against that Defendant for the relief demanded in the Complaint.

      DATED on ___    *3/30/2023*

Filing # 169980754 E-Filed 03/30/2023 10:44:00 AM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL
CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

DOUGLAS CHERTOK,

  Plaintiff,                  CASE NO. CACE-23-011273 Division: 05

v.

SRS ACQUIOM, INC., a Delaware

corporation, and WEWORK COMPANIES

LLC, a Delaware limited liability company

     Defendant.                    /

**SUMMONS**

THE STATE OF FLORIDA

To Each Sheriff of the State:

      YOU ARE HEREBY COMMANDED to serve this Summons and a copy of the Complaint

in the above-styled case upon the Defendant:

SRS ACQUIOM, INC.
c/o CORPORATION SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON, DE 19808

      The Defendant is hereby required to serve written defenses to said Complaint on Plaintiff,
whose name and address is:

Douglas Chertok
4250 Galt Ocean Drive, Suite 10H
Fort Lauderdale, FL 33308

within 20 days after service of this Summons on that Defendant, exclusive of the day of service,

and to file the original of the defenses with the Clerk of this Court either before service on

Plaintiff or immediately thereafter. If a Defendant fails to do so, a default will be entered

against that Defendant for the relief demanded in the Complaint.

      DATED on    *3/30/2023*

Filing # 172090357 E-Filed 04/30/2023 12:19:14 PM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORDIA

DOUGLAS CHERTOK

      Plaintiff,

        v.

SRS ACQUIOM, INC. a Delaware
corporation; and WEWORK COMPANIES LLC,
a Delaware limited liability company

      Defendants.

_____/

Case No. CACE-23-011273
Division: 05
Judge Martin J. Bidwill

**MOTION FOR DEFAULT**

**<u>MOTION FOR DEFAULT</u>**

TO THE CLERK OF THE CIRCUIT COURT:

      **Pursuant to <u>FLORIDA STATUTE 1.500,</u> Plaintiff respectfully requests that the Court enter a default judgment against Defendants. Defendants failed to serve or file a Notice of Appearance or otherwise respond to the Summons and Complaint within 20 days after Service of Process (dated April 6, 2023) on Defendants.** *See* **Docket Entries, dated April 6, 2023, "SUMMONS SERVED-POSTED" against <u>SRS ACQUIOM, INC</u>. AND <u>WEWORK COMPANIES LLC</u>.**

      I certify that a copy of this document was e-mailed to the persons listed below on April 30, 2023:

Defendant SRS ACQUIOM, INC.:
950 17th Street, Suite 1400
Denver, CO 80202
E-mail Address: <u>support@srsacquiom.com</u>

Defendant WEWORK COMPANIES LLC
75 Rockefeller Plaza
Floor 10
New York, NY 10019
E-mail Address: <u>feedback@wework.com</u>

1

*/s/ Douglas Chertok*
Douglas Chertok
4250 Galt Ocean Drive, Suite 10H
Ft. Lauderdale, Florida 33308
Tel: (917) 215-5214
dchertok@gmail.com

Dated:  April 30, 2023

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORDIA

DOUGLAS CHERTOK

       Plaintiff,

       v.

SRS ACQUIOM, INC. a Delaware
corporation; and WEWORK COMPANIES LLC,
a Delaware limited liability company

       Defendants.

_____/

Case No. CACE-23-011273
Division: 05
Judge Martin J. Bidwill

**DEFAULT JUDGMENT**

## <u>DEFAULT JUDGMENT</u>

       A default is entered in this action against Defendants for failure to serve or file a response or any paper as is required by law.

Dated: May \_\_\_, 2023

       CLERK OF THE CIRCUIT COURT

(SEAL)       By: _____
                  Deputy Clerk

       I certify that a copy of this document was e-mailed to the persons listed below on May \_\_\_, 2023:

Defendant SRS ACQUIOM, INC.:
950 17th Street, Suite 1400
Denver, CO 80202
E-mail Address: support@srsacquiom.com

Defendant WEWORK COMPANIES LLC
75 Rockefeller Plaza
Floor 10
New York, NY 10019
E-mail Address: feedback@wework.com

3

/s/ _____
Douglas Chertok
4250 Galt Ocean Drive, Suite 10H
Ft. Lauderdale, Florida 33308
Tel: (917) 215-5214
dchertok@gmail.com

Dated:  May ___, 2023

4

Filing # 172197966 E-Filed 05/01/2023 09:05:24 PM

IN THE CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT, IN AND FOR
BROWARD COUNTY, FLORIDA

DOUGLAS CHERTOK                          CASE NO.: CACE23-0011273

    Plaintiff,

vs.

SRS ACQUIOM, INC., a Delaware
Corporation; and WEWORK COMPANIES,
LLC, a Delaware limited
liability company

    Defendants.

_____/

## **MOTION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT**

Defendants, SRS ACQUIOM, INC., a Delaware Corporation ("SRS"); and WEWORK

COMPANIES, LLC, a Delaware limited liability company ("WeWork"), (collectively,

"Defendants"), by and through their undersigned counsel, hereby moves pursuant to Rules of Civil

Procedure including Fla. R. Civ. P. 1.090(b), for an extension of time to respond to Plaintiff,

DOUGLAS CHERTOK's ("Plaintiff") Complaint and Demand for Jury Trial ("Complaint"), and

in support thereof states as follows:

    1.    Plaintiff filed his Complaint in this matter on March 23, 2023.

    2.    Defendant WeWork was served on April 6, 2023 and Defendant SRS was served

on April 14, 2023.

    3.    Fla. R. Civ. P. 1.090(b) allows this Court to extend the time for Defendant to

respond to the Complaint for cause shown.

4.      Undersigned counsel was recently retained by Defendants and is working diligently to investigate the facts and issues of law raised in this matter in order to effectively respond to the Complaint, including the possibility of removing the action to the United States District Court, but Defendant is in need of additional time to prepare said response up to and including May 8, 2023.

5.      Undersigned counsel represents to this Court that this Motion is not being interposed for purposes of delay or harassment and, should the Court grant the relief requested herein, Plaintiff will not be unduly prejudiced.

WHEREFORE, Defendants, SRS ACQUIOM, INC., and WEWORK COMPANIES, LLC, respectfully request this Honorable Court for a 12-day extension to respond to Plaintiff's Complaint from April 26, 2023 to May 8, 2023.

By: */s/ Michael E. Dutko Jr.*
        Michael E. Dutko, Jr., Esq. (FBN 72505)
        michael.dutko@bipc.com
        **BUCHANAN INGERSOLL & ROONEY PC**

        401 E. Las Olas Blvd., Suite 2250
        Ft. Lauderdale, FL 33301
        Tel.: 954 703-3944
        *Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and was served on all counsel of record via the Florida E-Portal system this 1st day of May, 2023.

*/s/ Michael E. Dutko Jr.*
Michael E. Dutko, Jr., Esq. (FBN 72505)

Filing # 172222072 E-Filed 05/02/2023 09:54:08 AM

IN THE CIRCUIT COURT OF THE SEVENTEENTH JUDICIAL CIRCUIT,
IN AND FOR BROWARD COUNTY, FLORDIA

DOUGLAS CHERTOK

        Plaintiff,

        v.

SRS ACQUIOM, INC. a Delaware
corporation; and WEWORK COMPANIES LLC,
a Delaware limited liability company

        Defendants.

_____/

Case No. CACE-23-011273
Division: 05
Judge Martin J. Bidwill

### PLAINTIFF'S OPPSTION TO DEFENDANTS' MOTION FOR EXTENSION OF TIME TO RESPOND TO COMPLAINT

Plaintiff DOUGLAS CHERTOK ("Plaintiff") hereby opposes Defendants SRS ACQUIOM, INC. a Delaware corporation ("SRS"); and WEWORK COMPANIES LLC, a Delaware limited liability company ("WeWork"), (collectively, "Defendants") motion for an extension of time ("Motion") to respond to Plaintiff's Complaint ("Complaint") pursuant to Rule of Civil Procedure Fla. R. Civ. P. 1.090(b), and in support thereof states as follows:

1.      Plaintiff filed his Complaint on March 23, 2023.

2.      Both Defendants were served on April 6, 2023. *See* Docket Entries, dated April 6, 2023, "SUMMONS SERVED-POSTED" against SRS ACQUIOM, INC. AND WEWORK COMPANIES LLC.

3.      Defendants were required to respond to the Complaint within 20 days after Service of Process (*i.e.* April 27, 2023).

4.      Defendants failed to respond.

5.      Defendants' Motion *misrepresents* that Defendant SRS was served on April 14, 2023. *See* Motion ¶2. In fact, Defendants SRS was served on April 6, 2023. *Supra*.

1

6.    Plaintiff filed a Motion for Default on April 30, 2023. *See* Docket Entry, dated April 30, 2023.  That unopposed Motion for Default remains pending.

7.    Although Fla. R. Civ. P. 1.090(b) allows this Court to extend the time for Defendant to respond to the Complaint, such an extension requires Defendants' "excusable neglect":

> When an act is required or allowed to be done at or within a specified time by order of court, by these rules, or by notice given thereunder, for cause shown the court at any time in its discretion...(2) upon motion made and notice after the expiration of the specified period, may permit the act to be done when failure to act was the result of excusable neglect."

8.    Here, Defendants' Motion does not argue "excusable neglect".  Nor should the Court countenance Defendants' foregoing *misrepresentation* in support of its Motion. *See* ¶5 hereof, *supra*.

9.    Moreover, Fla. R. Civ. P. 1.010 provides that such "rules shall be construed to secure the just, *speedy*, and inexpensive determination of every action." (Emphasis added).

10.    Finally, Defendants' counsel represents "that th[e] Motion is not being interposed for purposes of delay or harassment and...Plaintiff will not be unduly prejudiced." *See* Motion ¶5.

11.    However, Defendants' Motion acknowledges "the possibility of removing the action to the United States District Court." *See* Motion ¶4.  Such removal would delay the action, and would prejudice Plaintiff by requiring Plaintiff to litigate in a different forum.

WHEREFORE, Plaintiff DOUGLAS CHERTOK respectfully requests that this Honorable Court deny Defendants' Motion, and grant Plaintiff's Motion for Default.

By: */s/ Douglas M. Chertok*
Douglas M. Chertok
dchertok@gmail.com
4250 Galt Ocean Drive
Suite 10H
Ft. Lauderdale, FL 33308
Tel.: 917-215-5214
*Pro Se Plaintiff*

2

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed electronically and was served on all counsel of record via the Florida E-Portal system this 2nd day of May, 2023.

*/s/ Douglas M. Chertok*
Douglas M. Chertok

3

Filing # 170534592 E-Filed 04/06/2023 06:28:29 PM

# CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

**DOUGLAS CHERTOK,**

            Plaintiff(s),

vs.

**SRS ACQUIOM, INC., ET AL,**

            Defendant(s).

**Case No.: CACE-23-011273 DIVISION: 05**

**AFFIDAVIT OF SERVICE**

Received by **DM PROFESSIONAL SERVICES** on 04/06/2023 at 8:46 AM to be served upon:

**SRS ACQUIOM, INC.**

STATE OF DELAWARE
COUNTIES OF NEW CASTLE, KENT AND SUSSEX   ss.

I, ADAM GOLDEN, depose and say that:

On **04/06/2023** at **12:52 PM, I SERVED** the within **SUMMONS & COMPLAINT; CIVIL COVER SHEET; EXHIBITS** on **SRS ACQUIOM, INC.** at c/o Corporation Service Company, 251 Little Falls Dr, Wilmington, DE 19808 in the following manner:

**CORPORATE SERVICE:** By delivering to and leaving same with **LEGAL REPRESENTATIVE , AUTHORIZED TO ACCEPT SERVICE** So served and authorized to accept service.

Description of person process was left with:

Sex: **Female** - Skin: **Caucasian** - Hair: **Brown** - Approx. Age: **25** - Height: **5'4"** - Weight: **115**

I declare under penalty of perjury that the information contained herein is true and correct and that this affidavit was executed on this ____6____ day of ____Apr____, 20_23_.

        X _____

Signed and sworn to before me on
this __6__ day of ____April____, 20_23_.

_____
Notary Public

**ADAM GOLDEN**
Special Process Server
DM PROFESSIONAL SERVICES
501 SILVERSIDE RD
WILMINGTON, DE 19809
302-792-0558

Law Firm: DOUGLAS CHERTOK
Atty File#: - Our File#: 424152

*424152*

Filing # 170534592 E-Filed 04/06/2023 06:28:29 PM

# CIRCUIT COURT OF THE 17TH JUDICIAL CIRCUIT IN AND FOR BROWARD COUNTY, FLORIDA

**DOUGLAS CHERTOK,**

             Plaintiff(s),

vs.

**SRS ACQUIOM, INC., ET AL,**

             Defendant(s).

Case No.: **CACE-23-011273 DIVISION: 05**

**AFFIDAVIT OF SERVICE**

Received by **DM PROFESSIONAL SERVICES** on **04/06/2023** at **8:49 AM** to be served upon:

**WEWORK COMPANIES LLC**

STATE OF DELAWARE
COUNTIES OF NEW CASTLE, KENT AND SUSSEX   ss.

I, ADAM GOLDEN, depose and say that:

On **04/06/2023** at **12:52 PM**, I SERVED the within **SUMMONS & COMPLAINT; CIVIL COVER SHEET; EXHIBITS** on **WEWORK COMPANIES LLC** at **c/o Corporation Service Company, 251 Little Falls Dr, Wilmington, DE 19808** in the following manner:

**CORPORATE SERVICE:** By delivering to and leaving same with **LEGAL REPRESENTATIVE , AUTHORIZED TO ACCEPT SERVICE** So served and authorized to accept service.

Description of person process was left with:

Sex: **Female** - Skin: **Caucasian** - Hair: **Brown** - Approx. Age: **25** - Height: **5"4"** - Weight: **115**

I declare under penalty of perjury that the information contained herein is true and correct and that this affidavit was executed on this ___6___ day of _____Apr_____, 20_23_.

Signed and sworn to before me on
this _____ day of _____Ap____, 20_23_.

_____
Notary Public

X _____
**ADAM GOLDEN**
Special Process Server
DM PROFESSIONAL SERVICES
501 SILVERSIDE RD
WILMINGTON, DE 19809
302-792-0558

Law Firm: DOUGLAS CHERTOK
Atty File#: - Our File#: 424153

*424153*

*** FILED: BROWARD COUNTY, FL BRENDA D. FORMAN, CLERK 04/06/2023 06:28:28 PM.****