# EXHIBIT A

CONFIDENTIAL

# PROJECT PADDINGTON

**SIGNING AND CLOSING DOCUMENTS**

**WITH RESPECT TO**

**WEWORK COMPANIES INC.'S**

**ACQUISITION**

**OF**

**CONDUCTOR, INC.**

**SIGNING: March 5, 2018**
**CLOSING: March 22, 2018**



## **ABBREVIATIONS**

| | |
|---|---|
| Acquiom Financial LLC | "Exchange Agent" |
| Conductor, Inc., a Delaware corporation | "Company" |
| Paddington Merger Subsidiary I Inc., a Delaware corporation | "Merger Sub I" |
| Paddington Merger Subsidiary II LLC, a New York limited liability company | "Merger Sub II" |
| Shareholder Representative Services LLC | "Stockholder Representative" |
| WeWork Companies Inc., a Delaware corporation | "Parent" |

Capitalized terms not defined have the meanings ascribed in the Agreement and Plan of Merger and Reorganization, among Parent, Merger Sub I, Merger Sub II, Company and Stockholder Representative, dated March 5, 2018, as amended (the "Merger Agreement").

# PROJECT PADDINGTON

# SIGNING AND CLOSING DOCUMENTS

## MERGER AGREEMENT AND RELATED DOCUMENTS

Agreement and Plan of Merger and Reorganization, among Parent, Merger Sub I, Merger Sub II, Company and Stockholder Representative, dated March 5, 2018.................................................................. 1.

Exhibit A – Form of Proxy and Joinder Agreement...................................................................... A

Exhibit B-1 – Form of First Step Surviving Entity Charter .......................................................... B

Exhibit B-2 – Form of Surviving Entity Certificate of Formation ................................................

Exhibit B-3 – Form of Surviving Entity Operating Agreement ....................................................

Exhibit C – Form of Merger Agreement Joinder ......................................................................... C

Exhibit D – Form of Stockholder Letter of Transmittal................................................................ D

Exhibit E – Form of Investor Questionnaire ................................................................................ E

Exhibit F-1 – Form of Change in Control Waiver – Good Reason ................................................ F

Exhibit F-2 – Form of Change in Control Waiver – Parent Equity Awards .................................

Exhibit G – Form of Optionholder Letter of Transmittal .............................................................. G

Exhibit H – Form of Company Written Consent............................................................................ H

Exhibit I – Form of FIRPTA Certificate ...................................................................................... I

Exhibit J – Illustrative Calculation of Company Net Cash ........................................................... J

Exhibit K – Form of Amended and Restated Parent Charter ........................................................ K

Schedule 1 to the Merger Agreement – Disclosure Schedule ....................................................... 2.

Schedule 2 to the Merger Agreement – Accredited Investors at Signing....................................... 3.

Schedule 3 to the Merger Agreement – Legends ......................................................................... 4.

Amendment to Merger Agreement, dated March 16, 2018 ........................................................... 5.

Stockholder Representative Consent to Proposed Changes to Registration Rights Agreement, dated March 20, 2018..................................................................................................................................... 6.

**CORPORATE PROCEEDINGS**

Merger Sub I Organizational Documents and Corporate Proceedings.................................................. 7.

    Certificate of Incorporation of Merger Sub I, as filed on March 1, 2018........................... .......... A

    Bylaws of Merger Sub I......................................................................................................... B

    Action by Written Consent of Sole Incorporator of Merger Sub I, dated March 5, 2018............ C

    Action by Written Consent of Sole Stockholder of Merger Sub I, dated March 5, 2018.............. D

Merger Sub II Organizational Documents and Corporate Proceedings................................................ 8.

    Certificate of Formation of Merger Sub II, as filed on March 2, 2018 ......................................... A

    Operating Agreement of Merger Sub II, dated February 28, 2018 ................................................ B

    Action by Written Consent of Sole Member of Merger Sub II, dated March 5, 2018 ................. C

    Amendment to Operating Agreement of Merger Sub II, dated March 16, 2018.......................... D

Company Corporate Proceedings .................................................................................................. 9.

    Written Consent of Company Board of Directors, dated March 5, 2018 ..................................... A

    Written Consent of Company Stockholders, dated March 5, 2018 ................................................ B

Parent Corporate Proceedings ...................................................................................................... 10.

    Written Consent of Parent Board of Directors, dated February 28, 2018 ..................................... A

    Approval of Special Committee of Parent Board of Directors, dated March 13, 2018................. B

    Written Consent of Parent Stockholders, dated March 20, 2018 ................................................. C

    Restated Certificate of Incorporation of Parent, as filed on March 22, 2018.............................. D

    Certificate of Designations of AP-1 Preferred Stock, as filed on March 22, 2018 ...................... E

    Seventh Amended and Restated Stockholders' Agreement, dated March 22, 2018 .................... F

    Seventh Amended and Restated Registration Rights Agreement, dated March 22, 2018............ G

Merger Certificates...................................................................................................................... 11.

    Certificate of First Step Merger as filed with the Secretary of State of Delaware on March 22, 2018 ........................................................................................................................................ A

Certificate of Second Step Merger as filed with the Department of State of New York on March 22, 2018................................................................................................................ B

Certificate of Second Step Merger as filed with the Secretary of State of Delaware on March 22, 2018 ................................................................................................................ C

## **COMPANY CLOSING DOCUMENTS**

Warrant Cancellation Agreements ................................................................................... 12.

Eastward Fund Management, LLC, dated March 14, 2018................................ A

SVB Financial Group, dated March 13, 2018 ................................................. B

Debt Payoff................................................................................................................... 13.

City National Bank Loan Payoff Letter, dated March 13, 2018........................ A

UCC-3 for City National Bank Loan, as filed on March 23, 2018................... B

Certificates of Good Standing ...................................................................................... 14.

Certificate of Good Standing of Conductor, Inc., dated March 15, 2018....................... A

Certificate of Good Standing of ZMB, LLC, dated March 15, 2018 ........................... B

Certificate of Good Standing of Conductor Europe Limited, dated March 16, 2018.................. C

Merger Agreement Joinder, as executed by Company Stockholders ................................. 15.

Proxy and Joinder Agreement, as executed by Company Stockholders.............................. 16.

Company Closing Certificates........................................................................................ 17.

Certificate of Final Allocation Schedule, dated March 22, 2018 ................................. A

Certificate of Estimated Closing Adjustment, dated March 22, 2018........................... B

Company Closing Officer's Certificate, dated March 22, 2018................................. C

Company Closing Secretary's Certificate, dated March 22, 2018 ............................. D

Confidential Information Statement, as distributed to Company Stockholders .......................... 18.

Change in Control Waiver................................................................................................ 19.

Change in Control Waiver – Good Reason, as executed by A. Ginsberg ...................... A

Change in Control Waiver – Parent Equity Awards, as executed by individuals ........................ B

280G Stockholder Vote, as executed by Company Stockholders ............................................. 20.

Approval of Payments to S. Besmertnik ......................................................... A

Approval of Payments to Key Employees ...................................................... B

Board Written Consent of Termination of Company 401(k) Plan, dated March 14, 2018 ........................ 21.

FIRPTA Certificate, dated March 22, 2018 ................................................................... 22.

Employment Package of S. Besmertnik ................................................................... 23.

Offer Letter, dated March 5, 2018........................................................... A

Employee Dispute Resolution Program, dated March 21, 2018 .................................................. B

Invention, Non-Disclosure, Non-Competition, and Non-Solicitation Agreement, dated March   C
21, 2018...........................................................................................................

Secured Promissory Note, dated March 22, 2018 ......................................................... D

**PARENT CLOSING DOCUMENTS**

Parent Closing Officer's Certificate, dated March 22, 2018 ...................................................... 24.

Payments Administration Agreement with Exchange Agent, dated March 22, 2018 ............................... 25.

Information Rights Agreements ................................................................................... 26.

FirstMark Capital I, L.P., dated March 22, 2018.............................................................. A

Matrix Partners VIII, L.P. and Weston & Co. VIII LLC, dated March 22, 2018........................... B

Catalyst Investors QP III, L.P. and Catalyst Investors III, L.P., dated March 22, 2018................ C

IGC Fund VI, L.P., dated March 22, 2018 ..................................................................... D

Blue Cloud Ventures II LP, dated March 22, 2018 .......................................................... E

Stockholder Letter of Transmittal, as provided to Company Stockholders................................ 27.

**CERTAIN THIRD PARTY CONSENTS**

Customertimes Development CORP Consent, dated March 8, 2018........................................ 28.

Direct Energy Services, LLC Consent, dated March 8, 2018 ............................................ 29.

American Eagle Outfitters, Inc. Consent, dated March 12, 2018........................................ 30.

Amazon Web Services, Inc. Consent, dated March 23, 2018 ............................................ 31.

\*        \*        \*

EXECUTION VERSION

**AGREEMENT AND PLAN OF MERGER AND REORGANIZATION**

**by and among**

**WEWORK COMPANIES INC.,**

**PADDINGTON MERGER SUBSIDIARY I INC.,**

**PADDINGTON MERGER SUBSIDIARY II LLC,**

**CONDUCTOR, INC.**

**and**

**SHAREHOLDER REPRESENTATIVE SERVICES LLC**

**Dated as of March 5, 2018**

# **TABLE OF CONTENTS**

Page

## ARTICLE I

## THE MERGER

Section 1.1    The Merger .......................................................................................................... 2
Section 1.2    Closing; Effective Time ...................................................................................... 2
Section 1.3    Organizational Documents; Directors and Officers of the Surviving Entity ..................... 2
Section 1.4    Additional Action ................................................................................................ 3

## ARTICLE II

## CONVERSION OF CAPITAL STOCK; OTHER CLOSING TRANSACTIONS

Section 2.1    Conversion of Capital Stock ................................................................................ 3
Section 2.2    Treatment of Options .......................................................................................... 4
Section 2.3    Treatment of Company Warrants .......................................................................... 5
Section 2.4    Future Payments ................................................................................................. 5
Section 2.5    Certain Closing Deliveries ................................................................................... 5
Section 2.6    Closing Payments; Certified Allocation Schedule; Closing Date Payments ..................... 6
Section 2.7    Holdback Amount ............................................................................................... 7
Section 2.8    Exchange Procedures; Other Matters .................................................................... 7
Section 2.9    Investor Questionnaire and Accredited Investor Determination .................................. 10
Section 2.10   Fractional Shares; Certificates; Value of Parent Stock ............................................ 10
Section 2.11   Reclassification of Parent Securities .................................................................... 11
Section 2.12   Appraisal Rights ................................................................................................ 11
Section 2.13   Withholding ....................................................................................................... 12
Section 2.14   Closing Adjustments .......................................................................................... 12
Section 2.15   Allocation Schedules .......................................................................................... 14

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Section 3.1    Due Organization and Good Standing ................................................................... 15
Section 3.2    Organizational Documents ................................................................................... 15
Section 3.3    Capitalization; Subsidiaries ................................................................................. 15
Section 3.4    Authority; Binding Nature of Agreement ................................................................ 17
Section 3.5    Non-Contravention; Consents .............................................................................. 18
Section 3.6    Company Financial Statements; Undisclosed Liabilities ........................................... 18
Section 3.7    Absence of Certain Changes ................................................................................ 19
Section 3.8    Intellectual Property ........................................................................................... 19
Section 3.9    Privacy and Security .......................................................................................... 21
Section 3.10   Title to Assets; Real Property .............................................................................. 23
Section 3.11   Material Contracts ............................................................................................. 23
Section 3.12   Compliance With Laws; Permits .......................................................................... 26
Section 3.13   Litigation; Claims; Orders .................................................................................. 26

i

Section 3.14    Tax Matters ................................................................................................ 27
Section 3.15    Employee Benefit Plans ............................................................................. 29
Section 3.16    Labor Matters ............................................................................................. 32
Section 3.17    Insurance .................................................................................................... 33
Section 3.18    Takeover Statutes ....................................................................................... 33
Section 3.19    Customers and Key Suppliers .................................................................... 33
Section 3.20    Sufficiency of Assets ................................................................................. 34
Section 3.21    Books and Records .................................................................................... 34
Section 3.22    Brokers ....................................................................................................... 34
Section 3.23    No Other Representations and Warranties ................................................. 34

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PARENT, MERGER SUB I AND MERGER SUB II

Section 4.1    Due Organization and Good Standing ....................................................... 34
Section 4.2    Capitalization ............................................................................................. 34
Section 4.3    Authority; Binding Nature of Agreement .................................................. 35
Section 4.4    Non-Contravention; Consents .................................................................... 36
Section 4.5    Ownership and Operations of Merger Sub I and Merger Sub II ................ 37
Section 4.6    Claims; Orders ........................................................................................... 37
Section 4.7    Brokers ....................................................................................................... 37
Section 4.8    Parent Governance Documents .................................................................. 37
Section 4.9    Parent Financial Statements ....................................................................... 37
Section 4.10    No Other Representations; No Reliance .................................................... 37

## ARTICLE V

## COVENANTS AND AGREEMENTS

Section 5.1    Interim Operations of the Acquired Entities ............................................. 38
Section 5.2    No Solicitation ........................................................................................... 41
Section 5.3    Consents, Approvals and Filings; Other Actions ...................................... 42
Section 5.4    Access ........................................................................................................ 42
Section 5.5    Employee Matters ...................................................................................... 42
Section 5.6    Publicity; Confidentiality .......................................................................... 44
Section 5.7    Termination of Affiliate Contracts ............................................................ 44
Section 5.8    Treatment of Company Equity Awards ..................................................... 44
Section 5.9    Company Stockholder Approval; Information Statement ........................... 45
Section 5.10    Notification of Certain Matters .................................................................. 45
Section 5.11    Financing Cooperation .............................................................................. 45
Section 5.12    Proprietary Information .............................................................................. 46
Section 5.13    No Claims ................................................................................................... 46
Section 5.14    280G Stockholder Vote .............................................................................. 48
Section 5.15    Final Allocation Schedule .......................................................................... 48
Section 5.16    Indemnification Obligations ...................................................................... 48

ARTICLE VI

CONDITIONS TO THE MERGER

Section 6.1    Conditions to Each Party's Obligation to Effect the Merger ............................................. 48
Section 6.2    Conditions to Obligations of Parent, Merger Sub I and Merger Sub II ........................... 49
Section 6.3    Conditions to Obligation of the Company ...................................................................... 50

ARTICLE VII

TERMINATION

Section 7.1    Termination Rights ......................................................................................................... 51
Section 7.2    Effect of Termination; Procedure for Termination ......................................................... 52

ARTICLE VIII

INDEMNIFICATION

Section 8.1     Survival ......................................................................................................................... 52
Section 8.2     Indemnification ............................................................................................................. 53
Section 8.3     Monetary Limitations .................................................................................................... 54
Section 8.4     Indemnification Procedures .......................................................................................... 55
Section 8.5     Losses ............................................................................................................................ 57
Section 8.6     Materiality Scrape ......................................................................................................... 57
Section 8.7     Tax Limitations ............................................................................................................. 57
Section 8.8     Adjustments for Tax Purposes ...................................................................................... 57
Section 8.9     Exclusive Remedy for Damages ................................................................................... 57
Section 8.10    Order of Recourse ......................................................................................................... 58
Section 8.11    Calculation of Number of Parent Shares For Satisfaction of Claims ............................ 58
Section 8.12    Satisfaction of Claims in Cash or Cash Equivalents ..................................................... 58
Section 8.13    Mitigation of Losses ..................................................................................................... 58

ARTICLE IX

TAX MATTERS

Section 9.1     Responsibility for Filing Tax Returns ........................................................................... 58
Section 9.2     Straddle Periods ............................................................................................................ 59
Section 9.3     Tax Refunds ................................................................................................................... 59
Section 9.4     Contests Related to Taxes ............................................................................................. 59
Section 9.5     Cooperation Related to Taxes ....................................................................................... 60
Section 9.6     Transfer Taxes ............................................................................................................... 60
Section 9.7     Tax Sharing Agreements ............................................................................................... 60
Section 9.8     Reorganization .............................................................................................................. 60

ARTICLE X

STOCKHOLDER REPRESENTATIVE

Section 10.1    Appointment .................................................................................................................. 61

Section 10.2    Exculpation; Indemnification..................................................................62
Section 10.3    Reliance ..............................................................................................63
Section 10.4    Access to Information ...........................................................................63
Section 10.5    Advisory Group ...................................................................................63
Section 10.6    Interest .................................................................................................63
Section 10.7    Expense Fund.......................................................................................63

ARTICLE XI

MISCELLANEOUS PROVISIONS

Section 11.1    Amendment...........................................................................................64
Section 11.2    Waiver...................................................................................................64
Section 11.3    Entire Agreement; Counterparts ...........................................................64
Section 11.4    Applicable Law; Jurisdiction; WAIVER OF JURY TRIAL ...............64
Section 11.5    Remedies; Specific Performance ..........................................................65
Section 11.6    Payment of Expenses ...........................................................................65
Section 11.7    Assignability; Third Party Rights .........................................................65
Section 11.8    Notices .................................................................................................65
Section 11.9    Severability ..........................................................................................67
Section 11.10   Construction..........................................................................................67
Section 11.11   Plan of Merger .....................................................................................68
Section 11.12   Consent to Representation; Conflict of Interest.....................................68
Section 11.13   Definitions ...........................................................................................69

**Exhibits**

Exhibit A        Form of Proxy and Joinder Agreement
Exhibit B-1      Form of First Step Surviving Entity Charter
Exhibit B-2      Form of Surviving Entity Certificate of Formation
Exhibit B-3      Form of Surviving Entity Operating Agreement
Exhibit C        Form of Merger Agreement Joinder
Exhibit D        Form of Stockholder Letter of Transmittal
Exhibit E        Form of Investor Questionnaire
Exhibit F-1      Form of Change in Control Waiver – Good Reason
Exhibit F-2      Form of Change in Control Waiver – Parent Equity Awards
Exhibit G        Form of Optionholder Letter of Transmittal
Exhibit H        Form of Company Written Consent
Exhibit I        Form of FIRPTA Certificate
Exhibit J        Illustrative Calculation of Company Net Cash
Exhibit K        Form of Amended and Restated Parent Charter

**Schedules**

Schedule 1       Disclosure Schedule
Schedule 2       Accredited Investors at Signing
Schedule 3       Legends

## AGREEMENT AND PLAN OF MERGER AND REORGANIZATION

This AGREEMENT AND PLAN OF MERGER (as may be amended from time to time, this "Agreement") is made and entered into as of March 5, 2018, by and among WeWork Companies Inc., a Delaware corporation ("Parent"), Paddington Merger Subsidiary I Inc., a Delaware corporation and a direct wholly owned Subsidiary of Parent ("Merger Sub I"), Paddington Merger Subsidiary II LLC, a New York limited liability company and a direct wholly owned Subsidiary of Parent ("Merger Sub II"), Conductor, Inc., a Delaware corporation (the "Company"), and Shareholder Representative Services LLC, a Colorado limited liability company, solely in its capacity as representative, agent and attorney in fact for the Company Stockholders (in such capacity, the "Stockholder Representative" and, together with Parent, Merger Sub I, Merger Sub II, the Company and each Company Stockholder who executes this Agreement pursuant to a Merger Joinder, the "Parties").

## RECITALS

WHEREAS, the acquisition of the Company by Parent shall be effected through (i) first, the merger of Merger Sub I with and into the Company in accordance with the terms of this Agreement and the DGCL, upon consummation of which Merger Sub I will cease to exist and the Company shall become a wholly owned subsidiary of Parent (the "First Merger"), and, (ii) second, as part of the same overall transaction, the merger of the Company, as the surviving entity of the First Merger, with and into Merger Sub II, upon consummation of which the Company will cease to exist (the "Second Merger" and, collectively or in seriatim with the First Merger, as appropriate, the "Merger"), in each case and in all respects in accordance with this Agreement and the DGCL;

WHEREAS, for U.S. federal income Tax purposes, it is intended that the First Merger and the Second Merger contemplated herein, taken together, shall qualify as a reorganization within the meaning of Section 368(a) of the Code;

WHEREAS, the board of directors of the Company has unanimously, upon the terms and subject to the conditions set forth herein, (a) declared that this Agreement and the transactions contemplated hereby, including the Merger, are advisable, fair to and in the best interests of the Company and the Company Stockholders, (b) approved the execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the Merger and the other transactions contemplated by this Agreement, (c) directed that the adoption of this Agreement and the approval of the transactions contemplated hereby, including the Merger, be submitted to the Company Stockholders for their adoption and approval and (d) recommended that the Company Stockholders adopt this Agreement and approve the transactions contemplated hereby, including the Merger; and

WHEREAS, in connection with the execution of this Agreement, and as a condition of the willingness of Parent to enter into this Agreement, each Company Stockholder listed on Schedule 2 has, on the date hereof, executed and delivered to Parent, to take effect at and contingent upon the Closing, a Proxy and Joinder Agreement, in the form attached as Exhibit A (each, a "Proxy and Joinder").

NOW, THEREFORE, in consideration of the foregoing Recitals and the representations, warranties, covenants and agreements set forth in this Agreement, and intending to be legally bound by this Agreement, the Parties agree as follows:

# ARTICLE I

# THE MERGER

Section 1.1    The Merger. At the Effective Time, and subject to and upon the terms and conditions of this Agreement and the applicable provisions of the DGCL, Merger Sub I shall merge with and into the Company, the separate existence of Merger Sub I shall cease, and the Company shall continue as the surviving entity in the First Merger (sometimes referred to herein as the "First Step Surviving Entity") and as a wholly owned subsidiary of Parent until the Second Effective Time. Upon the terms and subject to the conditions set forth herein, at the Second Effective Time, the First Step Surviving Entity shall merge with and into Merger Sub II, the separate corporate existence of the First Step Surviving Entity shall cease, and Merger Sub II shall continue as the surviving entity (sometimes referred to herein as the "Surviving Entity").

Section 1.2    Closing; Effective Time.

(a)    Parent, Merger Sub I, Merger Sub II and the Company shall consummate the Merger (the "Closing") at the offices of Parent at 115 West 18th Street, New York, New York 10011, at 10:00 a.m., New York City time, as soon as reasonably possible (but in no event later than two (2) Business Days) after the satisfaction or waiver of the last of the conditions set forth in ARTICLE VI to be satisfied or waived (other than any such condition that by its nature is to be satisfied at the Closing, but subject to the satisfaction or waiver of such condition at the Closing), unless the Parties otherwise agree in writing to another place, time and date. For purposes of this Agreement, the "Closing Date" means the date on which the Closing actually occurs. All transactions at the Closing shall be deemed to have taken place simultaneously, and each of the closing deliveries is deemed to occur concurrently with each other.

(b)    Subject to the provisions of this Agreement, prior to the Closing, Parent shall prepare or cause to be prepared a certificate of merger for the First Merger (the "First Certificate of Merger") and a certificate of merger for the Second Merger (the "Second Certificate of Merger"). At the Closing, the Company shall cause the First Certificate of Merger to be filed with the Secretary of State of the State of Delaware and shall make all other filings or recordings required under the DGCL in order to give effect to the First Merger, and the First Merger shall become effective at the time at which the Company files the First Certificate of Merger with the Secretary of State of the State of Delaware or such later time as is established by Parent and the Company and set forth in the First Certificate of Merger (the "Effective Time"). Promptly following the Effective Time, but in no event later than two (2) Business Days thereafter, the First Step Surviving Entity shall cause the Second Certificate of Merger to be filed with the Department of State of the State of New York and with the Secretary of State of the State of Delaware, and shall make all other filings or recordings required under the DGCL and the New York Limited Liability Company Law in order to give effect to the Second Merger, and the Second Merger shall become effective at the time at which the First Step Surviving Entity files the Second Certificate of Merger with the Department of State of the State of New York and with the Secretary of State of the State of Delaware or such later time as is established by Parent and Merger Sub II and set forth in the Second Certificate of Merger (the "Second Effective Time").

Section 1.3    Organizational Documents; Directors and Officers of the Surviving Entity.

(a)    At the Effective Time, the certificate of incorporation of the First Step Surviving Entity shall be amended and restated in the form attached as Exhibit B-1, until thereafter amended as provided therein and in accordance with applicable Law. In addition, the bylaws of the First Step Surviving Entity shall be amended and restated to be the same as the bylaws of Merger Sub I, as in

2

effect immediately prior to the Effective Time, until thereafter amended as provided therein and in accordance with applicable Law. At the Second Effective Time, the certificate of formation of the Surviving Entity shall be amended and restated in the form attached as <u>Exhibit B-2</u>, until thereafter amended as provided therein and in accordance with applicable Law. In addition, the limited liability company agreement of the Surviving Entity shall be amended and restated in the form attached as <u>Exhibit B-3</u>, until thereafter amended as provided therein and in accordance with applicable Law.

(b)     As of the Effective Time, (i) the directors of Merger Sub I as of immediately prior to the Effective Time shall be the directors of the First Step Surviving Entity, and (ii) the officers of Merger Sub I as of immediately prior to the Effective Time shall be the officers of the First Step Surviving Entity, in each case until their successors have been duly elected or appointed or until their earlier death, resignation or removal. As of the Second Effective Time, (x) the sole member of Merger Sub II as of immediately prior to the Effective Time shall be the sole member of the Surviving Entity, and (y) the officers of Merger Sub II as of immediately prior to the Effective Time shall be the officers of the Surviving Entity, in each case until their successors have been duly elected or appointed or until their earlier death, resignation or removal.

Section 1.4     <u>Additional Action</u>. The First Step Surviving Entity may, at any time from and after the Effective Time, take any action, including executing and delivering any document, in the name and on behalf of either the Company or Merger Sub I in order to consummate and give effect to the transactions contemplated by this Agreement. The Surviving Entity may, at any time from and after the Second Effective Time, take any action, including executing and delivering any document, in the name and on behalf of either the First Step Surviving Entity or Merger Sub II in order to consummate and give effect to the transactions contemplated by this Agreement.

## ARTICLE II

## CONVERSION OF CAPITAL STOCK; OTHER CLOSING TRANSACTIONS

Section 2.1     <u>Conversion of Capital Stock</u>. At the Effective Time, by virtue of the First Merger and without any further action on the part of Parent, Merger Sub I, the Company, any Company Stockholder or any other Person:

(a)     any shares of Company Stock (i) in the Company's treasury or held by the Company or (ii) owned by Parent, Merger Sub I, Merger Sub II or any other wholly owned Subsidiary of Parent immediately prior to the Effective Time shall be cancelled and retired and shall cease to exist, and no consideration shall be delivered in exchange therefor (the "<u>Cancelled Shares</u>");

(b)     except for any Cancelled Shares, and subject in all respects to <u>Section 2.8(a)</u>, <u>Section 2.10</u> and <u>Section 2.12</u>, each share of Company Stock that is issued and outstanding immediately prior to the Effective Time shall be converted into and shall thereafter represent only the right to receive the following:

(i)     for each share of Company Stock owned by an Accredited Investor: (x) a number of shares of Parent Stock equal to the quotient of (A) the Company Closing Per Share Value, <u>divided by</u> (B) the Parent Stock Per Share Value (the aggregate number of such shares of Parent Stock, the "<u>Parent Shares</u>") and (y) the right to receive shares of Parent Stock, if any, that may be distributed as a Future Payment; and

(ii)     for each share of Company Stock owned by a Person that is not an Accredited Investor: (x) an amount in cash, without interest, equal to the Company Closing Per Share Value and (y) the right to receive cash, if any, that may be distributed as a Future Payment; and

(c)     each share of common stock, par value $0.0001 per share, of Merger Sub I outstanding immediately prior to the Effective Time shall be converted into one (1) share of common stock, $0.0001 par value, of the First Step Surviving Entity and shall constitute the only outstanding share of capital stock of the First Step Surviving Entity as of immediately after the Effective Time.

Notwithstanding anything to the contrary in this Agreement, the aggregate amount of consideration (including any amounts withheld pursuant to Section 2.7) to be paid or reserved for issuance by Parent in connection with the Merger shall not exceed $124,000,000 (based on the Parent Stock Per Share Value), subject to the Estimated Closing Adjustment and Final Closing Adjustment pursuant to this Agreement and *de minimis* amounts as a result of payment calculations requiring the rounding of fractional cents; provided, for the avoidance of doubt, that options of Parent to be granted and payments made by or agreed to be made by Parent or the Surviving Entity upon or following the Closing pursuant to separate agreements or arrangements between Parent or the Surviving Entity and current or former employees of the Company or other independent contractors or consultants of the Company and any indemnification payments that may become payable by Parent pursuant to ARTICLE VIII are not included in this calculation, provided further that no change in the value or deemed value of the Parent Stock shall be taken into account for purposes of this limitation.

Section 2.2     Treatment of Options.

(a)     Each In The Money Option that is outstanding as of immediately prior to the Effective Time shall, without any further action on the part of any holder thereof, be terminated and cancelled at the Effective Time and shall not be assumed by Parent, and shall be converted into the right of the holder thereof to receive an amount in cash, without interest, with respect to each share of Company Common Stock issuable upon exercise of such In The Money Option, equal to the positive difference (if any) of (i) the Company Total Per Share Value minus (ii) the applicable exercise price per Company Option (the aggregate amount payable under this Section 2.2, the "Option Exercise Amount"), rounded down to the nearest cent and computed after aggregating cash amounts for all In The Money Options held by such Person, subject to any applicable payroll, income tax or other withholding taxes.

(b)     Each Company Option that is not an In The Money Option as of immediately prior to the Effective Time shall, without any further action on the part of any holder thereof, be terminated and cancelled at the Effective Time and shall not be assumed by Parent, and no payment or consideration shall be delivered in exchange therefor.

(c)     No Company Option shall be substituted with any equivalent option or right to purchase Parent Stock or any other security of Parent or otherwise. Prior to the anticipated Closing Date, the Company shall notify all Company Optionholders that Company Options shall be subject to the treatment described in this Section 2.2.

(d)     At the Closing and immediately following the Effective Time, Parent shall pay or cause to be paid to the Surviving Entity an amount equal to the Option Exercise Amount by wire transfer of immediately available funds to the account of the Surviving Entity identified in the Final Allocation Schedule. Subject to Section 5.8, all payments of the applicable portion of the Option Exercise Amount to each Company Optionholder shall be made (without interest) by the Surviving Entity to such Company Optionholder no later than the Surviving Entity's next regularly scheduled payroll date

4

following the date on which such Company Optionholder becomes entitled to such portion pursuant to this Agreement.

Section 2.3    Treatment of Company Warrants.

(a)    Each Company Warrant that is outstanding as of immediately prior to the Effective Time and is owned by a Person that is an Accredited Investor shall be converted into the right of the holder thereof to receive with respect to each share of Company Stock issuable upon exercise of such Company Warrant a number of shares of Parent Stock equal to the quotient of (i) the Company Total Per Share Value minus the applicable exercise price per Company Warrant, divided by (ii) the Parent Stock Per Share Value.

(b)    Each Company Warrant that is outstanding as of immediately prior to the Effective Time and is owned by a Person that is not an Accredited Investor shall be converted into the right of the holder thereof to receive an amount in cash, without interest, with respect to each share of Company Stock issuable upon exercise of such Company Warrant, equal to the positive difference (if any) of (i) the Company Total Per Share Value minus (ii) the applicable exercise price per Company Warrant.

Section 2.4    Future Payments. In the event that any Future Payment becomes payable to the Company Stockholders pursuant to Section 2.7(a), Section 2.7(b), Section 2.14(f) or Section 10.7, Parent shall promptly, and in any event within five (5) Business Days after a Future Payment becomes due and payable, shall, or instruct the Exchange Agent to, as applicable, provide the applicable consideration, without duplication, as follows:

(a)    if such Company Stockholder is an Accredited Investor, then such Company Stockholder shall receive in such distribution a number of shares of Parent Stock equal to the quotient of (x) the value to which such Company Stockholder is entitled to receive in such distribution pursuant to such Future Payment, divided by (y) the Parent Stock Per Share Value; and

(b)    if such Company Stockholder is not an Accredited Investor, then such Company Stockholder shall receive a cash payment equal to the value to which such Company Stockholder is entitled to receive in such distribution pursuant to such Future Payment.

For the avoidance of doubt, Company Options and Company Warrants will not be subject to the Holdback Amount, the Final Closing Adjustment or the Expense Fund Amount and will not be entitled to any Future Payment pursuant to this Agreement.

Section 2.5    Certain Closing Deliveries.

(a)    At the Closing, the Company shall deliver to Parent the following:

(i)    the Company Board Resolutions, duly certified by the secretary or assistant secretary of the Company;

(ii)    a validly issued certificate (dated not more than two (2) Business Days prior to the Closing Date) as to the good standing of each Acquired Entity in its respective jurisdiction of incorporation, formation or organization;

(iii)    joinder agreements in the form attached as Exhibit C (each, a "Merger Joinder"), duly executed by Company Stockholders holding at least ninety percent (90%) of the

5

Company Stock in the aggregate (determined on an as-converted Company Common Stock-equivalent basis);

(iv)    a CIC Waiver – Good Reason duly executed by the individuals set forth on <u>Section 5.5(d)(i)</u> of the Disclosure Schedule and a CIC Waiver – Parent Equity Awards duly executed by the individuals set forth on <u>Section 5.5(d)(ii)</u> of the Disclosure Schedule; and

(v)    a duly executed form of Parent's (i) invention, non-disclosure, non-competition and non-solicitation agreement, (ii) employee dispute resolution program agreement and (iii) equity award agreement by at least eighty five percent (85%) of the employees of the Company, the effectiveness of which is contingent upon the consummation of the Merger.

(b)    At the Closing, Parent shall deliver to the Company the following:

(i)    a duly executed agreement with the Exchange Agent providing for the Exchange Agent's services in connection with the transactions contemplated by this Agreement;

(ii)    each of the agreements set forth on <u>Section 2.5(b)</u> of the Disclosure Schedule, duly executed by Parent and to be entered into with the Persons named therein;

(iii)    a certified certificate of incorporation of Parent evidencing the filing of the Restated Charter with the Secretary of State of the State of Delaware, including the certificate of designations, rights and preferences evidencing the adoption of the requisite approvals to authorize the creation and issuance of the Parent Stock; and

(iv)    duly executed amended and restated Investor Agreements in the forms attached as exhibits to the Proxy and Joinder.

Section 2.6    <u>Closing Payments; Certified Allocation Schedule; Closing Date Payments</u>.

(a)    Within two (2) Business Days prior to the Closing Date, the Company shall prepare and deliver to Parent a certificate setting forth the Final Allocation Schedule executed by the Company's chief executive officer or its chief financial officer certifying the calculations therein. With respect to the calculation of the Company Transaction Expenses, the Company shall also deliver to Parent copies of the invoices and other accounting of such expenses, in each case in form and substance reasonably satisfactory to Parent. Parent, the Exchange Agent and their respective Affiliates shall be entitled to rely entirely upon the Final Allocation Schedule in connection with making payments and providing consideration hereunder.

(b)    On the Closing Date and in connection with the Closing, Parent shall make the following payments:

(i)    to each Person specified in the payoff letters delivered pursuant to <u>Section 5.11</u> as a recipient of payments in respect of the Closing Indebtedness, by wire transfer of immediately available funds, the applicable amount payable to such Person as specified in such payoff letters;

(ii)    to each Person specified in the Final Allocation Schedule as a recipient of payments in respect of Company Transaction Expenses that remain unpaid as of immediately

prior to the Effective Time, by wire transfer of immediately available funds, the amount payable to such Person as specified in the Final Allocation Schedule;

(iii)    to the Stockholder Representative, by wire transfer of immediately available funds, the Expense Fund Amount;

(iv)    to the Exchange Agent, by wire transfer of immediately available funds, the cash portion of the Closing Consideration, including the cash payable to Company Stockholders in lieu of any fractional share interests in Parent Stock; and

(v)    to each Company Warrantholder, by wire transfer of immediately available funds, the cash amount payable to such Person as specified in the Final Allocation Schedule (if any) or the issuance of shares of Parent Stock pursuant to Section 2.3(a) in accordance with any Consent delivered by such Warrantholder or otherwise agreed upon between Parent, the Company and such Company Warrantholder.

Section 2.7    Holdback Amount.

(a)    Parent shall hold the Holdback Amount (i) in a segregated account (with respect to the cash portion thereof) and (ii) as treasury shares held in a fiduciary capacity (with respect to the Parent Stock portion thereof). On the first Business Day following the date that is twelve (12) months following the Closing Date (such date is referred to herein as the "Release Date"), Parent shall distribute to the Company Stockholders, in accordance with Section 2.4, any remaining portion of the Holdback Amount, as additional consideration. Each Company Stockholder shall receive in such distribution either cash or shares of Parent Stock equal in value to the product of such Company Stockholder's Holdback Ownership Percentage as set forth on the Final Allocation Schedule multiplied by the difference between (x) the Holdback Amount less (y) the aggregate Claimed Amounts.

(b)    If, following the Release Date, any portion of any Claimed Amount exceeds the amount of the indemnifiable Losses to which Parent was determined to be entitled, either as agreed to by the Parties or as finally resolved by a court of competent jurisdiction (the "Excess Claimed Amount"), then, within five (5) Business Days following each such determination, Parent shall distribute to the Company Stockholders, in accordance with Section 2.4, as additional consideration, such Excess Claimed Amount. Each Company Stockholder shall receive in such distribution either cash or shares of Parent Stock equal in value to such Company Stockholder's Holdback Ownership Percentage as set forth on the Final Allocation Schedule multiplied by the Excess Claimed Amount.

(c)    As of the Effective Time, the Company Stockholders shall be treated as the owners of the Holdback Amount (and any income in respect thereof) for Tax purposes to the extent permitted by applicable Law and, with respect to Parent Shares included in the Holdback Amount, shall hold voting rights and the right to any distributions associated therewith.

Section 2.8    Exchange Procedures; Other Matters.

(a)    Exchange.

(i)    Prior to the Effective Time, Parent shall enter into a customary agreement with Wilmington Trust, N.A. or another paying, exchange or transfer agent or similar financial institution or trust company designated by Parent and reasonably acceptable to the Company (the "Exchange Agent") for the collection and review of any Stockholder Letters of Transmittal and Optionholder Letters of Transmittal and the payment of the cash portion of any Total Consideration that

becomes payable to Company Stockholders pursuant to this Agreement. From time to time prior to or following the Effective Time, Parent shall (1) deposit or cause to be deposited with the Exchange Agent, for exchange in accordance with this Section 2.8(a) through the Exchange Agent, cash sufficient to allow the Exchange Agent to make the cash payments that it is required to make pursuant to this Agreement and (2) for exchange in accordance with this Section 2.8(a) through the Exchange Agent, register a number of whole shares of Parent Stock in the name of the Company (to be held as treasury shares in a fiduciary capacity) sufficient to allow Parent to make the Parent Stock payments that it is required to make pursuant to this Agreement (any such cash amounts provided to the Exchange Agent or shares of Parent Stock, as applicable, the "Exchange Fund"). The Exchange Fund shall not be used for any purpose other than to fund payments pursuant to Section 2.1(b), except as expressly provided for in this Agreement. All fees and expenses of the Exchange Agent shall be borne equally by Parent and the Company and any such portion of the Company's fees and expenses shall be deemed a Company Transaction Expense, provided that such Company portion shall not exceed $15,000.

(ii)     Unless earlier mailed or delivered by the Company, Parent shall cause the Exchange Agent, as soon as reasonably practicable after the Effective Time, and in any event no later than three (3) Business Days after the Closing Date, to mail or deliver, or cause to be mailed or delivered, to each Company Stockholder in respect of the certificates of shares of Company Stock (the "Company Stock Certificates") held by such Company Stockholder or the book-entry shares representing shares of Company Stock ("Book-Entry Shares") held by such Company Stockholder, in each case, that were converted into the right to receive the applicable portion of the Total Consideration pursuant to Section 2.1(b), (1) a letter of transmittal in the form attached as Exhibit D with such changes as reasonably requested by the Exchange Agent (together with any required Form W-9 or Form W-8, duly completed and validly executed, a "Stockholder Letter of Transmittal") and (2) instructions for use in delivering a duly executed and fully completed Stockholder Letter of Transmittal to Parent or the Exchange Agent and effecting the surrender of the Company Stock Certificates and Book-Entry Shares, as applicable, in exchange for the applicable portion of the Total Consideration pursuant to Section 2.1(b) (such instructions, the "Surrender Instructions"). Until surrendered as contemplated by this Section 2.8(a), each Company Stock Certificate and each Book-Entry Share shall be deemed at all times after the Effective Time to represent only the right to receive upon such surrender the applicable portion of the Total Consideration payable to such Company Stockholder. Holders of Company Stock Certificates and Book-Entry Shares shall not be entitled to receive any applicable portion of the Total Consideration to which they would otherwise be entitled until such Company Stock Certificates and Book-Entry Shares are properly surrendered or an affidavit is delivered in accordance with Section 2.8(g). Notwithstanding anything to the contrary contained herein, as a condition to the payment of any portion of the Total Consideration (including any portion of the Holdback Amount or other Future Payment that may become payable) to Company Stockholders (whether in cash or Parent Stock pursuant to Section 2.1(b)), such Company Stockholder must execute and deliver the Merger Joinder and the Proxy and Joinder (if receiving shares of Parent Stock as consideration), agreeing to be bound by and subject to the terms thereof, and each such Person shall thereafter be deemed a party to the agreements referenced therein for all purposes thereunder.

(iii)     Upon delivery to the Exchange Agent by a Company Stockholder of a duly executed and fully completed Stockholder Letter of Transmittal and the surrender to the Exchange Agent of such Company Stockholder's Company Stock Certificates and Book-Entry Shares, as applicable, in accordance with the Surrender Instructions, subject to Section 2.8(g), (1) Parent shall use its commercially reasonable efforts to cause the Exchange Agent to pay the applicable cash portion of the Closing Consideration owed to such Company Stockholder and (2) Parent shall promptly, and in any event within five (5) Business Days, change the holder of record of each of the book-entry shares representing the applicable full number of whole shares of Parent Stock issuable as part of the Closing Consideration owed to such Company Stockholder in the name of such Company Stockholder as

set forth on the Final Allocation Schedule and/or the Stockholder Letters of Transmittal and issue such shares in certificated form, to be held by Parent in its vault.

(b)     Distributions with Respect to Unexchanged Shares. Subject to applicable Law, there shall be paid to the holder of shares of Parent Stock issued in exchange for Company Stock Certificates or Book-Entry Shares pursuant to Section 2.8(a)(iii), without interest, (i) at the time of delivery of such Parent Stock pursuant to Section 2.8(a)(iii), the amount of dividends or other distributions, if any, with a record date after the Effective Time theretofore paid with respect to such shares of Parent Stock, and (ii) at the appropriate payment date, the amount of dividends or other distributions, if any, with a record date after the Effective Time but prior to such delivery of such Parent Stock pursuant to Section 2.8(a)(iii), and a payment date subsequent to such delivery of such Parent Stock pursuant to Section 2.8(a)(iii), payable with respect to such shares of Parent Stock.

(c)     Transfers of Ownership. In the event of a transfer of ownership of Company Stock that is not registered in the transfer records of the Company, payment of the applicable portion of the Total Consideration (and any dividends or other distributions with respect to Parent Stock as contemplated by Section 2.8(b)) may be made to a Person other than the Person in whose name the Company Stock Certificate or Book-Entry Share so surrendered is registered, if such Company Stock Certificate shall be properly endorsed or otherwise be in proper form for transfer (and accompanied by all documents reasonably required by the Exchange Agent) or such Book-Entry Share shall be properly transferred and the Person requesting such payment shall pay any transfer or other Taxes required by reason of the payment to a Person other than the registered holder of such Company Stock Certificate or Book-Entry Share or establish to the satisfaction of Parent that such Tax has been paid or is not applicable.

(d)     No Interest. No interest will be paid or accrue for the benefit of any holder of Company Stock or otherwise with respect to any amount payable under this Agreement.

(e)     No Liability or Obligation. To the extent permitted by applicable Law, none of Parent, the Company, the Surviving Entity, the Exchange Agent or any of their respective Affiliates shall be liable to any Company Stockholder for any amount delivered to a public official pursuant to any applicable abandoned property, escheat or similar Law.

(f)     No Further Ownership Rights in Company Capital Stock. (i) All holders of Company Stock shall cease to have any rights as Company Stockholders from and after the Effective Time, except the specific rights set forth in Section 2.1(b), as applicable, with respect to each share of Company Stock evidenced thereby, (ii) the Company Stockholders shall have no rights as security holders of the First Step Surviving Entity, the Surviving Entity or Parent as a result of their right to receive any Future Payment except as set forth in Section 2.7(c) and (iii) at the Effective Time, the stock transfer books of the Company shall be closed with respect to all shares of Company Stock outstanding immediately prior to the Effective Time. No further transfer of any such Company Stock Certificates or Book-Entry Shares shall be made on such stock transfer books after the Effective Time.

(g)     Lost, Stolen or Destroyed Certificates. In the event any Company Stock Certificates shall have been lost, stolen or destroyed, Parent shall pay in exchange for such lost, stolen or destroyed Company Stock Certificates, upon the making of an affidavit of that fact by the holder thereof, such amount, if any, as may be required pursuant to Section 2.1(b), as applicable; provided, however, that Parent may, in its sole discretion and as a condition precedent to the issuance thereof, require the holder of such lost, stolen or destroyed Company Stock Certificates to provide an indemnity as security against any Claim that may be made against Parent, the First Step Surviving Entity or the Surviving Entity with

respect to any Claims arising from the Company Stock Certificates alleged to have been lost, stolen or destroyed.

(h)     Legends. Any certificates or book entry entitlements representing the Parent Shares to be issued pursuant to Section 2.8(a) shall bear the legends set forth on Schedule 3 to the extent applicable (along with any other legends that may be required under applicable Law).

(i)     Termination of Exchange Fund. Any portion of the Exchange Fund which remains undistributed to the holders of the Company Stock for fifteen (15) months after the Effective Time shall be delivered to Parent or its designee upon demand, and any Company Stockholders who have not theretofore complied with this ARTICLE II shall thereafter look only to Parent as general creditor thereof for payment of their claims for the applicable Total Consideration.

(j)     Investment of Exchange Fund. The Exchange Agent shall invest the cash included in the Exchange Fund as directed by Parent; provided that no such investment shall relieve Parent or the Exchange Agent from making the payments required by this ARTICLE II, and following any losses Parent shall promptly provide additional funds to the Exchange Agent for the benefit of the holders of Company Stock in the amount of such losses. Any interest or income produced by such investments will be payable to Parent or its designee as directed by Parent.

Section 2.9     Investor Questionnaire and Accredited Investor Determination. As promptly as practicable after the execution and delivery of this Agreement, the Company shall disseminate to all Company Stockholders and Company Warrantholders a questionnaire, in the form attached as Exhibit E (the "Investor Questionnaire"). The Company shall use its commercially reasonable efforts to cause each Company Stockholder and Company Warrantholder to complete and duly execute an Investor Questionnaire promptly, and the Company shall promptly deliver to Parent any completed and duly executed Investor Questionnaires that it receives. Prior to the Closing, the Company shall cooperate in good faith with Parent in determining which Company Stockholders and Company Warrantholders are Accredited Investors, including providing Parent with such additional information as it may reasonably request to confirm that each Investor Questionnaire is accurate and has been validly delivered. Parent shall identify each Company Stockholder and Company Warrantholder that it knows, or has a reasonable basis to believe, is an Accredited Investor. Notwithstanding anything to the contrary in this Agreement, if any Company Stockholder or Company Warrantholder is owed consideration in the form of Parent Stock pursuant to Section 2.1(b), and due receipt thereof by such Company Stockholder or Company Warrantholder would require under applicable Law (x) the registration or qualification of the Parent Shares or of any Person as a broker or dealer or agent with respect to such securities or (y) the provision to any Company Stockholder of any information other than such information as a prudent issuer would generally furnish in an offering made solely to "accredited investors" as defined in Regulation D promulgated under the Securities Act, Parent may cause to be paid to any such Company Stockholder in lieu thereof, against surrender of the shares of Company Stock which would have otherwise been surrendered by such Company Stockholder or Company Warrantholders, an amount in cash equal to the fair value (as determined pursuant to Section 2.1(b)(ii)) of the Parent Stock which such Company Stockholder or Company Warrantholders would have otherwise received in exchange for such Company Stockholder's or Company Warrantholder's shares of Company Stock or Company Warrants.

Section 2.10     Fractional Shares; Certificates; Value of Parent Stock.

(a)     No certificate or scrip representing fractional shares of Parent Stock shall be issued upon the conversion of Company Stock pursuant to Section 2.1(b)(i), and such fractional share interests shall not entitle the owner thereof to any Parent Stock or to vote or to any other rights of a holder of Parent Stock. All such fractional shares that a single record holder of Company Stock would be

10

otherwise entitled to receive shall be aggregated and calculations shall be rounded to three (3) decimal places. If the aggregated amount of such aggregated shares is greater than or equal to one (1), the record holder shall receive such number of whole shares of Parent Stock as necessary for such fractional share amount to be less than one (1). In lieu of any such remaining fractional shares, each record holder of Company Stock who would otherwise be entitled to such fractional shares shall be entitled to an amount in cash, without interest, rounded to the nearest cent with $0.005 rounded up, equal to the product of (a) the amount of the fractional share interest in a share of Parent Stock to which such holder would, but for this Section 2.10, be entitled under Section 2.1(b)(i) and (b) the Parent Stock Per Share Value. Promptly, and in any event within five (5) Business Days, after the determination of the amount of cash, if any, to be paid to such holders of Company Common Stock in lieu of any fractional share interests in Parent Stock, Parent shall provide the Exchange Agent with such cash amount, without interest, to such holders of Company Stock entitled to receive such cash. The payment of cash in lieu of fractional share interests pursuant to this Section 2.10 is not a separately bargained-for consideration.

(b)     All shares of Parent Stock distributed to an Accredited Investor pursuant to this Agreement shall be issued in certificated form and held by Parent in its vault; provided that in the event that Parent holds such certificated shares in its vault, Parent shall agree to acknowledge with auditors to any Accredited Investor that is a professional investment fund the shares held by such fund, including acknowledgment of such shares' exact count and capitalization structure.

(c)     Except for Section 2.2(a), the calculations of all cash payments to be made by Parent to the Company Securityholders pursuant to this Agreement shall be rounded to the nearest cent with $0.005 rounded up.

(d)     For purposes of all calculations in this Agreement that include the value of shares of Parent Stock, such value shall be equal to the Parent Stock Per Share Value.

Section 2.11     Reclassification of Parent Securities. If, at any time during the period between the date hereof and the Effective Time, any change in the outstanding shares of capital stock of Parent shall occur as a result of any reclassification, recapitalization, stock split (including a reverse stock split) or combination, exchange or readjustment of shares, or any stock dividend or stock distribution with a record date during such period, the provisions of this ARTICLE II shall be equitably adjusted.

Section 2.12     Appraisal Rights. Notwithstanding anything to the contrary contained in this Agreement, any share of Company Stock held by a holder who is entitled to demand and has made a valid demand for appraisal of such share in accordance, and complies in all respects, with Section 262 of the DGCL ("Dissenting Shares") shall not be converted into the right to receive the specific rights set forth in Section 2.1(b), as applicable, but instead shall be entitled only to such rights as are granted by the DGCL to a holder of Dissenting Shares. At the Effective Time, all Dissenting Shares shall no longer be outstanding and shall automatically be cancelled and shall cease to exist, and each holder of Dissenting Shares shall cease to have any rights with respect thereto, except the right to receive the "fair value" of such Dissenting Shares in accordance with Section 262 of the DGCL. Notwithstanding the foregoing, if any Dissenting Shares shall lose their status as such (through failure to perfect, waiver, effective withdrawal or otherwise), then, as of the later of the Effective Time or the date of loss of such status, each such Dissenting Share shall automatically be converted into or shall have deemed to have been, at the Effective Time, converted into, as applicable, and shall represent only, the specific rights set forth in Section 2.1(b), as applicable, following the surrender of the Company Stock Certificates representing such former Dissenting Shares. The Company shall give Parent prompt written notice of any written demand for appraisal pursuant to the DGCL received by the Company prior to the Effective Time and Parent shall have the right to direct all negotiations and proceedings with respect to such demands for appraisal. Parent shall keep the Company reasonably informed of the status of negotiations related to any

such demands. Prior to the Effective Time, the Company shall not make any payment, settle or offer to settle, or, in each case, agree to do any of the foregoing, with respect to any such demand without Parent's prior written consent, which shall not be unreasonably withheld, conditioned or delayed.

Section 2.13   Withholding. Each of Parent, the Company, the First Step Surviving Entity, the Surviving Entity and the Exchange Agent shall be entitled to deduct and withhold from any amounts otherwise payable pursuant to this Agreement such amounts as are required to be deducted or withheld from such consideration under the Code, the Treasury Regulations or any provision of any other Tax Law (including any state, local or foreign Tax Law). Any amounts so deducted and withheld shall be treated for all purposes of this Agreement as having been paid to the Person in respect of which such deduction and withholding was made.

Section 2.14   Closing Adjustments. The Estimated Closing Adjustment and the Final Closing Adjustment shall be determined as set forth below in this Section 2.14:

(a)   Prior to the Closing Date, the Company shall prepare and deliver to Parent a statement (the "Estimated Closing Adjustment Statement") setting forth the Estimated Closing Adjustment, including an estimated consolidated balance sheet of the Company as of immediately prior to the Effective Time, together with all relevant backup materials, in detail reasonably acceptable to Parent. The Estimated Closing Adjustment Statement and such consolidated balance sheet shall be prepared in accordance with GAAP applied on a basis consistent with the application thereof to the most recent financial statements included in the Company Financial Statements (to the extent consistent with GAAP). From the delivery of the Estimated Closing Adjustment Statement until such time as the calculation of the Estimated Closing Adjustment has been finally determined pursuant to this Section 2.14(a), Parent and its accountants shall, upon reasonable notice and during normal business hours, be permitted to discuss with the Company and its accountants the Estimated Closing Adjustment Statement and shall be provided complete and accurate copies of, and have reasonable access, upon reasonable notice at reasonable times during normal business hours, to the work papers and supporting records of the Company and its accountants so as to allow Parent and its accountants to verify the accuracy of the Estimated Closing Adjustment Statement. If Parent objects to the Estimated Closing Adjustment Statement, the Company and Parent will work together in good faith to resolve the issues in dispute. If all disputed issues are resolved, the amounts as agreed upon by Parent and the Company shall be used to determine the Estimated Closing Adjustment. If Parent and the Company are unable to resolve all such disputed issues within three (3) Business Days following Parent's receipt of the Estimated Closing Adjustment Statement, the Estimated Closing Adjustment shall be as determined by the Company.

(b)   Not later than sixty (60) days after the Closing Date, Parent shall deliver to the Stockholder Representative the Closing Adjustment Statement, including a consolidated balance sheet of the Company as of immediately prior to the Effective Time. The Closing Adjustment Statement and such consolidated balance sheet shall be prepared in accordance with GAAP applied on a basis consistent with the application thereof to the most recent financial statements included in the Company Financial Statements (to the extent consistent with GAAP). The Closing Adjustment Statement delivered pursuant to this Section 2.14(b) shall be accompanied by a statement setting forth the amount, if any, by which the total of the Closing Adjustment Items is greater than, or less than, the Estimated Closing Adjustment. The Closing Adjustment Statement, as proposed by Parent pursuant to this Section 2.14(b), shall be deemed for purposes of this Section 2.14 to be the "Final Closing Adjustment Statement," the Closing Adjustment Items reflected thereon shall be deemed for purposes of this Section 2.14 to be the "Final Closing Adjustment Items" and each shall be final and binding on all Parties and on all Company Stockholders, unless the Stockholder Representative timely delivers to Parent an Objection Notice in accordance with Section 2.14(c).

(c)      In the event that the Stockholder Representative disputes the Closing Adjustment Statement or the amount of the Closing Adjustment Items, the Stockholder Representative shall notify Parent in writing (the "Objection Notice") of the amount, nature and basis of such dispute, within thirty (30) days after delivery of the Closing Adjustment Statement pursuant to Section 2.14(b). Any such Objection Notice shall specify those items or amounts as to which the Stockholder Representative disagrees, and the Stockholder Representative shall be deemed to have agreed with all other items and amounts contained in the Closing Adjustment Statement and the amount of the Closing Adjustment Items delivered pursuant to Section 2.14(b). In the event of such a dispute, Parent and the Stockholder Representative shall first negotiate in good faith to reach agreement on the disputed items or amounts in order to determine the amount of the Closing Adjustment Items, which amount shall not be greater than Parent's calculation delivered pursuant to Section 2.14(b) nor less than the Stockholder Representative's calculation delivered pursuant to this Section 2.14(c). If Parent and the Stockholder Representative reach a final resolution on the Closing Adjustment Statement within thirty (30) days after Parent's receipt of the Objection Notice (or within any additional period as mutually agreed to between Parent and the Stockholder Representative), then the Closing Adjustment Statement agreed upon by Parent and the Stockholder Representative shall be deemed for purposes of this Section 2.14 to be the "Final Closing Adjustment Statement," the Closing Adjustment Items reflected thereon shall be deemed for purposes of this Section 2.14 to be the "Final Closing Adjustment Items" and each shall be final and binding on all Parties and on all Company Stockholders.

(d)      If Parent and the Stockholder Representative are unable to resolve the dispute within thirty (30) days after delivery of the Objection Notice, then any remaining items in dispute shall be submitted to an independent nationally recognized accounting firm selected in writing by the Stockholder Representative and Parent or, if the Stockholder Representative and Parent fail or refuse to select a firm within ten (10) days after written request therefor by the Stockholder Representative or Parent, such an independent nationally recognized accounting firm shall be selected in accordance with the rules of the New York, New York office of the American Arbitration Association (the "Neutral Accountant"). All determinations and calculations pursuant to this Section 2.14(d) shall consider only those Closing Adjustment Items that are set forth in the Objection Notice and remain in dispute, shall be a value that is not greater than Parent's calculation delivered pursuant to Section 2.14(b) nor less than the Stockholder Representative's calculation delivered pursuant to Section 2.14(c), shall be in writing and shall be delivered to Parent and the Stockholder Representative as promptly as practicable. Absent fraud or manifest error, the Closing Adjustment Statement as finally determined by the Neutral Accountant shall be deemed for purposes of this Section 2.14 to be the "Final Closing Adjustment Statement," the Closing Adjustment Items reflected thereon shall be deemed for purposes of this Section 2.14 to be the "Final Closing Adjustment Items" and each shall be final and binding on all Parties and on all Company Stockholders. In determining the Closing Adjustment Statement and the Closing Adjustment Items, the Neutral Accountant shall act as an expert and not as arbitrator. A judgment on the determination made by the Neutral Accountant pursuant to this Section 2.14 may be entered in and enforced by any court having jurisdiction thereover.

(e)      The fees and expenses of the Neutral Accountant in connection with the resolution of disputes pursuant to Section 2.14(d) shall be borne by the Company Stockholders, on the one hand, and Parent, on the other hand, in proportion to the amounts by which the proposals of Parent and the Stockholder Representative differed from the Neutral Accountant's final determination.

(f)      The "Final Closing Adjustment" shall be equal to (i) the amount of the Final Closing Adjustment Items, minus (ii) the Estimated Closing Adjustment. For the avoidance of doubt, the Final Closing Adjustment may be a positive or negative number.

(i)      If the Final Closing Adjustment is greater than zero (0), then Parent shall be entitled to receive payment of the Final Closing Adjustment from the Company Stockholders promptly (and in no event later than five (5) Business Days) after the date of determination of the Final Closing Adjustment; <u>provided</u> that such amount shall be funded by the Company Stockholders first through a reduction of the Holdback Amount and, if such amount is insufficient, the Company Stockholders shall fund the Final Closing Adjustment, or applicable portion thereof that is not funded through the Holdback Amount, by making a direct cash payment to Parent or forfeiting shares of Parent Stock, in each case on a proportionate basis in accordance with their respective Expense Fund Percentages as set forth on the Final Allocation Schedule.

(ii)      If the Final Closing Adjustment is less than zero (0), then promptly (and in no event later than five (5) Business Days) after the date of determination of the Final Closing Adjustment, Parent shall distribute the absolute value of the Final Closing Adjustment to the Company Stockholders as additional consideration pursuant to <u>Section 2.4</u>. Each Company Stockholder shall receive in such distribution either cash or shares of Parent Stock equal in value to such Company Stockholder's respective Expense Fund Percentage as set forth on the Final Allocation Schedule.

(g)      The Parties agree that the procedures set forth in this <u>Section 2.14</u> shall be the sole and exclusive method for resolving any disputes with respect to the determination of the Final Closing Adjustment Statement, the Final Closing Adjustment Items and the Final Closing Adjustment; <u>provided</u>, that this provision shall not prohibit Parent or the Stockholder Representative from instituting litigation to enforce the determination of the Neutral Accountant and shall not limit any remedy of any party under <u>ARTICLE VIII</u>.

Section 2.15      <u>Allocation Schedules</u>. Concurrently with the execution and delivery of this Agreement, the Company shall deliver to Parent a schedule consisting of the following information estimated as of immediately prior to the Closing, and prior to the Closing the Company shall deliver to Parent an updated schedule (the "<u>Final Allocation Schedule</u>") consisting of the following information as of immediately prior to the Closing:

(a)      (x) detailed calculations of (1) the Company Transaction Expenses (including specific payment instructions), (2) the Employee Amounts, (3) Closing Indebtedness (including specific payment instructions), (4) the Holdback Amount, (5) the Closing Consideration, (6) the Estimated Closing Adjustment, (7) the Company Total Per Share Value, the Company Closing Per Share Value, the Holdback Per Share Value and the Expense Fund Per Share Value, (8) the total number of In The Money Options and (9) the aggregate Option Exercise Amount and (y) the information with respect to each Company Stockholder, Company Warrantholder and Company Optionholder, as applicable, listed below in clauses (i) through (iv);

(i)      the name, email address and mailing address of each Company Stockholder, Company Warrantholder and Company Optionholder, as reflected on the stock ledger or other corporate records of the Company;

(ii)      with respect to the shares of Company Stock held by a Company Stockholder, (1) whether such shares are Company Common Stock or Company Preferred Stock, (2) if certificated, the number and class or series of shares of Company Stock represented by such certificate, (3) the status of such Company Stockholder as an Accredited Investor, (4) the number of shares of Company Common Stock into which any shares of Company Preferred Stock are convertible pursuant to the Company Charter, if applicable, (5) the consideration payable to such Company Stockholder as specified in <u>Section 2.1(b)</u>, (6) the applicable portion of such consideration subject to the Holdback Amount and (7) the Holdback Ownership Percentage and Securityholder Ownership Percentage (for

14

purposes of allocating the applicable portion of any Future Payments attributable to such Company Stockholder);

(iii)    with respect to each In The Money Option held by a Company Optionholder, (1) the number of shares of Company Common Stock subject to such In The Money Option, (2) the per share exercise price of such In The Money Option and (3) the applicable portion of the Option Exercise Amount; and

(iv)    the total gross consideration payable to each Company Stockholder, Company Warrantholder and Company Optionholder, as applicable, including the amount of such consideration payable in the form of cash or Parent Stock.

(b)    From time to time after the Effective Time, the Stockholder Representative may, with the written agreement of Parent (not to be unreasonably withheld, conditioned or delayed), update, correct or otherwise amend or modify the Final Allocation Schedule in any manner that is consistent with the express provisions of this ARTICLE II. Parent shall be entitled to rely conclusively on the Final Allocation Schedule as in effect from time to time.

## ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to each of Parent, Merger Sub I and Merger Sub II as follows:

Section 3.1    Due Organization and Good Standing. Each Acquired Entity has been duly organized and is validly existing and in good standing under the Laws of the jurisdiction of its incorporation, organization or formation and has all requisite corporate or other power and authority to own, lease and operate its properties and assets and to conduct its businesses in the manner in which its businesses are currently being conducted. Each Acquired Entity is duly qualified to do business as a foreign corporation, and is in good standing under the Laws of the jurisdictions where the nature of its businesses or the character of its owned and leased properties and assets requires such qualification, except where the failure to be so qualified would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect to such Acquired Entity.

Section 3.2    Organizational Documents. The Company has made available to Parent true, complete and correct copies of the Organizational Documents of each Acquired Entity, in each case as amended through the date hereof, and each such Organizational Document is in full force and effect. No Acquired Entity is in violation of its Organizational Documents.

Section 3.3    Capitalization; Subsidiaries.

(a)    The authorized capital stock of the Company consists of (i) 32,000,000 shares of Company Common Stock, of which 5,385,843 shares were issued and outstanding as of the date hereof and (ii) 20,774,189 shares of Company Preferred Stock, of which 20,531,336 shares were issued and outstanding as of the date hereof. Section 3.3 of the Disclosure Schedule sets forth a true, complete and correct list, as of the date hereof, of each Company Stockholder (or the holding account of such Company Stockholder) and the number of shares of Company Stock owned by such Company Stockholder. Except as described in this Section 3.3(a) and in Section 3.3(b), there are no (i) shares of capital stock or other voting securities or equity interests of the Company, (ii) outstanding subscriptions, options, calls, warrants, rights, commitments or agreements to acquire or that obligate any Acquired

Entity to issue any shares of the capital stock or other equity securities or voting interests of such Acquired Entity, (iii) restricted shares, stock appreciation rights, redemption rights, repurchase rights, "phantom" stock rights, performance shares, performance units, interests in or rights to the ownership or earnings of any Acquired Entity or other equity equivalent or equity-based awards or rights or (iv) outstanding securities, instruments or obligations of any Acquired Entity that are or may become convertible into or exchangeable for any shares of the capital stock or other equity security or voting interest of such Acquired Entity (the items in clauses (i) through (iv) above, collectively, the "Company Securities").

(b)    Section 3.3(b) of the Disclosure Schedule sets forth, as of the date hereof, a schedule of all outstanding Company Options, including (i) the holder thereof, (ii) the date of grant thereof, (iii) the number of shares of Company Common Stock issuable upon the exercise thereof or subject thereto, as applicable, (iv) the exercise price per share thereof (if any), (v) the number of shares underlying such Company Options that are vested or unvested and (vi) the vesting criteria thereof.

(c)    All of the issued and outstanding shares of Company Stock have been, and all shares of Company Common Stock that may be issued pursuant to the Company Options will be, when issued in accordance with the respective terms thereof, duly authorized and validly issued, and are (or in the case of such shares of Company Common Stock not yet issued, will be) fully paid and nonassessable and free of preemptive rights. There are no outstanding obligations of the Acquired Entities to repurchase, redeem or otherwise acquire any Company Securities. No Acquired Entity is a party to any Contract restricting the transfer of, relating to the voting of, requiring registration of, or granting any antidilutive rights, rights of first refusal or preemptive rights of any kind which obligate any Acquired Entity to issue or deliver any Company Securities or other similar rights with respect to any Company Securities. There is no outstanding Indebtedness of an Acquired Entity for which the holders thereof have the right to vote (or convertible into or exchangeable or exercisable for securities having the right to vote) on any matters on which Company Stockholders or any equity holder of an Acquired Entity may vote.

(d)    Each Company Option (i) was granted in compliance with all applicable Laws and all of the terms and conditions of the applicable Company Equity Plan, (ii) has an exercise price per share equal to or greater than the fair market value of a share of Company Stock on the grant date, and (iii) has a grant date identical to the date on which the Company's board of directors or compensation committee actually awarded such Company Option.

(e)    Section 3.3(e) of the Disclosure Schedule sets forth each of the Company's Subsidiaries, including its jurisdiction of incorporation, formation or organization, as applicable, issued and outstanding capital stock, and each record holder of its capital stock. Except for the capital stock of, or other equity or voting interests in, its Subsidiaries, the Company does not own, directly or indirectly, any equity, membership interest, partnership interest, joint venture interest or other equity or voting interest in, or any interest convertible into, exercisable or exchangeable for any of the foregoing, and none of the Company or its Subsidiaries are under any obligation to form or participate in, provide funds to or make any loan, capital contribution, guarantee, credit enhancement or other investment in, any Person. All of the outstanding shares of capital stock or other equity interests of each of the Company's Subsidiaries have been duly authorized and validly issued, are fully paid and nonassessable and free of preemptive rights, and are wholly owned beneficially and of record by an Acquired Entity, free and clear of any Liens. No outstanding shares of Company Common Stock are held by any of the Company's Subsidiaries.

(f)    No dividends or similar distributions have accrued or been declared but are unpaid on any shares of Company Stock, any Company Options or any shares of capital stock or other equity interests of the Company, and the Company is not subject to any obligation (contingent or

otherwise) to pay any dividend or otherwise to make any distribution or payment to any current or former holder of any shares of Company Stock, any Company Options, or any shares of capital stock or other equity interests of the Company.

(g)     The information set forth in the Final Allocation Schedule, including the applicable portion of the Total Consideration to be delivered to each Company Stockholder and Company Optionholder, as, if, and when payable pursuant to ARTICLE II, shall be true, complete and correct (or, to the extent any information is estimated, such estimates shall be made in good faith) as of the Effective Time, and the calculations performed to compute such information shall be accurate and in accordance with the terms of this Agreement, the Organizational Documents of the Company and all other agreements and instruments among the Company and the Company Stockholders or the Company Optionholders, as applicable, and no Company Stockholder or Company Optionholder, as applicable, shall be entitled to any payments or consideration under this Agreement except as provided on the Final Allocation Schedule or as a result of exercised and perfected appraisal or dissenter's rights.

Section 3.4     Authority; Binding Nature of Agreement. The Company has the requisite corporate power and authority to enter into, and to perform its covenants and agreements under, this Agreement and each Other Transaction Agreement to which the Company is or will be a party and, subject only to the adoption of this Agreement by (a) a majority of the outstanding shares of the Company Stock, voting together as single class and determined on an as-converted-to Company Common Stock basis and (b) sixty percent (60%) of the outstanding shares of Company Preferred Stock, voting together as single class and determined on an as-converted-to Company Common Stock basis, in accordance with the Company Charter and the DGCL (the "Company Stockholder Approval"), to consummate the Merger and the other transactions contemplated by this Agreement and each Other Transaction Agreement to which the Company is or will be a party. The Company Stockholder Approval is the only vote or approval of the holders of any class or series of capital stock of the Company that is necessary to adopt this Agreement or approve the Merger. The Company's board of directors has unanimously adopted resolutions (a) declaring that this Agreement and the transactions contemplated hereby, including the Merger, are advisable, fair to and in the best interests of the Company and the Company Stockholders, (b) approving the execution, delivery and performance of this Agreement by the Company and the consummation by the Company of the Merger and the other transactions contemplated by this Agreement, (c) directing that the adoption of this Agreement and the approval of the transactions contemplated hereby, including the Merger, be submitted to the Company Stockholders for their consideration at a stockholders' meeting to be duly called and held or by written consent and (d) recommending that the Company Stockholders adopt this Agreement and approve the transactions contemplated hereby, including the Merger (such resolutions, the "Company Board Resolutions"). The Company Board Resolutions have not been subsequently rescinded, modified or withdrawn in any way. The execution, delivery and performance of this Agreement by the Company and each Other Transaction Agreement to which the Company is or will be a party and the consummation by the Company of the transactions contemplated by this Agreement and each Other Transaction Agreement to which the Company is or will be a party have been duly and validly authorized by all necessary corporate action on the part of the Company, and no other corporate proceedings on the part of the Company are necessary to authorize this Agreement or each Other Transaction Agreement to which the Company is or will be a party, the performance by the Company of its covenants and agreements under this Agreement and each Other Transaction Agreement to which the Company is or will be a party or the consummation of the transactions contemplated by this Agreement and each Other Transaction Agreement to which the Company is or will be a party, except for the Company Stockholder Approval and the filing of the First Certificate of Merger with the Secretary of State of the State of Delaware and the Second Certificate of Merger with the Secretary of State of the State of Delaware and the Department of State of the State of New York. This Agreement and each Other Transaction Agreement to which the Company is or will be a party has been or will be, as applicable, duly and validly executed and delivered on behalf of the

Company and, assuming the due authorization, execution and delivery of this Agreement and each Other Transaction Agreement to which the Company is or will be a party by the other parties thereto, constitutes a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with its terms, subject to (i) Laws of general application relating to bankruptcy, insolvency, reorganization, moratorium and other Laws affecting creditors' rights generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 3.5       Non-Contravention; Consents.

(a)       The execution, delivery and performance of this Agreement, and each Other Transaction Agreement to which the Company is or will be a party, by the Company and the consummation by the Company of the transactions contemplated by this Agreement and each Other Transaction Agreement to which the Company is or will be a party does not and will not (i) contravene, conflict with or result in any violation or breach of any of the provisions of the Organizational Documents of any Acquired Entity, (ii) subject to making or obtaining, as applicable, the Consents and Filings set forth in Section 3.5(b), contravene, conflict with or result in any violation or breach of any Law or (iii) require any consent, approval or authorization of (each, a "Consent"), or any notice to or filing with (each, a "Filing"), any Third Party with respect to, result in any breach or violation of or constitute a default (or an event which with or without notice or lapse of time or both would become a default) or result in the loss of a benefit or result in the imposition of an obligation under, or give rise to any right of termination, cancellation, amendment or acceleration of any right or obligation of any Acquired Entity, or result in the creation of a Lien on any asset of an Acquired Entity, under, any (1) Material Contract to which an Acquired Entity is a party or by which an Acquired Entity or its properties or assets are bound or (2) Permit held by an Acquired Entity or pursuant to which an Acquired Entity or its properties or assets are subject.

(b)       No Acquired Entity is required to make any Filing with or to, or to obtain any Consent from, any Governmental Entity in connection with the execution and delivery of this Agreement, or any Other Transaction Agreement to which the Company is or will be a party, by the Company or the performance and consummation by the Company of the transactions contemplated by this Agreement or any Other Transaction Agreement to which the Company is or will be a party, except for the filing of the First Certificate of Merger with the Secretary of State of the State of Delaware and the Second Certificate of Merger with the Secretary of State of the State of Delaware and the Department of State of the State of New York.

Section 3.6       Company Financial Statements; Undisclosed Liabilities.

(a)       Section 3.6(a) of the Disclosure Schedule sets forth (i) the unaudited consolidated balance sheet of the Company as of January 31, 2018 (the "Latest Balance Sheet"), and the related consolidated statements of operations, stockholders' equity and cash flows for the one (1) month period then ended, (ii) the unaudited consolidated balance sheet of the Company as of December 31, 2017, and the related consolidated statements of operations, stockholders' equity and cash flows for the year then ended, and (iii) the audited consolidated balance sheets of the Company as of December 31, 2016 and December 31, 2015, and the related consolidated statements of operations, stockholders' equity and cash flows for the years then ended (all such financial statements referred to in the foregoing clauses (i), (ii) and (iii), the "Company Financial Statements"). The Company Financial Statements were prepared from the books and records of the Company and fairly present, in all material respects, the consolidated financial position of the Company as at the respective dates thereof and the consolidated results of operations and cash flows of the Company for the respective periods covered thereby in accordance with GAAP applied on a consistent basis throughout the periods covered (except as may be indicated in the

18

notes to such financial statements or, in the case of unaudited statements, subject to the absence of notes not required by GAAP and normal year-end adjustments).

(b)     No shares or class of capital stock of any Acquired Entity is registered under the Securities Act or the Exchange Act or is listed on any securities exchange. No Acquired Entity is subject to the periodic reporting requirements of the Exchange Act or the periodic reporting or corporate governance requirements of any foreign Governmental Entity that performs a similar function to that of the SEC or the requirements of any securities exchange or quotation system.

(c)     Except as set forth on the claims reserve report set forth in Section 3.6(c) of the Disclosure Schedule and any executory contracts previously made available to Parent, no Acquired Entity has any Liabilities, except for (i) Liabilities accrued or disclosed in the Latest Balance Sheet, (ii) Liabilities incurred in connection with this Agreement, the Other Transaction Agreements and the transactions contemplated by this Agreement or the Other Transaction Agreements, (iii) Liabilities incurred in the ordinary course of business consistent with past practice since the date of the Latest Balance Sheet or (iv) Liabilities that are not or would not reasonably be expected to result in liability to the Company in excess of $30,000 in the aggregate. For clarity, the mere existence of a claim, complaint or notice from a third party involving the Company arising after the date hereof shall not constitute a breach of this Section 3.6(c) on the theory that such claim or the matters underlying such claim (absent an underlying breach of another applicable representation, warranty or covenant) constitute an unknown, contingent, unmatured or other debt, liability or obligation of the Company.

(d)     Section 3.6(d) of the Disclosure Schedule sets forth a list of all Indebtedness of the Company as of the date hereof.

Section 3.7     Absence of Certain Changes. Since December 31, 2016 until the date hereof, (a) other than with respect to the transactions contemplated by this Agreement and the process leading up to this Agreement, each Acquired Entity has conducted its businesses in all material respects only in accordance with the ordinary course of such businesses consistent with past practices, (b) there has not occurred a Material Adverse Effect and (c) no Acquired Entity has taken any action that, if taken after the date hereof, would require Parent's prior written consent under Section 5.1.

Section 3.8     Intellectual Property.

(a)     Section 3.8(a) of the Disclosure Schedule sets forth true, complete and correct lists of the following Intellectual Property, both United States and foreign, that is owned by an Acquired Entity as of the date of this Agreement, along with the record owner of each such item of the Company's Registered Intellectual Property, the jurisdiction in which each such item of the Company's Registered Intellectual Property has been registered or filed and the applicable registration, application or serial number or similar identifier:

(i)     all Patents;

(ii)     all Trademark registrations, including all Internet domain name registrations, pending Trademark applications and material unregistered Trademarks;

(iii)     all Copyright registrations and pending Copyright applications;

(iv)     all material Software; and

(v)     all domain names.

19

For purposes of this Agreement, the "Company's Registered Intellectual Property" shall mean the above categories (i), (ii) and (iii), collectively (excluding material unregistered Trademarks).

(b)     All of the Company's Registered Intellectual Property is owned beneficially and of record solely by an Acquired Entity free and clear of any Liens (other than Permitted Liens).

(c)     All of the Company's Registered Intellectual Property is valid, subsisting, in full force and effect (except with respect to applications), and has not expired or been cancelled or abandoned. All necessary documents and certificates in connection with the Company's Registered Intellectual Property have been filed with, and all relevant fees have been paid to, the relevant patent, copyright, trademark or other authorities in the United States or foreign jurisdictions, as the case may be, for the purposes of perfecting an Acquired Entity's rights in, prosecuting and maintaining the Company's Registered Intellectual Property.

(d)     Each Acquired Entity owns, or has valid rights to use, all of the Intellectual Property used or held for use in its business, as currently conducted, including the design, development, reproduction, manufacture, branding, marketing, use, distribution, importation, licensing, provision, offer for sale and sale of any product, technology, Software or service currently being marketed, sold, licensed, researched or developed or under development by such Acquired Entity (each, a "Proprietary Product").

(e)     To the Acquired Entities' Knowledge, the conduct of the business of each Acquired Entity as currently conducted (and as conducted since January 1, 2016), including the design, development, reproduction, manufacture, branding, marketing, use, distribution, importation, licensing, provision, offer for sale and sale of Proprietary Products, does not infringe upon, dilute or misappropriate or otherwise violate (and since January 1, 2016 has not infringed upon, diluted, misappropriated or otherwise violated) any Intellectual Property or other proprietary right of any Person (including any right to privacy or publicity).

(f)     There is no Claim pending or threatened in writing, and at no time has there been any Claim pending or threatened in writing, in any jurisdiction (i) challenging the use, ownership, or scope of any Company Intellectual Property, or the validity, enforceability or registerability of any of the Company's Registered Intellectual Property or (ii) alleging that the activities or the conduct of any Acquired Entity's business dilutes, misappropriates, infringes, violates or constitutes the unauthorized use of, or will dilute, misappropriate, infringe upon, violate or constitute the unauthorized use of the Intellectual Property of any Person. No Acquired Entity is party to any settlement, covenant not to sue, consent, decree, stipulation, judgment, or order resulting from any Claim which (A) permits Third Parties to use any of the Intellectual Property owned by an Acquired Entity or used or held for use in the business of any Acquired Entity, (B) restricts any Acquired Entity's rights to use any Intellectual Property, (C) restricts any Acquired Entity's business in order to accommodate any other Person's Intellectual Property or (D) requires any future payment by an Acquired Entity to any Person in relation to the past, present or future use of any Intellectual Property.

(g)     To the Acquired Entities' Knowledge, no Person is misappropriating, infringing, diluting or violating any Intellectual Property owned or purported to be owned by an Acquired Entity (the "Company Intellectual Property"). No Claim alleging any Intellectual Property or other proprietary right (or other conduct) misappropriates, infringes, dilutes or violates the Company Intellectual Property has been brought or threatened against any Person by an Acquired Entity.

(h)      Each current and former employee of any Acquired Entity has executed the form(s) of confidentiality and nondisclosure agreement previously made available to Parent by the Company. Other than under an appropriate confidentiality or nondisclosure agreement or contractual provision relating to confidentiality and nondisclosure, to the Acquired Entities' Knowledge there has been no disclosure to any Person of material confidential information or Trade Secrets of any Acquired Entity or of any confidential information owned by a Person to whom any Acquired Entity has a confidentiality obligation. All current and former employees of any Acquired Entity who have made material contributions to the development of any Company Intellectual Property (including all such individuals who have designed, written, tested or worked on any Software code contained in any Company Intellectual Property) have executed one of the forms of assignment of inventions agreement attached as Section 3.8(h) of the Disclosure Schedule. All service providers and other Third Parties who have made material contributions in the course of their work for any Acquired Entity to the development of any Company Intellectual Property or Proprietary Product (including all service providers and other Third Parties who have designed, written, tested or worked on any Software code contained in any Company Intellectual Property or Proprietary Product) have entered into a written work-made-for-hire or invention assignment agreement that assigns, or have otherwise assigned to such Acquired Entity (or to a Person that previously conducted any business currently conducted by such Acquired Entity and that has assigned in writing its rights in such Intellectual Property or Proprietary Product to such Acquired Entity) in writing all of their right, title and interest (other than moral rights, if any, to the extent such assignment of moral rights is not permitted under the Laws of any jurisdiction) in and to the portions of such Intellectual Property or Proprietary Product developed by them in the course of their work for such Acquired Entity.

(i)      Upon Closing, all Company Intellectual Property used or held for use in the operation of the business will be fully transferable, alienable and licensable by the Surviving Entity and Parent without restriction and without payment of any kind to any other Person.

(j)      No current or former Affiliate, partner, stockholder (other than Parent and its Affiliates), employee or director will, after giving effect to the transactions contemplated hereby, own or retain any proprietary rights in any of the Intellectual Property owned, used or held for use by any Acquired Entity.

Section 3.9      Privacy and Security.

(a)      The Acquired Entities have, at all times, implemented and maintained (i) policies that govern its Processing of Personal Data (a "Privacy Policy") and its administrative, technical, and physical safeguards designed to protect the confidentiality, integrity, and availability of Personal Data processed by or on behalf of the Acquired Entities, Systems, and Proprietary Products (a "Security Policy") and (ii) administrative, technical, and physical safeguards designed to protect the confidentiality, integrity, and availability of Personal Data, Systems, and Proprietary Products within the Acquired Entities' possession or control against loss, damage, unauthorized access, unauthorized use, unauthorized modification, or other misuse, including an industry standard data program (such safeguards, collectively, the "Security Practices"). To the Acquired Entities' Knowledge, the Acquired Entities' Security Practices conform (and since January 1, 2016 have conformed) in all material respects with any public information security statements made by the Acquired Entities, including in the current Privacy Policy and with applicable Data Laws. To the Acquired Entities' Knowledge, there has been no unauthorized access, use or acquisition of Personal Data maintained by or on behalf of the Acquired Entities by any third party, nor any unauthorized access to Systems.

(b)      Each of the Acquired Entities and, to the Acquired Entities' Knowledge, each of the Acquired Entities' Third Party data suppliers, vendors, partners, customers, clients, or other

commercial parties that access Systems or transfer or receive or otherwise process Personal Information to or from any Acquired Entity (each, a "PII Third Party") have complied in all material respects with the Security Policies and data Privacy Policies, and the related policies, requirements, programs or other notices (if any) applicable to the collection, processing, use, sale, storage, sharing, access to, transfer, or destruction of Personal Information, of the Company, such PII Third Party and any other applicable PII Third Party and applicable Data Laws. Each of the Acquired Entities has (i) provided notice of its external Privacy Policy on all of its websites and mobile applications, and, to the Acquired Entities' Knowledge, in a manner compliant in material respects with applicable Legal Requirements; and (ii) provided employees, contractors, and other relevant third parties with notice of, and training with respect to, their compliance obligations with respect to the Privacy Policies and Security Policies. To the Acquired Entities' Knowledge, each Privacy Policy, during the time period in effect has complied or does comply in all material respects with all applicable Data Laws. To the Acquired Entities' Knowledge, none of the Acquired Entities' commitments in a Contract conflict in any material way with a Privacy Policy or with the Acquired Entities' Security Policies or Security Practices.

(c)     To the Acquired Entities' Knowledge, each of the Acquired Entities, and each of the Acquired Entities' third-party suppliers, data suppliers, vendors, partners, or other commercial parties that Process Personal Data or access Systems, complies (and since January 1, 2016 have complied) in all material respects with: (i) all applicable Data Laws, including with respect to the collection, use, transfer (including cross-border transfers) and other Processing of Personal Data to which the Acquired Entities have had access or otherwise collected or handled or that is handled by third parties acting on the Acquired Entities behalf (including Personal Data of users, customers, employees, visitors, contractors and non-employee service providers); (ii) to the extent applicable, the Payment Card Industry (PCI) Data Security Standard (DSS) with respect to any payment card data that the Acquired Entities have collected or handled or that has been collected or handled on behalf of the Acquired Entities; (iii) to the extent applicable, mobile application platform (i.e., "app store") requirements relating to data privacy, data protection and data security; and (iv) all applicable self-regulatory principles issued by the Digital Advertising Alliance ("DAA") or affiliates of the DAA in other jurisdictions with respect to interest-based advertising or online privacy, as interpreted by the DAA, any such affiliate, or any accountability body with responsibility to enforce the DAA's or its affiliates' self-regulatory principles in any compliance proceeding.

(d)     Except for restrictions set forth in any applicable Privacy Policies (a true, complete and correct copy of which has been made available to Company prior to the date hereof) and applicable Data Laws, there is no restriction on the use by the Acquired Entities of Personal Information collected, used or stored by the Acquired Entities prior to the Closing Date.

(e)     Each Acquired Entity has promptly (i) taken appropriate actions to address known or suspected information security breaches, intrusions, and failures, including any unauthorized or illegal use or disclosure of, or access to, or other misuse of Personal Information or Company Systems (a "Security Related Incident") and (ii) remedied the cause of any such Security Related Incident(s). Since January 1, 2016, no material Security Related Incident has occurred, or has been threatened in writing.

(f)     Each Acquired Entity has taken commercially reasonable measures to provide for the back-up and recovery of the data and information, including Personal Information, necessary to the conduct of the business of such Acquired Entity (including such data and information that is stored on magnetic or optical media in the ordinary course), without material disruption to, or material interruption in, the conduct of the business of such Acquired Entity.

(g)     No Person (including any Governmental Entity) has made any written claim or commenced any Claim with respect to breach of security, loss, damage, or unauthorized access, collection, use, disclosure, or modification of Personal Information maintained by or on behalf of any Acquired Entity.

(h)     The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby will not violate any Privacy Policy or applicable Data Laws.  The Acquired Entities are taking commercially reasonable measures to evaluate the potential effects and impact of the European Union's General Data Protection Regulation ("GDPR") coming into effect in May 2018 on the conduct of the Acquired Entities' business as currently conducted and as currently proposed to be conducted. Other than as set forth on Section 3.9(h) of the Disclosure Schedule, to the Acquired Entities' Knowledge, the GDPR becoming effective will not (i) require any material changes in the conduct of the Acquired Entities' business as currently conducted in order to comply with the GDPR, (ii) result in any material capital expenditures by the Acquired Entities to address or avoid any adverse effects or impact of the GDPR on the Acquired Entities' business as currently conducted or as currently proposed to be conducted, or (iii) adversely affect or impact the conduct of the Acquired Entities' business as currently conducted or as currently proposed to be conducted in any material respect.

Section 3.10     Title to Assets; Real Property.

(a)     Each Acquired Entity owns, and has good and valid title to, or has a valid right to use all tangible personal property used or held for use in its businesses, free and clear of any Lien (other than Permitted Liens).

(b)     No Acquired Entity owns any real property.

(c)     Section 3.10(c) of the Disclosure Schedule sets forth the addresses and the names of the fee owners, landlords, tenants, subtenants and sub-subtenants, as applicable, of each real property leased, subleased, sub-subleased, licensed or otherwise occupied, or used, by each Acquired Entity (the "Leased Real Property"), as well as any and all leases, subleases, sub-subleases, licenses, occupancy agreements, and purchase options thereunder, and all amendments, terminations and modifications thereof (collectively, the "Real Estate Leases"). Each Acquired Entity has a valid leasehold interest in, and enjoys actual, exclusive, peaceful and undisturbed possession of, the relevant Leased Real Property, in each case free and clear of any Lien (other than Permitted Liens). There are no leases, subleases, licenses, occupancy agreements, options, rights or other agreements or arrangements to which any Acquired Entity is a party granting to any Person the right to use, occupy or otherwise obtain a real property interest in all or any portion of a Leased Real Property.

(d)     Each Acquired Entity is in material compliance with all Liens and other matters of record affecting the Leased Real Property, and as of the date hereof no Acquired Entity has received any written notice alleging any default under any of such Liens or other matters of record as of the date hereof.

(e)     Except as provided by the Real Estate Leases, there are no outstanding Contracts, commitments, options, rights of reverter or rights of first refusal to which any Acquired Entity is a party or sub-landlord, as applicable, in each case, granted to third parties to purchase or lease any Leased Real Property, or any portion thereof or interest therein.

Section 3.11     Material Contracts.

(a)  Section 3.11 of the Disclosure Schedule sets forth, as of the date hereof, each Contract described below to which any Acquired Entity is a party or by which any Acquired Entity or any of its assets or properties is bound (each, a "Material Contract"):

(i)  any Contract with respect to a joint venture, partnership, limited liability company or other similar agreement or arrangement, related to the formation, creation, operation, management or control of any partnership, joint venture or limited liability company;

(ii)  any Contract relating to Indebtedness, any obligation to purchase, redeem, retire, defease or otherwise acquire for value any capital stock or any warrants, rights or options to acquire such capital stock;

(iii)  any Contract relating to an acquisition, divestiture, merger or similar transaction that contains representations, covenants, indemnities or other obligations (including payment, indemnification, "earnout" or other contingent obligations) that are in effect on the date hereof;

(iv)  any Contract that obligates any Acquired Entity to make payments to acquire or maintain fixed assets, including land buildings and equipment;

(v)  any Contract that prohibits the payment of dividends or distributions in respect of the Company Securities or otherwise, prohibits the pledging of the Company Securities or prohibits the issuance of guarantees by any Acquired Entity;

(vi)  any Contract containing any covenant limiting or prohibiting the right of any Acquired Entity (1) to engage in any line of business or conduct business in any geographic area, (2) to distribute or offer any products or services or (3) to compete with any other Person in any line of business or in any geographic area or levying a fine, charge or other payment for doing any of the foregoing;

(vii)  any Contract that grants any right of first refusal, right of first offer or similar right with respect to any material assets, rights or properties of any Acquired Entity;

(viii)  any Contract that would reasonably be expected to involve payments by or to any Acquired Entity in excess of $250,000 during the twelve (12) month period after the date hereof;

(ix)  any Contract with any Governmental Entity;

(x)  any Contract pursuant to which any of the benefits thereunder, to any Acquired Entity or to any other party thereto, will be increased, or the vesting of benefits of which will be accelerated, by the consummation of the Merger or the other transactions contemplated by this Agreement or the value of any of the benefits of which will be calculated on the basis of any of the transactions contemplated by this Agreement;

(xi)  any written Contract (1) relating to the employment of, or the performance of services by, any director or employee of any Acquired Entity that requires payment of base salary (or base compensation) in excess of $250,000 on an annual basis to any Person, (2) relating to the performance of services by any consultant that requires payment of compensation in excess of $150,000 on an annual basis to any Person, (3) the terms of which obligate or may in the future obligate any Acquired Entity to make any severance, termination or similar payment to any current or former

24

employee or (4) pursuant to which any Acquired Entity may be obligated to make any bonus or similar payment in excess of $50,000 to any current or former employee or director;

(xii)     any Real Estate Lease;

(xiii)    any Collective Bargaining Agreement;

(xiv)    any Contract with respect to any Intellectual Property that is material to any Acquired Entity's business as currently conducted or as currently proposed to be conducted (other than (1) ordinary course customer contracts or (2) routine inbound "click-wrap", "shrink-wrap" and similar mass market, commercial binary code end-user licenses with annual or one-time fees of less than $100,000), including all such Contracts pursuant to which an Acquired Entity (A) is granted or obtains or agrees to grant or obtain any right to use any material Intellectual Property, (B) is restricted in its right to use or register any material Intellectual Property or (C) permits or agrees to permit any other Person to use, enforce or register any material Intellectual Property, including all licenses of Intellectual Property granted to or by any Acquired Entity;

(xv)     any Contract with (1) any Company Stockholder or any Affiliate (other than any Acquired Entity), director, manager or officer of any Acquired Entity or (2) to the Company's Knowledge, any Affiliate of, or any "associate" or any member of the "immediate family" (as such terms are defined in Rules 12b-2 and 16a-1 under the Exchange Act) of, any such Company Stockholder or any such Affiliate, director, manager or officer (each such Contract, collectively, the "Affiliate Contracts") (other than ordinary course option grant and exercise agreements);

(xvi)    any Contract obligating any Acquired Entity to purchase or otherwise obtain any product or service exclusively from any Person or sell any product or service exclusively to any Person;

(xvii)   any Contract relating to leases of equipment, vehicles or other personal property that, in each case, would reasonably be expected to involve payments by or to any Acquired Entity in excess of $100,000 during the twelve (12) month period after the date hereof;

(xviii)  any stockholders, investors rights, registration rights or similar agreement or arrangement;

(xix)    any Contract under which an Acquired Entity has an obligation to indemnify any counterparty thereto (other than ordinary course customer contracts);

(xx)     any Contract with a Significant Customer (each such Contract, a "Significant Customer Contract");

(xxi)    any Contract with a Key Supplier; and

(xxii)   any Contract under which any Person provides marketing, advertising or sales services to any Acquired Entity that, in each case, would reasonably be expected to involve payments by or to any Acquired Entity in excess of $100,000 during the twelve (12) month period after the date hereof.

(b)     Prior to the date hereof, the Company has made available to Parent true, complete and correct copies of each Material Contract (including all exhibits and schedules thereto).

(c)     To the Acquired Entities' Knowledge, each Material Contract is in full force and effect and is the legal, valid and binding obligation of the Acquired Entity party thereto and the other parties thereto, enforceable against each of them in accordance with its terms, subject to (i) Laws of general application relating to bankruptcy, insolvency, reorganization, moratorium and other Laws affecting creditors' rights generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies. No Acquired Entity is in material breach of or in material default under any Material Contract, and, to the Acquired Entities' Knowledge, no other party to any Material Contract is in material breach of or material default thereunder, and no event has occurred that with notice or lapse of time or both would constitute a material breach or material default of the Acquired Entity party thereto or any other party thereto. As of the date hereof, no party to any Material Contract has provided written notice to any other party requesting any indemnification or defense under such Material Contract. As of the date hereof, no party to any Material Contract has provided written notice exercising any termination rights with respect thereto, and no party to any of the Material Contracts has given written notice of any termination or nonrenewal or of any material dispute with respect to any Material Contract.

Section 3.12     Compliance With Laws; Permits.

(a)     Each Acquired Entity is, and since January 1, 2016 has been, in compliance in all material respects with all applicable Laws. Since January 1, 2016 through the date hereof, (i) no Acquired Entity has received any written communication from any Governmental Entity alleging or asserting that any Acquired Entity is not in compliance in any material respect with any Laws, and (ii) no Governmental Entity is conducting, or has conducted, any investigation into any Acquired Entity's potential noncompliance in a material respect with any applicable Law.

(b)     Each Acquired Entity holds all material Permits necessary for the lawful conduct of its business as it is currently being conducted. Such Permits are valid and in full force and effect. Each Acquired Entity is in material compliance with the terms and requirements of such Permits. As of the date hereof, no Acquired Entity has received any notice from any Governmental Entity (and no Governmental Entity has threatened any notice) (i) asserting any material violation of any term or requirement of any such Permit, (ii) notifying any Acquired Entity of the revocation or withdrawal of any such Permit or (iii) imposing any condition, modification or amendment on any such Permit, in each case that has not been cured or waived.

(c)     The Acquired Entities are, and have at all times been, in compliance with all applicable anti-corruption Laws.

Section 3.13     Litigation; Claims; Orders.

(a)     Except as set forth in Section 3.13(a) of the Disclosure Schedule, there is no Claim pending or threatened in writing against any Acquired Entity, or, to the Company's Knowledge, affecting any Acquired Entity or any present or former officer, director, employee, consultant, agent or stockholder of any Acquired Entity in his or her capacity as such, or seeking to prevent or delay the transactions contemplated hereby, and no written notice of any Claim involving or relating to any Acquired Entity, whether pending or threatened, has been received by any Acquired Entity. There is no Order outstanding against any Acquired Entity or any present or former officer, director, employee, consultant, agent or stockholder of any Acquired Entity in his or her capacity as such or to which any of the foregoing is subject. As of the date hereof, there is no Claim by any Acquired Entity pending, or which any Acquired Entity has commenced preparations to initiate, against any other Person.

(b)      All Claims set forth in <u>Section 3.13(a)</u> of the Disclosure Schedule are covered by insurance policies currently in effect (subject to any deductibles and policy limits set forth in such policies), and there has been no denial of coverage by any insurer with respect to any such Claim.

Section 3.14      <u>Tax Matters</u>.

(a)      Each of the Acquired Entities has timely filed with the appropriate Taxing Authority, or has caused to be timely filed on its behalf (taking into account any extension of time within which to file), all income and other material Tax Returns required by Law to be filed by it, and all such filed Tax Returns are true, correct and complete in all material respects. No Acquired Entity is currently the beneficiary of any extension of time within which to file any Tax Return, other than automatic extensions of time to file Tax Returns obtained in the ordinary course of business.

(b)      All Taxes due and payable by or with respect to any of the Acquired Entities, whether or not shown to be due on any Tax Return, have been timely paid in full. With respect to any period for which Tax Returns have not yet been filed or for which Taxes are not yet due or payable, each of the Acquired Entities have made due and sufficient accruals for such Taxes on the Latest Balance Sheet. All required estimated Tax payments sufficient to avoid any underpayment penalties or interest have been made by or on behalf of each of the Acquired Entities. The unpaid Taxes of each of the Acquired Entities (i) did not, as of the date of the Latest Balance Sheet, exceed the amount of any reserves or accruals specifically identified for Tax liability (not including any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the Latest Balance Sheet, and (ii) do not exceed the amount of those reserves or accruals as adjusted for the passage of time through the Closing Date in accordance with the past custom and practice of the Acquired Entities in filing their respective Tax Returns and in accordance with applicable Law. Since the date of the Latest Balance Sheet, no Acquired Entity has incurred any liability for Taxes outside the ordinary course of business consistent with past custom and practice.

(c)      All Taxes required to have been withheld and paid by each of the Acquired Entities under applicable Law, including in connection with amounts paid or owing to any employee, independent contractor, creditor, shareholder or other Person, have been timely withheld and paid to the appropriate Taxing Authority, and all IRS Forms W-2 and 1099 and other applicable information reporting required with respect thereto have been properly completed and timely filed.

(d)      To the Acquired Entities' Knowledge, no examination or audit or other action of or relating to any Tax Return of any Acquired Entity by any Governmental Entity is currently in progress, threatened or contemplated. No deficiency with respect to Taxes has been threatened, contemplated, proposed, asserted or assessed in writing against any Acquired Entity which has not been fully paid or adequately reflected on the Company Financial Statements.

(e)      There is no audit, claim or assessment pending, proposed, asserted or threatened in writing against or with respect to any Acquired Entity by any Taxing Authority in respect of any Tax or Tax Return, and no Taxing Authority has indicated an intent to investigate, commence or open such an audit, claim or assessment with respect to any such Tax or Tax Return.

(f)      No Acquired Entity (i) is or has ever been a member of a group filing an affiliated, consolidated, combined or unitary Tax Return, nor has any Acquired Entity been included in any similar arrangement for relief under applicable Law, such as a loss sharing regime, and (ii) has any liability for Taxes of any other Person under Treasury Regulations Section 1.1502-6 (or any analogous, comparable or similar provision of state, local or foreign Law) or as a transferee or successor under any provision of applicable Law, by Contract or otherwise.

27

(g)      No Acquired Entity will be required to include any item of income in, or exclude any item of deduction from, taxable income for any taxable period (or portion thereof) beginning after the Closing Date as a result of any (i) change in method of Tax accounting initiated prior to the Closing for a Pre-Closing Tax Period, (ii) "closing agreement" as described in Section 7121 of the Code (or any analogous, comparable or similar provision of state, local or foreign Law) executed on or prior to the Closing Date, (iii) intercompany transaction or excess loss account described in Section 1502 of the Code (or any analogous, comparable or similar provision of state, local or foreign Law), (iv) installment sale or open transaction disposition made on or prior to the Closing Date, (v) prepaid amount received on or prior to the Closing Date or (vi) election under Section 108(i) of the Code (or any analogous, comparable or similar provision of state, local or foreign Law).

(h)      No Acquired Entity is party to, is bound by or has any obligation under any Tax Sharing Agreement (other than any such agreement (i) solely between or among the Acquired Entities or (ii) customary gross-up and indemnification provisions in credit agreements, derivatives, leases and supply agreements entered into in the ordinary course of business with respect to which taxation is an incidental matter).

(i)      No Acquired Entity has distributed stock of another Person, or has had its stock distributed by another Person, in a transaction that was purported or intended to be governed in whole or in part by Section 355 of the Code (or any analogous, comparable or similar provision of state, local or foreign Law).

(j)      No closing agreements (as described in Section 7121 of the Code or any corresponding, analogous or similar provision of state, local or foreign Law), private letter rulings, technical advice memoranda or similar agreements or rulings have been entered into or requested by or with respect to any Acquired Entity.

(k)      No Acquired Entity is or has been a party to any "reportable transaction" as defined in Section 6707A(c) of the Code or Treasury Regulations Section 1.6011-4 or any "listed transaction" as set forth in Treasury Regulations Section 301.6111-2(b)(2) or any analogous provision of state, local or foreign Law. Each Acquired Entity has disclosed on its federal income Tax Returns all positions taken therein that could reasonably be expected to give rise to a substantial understatement of federal income Tax within the meaning of Section 6662 of the Code.

(l)      There are no Liens with respect to Taxes upon any of the assets or properties of any Acquired Entity, other than Liens for Taxes not yet due and payable or Liens for Taxes being contested in good faith by appropriate proceedings and for which adequate reserves have been established in accordance with GAAP.

(m)      No claim has been made by a Taxing Authority in a jurisdiction where Tax Returns are not filed or Taxes are not paid by or with respect to any Acquired Entity that such a Tax Return is required to be filed or such Taxes are required to be paid. No Acquired Entity has ever engaged in a trade or business or had a permanent establishment in any country other than the United States.

(n)      There are no currently outstanding agreements, requests, consents or waivers to extend any statute of limitations filed by or on behalf of any Acquired Entity with respect to any Tax Return of any Acquired Entity or in respect of any Taxes payable by or with respect to any Acquired Entity. No Acquired Entity has requested any extension of time within which to file any Tax Return, which Tax Return has not yet been filed. No power of attorney has been granted with respect to any matter relating to Taxes payable by or with respect to any Acquired Entity that is currently in force

(other than authorizations to contact Tax Return preparers that were included in Tax Returns filed by the Acquired Entities).

(o)     The Company Stock represents the only equity interests in the Company for Tax purposes, other than instruments issued under the Company Equity Plan.

(p)     No Acquired Entity owns any interest in an entity, nor is it a party to any contractual arrangement or joint venture or other arrangement, that is or could be characterized as a partnership for United States federal income Tax purposes.

(q)     The Company has not been a United States real property holding corporation within the meaning of Section 897(c)(2) of the Code during the applicable period specified in Section 897(c)(l)(A)(ii) of the Code.

(r)     No Acquired Entity is a party to a gain recognition agreement under Section 367 of the Code.

(s)     No Acquired Entity has been or will be required to include in income any amount under Section 965 of the Code.

(t)     No Acquired Entity has made a "base erosion payment" within the meaning of Section 59A(d) of the Code.

(u)     No Acquired Entity has ever been a party to a transaction or agreement that is in conflict with the Tax rules on transfer pricing in any relevant jurisdiction.

(v)     No Acquired Entity is a party to a lease that is treated as a "Section 467 rental agreement" within the meaning of Section 467(d) of the Code.

(w)     No holder of Company Stock holds any Company Stock that is non-transferable and subject to a substantial risk of forfeiture within the meaning of Section 83 of the Code with respect to which a valid election under Section 83(b) of the Code has not been made.

(x)     No Acquired Entity has ever participated in an international boycott as defined in Section 999 of the Code.

(y)     The Company has made available to Parent (i) correct and complete copies of all Tax Returns of each Acquired Entity relating to Taxes for all taxable periods for which the applicable statute of limitations has not yet expired, (ii) complete and correct copies of all private letter rulings, revenue agent reports, information document requests, notices of proposed deficiencies, deficiency notices, protests, petitions, closing agreements, settlement agreements, pending ruling requests and any similar documents submitted by, received by, or agreed to by or on behalf of any Acquired Entity relating to Taxes for all taxable periods for which the statute of limitations has not yet expired, and (iii) copies of all material agreements, rulings, settlements or other Tax documents with or from any Governmental Entity relating to Tax incentives of any Acquired Entity.

Section 3.15     Employee Benefit Plans.

(a)     Section 3.15(a) of the Disclosure Schedule contains a true, complete and correct list of each Company Plan. The Company has described or provided or made available to Parent (i) current, accurate and complete copies of all material Company Plans, including all amendments thereto

and all related trust documents, or a written description of the Company Plan if such Company Plan is not set forth in a written document, (ii) the most recent annual reports (Form Series 5500), if any, required under ERISA or the Code in connection with each Company Plan, (iii) the most recent actuarial reports (if applicable) for all Company Plans, (iv) the most recent summary plan description, if any, required under ERISA with respect to each Company Plan, (v) all material correspondence to or from any Governmental Entity received in the last three (3) years with respect to any Company Plan and (vi) the most recent IRS determination or opinion letter issued with respect to each Company Plan intended to be qualified under Section 401(a) of the Code. "Company Plans" means employee benefit plans, programs and arrangements (including any "employee benefit plan" as defined in Section 3(3) of the Employee Retirement Income Security Act of 1974 ("ERISA")) and any other employment, bonus, stock option, stock purchase, incentive, deferred compensation, supplemental retirement, health, life or disability insurance, dependent care, severance and other fringe or employee benefit plans, programs, arrangements or agreements sponsored or maintained by any Acquired Entity or to which any Acquired Entity makes contributions or with respect to which any Acquired Entity has or would reasonably be expected to have any liability (contingent or otherwise) or that otherwise provides compensation or benefits to any current or former employee, officer, director, consultant or other natural person service provider of the Company in their capacity as such. No Acquired Entity has any express or implied commitment to create any other material employee benefit plan, program or arrangement or to modify, change or terminate any Company Plan, other than with respect to a modification, change or termination required by ERISA or the Code.

(b)      Each Company Plan that is intended to be qualified under Section 401(a) of the Code has received a favorable determination from the IRS stating that such Company Plan is so qualified or is a prototype plan to whose sponsor a favorable opinion letter has been issued by the IRS and nothing has occurred that caused or is reasonably likely to cause the loss of such qualification. Each Company Plan has been operated in material compliance with its terms and all applicable Laws and complies in form and in operation in all material respects with all applicable Laws.

(c)      Except as set forth in Section 3.15(c) of the Disclosure Schedule, no current or former employee, officer, director, consultant or other service provider of any Acquired Entity is or may become entitled under any Company Plan to receive health, life insurance or other welfare benefits (whether or not insured), beyond their retirement or other termination of service, other than health continuation coverage as required by Section 4980B of the Code.

(d)      Each Company Plan that constitutes in any part a nonqualified deferred compensation plan within the meaning of Section 409A of the Code has been operated and maintained in all material respects in operational and documentary compliance with Section 409A of the Code and all IRS guidance promulgated thereunder.

(e)      Neither the execution and delivery of this Agreement, stockholder or other approval of this Agreement nor the consummation of the transactions contemplated by this Agreement could, either alone or in combination with another event, (i) entitle any current or former employee, director, officer or independent contractor of any Acquired Entity to severance pay or any material increase in severance pay, (ii) accelerate the time of payment or vesting, or materially increase the amount of compensation due to any such employee, director, officer or independent contractor, (iii) directly or indirectly cause any Acquired Entity to transfer or set aside any assets to fund any material benefits under any Company Plan, (iv) otherwise give rise to any material liability under any Company Plan or (v) limit or restrict the right to merge, materially amend, terminate or transfer the assets of any Company Plan on or following the Effective Time.

(f)      No Acquired Entity is party to any Contract (including any Company Plan) that has resulted or would result, separately or in the aggregate, in connection with the transactions

contemplated by this Agreement (either alone or in combination with any other events), in the payment of any "excess parachute payments" within the meaning of Section 280G of the Code.

(g)    Each Acquired Entity is in compliance in all material respects with all applicable Laws relating to the employment of its employees or any other natural person service providers.

(h)    Other than benefit Claims made in the ordinary course of business, there are no Claims which have been asserted, instituted or threatened against any Company Plan, the assets of any Company Plan or the plan administrator or any fiduciary of the Company Plans with respect to the operation of such Company Plans.

(i)    No Acquired Entity has incurred any material liability for any Tax, fine or penalty under the Code, ERISA or other applicable Law in connection with the existence or operation of any Company Plan, and no fact or event exists which could give rise to any such material liability.

(j)    None of the Acquired Entities nor any ERISA Affiliate sponsors, contribute to, or have any liability (contingent or actual) with respect to, a multiemployer plan within the meaning of Section 3(37) or Section 4001(a)(3) of ERISA ("Multiemployer Plan"), a multiple employer welfare arrangement within the meaning of Section 3(40) of ERISA (a "MEWA") or an arrangement subject to Section 302 or Title IV of ERISA or Section 412 of the Code (a "Title IV Plan"), and during the preceding six (6) years none of the Acquired Entities nor any ERISA Affiliate have maintained, sponsored or contributed to or been required to contribute to a Multiemployer Plan, MEWA or Title IV Plan.

(k)    None of the Acquired Entities nor any ERISA Affiliate have used the services of workers provided by third party contract labor suppliers, temporary employees, "leased employees" within the meaning of Section 414(n) of the Code or individuals who have provided services as independent contractors in a manner that could result in the disqualification of any Company Plan or the imposition of penalties or excise taxes with respect to any Company Plan by the IRS, the Department of Labor or any other Governmental Entity.

(l)    No Acquired Entity has an obligation to provide, and no Company Plan or other agreement provides any individual with the right to, a gross up, indemnification, reimbursement or other payment for any excise or additional taxes, interest or penalties incurred pursuant to Section 409A or Section 4999 of the Code or due to the failure of any payment to be deductible under Section 280G of the Code.

(m)    With respect to each Company Plan that is subject to the law of any jurisdiction outside the United States (each, a "Foreign Benefit Plan"):

(i)    all employer and employee contributions to each Foreign Benefit Plan required by law or by the terms of such Foreign Benefit Plan have been timely made, or, if applicable, accrued, in accordance with applicable accounting practices;

(ii)    the fair market value of the assets of each funded Foreign Benefit Plan, the liability of each insurer for any Foreign Benefit Plan funded through insurance or the book reserve established for any Foreign Benefit Plan, together with any accrued contributions, is sufficient to procure or provide for the accrued benefit obligations, as of the Effective Time, with respect to all current and former participants in such plan according to the actuarial assumptions and valuations most recently used to determine employer contributions to such Foreign Benefit Plan and no transaction

31

contemplated by this Agreement shall cause such assets or insurance obligations to be less than such benefit obligations; and

(iii)    each Foreign Benefit Plan required to be registered has been registered and has been maintained in good standing with applicable Governmental Entities.

Section 3.16    Labor Matters.

(a)    No Acquired Entity is party to, or bound by, any Collective Bargaining Agreements; to the Acquired Entities' Knowledge, there are no Collective Bargaining Agreements that pertain to any of the employees of any Acquired Entity; and to the Acquired Entities' Knowledge, no employees of any Acquired Entity are represented by any labor union, works council, trade union or labor organization with respect to their employment with any Acquired Entity.

(b)    There is no pending demand for recognition or certification made by any labor union, trade union, labor organization or group of employees of any Acquired Entity, and there are no representation or certification proceedings or petitions seeking a representation proceeding presently pending or threatened in writing to be brought or filed with the National Labor Relations Board or any other labor relations tribunal or authority. To the Acquired Entities' Knowledge, there have been no union organizing activities with respect to any employees of any Acquired Entity.

(c)    (i) There are no actual or threatened material arbitrations, material grievances, strikes, lockouts, slowdowns, work stoppages or material labor-related Claims or disputes (collectively, "Labor Disputes") against or affecting any Acquired Entity, and no such Labor Disputes are pending, (ii) no Acquired Entity has committed any unfair labor practice as defined in the National Labor Relations Act, (iii) no Acquired Entity is in material violation of any Collective Bargaining Agreement or Law pertaining to labor, employment or employment practices, including all Laws regarding worker classification, health and safety, wages and hours, labor relations, employment discrimination, disability rights or benefits, equal opportunity, immigration, plant closures and layoffs, affirmative action, employee leave issues, unemployment insurance and workers' compensation and (iv) no Acquired Entity is party to any Claim alleging a violation of any Collective Bargaining Agreement or Law pertaining to labor, employment or employment practices, nor is any such Claim pending or threatened.

(d)    The Acquired Entities (i) since January 1, 2016, have properly classified and treated all of their respective workers as independent contractors or employees, (ii) since January 1, 2016, have properly classified and treated all of their respective employees as "exempt" or "nonexempt" in compliance with all applicable Laws pertaining to wages and hours, overtime requirements and taxes, (iii) are not delinquent in any payments to, or on behalf of, any current or former independent contractors or employees of any Acquired Entity for any services, benefits or amounts required to be reimbursed or otherwise paid or provided, (iv) have withheld and reported all amounts required by Law or by agreement to be withheld and reported with respect to wages, salaries and other payments to any current or former independent contractors or employees of any Acquired Entity and (v) except as set forth in Section 3.16(d) of the Disclosure Schedule, are not liable for any payment to any trust or other fund governed by or maintained by or on behalf of any Governmental Entity with respect to unemployment compensation benefits, social security or other benefits or obligations for any current or former independent contractors or employees of any Acquired Entity (other than routine payments to be made in the ordinary course of business and consistent with past practice). No Acquired Entity is subject to any pending audit or investigation by any Governmental Entity with respect to its employee classification or wage and hour practices or compliance.

(e)     No Acquired Entity is or has ever been (i) a "contractor" or "subcontractor" (as defined by Executive Order 11246), (ii) required to comply with Executive Order 11246 or (iii) required to maintain an affirmative action plan.

(f)     To the Acquired Entities' Knowledge, no employee of any Acquired Entity is in any material respect in violation of any term of any employment agreement, nondisclosure agreement, common law nondisclosure obligation, fiduciary duty, noncompetition agreement, restrictive covenant or other obligation (i) to any Acquired Entity or (ii) to a former employer of any such employee relating (1) to the right of any such employee to be employed by any Acquired Entity or (2) to the knowledge or use of Trade Secrets or proprietary information.

(g)     The Acquired Entities are and, since January 1, 2016, have been in compliance with all notice and other requirements under the WARN Act. In the eighteen (18) months prior to the date hereof, no Acquired Entity has (i) effectuated a "plant closing" (as defined in the WARN Act), or (ii) effectuated a "mass layoff" (as defined in the WARN Act).

(h)     No Acquired Entity is party to a settlement agreement executed since January 1, 2016 with a current or former officer, employee or independent contractor of any Acquired Entity that involves allegations relating to sexual harassment by either (i) an officer of any Acquired Entity or (ii) an employee of any Acquired Entity at any management level.

Section 3.17     Insurance. Section 3.17 of the Disclosure Schedule sets forth all material insurance policies naming any Acquired Entity or any director, officer or employee thereof as an insured or beneficiary or as a loss payable payee for which any Acquired Entity is obligated to pay all or part of the premiums as of the date hereof. Since January 1, 2016, the Acquired Entities have been continuously insured with recognized insurers or has self-insured, in each case in such amounts and with respect to such risks and losses as is required by Law and any Material Contract and as is customary for companies in the United States conducting the businesses conducted by the Acquired Entities. Since January 1, 2016 until and as of the date hereof, no Acquired Entity has received any written communication notifying it of any (a) cancellation or invalidation of any insurance policy held by it, (b) refusal of any coverage or rejection of any material Claim under any insurance policy held by it or (c) material adjustment in the amount of the premiums payable with respect to any material insurance policy held by it. As of the date hereof, there is no pending material Claim by any Acquired Entity against any insurance carrier under any insurance policy held by any Acquired Entity.

Section 3.18     Takeover Statutes. No "business combination," "fair price," "moratorium," "control share acquisition" or similar antitakeover statute or regulation (including Section 203 of the DGCL) is applicable to the Company, the shares of Company Stock or the Merger in connection with the transactions contemplated by this Agreement.

Section 3.19     Customers and Key Suppliers. Section 3.19 of the Disclosure Schedule sets forth (a) (i) the ten (10) largest customers of the Acquired Entities during the period of January 1, 2017 through December 31, 2017, measured by the amounts paid by such customers to the Acquired Entities during the period of January 1, 2017 through December 31, 2017 (each, a "Significant Customer") and (ii) all revenue received by the Acquired Entities from each Significant Customer during such period and (b) (i) the ten (10) largest suppliers and vendors of the Acquired Entities, measured by amounts paid by the Acquired Entities to such supplier or vendor during the period of January 1, 2017 through December 31, 2017 (each, a "Key Supplier") and (ii) all amounts paid by the Acquired Entities to each Key Supplier during such period. As of the date hereof, no Acquired Entity has received any written notice from any Person alleging or asserting that any Acquired Entity's performance under any Significant Customer Contract, or the performance of any Acquired Entity's products or services under

any Significant Customer Contract (1) is or has been deficient or substandard or (2) is or has been adverse to, or caused substantial disruption to, the businesses or operations of any Significant Customer.

Section 3.20    Sufficiency of Assets. (a) Upon the Closing, the assets and properties of or used by the Acquired Entities will constitute all of the material assets and properties used or held for use in the businesses of the Acquired Entities as currently conducted and (b) at the Closing, Parent will have sufficient rights, property and assets to conduct the operations of the businesses of the Acquired Entities as currently conducted in all material respects.

Section 3.21    Books and Records. The minute books and other similar records of the Acquired Entities covering the period of the last three (3) years contain complete and accurate records of all actions taken at any meetings of the Acquired Entities' stockholders, boards of directors or any committees thereof and of all written consents executed in lieu of the holding of any such meetings. Section 3.21 of the Disclosure Schedule contains a list of all bank accounts and safe deposit boxes of the Acquired Entities and the names of persons having signature authority with respect thereto or access thereto.

Section 3.22    Brokers. No broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of any Acquired Entity.

Section 3.23    No Other Representations and Warranties. Except for the representations and warranties expressly set forth in this ARTICLE III or in the certificate delivered by the Company at Closing pursuant to Section 6.2(c), neither the Company nor any other Person has made or is making any other express or implied representation or warranty, whether written or oral, on behalf of the Company or any of its Affiliates, directors, officers, employees, Subsidiaries, controlling persons, agents or other representatives.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF PARENT, MERGER SUB I AND MERGER SUB II

Parent, Merger Sub I and Merger Sub II, jointly and severally, hereby represent and warrant to the Company as follows:

Section 4.1    Due Organization and Good Standing. Each of Parent and Merger Sub I has been duly organized and is validly existing and in good standing under the Laws of the State of Delaware and Merger Sub II has been duly organized and is validly existing and in good standing under the Laws of the State of New York. Each of Parent, Merger Sub I and Merger Sub II has all requisite corporate (or limited liability company) power and authority to own, lease and operate its properties and assets and to conduct its businesses in the manner in which its businesses are currently being conducted. Parent owns beneficially and of record all outstanding equity interests in Merger Sub I and Merger Sub II, and no other Person holds any capital stock or membership interests of either Merger Sub I or Merger Sub II nor has any rights to acquire any interest in either Merger Sub I or Merger Sub II.

Section 4.2    Capitalization.

(a)    The rights and privileges of each class of Parent's capital stock are set forth in the certificate of incorporation of Parent. All the issued and outstanding shares of Parent's stock have been duly authorized and validly issued and are fully paid and nonassessable. All the Parent Shares

will be, when issued on the terms and conditions of this Agreement, duly authorized, validly issued, fully paid and nonassessable and not subject to (except for any Company Stockholders that execute a Proxy and Joinder, which will be subject to the restrictions therein) or issued in violation of any purchase option, call option, right of first refusal, preemptive right, subscription right, voting agreement, registration agreement, agreement on restriction(s) of the sale or transfer of shares of capital stock of Parent or any similar right, agreement or restriction under any provision of the certificate of incorporation or bylaws of Parent, or any agreement to which Parent is a party or is otherwise bound.

(b)        As of the date hereof, the authorized capital of Parent consists of:

(i)        459,934,875 shares of Class A Common Stock, $0.001 par value per share, 31,123,914 of which are issued and outstanding, and 183,942,797 shares of Class B Common Stock, $0.001 par value per share, 132,034,458 of which are issued and outstanding;

(ii)        38,392,950 shares of Series A Preferred Stock, $0.001 par value per share, all of which are issued and outstanding;

(iii)        22,165,260 shares of Series B Preferred Stock, $0.001 par value per share, all of which are issued and outstanding;

(iv)        1,500 shares of Junior Preferred Stock, $0.001 par value per share, all of which are issued and outstanding;

(v)        29,189,230 shares of Series C Preferred Stock, $0.001 par value per share, 28,403,928 of which are issued and outstanding;

(vi)        11,939,097 shares of Series D-1 Preferred Stock, $0.001 par value per share, all of which are issued and outstanding;

(vii)        9,380,718 shares of Series D-2 Preferred Stock, $0.001 par value per share, all of which are issued and outstanding;

(viii)        13,193,676 shares of Series E Preferred Stock, $0.001 par value per share, all of which are issued and outstanding;

(ix)        14,942,546 shares of Series F Preferred Stock, $0.001 par value per share, 13,759,327 of which are issued and outstanding; and

(x)        34,742,329 shares of Series G Preferred Stock, $0.001 par value per share, 33,113,319 of which are issued and outstanding.

Section 4.3        Authority; Binding Nature of Agreement. Each of Parent, Merger Sub I and Merger Sub II has the requisite corporate power and authority to enter into and to perform its covenants and agreements under this Agreement and each Other Transaction Agreement to which it is a party and, subject only to the Parent Approvals, to consummate the Merger and the other transactions contemplated by this Agreement and each Other Transaction Agreement to which it is a party. The execution, delivery and performance of this Agreement by Parent, Merger Sub I and Merger Sub II, and each Other Transaction Agreement to which Parent, Merger Sub I or Merger Sub II is or will be a party and the consummation by Parent, Merger Sub I and Merger Sub II of the transactions contemplated by this Agreement and each Other Transaction Agreement to which Parent, Merger Sub I or Merger Sub II is or will be a party have been duly and validly authorized by all necessary corporate action on the part of

35

Parent, Merger Sub I and Merger Sub II, and no other corporate proceedings on the part of Parent, Merger Sub I or Merger Sub II are necessary to authorize this Agreement, each Other Transaction Agreement to which Parent, Merger Sub I or Merger Sub II is or will be a party, the performance by Parent, Merger Sub I and Merger Sub II of their respective covenants and agreements under this Agreement and each Other Transaction Agreement to which Parent, Merger Sub I or Merger Sub II is or will be a party or the consummation of the transactions contemplated by this Agreement and each Other Transaction Agreement to which Parent, Merger Sub I or Merger Sub II is or will be a party, other than the Parent Approvals and the filing of the Restated Charter, the First Certificate of Merger and the Second Certificate of Merger with the Secretary of State of the State of Delaware. This Agreement and each Other Transaction Agreement to which Parent, Merger Sub I and Merger Sub II is or will be a party has been duly and validly executed and delivered on behalf of Parent, Merger Sub I and Merger Sub II, as applicable, and, assuming the due authorization, execution and delivery of this Agreement and each Other Transaction Agreement to which Parent, Merger Sub I or Merger Sub II is or will be a party by the other parties thereto, constitutes a legal, valid and binding obligation of Parent, Merger Sub I and Merger Sub II, enforceable against Parent, Merger Sub I and Merger Sub II in accordance with its terms, subject to (i) Laws of general application relating to bankruptcy, insolvency, reorganization, moratorium and other Laws affecting creditors' rights generally and (ii) rules of law governing specific performance, injunctive relief and other equitable remedies.

Section 4.4     Non-Contravention; Consents.

(a)     The execution, delivery and performance of this Agreement, and each Other Transaction Agreement to which Parent, Merger Sub I and Merger Sub II is or will be a party, by Parent, Merger Sub I and Merger Sub II, as applicable, and the consummation by Parent, Merger Sub I and Merger Sub II of the transactions contemplated by this Agreement and each Other Transaction Agreement to which Parent, Merger Sub I or Merger Sub II is or will be a party do not and will not (i) contravene, conflict with or result in any violation or breach of any of the provisions of the Organizational Documents of Parent, Merger Sub I and Merger Sub II, (ii) subject to making or obtaining, as applicable, the Consents and Filings set forth in Sections 4.4(b) contravene, conflict with or result in any violation or breach of any Law or (iii) require any Consent of or Filing with or to any Third Party with respect to, result in any breach or violation of or constitute a default (or an event which with or without notice or lapse of time or both would become a default) or result in the loss of a benefit or result in the imposition of an obligation under, or give rise to any right of termination, cancellation, amendment or acceleration of any right or obligation of Parent, Merger Sub I or Merger Sub II, or result in the creation of a Lien on any asset of Parent, Merger Sub I and Merger Sub II, under, any (1) Contract to which Parent, Merger Sub I or Merger Sub II is a party or by which Parent, Merger Sub I or Merger Sub II or any of their respective properties or assets are bound or (2) Permit held by Parent, Merger Sub I or Merger Sub II or pursuant to which Parent, Merger Sub I or Merger Sub II or any of their respective properties or assets are subject, except, in the case of the foregoing clauses (i) and (ii), as would not result in a material adverse effect on the ability of Parent, Merger Sub I or Merger Sub II to comply with its obligations under this Agreement.

(b)     Neither Parent nor Merger Sub I or Merger Sub II is required to make any Filing with or to, or to obtain any Consent from, any Governmental Entity in connection with the execution and delivery of this Agreement, or any Other Transaction Agreement to which Parent, Merger Sub I and Merger Sub II is or will be a party, by Parent, Merger Sub I or Merger Sub II or the performance and consummation by Parent, Merger Sub I or Merger Sub II of the transactions contemplated by this Agreement or any Other Transaction Agreement to which Parent, Merger Sub I and Merger Sub II is or will be a party, except for the filing of the Restated Certificate, the First Certificate of Merger with the Secretary of State of the State of Delaware and the Second Certificate of Merger with the Secretary of State of the State of Delaware and the Department of State of the State of New York.

Section 4.5     <u>Ownership and Operations of Merger Sub I and Merger Sub II</u>. From the date of the formation of Merger Sub I through the Effective Time, Parent owns all of the outstanding shares of common stock of Merger Sub I and from the date of the formation of Merger Sub II through the Second Effective Time, Parent owns all of the limited liability company interests of Merger Sub II that are treated as equity for federal income tax purposes. Until and throughout such time as the Second Merger is consummated, Merger Sub II shall be treated as a disregarded entity for purposes of federal taxation. Merger Sub I and Merger Sub II were formed solely for the purpose of engaging in the transactions contemplated by this Agreement and have no assets, liabilities or obligations of any nature other than those incident to their formation and pursuant to the transactions contemplated by this Agreement, and prior to the Effective Time, will not have engaged in any other business activities other than those relating to such transactions.

Section 4.6     <u>Claims; Orders</u>. There is no material Claim pending (or, to Parent's actual knowledge, being threatened) against Parent, Merger Sub I or Merger Sub II, and there is no material Order outstanding against Parent, Merger Sub I or Merger Sub II or to which Parent, Merger Sub I or Merger Sub II are subject, in each case that would result in a material adverse effect on the ability of Parent, Merger Sub I or Merger Sub II to comply with its obligations under this Agreement.

Section 4.7     <u>Brokers</u>. No broker, finder or investment banker is entitled to any brokerage, finder's or other similar fee or commission in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of Parent, Merger Sub I or Merger Sub II.

Section 4.8     <u>Parent Governance Documents</u>. Except for the Investor Agreements, Parent has not, and to Parent's knowledge no stockholder of Parent has, entered into any agreements with respect to the voting, registration or restrictions on the sale or transfer of shares of capital stock of Parent, in each case that would result in a material adverse effect on the ability of Parent, Merger Sub I or Merger Sub II to comply with its obligations under this Agreement. To Parent's knowledge, each of the Investor Agreements is in full force and effect and is the legal, valid and binding obligation of Parent and the other parties thereto, enforceable against each of them in accordance with their applicable terms. The execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereby by Parent do not breach or violate any rights or obligations under the Investor Agreements that have not been complied with or waived.

Section 4.9     <u>Parent Financial Statements</u>. Parent has delivered to the Company prior to the date hereof (i) the unaudited consolidated balance sheet of Parent as of September 30, 2017, and the related consolidated statements of operations, stockholders' equity and cash flows for the nine months then ended and (ii) the audited consolidated balance sheet of Parent as of December 31, 2016, and the related consolidated statements of operations, stockholders' equity and cash flows for the year then ended (all such financial statements referred to in the foregoing clauses (i) and (ii), the "<u>Parent Financial Statements</u>"). The Parent Financial Statements were prepared from the books and records of Parent and fairly present, in all material respects, the consolidated financial position of Parent as at the respective dates thereof and the consolidated results of operations and cash flows of Parent for the respective periods covered thereby in accordance with GAAP applied on a consistent basis throughout the periods covered (except as may be indicated in the notes to such financial statements or, in the case of unaudited statements, subject to the absence of notes not required by GAAP and normal year-end adjustments).

Section 4.10     <u>No Other Representations; No Reliance</u>. Parent is a sophisticated purchaser and has made its own independent investigation, review and analysis regarding the Acquired Entities and the transactions contemplated hereby, which investigation, review and analysis were conducted by Parent together with expert advisors, including legal counsel, that it has engaged for such

purpose. Parent has not relied on any representation or warranty of the Company, the Company Stockholders or any of their respective Representatives or Affiliates (or any other Person) in executing, delivering and performing this Agreement or any of the transactions contemplated by this Agreement or otherwise, in each case except for the representations and warranties of the Company set forth in ARTICLE III of this Agreement (as modified by the Disclosure Schedule) and in the certificate delivered by the Company at the Closing pursuant to Section 6.2(c) and the representations and warranties of each Company Securityholder (made solely in their individual capacities) in certain Other Transaction Agreements. Without limiting the generality of the foregoing, Parent hereby acknowledges and agrees that (i) any projections, forecasts, estimates, predictions, plans or budgets of future revenue, future expenses or future expenditures, future results of operations, future cash flows, future financial condition or other forward looking statements regarding the Acquired Entities are not and shall not be deemed to be or to include representations or warranties of the Company or any other Person, and are not and shall not be deemed to be relied upon by Parent in executing, delivering and performing this Agreement or the transactions contemplated by this Agreement or otherwise and neither the Company nor any of its Representatives or Affiliates (or any other Person, including the Company Stockholders) shall have any liability to Parent or any other Person with respect thereto and (ii) except as expressly set forth in ARTICLE III of this Agreement (as modified by the Disclosure Schedule) or in the certificate delivered by the Company at Closing pursuant to Section 6.2(c), no Person shall have any claim (whether in warranty, contract, tort (including negligence or strict liability) or otherwise) or right to indemnification pursuant to ARTICLE VIII (or otherwise) with respect to any information, documents or materials made available or otherwise furnished to or for Parent, its Affiliates or their respective Representatives by the Company, any Company Stockholder, any of their respective Affiliates, or any of their respective Representatives, including any financial projections or other statements regarding future performance, any "teaser" or confidential information memorandum regarding, among other things, the Acquired Entities and their business provided to Parent, its Affiliates or their respective Representatives and any other information, documents or materials, whether oral or written, made available to Parent, its Affiliates or their respective Representatives in any "data room," management presentation, "break-out" discussions, responses to questions submitted on behalf of Parent, its Affiliates or their respective Representatives or otherwise furnished to Parent, its Affiliates or their respective Representatives in any form in expectation of the transactions contemplated hereby or by the Other Transaction Agreements (and it is understood that any information provided to Parent, its Affiliates or their respective Representatives are not and shall not be deemed to be or to include representations and warranties of the Company or of any other Person, except for the representations and warranties expressly set forth in ARTICLE III of this Agreement (as modified by the Disclosure Schedule) or in the certificate delivered by the Company at Closing pursuant to Section 6.2(c)). Parent specifically acknowledges and agrees that neither the Company nor any other Person makes any, nor has made any, representations or warranties to Parent or any other Person regarding the probable success or profitability of the Acquired Entities, except for the representations and warranties expressly set forth in ARTICLE III of this Agreement (as modified by the Disclosure Schedule) or in the certificate delivered by the Company at Closing pursuant to Section 6.2(c).

## ARTICLE V

## COVENANTS AND AGREEMENTS

Section 5.1    Interim Operations of the Acquired Entities.

(a)    Prior to the Closing, except as expressly permitted by this Agreement, the Company shall, and shall cause each of its Subsidiaries to, (i) carry on its businesses in the ordinary course consistent with past practice and (ii) use its commercially reasonable efforts to preserve its business and goodwill and its relationships with Governmental Entities, customers, suppliers, landlords

and other persons with which it has material business relations, and to keep available the services of its current officers and employees.

(b)      Without limiting the generality of <u>Section 5.1(a)</u> and except as expressly contemplated by this Agreement, as set forth in <u>Section 5.1(b)</u> of the Disclosure Schedule or as required by applicable Law, <u>provided</u> that the Company provides Parent advance written notice within three (3) Business Days prior to taking any such action required by applicable Law, the Company agrees that, prior to the Closing, except as expressly permitted by this Agreement, the Company shall not, and shall not permit any of its Subsidiaries, without the prior written consent of Parent (which, with respect to clause <u>(xvii)</u> or <u>(xviii)</u> below, shall not be unreasonably withheld, conditioned or delayed) to:

(i)      amend its Organizational Documents;

(ii)      adjust, split, combine, amend the terms of or reclassify any shares of its capital stock;

(iii)      declare, set aside or pay any dividend or distribution (other than any dividend or distribution payable solely in cash) with respect to any shares of its capital stock or issue or propose or authorize the issuance of any other securities in respect of, in lieu of or in substitution for shares of its capital stock;

(iv)      enter into any Contract with respect to the voting of its capital stock;

(v)      merge or consolidate with any other Person or restructure, reorganize, recapitalize or completely or partially liquidate (or adopt a plan of liquidation);

(vi)      acquire (including by merger or consolidation) any equity interest in any other Entity;

(vii)      acquire tangible assets from any other Person other than in the ordinary course of business consistent with past practice;

(viii)      issue, sell, grant, pledge, dispose of, transfer or encumber, or authorize the issuance, sale, grant, pledge, disposition, transfer or encumbrance of, any shares of capital stock or other securities of any Entity, other than shares of Company Common Stock issuable upon the exercise of Company Options, Company Warrants, or other convertible or exercisable securities outstanding on the date hereof;

(ix)      sell, transfer, lease, sublease or license to any Third Party, or encumber, any material tangible assets or properties, other than in the ordinary course of business consistent with past practice;

(x)      acquire from, or sell, transfer, license or otherwise grant any rights to, any Third Party in, allow to lapse, abandon, dispose of or encumber any material Intellectual Property rights, except for non-exclusive licenses or other non-exclusive grants of rights in the ordinary course of business consistent with past practice;

(xi)      disclose to any Person, other than Representatives of Parent, any material Trade Secrets, except in the ordinary course of business consistent with past practice pursuant to

appropriate confidentiality or nondisclosure agreements or contractual provisions relating to confidentiality and nondisclosure;

(xii)     repurchase, redeem or otherwise acquire any shares of its capital stock or any other equity interests or any rights, warrants or options to acquire such shares or interests, in each case excluding the repurchase of employee restricted stock upon termination of service;

(xiii)    incur any Indebtedness;

(xiv)     terminate, materially extend or materially amend any Material Contract, waive, release or assign any material rights or Claims under any Material Contract or enter into or adopt any Contract that would be a Material Contract if it had been entered into or adopted on or prior to the date hereof; except in each case, in the ordinary course of business;

(xv)     change any of its methods of accounting or accounting practices in any material respect, except as may be required by applicable Laws or GAAP;

(xvi)     (A) make, change or revoke any Tax election, (B) surrender or compromise any right to claim for Tax refunds, (C) settle or compromise any claim, notice, audit, assessment or other proceeding relating to Taxes, (D) amend any Tax Return, (E) adopt or change any method, policy or practice of Tax accounting, (F) enter into any agreement affecting any Tax liability or refund or file any request for rulings or special Tax incentives with any Taxing Authority, (G) enter into any Tax Sharing Agreement, (H) extend or waive the statute of limitations period applicable to any Tax or Tax Return or (I) take, cause or otherwise permit any other Person to take or cause any action which could reasonably be expected to (1) increase Parent's or any of its Affiliates' (which, following the Closing, shall include the Company and its Subsidiaries) liability for Taxes or (2) result in, or change the character of, any income or gain that Parent or any of its Affiliates (which, following the Closing, shall include the Company and its Subsidiaries) must report on any Tax Return;

(xvii)    fund any capital expenditure in any calendar quarter which, when added to all other capital expenditures made by the Acquired Entities in such calendar quarter, would materially exceed the aggregate amount budgeted for capital expenditures in such calendar quarter (as set forth in Section 5.1(b)(xvii) of the Disclosure Schedule);

(xviii)   settle or compromise any Claim (1) where the settlement or compromise involves injunctive or other equitable relief against any Acquired Entity that would result in such Acquired Entity incurring costs to comply in excess of $250,000, (2) if such settlement or compromise would result in any Acquired Entity paying an amount greater than $250,000 in excess of the proceeds received or to be received, if any, from any insurance policies or any third party indemnitor in connection with such settlement or compromise or (3) concerning any material Intellectual Property;

(xix)     make any loan or advance to, or any investment in (either by purchase of stock or securities, contributions to capital, property transfers or purchase of any property or assets of), any Person;

(xx)     incur any Lien (other than a Permitted Lien) on any of the properties or assets (whether tangible or intangible) of, or used by, any Acquired Entity (other than Permitted Liens); or

(xxi)     except as required pursuant to the terms of any Company Plan in effect as of the date hereof and set forth in Section 5.1(b)(xxi) of the Disclosure Schedule, or as otherwise

required by applicable Law or as contemplated by this Agreement, (A) increase in any manner the compensation or consulting fees, bonus, pension, welfare, fringe or other benefits, severance or termination pay of any employee, director or independent contractor (who is a natural person) of any Acquired Entity, (B) become a party to, establish, adopt, amend, commence participation in or terminate any Company Plan or any arrangement that would have been a Company Plan had it been entered into prior to this Agreement, (C) grant any new awards, or amend or modify the terms of any outstanding awards, under any Company Plan, (D) take any action to accelerate the vesting or lapsing of restrictions or payment, or fund or in any other way secure the payment, of compensation or benefits under any Company Plan, (E) change any actuarial or other assumptions used to calculate funding obligations with respect to any Company Plan that is required by applicable Law to be funded or change the manner in which contributions to such plans are made or the basis on which such contributions are determined, except as may be required by GAAP, (F) forgive any loans or issue any loans (other than routine travel advances issued in the ordinary course of business) to any employee of an Acquired Entity or (G) hire any employee or engage any independent contractor (who is a natural person) with an annual salary or wage rate or consulting fees in excess of $200,000;

(xxii)    become a party to, establish, adopt, amend, commence participation in or terminate any Collective Bargaining Agreement or other agreement with a labor union, works council or similar organization; or

(xxiii)   enter into a Contract to take any of the actions described in this Section 5.1(b).

Section 5.2    No Solicitation.

(a)    The Company shall not, and shall direct its Representatives not to, directly or indirectly, (i) discuss, knowingly encourage, negotiate, undertake, initiate, authorize, recommend, propose or enter into, whether as the proposed surviving, merged, acquiring or acquired corporation or otherwise, any transaction involving an Acquisition Proposal, other than the transactions contemplated by this Agreement, (ii) facilitate, knowingly encourage, solicit or initiate discussions, negotiations or submissions of proposals or offers in respect of an Acquisition Proposal, (iii) furnish or cause to be furnished, to any Person, any information concerning the business, operations, employees, properties or assets of the Company in connection with an Acquisition Proposal or (iv) otherwise consent to, or cooperate in any way with, or assist or participate in, facilitate or knowingly encourage, any effort or attempt by any other Person to do or seek any of the foregoing.

(b)    Notwithstanding Section 5.2(a), prior to the receipt of the Company Stockholder Approval, the board of directors of the Company, directly or indirectly through any Representative, may: (i) participate in negotiations or discussions with any third party that has made (and not withdrawn) a bona fide, unsolicited takeover proposal in writing that the board of directors of the Company believes in good faith, after consultation with outside legal counsel, constitutes a superior proposal; (ii) thereafter furnish to such Third Party non-public information relating to the Company or any of its Subsidiaries pursuant to an executed confidentiality agreement and (iii) following receipt of and on account of a superior proposal, withdraw, amend, modify, or materially qualify, in a manner adverse to Parent, its recommendation with respect to the Merger, but in each case referred to in the foregoing clauses (i) through (iii), only if the board of directors of the Company determines in good faith, after consultation with outside legal counsel, that the failure to take such action would cause the board of directors of the Company to be inconsistent with its fiduciary duties under applicable Law.

(c)    The Company shall notify Parent orally and in writing promptly (but in no event later than twenty four (24) hours) after receipt by the Company, or any of its Representatives of

41

any Acquisition Proposal from any Person, other than Parent or its Affiliates, or any request for non-public information relating to the Company or for access to the properties, books or records of the Company by any Person, other than Parent, its Affiliates or its Representatives. Any such notice of an Acquisition Proposal shall include the name of the proposed purchaser, the dollar amount, if any, of the purchase price of the Acquisition Proposal, its composition (i.e., cash, securities, etc.), any material contingencies (e.g., earn-out or other conditions) and any other material terms and provisions thereof.

Section 5.3     Consents, Approvals and Filings; Other Actions.

(a)     Subject to the terms and conditions of this Agreement, each Party (other than the Stockholder Representative) shall use its commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable under applicable Law to cause the conditions to the Closing set forth in ARTICLE VI to be satisfied as promptly as reasonably practicable after the date hereof, including using commercially reasonable efforts to (i) prepare and make all Filings with Governmental Entities that are necessary, appropriate or advisable to consummate the Closing, (ii) obtain all Consents of Governmental Entities that are necessary, proper or advisable to consummate the Closing, (iii) obtain the Required Contractual Consents and all other Consents of Third Parties (not including Governmental Entities) that are necessary, proper or advisable to consummate the Merger; provided, however, Parent and the Company shall not be required to, and, without the prior written consent of Parent, the Company shall not be permitted to, expend money (other than reasonable fees of, and payments to, their respective legal and other professional advisors), commence any litigation or offer or grant any accommodation (financial or otherwise) to any Person, in each case, in connection with obtaining the Required Contractual Consents or any such other Consent of a Third Party, and (iv) execute and deliver any additional instruments that are necessary, proper or advisable to consummate the Merger.

(b)     Notwithstanding anything to the contrary in this Section 5.3, in no event shall Parent, Merger Sub I or Merger Sub II, in connection with obtaining any Consent contemplated by this Section 5.3 or otherwise, be required, and no Acquired Entity shall be permitted, (i) to propose, negotiate, commit to, agree to or effect, by consent decree, hold separate order or otherwise, the sale, divestiture or disposition of any assets or businesses of Parent, its Affiliates or the Acquired Entities, (ii) to agree to any limitation on the conduct of business of Parent, its Affiliates or the Acquired Entities, (iii) to commence any litigation in connection with any Consent contemplated by this Section 5.3 or (iv) to take, or agree to take, any other action, or agree to any condition, that would reasonably be expected to result in a material reduction in the expected benefits to Parent of the transactions contemplated by this Agreement.

(c)     Notwithstanding anything in this Agreement to the contrary, Section 5.3(a) shall not apply in respect of Tax matters.

Section 5.4     Access. Upon reasonable notice, the Company shall provide Parent and its Representatives reasonable access, during normal business hours throughout the period prior to the Effective Time, to each Acquired Entity's properties, books, records and personnel, and during such period, the Company shall cause to be furnished promptly to Parent and its Representatives all readily available information concerning each Acquired Entity's businesses as Parent may reasonably request. All information obtained by Parent and its Representatives pursuant to this Section 5.4 shall be treated as confidential.

Section 5.5     Employee Matters.

42

(a)       For eligibility and vesting purposes under the employee benefit plans of Parent and its Affiliates, if any, that are offered and provide benefits to Continuing Employees after the Closing Date (the "Parent Plans"), each Continuing Employee shall be credited with his or her years of service or comparable experience with the Company before the Closing Date to the same extent as such employee was entitled before the Closing Date to credit for such service under any similar Company Plan, except to the extent such credit would result in a duplication of benefits. For purposes of each Parent Plan, if any, providing medical, dental, pharmaceutical or vision benefits to any Continuing Employee, to the extent such Continuing Employee satisfied participation requirements and waiting period requirements under the relevant health and welfare benefit plans in which such Continuing Employee (and dependents) will be eligible to participate as of and after the Effective Time, all pre-existing condition exclusions and actively-at-work requirements of such Parent Plan shall be waived for such Continuing Employee and his or her covered dependents, and all eligible expenses incurred by such Continuing Employee and his or her covered dependents under the relevant health and welfare benefit plans in which such Continuing Employee (and dependents) will be eligible to participate as of and after the Effective Time during the portion of the plan year ending on the date of such Continuing Employee's participation in the corresponding Parent Plan begins shall be taken into account under such Parent Plan for purposes of satisfying all deductible, coinsurance and maximum out-of-pocket requirements applicable to such employee and his or her covered dependents for the applicable plan year as if such amounts had been paid in accordance with such Parent Plan subject to all applicable terms and conditions relating to such benefits or amounts.

(b)       Prior to the Closing, the Company shall cause the Conductor 401(k) Plan (the "Company 401(k) Plan") to be terminated effective immediately prior to the Closing. The Company shall provide Parent with evidence that such Company Plan has been terminated (the form and substance of which shall be subject to review and approval by Parent) not later than the day immediately preceding the Closing.

(c)       The Company shall use its commercially reasonable efforts to cause each of its employees, officers and directors to repay prior to the Closing any outstanding Indebtedness owed to the Company, the Company 401(k) Plan or any Company Plan, including the loans and advances set forth on Section 5.5(c) of the Disclosure Schedule.

(d)       Prior to the Closing, the Company shall use its commercially reasonable efforts to cause (i) each of individuals set forth in Section 5.5(d)(i) of the Disclosure Schedule to execute a change in control waiver agreement in the form attached as Exhibit F-1 (each a "CIC Waiver – Good Reason") and (ii) each of individuals set forth in Section 5.5(d)(ii) of the Disclosure Schedule to execute a change in control waiver agreement in the form attached as Exhibit F-2 (each a "CIC Waiver – Parent Equity Awards").

(e)       Effective as of the Closing, Parent shall take (or cause the Surviving Entity to take) each of the actions described in Section 5.5(e) of the Disclosure Schedule.

(f)       Nothing in this Section 5.5 shall be treated as an amendment of, an undertaking to amend or terminate, or a limitation on the ability of Parent or its Affiliates to amend or terminate any employee benefit plan (including any Company Plan). Nothing in this Agreement shall require Parent and the Surviving Entity to continue to employ the services of any particular individual following the Closing Date. No provision of this Agreement shall create any third party beneficiary rights in any employee or any other natural person service provider of any Acquired Entity or any beneficiary or dependents thereof with respect to the compensation, terms and conditions of employment and benefits that may be provided.

43

Section 5.6     <u>Publicity; Confidentiality</u>. Prior to the Closing, none of the Parties or any of their Representatives shall issue any press release or make any public announcement or comment concerning this Agreement or the transactions contemplated by this Agreement without obtaining the prior written consent of the Company (in the case of a disclosure by Parent, Merger Sub I or Merger Sub II) or Parent (in the case of a disclosure by the Company, the Stockholder Representative or any Company Stockholder), unless (i) any such release, announcement or comment is reasonably necessary to comply with such Party's obligations under applicable Law or under the rules of any national securities exchange on which the securities of such Party or any of its Affiliates are listed or in connection with dispute resolution proceedings regarding this Agreement or transactions contemplated by this Agreement; <u>provided</u> that, to the extent so required by applicable Law, (i) the Party intending to make such release, announcement or comment shall use its commercially reasonable efforts consistent with applicable Law to consult with the other Parties in advance of such release with respect to the text thereof, and (ii) any such press release, announcement or comment is consistent with any release, announcement or comment already made in compliance with this <u>Section 5.6</u>. The Company acknowledges and agrees that it has consented to Parent's initial press release concerning this Agreement or the transactions contemplated by this Agreement. Each Party agrees that this Agreement and the terms and conditions hereof, and any other agreement entered into in connection with this Agreement and the terms and conditions thereof, shall be kept confidential and shall not be disclosed or otherwise made available to any other Person and that copies of this Agreement and such other agreements shall not be publicly filed or otherwise made available to the public, except where such disclosure, availability or filing, is reasonably necessary to comply with applicable Law or the rules of any national securities exchange on which the securities of such Party or any of its Affiliates are listed.   Notwithstanding the foregoing, (i) any Company Stockholder that is a venture capital or similar private investment fund may disclose only the terms of this Agreement to the extent necessary to report the transactions contemplated hereby to its members or limited partners in accordance with such fund's standard practice and (ii) the Stockholder Representative may disclose information as required by Law or to its employees, advisors, agents or consultants and to the Company Stockholders, in each case who have a need to know such information, provided that such Persons are subject to confidentiality obligations with respect thereto.

Section 5.7     <u>Termination of Affiliate Contracts</u>. Except for any Affiliate Contract identified in writing by Parent to the Company prior to the Closing or any contract for the indemnification of present and former members of the board of directors of the Company and present and former officers of the Company, at or prior to the Closing, the Company shall terminate, or cause to be terminated, all Affiliate Contracts and shall cause each Acquired Entity to be released from all covenants, agreements, liabilities and obligations under the Affiliate Contracts, whether arising prior to, at or after the Closing, in each case, to be effective at or prior to the Closing.

Section 5.8     <u>Treatment of Company Equity Awards</u>.

(a)     Prior to the Effective Time, the Company shall take or cause to be taken any and all actions necessary under all Company Options and each Company Equity Plan to cause the Company Options to be treated as set forth in <u>Section 2.2</u>, including obtaining the written consent of the holder of each Company Option to the treatment set forth in <u>Section 2.2(b)</u> if required by the terms of such Company Option.

(b)     Unless earlier mailed or delivered by the Company, as soon as reasonably practicable after the Effective Time, and in any event no later than three (3) Business Days after the Closing Date, Parent or the Surviving Entity shall mail or deliver, or cause to be mailed or delivered, to each Company Optionholder a letter of transmittal, in the form attached as <u>Exhibit G</u> (each, an "<u>Optionholder Letter of Transmittal</u>"). A Company Optionholder shall not be entitled to receive any portion of the Option Exercise Amount under <u>Section 2.2(a)</u> until such Company Optionholder has

delivered to Parent or the Exchange Agent a duly executed and fully completed Optionholder Letter of Transmittal. Upon delivery to Parent or the Exchange Agent by a Company Optionholder of a duly executed and fully completed Optionholder Letter of Transmittal, (i) such Company Optionholder shall be entitled to receive the applicable portion of the Option Exercise Amount (if any) under Section 2.2(a) as, if, and when payable in accordance with this Agreement and (ii) the Surviving Entity shall pay the applicable portion of the Option Exercise Amount (if any) to such Company Optionholder in accordance with Section 2.2(d). From and after the Effective Time, each Company Option will be deemed, for all corporate purposes, to evidence only the rights set forth in Section 2.2(a).

Section 5.9    Company Stockholder Approval; Information Statement. Promptly (and in any event within twenty four (24) hours) after the execution and delivery of this Agreement, the Company shall deliver to Parent a copy of an action by written consent, in the form attached as Exhibit H, duly executed by the requisite Company Stockholders, evidencing the Company Stockholder Approval (the "Company Written Consent"). To the extent required by the DGCL, within ten (10) days after the date on which the Company obtains the Company Stockholder Approval, the Company shall distribute to all Company Stockholders that do not adopt this Agreement pursuant to the Company Written Consent or otherwise in accordance with the DGCL a notice of the adoption of this Agreement by the written consent of the requisite Company Stockholders pursuant to the applicable provisions of the DGCL, and the Company shall take all actions to provide that such notices constitute the notice to the Company Stockholders required by applicable Law that appraisal rights may be available to the Company Stockholders pursuant to the DGCL. No later than five (5) days prior to circulating such notice, the Company shall provide a copy thereof to Parent and shall consider in good faith and include Parent's reasonable comments thereon prior to distributing such notice to the Company Stockholders.

Section 5.10    Notification of Certain Matters. The Company and Parent, respectively, shall deliver written notice to the other Party promptly after such first Party becomes aware of (a) the occurrence or non-occurrence of any state of fact, event, change, condition or development whose occurrence or non-occurrence would be reasonably likely to cause (i) any representation or warranty contained in this Agreement to be untrue or incorrect in any material respect as of the Closing such that the conditions set forth in Section 6.2(a) would not then be satisfied, (ii) any condition set forth in ARTICLE VI not being able to be satisfied at any time after the date hereof or (iii) the occurrence of a Material Adverse Effect or a material adverse effect on the ability of Parent, Merger Sub I or Merger Sub II to comply with its obligations under this Agreement; (b) any material failure of any Party or any of its Affiliates or any officer, director, employee or agent thereof, to comply with or satisfy any covenant, condition or agreement to be complied with or satisfied by it hereunder such that the conditions set forth in Section 6.2(a) would not then be satisfied; and (c) any notice in writing or claim of material default, breach or violation under any Material Contract, or any written notice of any intent to terminate, not renew or challenge the validity or enforceability of any Material Contract; provided that neither such written notice nor the obligation to provide such notice shall (1) affect the representations, warranties, covenants or agreements of any Party or the conditions under ARTICLE VI, (2) otherwise limit or affect any remedy of any non-breaching Party and (3) amend, modify or supplement the Disclosure Schedule; provided further, that an unintentional failure of the Company to give notice under this Section 5.10 shall not be deemed to be a breach of covenant under this Section 5.10 and shall constitute only a breach of the underlying representation, warranty, covenant, condition, or agreement, as the case may be.

Section 5.11    Financing Cooperation. Concurrently with the execution and delivery of this Agreement, the Company shall deliver to Parent customary payoff letters in form and substance reasonably satisfactory to Parent from the applicable lenders or holders of all Indebtedness of the Company evidencing the amount necessary to repay or satisfy and discharge all Closing Indebtedness outstanding thereunder and shall have made customary arrangements for such lenders or holders of such Indebtedness of the Company to deliver all related Liens releases to Parent as soon as practicable, but in

any event prior to the Closing; <u>provided</u> that Parent agrees that no such releases shall be effective prior to the consummation of the Closing.

        Section 5.12    <u>Proprietary Information</u>.

        (a)    From and after the Closing until the eighteen (18) month anniversary of the Closing, no Company Stockholder shall disclose or make use of any information relating to the business of Parent, the Company, the Surviving Entity or any of their respective Affiliates that is not generally known by, nor easily learned or determined by, persons outside the Company (collectively referred to herein as "<u>Proprietary Information</u>") including, but not limited to: (i) specifications, manuals, Software in various stages of development, and other technical data; (ii) customer and prospect lists, details of agreements and communications with customers and prospects, and other customer information; (iii) sales plans and projections, product pricing information, protocols, acquisition, expansion, marketing, financial and other business information and existing and future products and business plans and strategies; (iv) sales proposals, demonstrations systems and sales material; (v) research and development; (vi) software systems, computer programs and source codes; (vii) sources of supply; (viii) identity of specialized consultants and contractors and Proprietary Information; (ix) purchasing, operating and other cost data; (x) special customer needs, cost and pricing data; and (xi) employee information (including personnel, payroll, compensation and benefit data and plans), including all such information recorded in manuals, memoranda, projections, reports, minutes, plans, drawings, sketches, designs, data, specifications, software programs and records, whether or not legended or otherwise identified as Proprietary Information, as well as such information that is the subject of meetings and discussions and not recorded. Proprietary Information shall not include such information that a Company Stockholder can demonstrate (A) is generally available to the public (other than as a result of a disclosure by such Company Stockholder), (B) was disclosed to such Company Stockholder by a Third Party under no obligation to keep such information confidential, or (C) was independently developed by such Company Stockholder without reference to Proprietary Information and such Proprietary Information does not relate to a competitive business. Notwithstanding the foregoing, no Company Stockholder shall have any obligation hereunder to keep confidential any of the Proprietary Information to the extent disclosure thereof is required by Law or in connection with dispute resolution proceedings regarding this Agreement or transactions contemplated by this Agreement; <u>provided</u>, <u>however</u>, that in the event disclosure is required by Law, such Company Stockholder shall use reasonable efforts to provide Parent with prompt advance notice, as permitted by applicable Law, of such requirement so that Parent may seek an appropriate protective order.

        (b)    Each Company Stockholder agrees that the remedy at Law for any breach of this Section would be inadequate and that Parent, Merger Sub I, Merger Sub II, the First Step Surviving Entity or the Surviving Entity, as applicable, shall be entitled to injunctive relief, without the requirement of posting any bond or other security, in addition to any other remedy it may have upon breach of any provision of this Section.

        Section 5.13    <u>No Claims</u>. Effective as of the Closing, each Company Stockholder hereby (a) waives any and all rights of indemnification, contribution and other similar rights against the Company, the First Step Surviving Entity and the Surviving Entity (other than any indemnification rights that a Company Stockholder may have under the Organizational Documents of the Company or any indemnification agreement between such Company Stockholder (or, in the case of a Company Stockholder that is a private investment fund, its Representatives) and the Company) arising out of the representations, warranties, covenants and agreements contained in this Agreement and/or out of the negotiation, execution or performance of this Agreement, and agrees that any claim of Parent, whether for indemnity or otherwise, may be asserted directly against the Company Stockholders or any Company Stockholder (solely to the extent, and subject to the limitations, provided in this Agreement), without any

46

need for any claim against, or joinder of, any other Company Stockholder, and (b) irrevocably and unconditionally waives, releases and forever discharges, with prejudice, Parent, Merger Sub I, Merger Sub II, the Acquired Entities, the First Step Surviving Entity, the Surviving Entity and each of their respective Affiliates from any and all charges, complaints, Claims, counterclaims, set-offs, defenses, acts and omissions, decrees, judgments, duties, penalties, sanctions, rights (including rights of indemnification, contribution and other similar rights, from whatever source, whether under Contract, applicable Law or otherwise), causes of action, protests, suits, disputes, orders, obligations, Indebtedness, demands, proceedings, Contracts, agreements, promises, Liabilities, controversies, costs, interests, expenses, fees (including attorneys' fees), Losses or damages of any kind, arising by any means (including subrogation, assignment, reimbursement, operation of law or otherwise), whether liquidated or unliquidated, apparent or unapparent, absolute or contingent, express or implied, fixed or variable, known or unknown, suspected or unsuspected, accrued or not accrued, foreseen or unforeseen, or mature or unmature, and whether derivative, joint, several or secondary, whether based on or arising out of state, federal, local, foreign, statutory, regulatory, common, or other Law, rule or regulation of any kind, related or with respect to, in connection with, or arising out of, directly or indirectly, any event, fact, matter, transaction, statement or representation, condition, circumstance, occurrence, act or omission that was in existence (or that occurred or failed to occur) at or prior to the Closing related to or in any way connected with, directly or indirectly, Parent, Merger Sub I, Merger Sub II, the First Step Surviving Entity, the Surviving Entity, the Acquired Entities or any of their respective Affiliates or shares of Company Stock that the Company Stockholders may own or have owned relating to the Company in their capacity as a service provider or as an equity holder; provided that this Section shall not be construed as releasing any Company Stockholder's rights under this Agreement or any agreement instrument, certificate or document delivered pursuant hereto. The foregoing release shall not cover (i) Claims arising from the rights of any Company Stockholder under this Agreement or any agreement, certificate or document delivered pursuant hereto; (ii) any rights to indemnification, advancement of expenses, reimbursement, contribution and exculpation by the Acquired Entities (including the Surviving Entity) for acts and omissions by the Company Stockholder or its Representative(s) in his or her capacity as a director, officer or Representative of any Acquired Entity occurring prior to the Effective Time, to the extent provided in (A) the Company Charter or the Company's bylaws, (B) liability insurance policies, (C) any indemnification agreement between the Company Stockholder (or, in the case of a Company Stockholder that is a private investment fund, its Representatives) and any Acquired Entity and (D) as otherwise set forth in this Agreement; (iii) the Company's existing formal written employee benefit plans, (iv) if the Company Stockholder is or was an employee, consultant or other service provider of the Company, (A) rights to accrued but unpaid wages, salaries or other cash compensation due to the Company Stockholder that remain unpaid as of the Closing, (B) rights to reimbursements for expenses incurred and documented prior to the Closing and consistent with the Company's reimbursement policies, (C) unreimbursed claims under employee health and welfare plans, consistent with terms of coverage related thereto, and (D) the Company Stockholder's entitlement to continuation coverage benefits or any other similar benefits required to be provided by Law and (v) any written Contract not arising out of or related to this Agreement or the negotiation, execution, performance or subject matter hereof or the transactions contemplated hereby between any Company Stockholder or its Affiliates and Parent or its Affiliates entered into prior to the Effective Time or any tort claim by any Company Stockholder or its Affiliates against Parent or its Affiliates which claim accrued prior to the Effective Time. The Company Stockholder further acknowledges and agrees that neither such Company Stockholder nor his, her or its Affiliates shall have any right of contribution, indemnification or right of advancement from Parent, Merger Sub I, Merger Sub II, the Acquired Entities, the First Step Surviving Entity, the Surviving Entity or any of their respective Affiliates with respect to any Losses claimed by any of such Persons against such Company Stockholder or any Affiliate thereof in their capacities as an Indemnifying Party pursuant to ARTICLE VIII of this Agreement.

Section 5.14 __280G Stockholder Vote__. Promptly following the execution and delivery of this Agreement, (a) the Company shall submit for approval by its stockholders, in conformance with Section 280G of the Code and the regulations thereunder (the "__280G Stockholder Vote__"), any payments that could constitute a "parachute payment" pursuant to Section 280G of the Code (each, a "__Parachute Payment__"), (b) the Company shall use commercially reasonable efforts to ensure that the right to any Parachute Payment shall have been irrevocably waived by each of the applicable "disqualified individuals" (as defined under Section 280G of the Code and the regulations promulgated thereunder) and (c) the Company shall deliver to Parent true and complete copies of all disclosure and documents that comprise the stockholder approval of each Parachute Payment and reflect all reasonable comments of Parent thereon.

Section 5.15 __Final Allocation Schedule__. The Company shall use its commercially reasonable efforts in preparing the Final Allocation Schedule, consult with Parent prior to Closing regarding the Final Allocation Schedule and consider any comments made by Parent in good faith. The Company shall provide Parent with all relevant supporting documentation and information as it may reasonably request with respect to all information and calculations set forth in the Final Allocation Schedule and the Company shall otherwise cooperate with Parent in its preparation.

Section 5.16 __Indemnification Obligations__. During the period ending six (6) years after the Effective Time, Parent will ensure that the Surviving Entity fulfills its indemnification, exculpation and expense advancement obligations to present and former members of the board of directors of the Company and present and former officers of the Company and present and former directors and officers of the Company's Subsidiaries (the "__Indemnified D&Os__") and present and former Company Stockholders affiliated with such Indemnified D&Os (the "__Appointing Stockholders__") pursuant to the terms of the Company's certificate of incorporation or bylaws, equivalent organizational documents of the Company's Subsidiaries and indemnification agreements as in effect as of the date hereof, for acts or omissions or matters which occurred or arose at or prior to the Effective Time (regardless of whether any proceeding relating to any Indemnified D&O's or Appointing Stockholders' rights to indemnification, exculpation, or expense advancement with respect to any such acts, omissions or matters is commenced before or after the Effective Time). Any claims for indemnification, exculpation or expense advancement made under this __Section 5.16__ on or prior to the sixth (6th) anniversary of the Effective Time shall survive until the final resolution thereof.

## ARTICLE VI

## CONDITIONS TO THE MERGER

Section 6.1 __Conditions to Each Party's Obligation to Effect the Merger__. The respective obligations of Parent, Merger Sub I, Merger Sub II and the Company to consummate the Merger shall be subject to the satisfaction (or waiver by Parent, Merger Sub I, Merger Sub II and the Company, if permissible under applicable Laws) on or prior to the Closing Date of the following conditions:

(a) __Company Stockholder Approval__. The Company shall have obtained the Company Stockholder Approval.

(b) __Parent Approvals__. Parent shall have obtained the Parent Approvals.

(c) __Restated Charter__. Parent shall have filed the Restated Charter with the Secretary of State of the State of Delaware.

(d)     Legal Restraints. No Law, whether preliminary, temporary or permanent, shall be in effect that prevents, makes illegal or prohibits, and no Claim by any Governmental Entity shall be pending that seeks to prevent, make illegal or prohibit, the consummation of the Merger (any such Law or Claim, a "Legal Restraint").

(e)     Accredited Investors. The total cash consideration payable in connection with the Merger (including pursuant to such Person's respective portion of the Holdback Amount that may become payable) to Company Stockholders that have failed to be determined by Parent in good faith to be an Accredited Investor in accordance with Section 2.9 shall not be greater than $3,000,000 as set forth in the Final Allocation Schedule.

Section 6.2     Conditions to Obligations of Parent, Merger Sub I and Merger Sub II. The obligation of Parent, Merger Sub I and Merger Sub II to consummate the Merger are further subject to the satisfaction (or waiver by Parent, if permissible under applicable Law) at or prior to the Closing of the following conditions:

(a)     Representations and Warranties.  The representations and warranties of the Company made in this Agreement shall be true and correct (read, for purposes of this Section 6.2(a) only, without giving effect to any qualifier as to materiality, "material" or "Material Adverse Effect" (other than the representation and warranty of the Company in Section 3.7(b)) in all material respects as of the date hereof and as of the Effective Time as if made as of the Effective Time (except to the extent any such representation or warranty expressly speaks as of the date hereof or any other specific date, in which case such representation or warranty shall have been accurate in all respects as of such date). Notwithstanding the foregoing, for purposes of making the determinations in this Section 6.2 only, the references to "as of the date hereof" contained in Section 3.10(d), Section 3.11(c), Section 3.12(b), Section 3.13(a) and the last sentence of Section 3.19, will be disregarded.

(b)     Performance of Covenants of the Company. The Company shall have performed or complied in all material respects with each covenant or agreement required to be performed or complied with by it under this Agreement at or prior to the Closing.

(c)     Officers' Certificate. Parent shall have received a certificate, dated as of the Effective Time and duly executed by an executive officer of the Company, certifying as to the matters set forth in Section 6.2(a) and Section 6.2(b).

(d)     Third Party Consents. The Company shall have (i) obtained Consents to the consummation of the transactions contemplated by this Agreement pursuant to the Contracts set forth in Section 6.2(d) of the Disclosure Schedule (the "Required Contractual Consents") and (ii) delivered to Parent evidence, reasonably acceptable thereto, of the obtainment of the Required Contractual Consents.

(e)     No Legal Proceedings. No judgment, order, decree, stipulation or injunction shall be in effect, and no Claim shall be pending or shall have been threatened, that would reasonably be expected to (i) prevent consummation of the transactions contemplated by this Agreement, or (ii) cause the transactions contemplated by this Agreement to be rescinded following consummation of such transaction.

(f)     Stockholder Written Consent. Parent shall have received the Company Written Consent, duly executed by Company Stockholders holding at least ninety percent (90%) of the Company Stock in the aggregate (determined on an as-converted Company Common Stock-equivalent basis).

(g)      Proxy and Stockholder Joinders.  Parent shall have received a Proxy and Joinder, duly executed by each Accredited Investor, other than any Accredited Investor who is not required by the terms of this Agreement, excluding this Section 6.2(g), to execute any Other Transaction Agreement prior to the Closing.

(h)      Dissenting Shares. The number of Dissenting Shares outstanding shall constitute not more than three percent (3%) of the Company Stock in the aggregate (determined on an as-converted Company Common Stock-equivalent basis).

(i)      280G Stockholder Vote. The 280G Stockholder Vote shall have occurred and any payments that could reasonably be expected to be non-deductible under Section 280G of the Code shall have been irrevocably waived by each of the applicable "disqualified individuals" (as defined under Section 280G of the Code and the regulations promulgated thereunder) and either approved or disapproved in the 280G Stockholder Vote.

(j)      Deliveries. Parent shall have received each of the items listed in Section 2.5(a).

(k)      Parent shall have received evidence, reasonably satisfactory to Parent, as to the termination of the Company 401(k) Plan pursuant to Section 5.5(b), without any Liabilities thereunder on the part of the Company.

(l)      FIRPTA Certificate. Parent shall have received a duly executed certification from the Company that shares of Company Stock are not United States real property interests as defined in Section 897(c) of the Code, together with a notice to the IRS, in accordance with Treasury Regulations under Sections 897 and 1445 of the Code, in the form attached as Exhibit I.

(m)      Final Allocation Schedule. Parent shall have received the certified Final Allocation Schedule in accordance with Section 2.6(a) subject to its reasonable satisfaction.

(n)      Closing Employment Packages. The individuals listed on Section 6.2(n) of the Disclosure Schedule and Parent or its designated Affiliates shall have executed and delivered (a) offer letters, (b) retention and forfeiture agreements and (c) invention, non-disclosure, non-competition and non-solicitation and employee dispute resolution program agreements, in each case the effectiveness of which are contingent upon the consummation of the Merger (collectively, the "Employment Packages"), which documents shall remain in full force and effect as of the Effective Time. All individuals listed on Section 6.2(n) of the Disclosure Schedule shall not have indicated to Parent, the Company or any of their Representatives an unwillingness to perform in accordance with the terms of their respective Employment Packages, as applicable.

Section 6.3      Conditions to Obligation of the Company. The obligation of the Company to consummate the Merger is further subject to the satisfaction (or waiver by the Company, if permissible under applicable Laws) at or prior to the Closing of the following conditions:

(a)      Representations and Warranties. The representations and warranties of Parent, Merger Sub I and Merger Sub II contained in this Agreement shall be true and correct (read, for purposes of this Section 6.3(a) only, without any qualifier as to materiality or "material") in all material respects as of the date hereof and as of the Closing Date as if made as of the Closing Date (except to the extent any such representation or warranty expressly speaks as of the date hereof or any other specific date, in which case such representation or warranty shall have been accurate in all respects as of such date).

(b)    <u>Performance of Obligations of Parent, Merger Sub I and Merger Sub II</u>. Each of Parent, Merger Sub I and Merger Sub II shall have performed or complied with in all material respects each covenant or agreement required to be performed or complied with by it under this Agreement at or prior to the Closing.

(c)    <u>Officers' Certificate</u>. The Company shall have received a certificate dated as of the Closing Date and duly executed by an executive officer of Parent certifying as to the matters set forth in <u>Section 6.3(a)</u> and <u>Section 6.3(b)</u>.

(d)    <u>Deliveries</u>. The Company shall have received each of the items listed in <u>Section 2.5(b)</u>.

## ARTICLE VII

## <u>TERMINATION</u>

Section 7.1    <u>Termination Rights</u>.

(a)    <u>Termination by Mutual Consent</u>. The Company and Parent shall have the right to terminate this Agreement at any time prior to the Effective Time by mutual written consent.

(b)    <u>Termination by Either the Company or Parent</u>. Each of the Company and Parent shall have the right to terminate this Agreement at any time prior to the Effective Time, if:

(i)    the Closing shall not have been consummated prior to 5:00 p.m. New York City time on April 30, 2018 (the "<u>End Date</u>"); <u>provided</u> that the right to terminate under this <u>Section 7.1(b)(i)</u> shall not be available in the event that the terminating Party's breach is the cause of such delay in consummation; or

(ii)    a Legal Restraint is in effect that has become final and nonappealable.

(c)    <u>Termination by Parent</u>.

(i)    Parent shall have the right to terminate this Agreement if the Company breaches or fails to perform any of its covenants or agreements contained in this Agreement, or if any of the representations or warranties of the Company contained in this Agreement fails to be accurate, which breach or failure (1) would give rise to the failure of a condition set forth in <u>Section 6.1</u>, <u>Section 6.2(a)</u> or <u>Section 6.2(b)</u>, as applicable, and (2) is not reasonably capable of being cured by the Company by the End Date or, if reasonably capable of being cured by the End Date, is not cured by the Company within ten (10) days after receiving written notice from Parent of such breach or failure; <u>provided</u> that the right to terminate this Agreement under this <u>Section 7.1(c)(i)</u> shall not be available if Parent is at that time in material breach of this Agreement.

(ii)    Parent shall have the right to terminate this Agreement if the Company does not deliver the Company Written Consent to Parent in accordance with <u>Section 5.9</u>; <u>provided</u>, <u>however</u>, that Parent shall not be permitted to terminate this Agreement under this <u>Section 7.1(c)(ii)</u> after the Company delivers the Company Written Consent to Parent.

(d)    <u>Termination by the Company</u>.

(i)     The Company shall have the right to terminate this Agreement if Parent, Merger Sub I or Merger Sub II breach or fail to perform any of its covenants or agreements contained in this Agreement, or if any of the representations or warranties of Parent, Merger Sub I or Merger Sub II contained in this Agreement fails to be accurate, which breach or failure (i) would give rise to the failure of a condition set forth in Section 6.1, Section 6.3(a) or Section 6.3(b), as applicable, and (ii) is not reasonably capable of being cured by Parent, Merger Sub I or Merger Sub II by the End Date or, if reasonably capable of being cured by the End Date, is not cured by Parent, Merger Sub I or Merger Sub II within ten (10) days after receiving written notice from the Company of such breach or failure; provided that the right to terminate this Agreement under this Section 7.1(d)(i) shall not be available if the Company is at that time in material breach of this Agreement.

(ii)     The Company shall have the right to terminate this Agreement if the condition set forth in Section 6.1(b) and Section 6.3(d) shall not have been satisfied prior to 5:00 p.m. New York City time on March 16, 2018; provided, however, that the Company shall not be permitted to terminate this Agreement under this Section 7.1(d)(ii) after Parent provides evidence of the Parent Approvals to the Company.

Section 7.2     Effect of Termination; Procedure for Termination.

(a)     In the event that this Agreement is terminated pursuant to Section 7.1, this Agreement shall be of no force or effect, without any liability or obligation on the part of any Party (or any stockholder or Representative thereof), whether arising before or after such termination, based on, arising out of or relating to this Agreement or the negotiation, execution, performance or subject matter hereof (whether in contract or in tort or otherwise, or whether at law (including at common law or by statute) or in equity); provided, however, that (i) this Section 7.2 and ARTICLE XI shall survive the termination of this Agreement and shall remain in full force and effect and (ii) this Section 7.2(a) shall not relieve any Party of any liability for fraud or any willful and material breach of this Agreement occurring prior to any such termination.  No termination of this Agreement shall affect the obligations of the parties contained in the Non-Disclosure Agreement, which shall survive termination of this Agreement on the terms set forth therein.

(b)     This Agreement may be terminated only pursuant to Section 7.1. In order to terminate this Agreement under Section 7.1, the Party desiring to terminate this Agreement shall give written notice of such termination to the other Parties in accordance with Section 11.8, specifying the provision of this Agreement pursuant to which such termination is effected.

## ARTICLE VIII

## INDEMNIFICATION

Section 8.1     Survival. The representations and warranties of the Parties contained in this Agreement and any Other Transaction Agreement shall survive the Closing until the date that is twelve (12) months after the Closing Date; provided, however, that the Fundamental Representations and the Company Tax Representations shall survive the Closing until the date that is ninety (90) days after the expiration of the statute of limitations (including all extensions or waivers thereof) applicable to the subject matter of the applicable representation or warranty. All of the covenants and agreements of the Parties contained in this Agreement and any Other Transaction Agreement shall survive the Closing until, and all Claims with respect thereto shall terminate on, (i) the date provided in such covenants and agreements, if any, or until the date on which they are performed in accordance with their respective terms, plus an additional thirty (30) days, and in the case of any covenant relating to Taxes, ninety (90) days after the expiration of the statute of limitations (including all extensions or waivers thereof)

applicable to the subject matter of the applicable covenant; provided that covenants (except any covenants set forth in ARTICLE IX) to be performed on or before the Effective Time shall survive for twelve (12) months following the Closing.  For clarity, indemnification obligations under ARTICLE VIII are not themselves covenants for purposes of this Section 8.1, the right to bring any claim for indemnification that is made pursuant to Section 8.2(a)(iv) will survive until the date that is ninety (90) days after the expiration of the applicable statute of limitations (including all extensions or waivers thereof), the right to bring any claim for indemnification that is made pursuant to Section 8.2(a)(v) or Section 8.2(a)(vi) will survive until the expiration of the applicable statute of limitations with respect to the underlying subject matter of such claim, and the right to bring any claim for indemnification that is made pursuant to Section 8.2(a)(vii) will survive until the date that is twelve (12) months after the Closing Date. Notwithstanding the foregoing, if a Claim Notice with respect to a Claim for indemnification under Section 8.2 has been delivered pursuant to Section 8.4 prior to the expiration of the applicable survival period set forth in this Section 8.1, the representations, warranties, covenants or agreements that are the subject of such Claim Notice shall survive with respect to such Claim Notice until such Claim is finally and fully resolved. This Section 8.1 shall operate as a contractual statute of limitations; provided, however, that nothing in this Section 8.1 shall limit any liability for, or any Party's rights to bring a Claim for, fraud, intentional breach or willful misconduct (including fraud, intentional breach or willful misconduct arising from or related to any breach or inaccuracy of any of the representations and warranties set forth in this Agreement, any certificate delivered hereunder or in any Other Transaction Agreement). As used in this ARTICLE VIII, "fraud" means intentional fraud (i.e. with scienter).  For the avoidance of doubt, no reference in this Agreement, any Other Transaction Agreement, or any certificate delivered pursuant hereto or thereto, to any applicable statute of limitations shall be deemed to refer to the Delaware extended breach of contract statute of limitations.

Section 8.2      Indemnification.

(a)      From and after the Closing, subject to the other provisions of this ARTICLE VIII, the Company Securityholders, severally and not jointly, in accordance with their respective Holdback Ownership Percentages or Securityholder Ownership Percentages, as applicable and as set forth herein, shall indemnify Parent for, and defend and hold Parent harmless from and against, any and all Losses actually suffered, paid or incurred by Parent or its Representatives (including any Acquired Entity) as a result of or related to:

(i)      any breach or inaccuracy, as of the date hereof or as of the Effective Time, of any of the representations and warranties of the Company set forth in this Agreement, other than the Company Fundamental Representations, or in any certificates delivered by the Company pursuant to this Agreement;

(ii)      any breach or inaccuracy, as of the date hereof or as of the Effective Time, of any of the Company Fundamental Representations or Company Tax Representations;

(iii)      any breach of any covenant or agreement of the Company set forth in this Agreement;

(iv)      any Pre-Closing Tax Obligation;

(v)      (1) any error or inaccuracy in the Final Allocation Schedule and (2) any Claim made by a Company Securityholder against Parent, Merger Sub I, Merger Sub II, the First Step Surviving Entity, the Surviving Entity or the Company (or any director or officer thereof) in connection with this Agreement or the Other Transaction Agreements or the transactions contemplated by this Agreement or the Other Transaction Agreements, as a result of, related to or arising from the

allocation among the Company Securityholders of the Total Consideration payable to such Persons under this Agreement, except for any Claim for indemnification pursuant to Section 8.2(b);

(vi)      any payments made by Parent in respect of Dissenting Shares, including all Claims and Orders as a result of, related to or arising from any Dissenting Shares (including any demand for appraisal under the DGCL or litigation related thereto), in each case, limited to an amount paid in excess of the amount that would have been due to such Dissenting Shares in connection with the transactions contemplated by this Agreement; or

(vii)      any payments or other Liabilities incurred by any Acquired Entity as a result of any such entity being deemed to be (or have been) the employer of any individual in Ukraine, including, without limitation, any amounts consisting of or related to social insurance contributions, employer Tax or Tax withholding, employee benefits or pensions, health and safety or other work condition Laws, rules or regulations, works council or other employee organization Liabilities or otherwise.

(b)      From and after the Closing, subject to the other provisions of this ARTICLE VIII, Parent shall indemnify the Company Securityholders (and, in the case of Losses indemnifiable by Parent and arising out of or related to Taxes, shall also indemnify persons holding direct or indirect ownership interests in Company Securityholders), on a proportionate basis in accordance with their respective Securityholder Ownership Percentages as set forth on the Final Allocation Schedule, for, and defend and hold each of them harmless from and against, any and all Losses actually suffered, paid or incurred by the Company Stockholders or their respective Representatives (excluding the Acquired Entities) as a result of or related to:

(i)      any breach or inaccuracy, as of the date hereof or as of the Effective Time, of any of the representations and warranties of Parent, Merger Sub I or Merger Sub II set forth in this Agreement, other than the Parent Special Fundamental Representations, or in any certificates delivered by such Persons pursuant to this Agreement;

(ii)      any breach or inaccuracy, as of the date hereof or as of the Effective Time, of any of the Parent Special Fundamental Representations; or

(iii)      any breach of any covenant or agreement of Parent, Merger Sub I or Merger Sub II set forth in this Agreement.

Section 8.3      Monetary Limitations.

(a)      Except with respect to fraud, intentional breach or willful misconduct (including fraud, intentional breach or willful misconduct arising from or related to any breach or inaccuracy of any of the representations and warranties set forth in this Agreement, any certificate delivered hereunder or in any Other Transaction Agreement), (i) the Company Securityholders shall not have any obligation to indemnify Parent under Section 8.2(a)(i) until the aggregate amount of all Losses for which the Company Securityholders are obligated to indemnify Parent pursuant to Section 8.2(a)(i) exceeds $750,000 (the "Basket"), at which point the Company Securityholders shall indemnify Parent for all such Losses to the first dollar, (ii) each Company Securityholder's liability to Parent under Section 8.2(a)(i) shall not exceed an amount equal to the product of such Company Securityholder's Holdback Ownership Percentage multiplied by the Holdback Amount (such aggregate amount, the "Cap"), (iii) Parent shall not have any obligation to indemnify the Company Securityholders under Section 8.2(b)(i) until the aggregate amount of all Losses for which Parent is obligated to indemnify the Company Securityholders pursuant to Section 8.2(b)(i) exceeds the Basket, at which point Parent shall indemnify

the Company Securityholders for all such Losses to the first dollar and (iv) Parent's aggregate liability to the Company Securityholders under Section 8.2(b)(i) shall not exceed the Cap.

(b)      Except with respect to fraud, intentional breach or willful misconduct (including fraud, intentional breach or willful misconduct arising from or related to any breach or inaccuracy of any of the representations and warranties set forth in this Agreement, any certificate delivered hereunder or in any Other Transaction Agreement), (i) no Indemnifying Party shall have any obligation to indemnify any Indemnified Person pursuant to Section 8.2(a)(i) or Section 8.2(b)(i), as applicable, in respect of Losses that are less than $30,000 for any series of one (1) or more related Claims arising out of the same facts or circumstances, and (ii) any such Losses that do not meet the threshold set forth in clause (i) above shall be excluded from any determination of whether the Basket has been exceeded.

(c)      Except for a Company Securityholder's liability for its own commission of fraud, intentional breach or willful misconduct (including fraud, intentional breach or willful misconduct arising from or related to any breach or inaccuracy of any of the representations and warranties set forth in any Other Transaction Agreement) in its capacity as a Company Securityholder and not as an employee or agent of the Company (in which case the only indemnity available is indemnification by such fraudulent Company Securityholder), and subject to the limitations set forth in Section 8.3(a), the aggregate liability of any Company Securityholder under Section 8.2 shall not exceed an amount equal to the value of the Total Consideration received by such Company Securityholder, valuing any shares of Parent Stock received as Total Consideration at the Parent Stock Per Share Value.

(d)      Except for fraud, intentional breach or willful misconduct (including fraud, intentional breach or willful misconduct arising from or related to any breach or inaccuracy of any of the representations and warranties set forth in this Agreement or in any certificate delivered hereunder), the aggregate liability of Parent under Section 8.2(b) shall not exceed the Merger Consideration.

(e)      Notwithstanding any other provision of this Agreement, in no event will any Company Securityholder be liable for any other Company Securityholder's breach of such other Company Securityholder's representations, warranties, covenants, or agreements contained in this Agreement or any Other Transaction Agreement to which such other Company Securityholder is a party, or for fraud, intentional breach or willful misconduct committed by such other Company Securityholder.

(f)      Any claim for Losses will be calculated without regard to any punitive, exemplary, special, incidental, or consequential damages unless (i) any such punitive, exemplary, special, incidental, or consequential damages are actually awarded to a third party by a Governmental Entity or (ii) in the case of special or consequential damages only, any such special or consequential damages are reasonably foreseeable; provided that Taxes shall not constitute exemplary, special, incidental, or consequential damages.

(g)      Any liability for indemnification under this ARTICLE VIII shall be determined without duplication of recovery by reason of the state of facts giving rise to such liability constituting a breach or other violation of more than one representation, warranty, covenant, agreement, certificate or certification.  In addition, if and solely to the extent that an amount of Losses in connection with an indemnifiable matter was already taken into account in connection with calculation of the Total Consideration, including the Final Closing Adjustment, the same Losses may not be recovered under this ARTICLE VIII.

Section 8.4      Indemnification Procedures.

(a)  <u>Claim Notice</u>.  Throughout this Section 8.4, the terms "Indemnified Person" and "Indemnifying Party" shall be deemed to include the Stockholder Representative acting on the Company Stockholders' behalf when such terms are used in reference to the Company Stockholders; provided, that the Stockholder Representative shall not be required to make any indemnification payments to any Person. Any Person seeking indemnification under <u>Section 8.2</u> (each, an "<u>Indemnified Person</u>") shall assert any Claim for indemnification, including any Third-Party Claim, by delivering written notice thereof (a "<u>Claim Notice</u>") in accordance with <u>Section 11.8</u> to the Party from which indemnification is sought pursuant to <u>Section 8.2</u> (the "<u>Indemnifying Party</u>") promptly after learning of the basis for such Claim; <u>provided</u> that when indemnification is sought from the Company Stockholders, such notice shall be delivered to the Stockholder Representative; <u>provided</u>, <u>further</u>, that the failure to so notify the Party from which indemnification is sought shall not limit the Indemnified Person's rights to indemnification hereunder except to the extent that an Indemnifying Party is actually and materially prejudiced by such failure. Each Claim Notice shall describe in reasonable detail the nature of the Claim specifying in reasonable detail the basis for the Claim, as well as the Losses relating thereto (which, if not determinable at such time, may be a reasonable good faith estimate thereof), and attach copies of all material written evidence thereof that the Indemnified Person has received from any Person that is not a Party or a Person Affiliated with a Party (a "<u>Third Party</u>") to the date of the Claim Notice.

(b)  <u>Defense of Third-Party Claims</u>.  Upon receipt by an Indemnifying Party of a Claim Notice in respect of a Claim brought by a Third Party (a "<u>Third-Party Claim</u>"), the Indemnifying Party shall be entitled to (i) assume and have sole control over the defense and investigation of such Third-Party Claim at its sole cost and expense (subject to the last sentence of this <u>Section 8.4(b)</u>) and with counsel of its own choosing if it gives notice of its intention to do so to the Indemnified Person within thirty (30) days after the delivery of such Claim Notice by the Indemnified Person and (ii) negotiate a settlement or compromise of, or consent to the entry of an Order with respect to, such Claim; <u>provided</u> that, if (1) such settlement, compromise or consent does not include a full and unconditional waiver and release by such Third Party of all applicable Indemnified Persons for all Losses with respect to such Third-Party Claim, (2) such settlement, compromise or consent imposes a Lien on any of the assets of any such Indemnified Person or (3) such settlement, compromise or consent results or would reasonably be expected to result in any restriction or condition that would apply to or affect any such Indemnified Person, or the conduct of any such Indemnified Person's business, or would have a material adverse effect on the reputation of such Indemnified Person or any of its Affiliates, such settlement, compromise or consent shall be permitted only with the prior written consent of such Indemnified Person (whether or not such Indemnified Person is an actual or potential party to such Third-Party Claim), which consent shall not be unreasonably withheld, conditioned or delayed. If the Indemnifying Party elects to assume control of the defense and investigation of any such Third-Party Claim, then the Indemnified Person shall be entitled to participate in (but not control) such defense and investigation with counsel reasonably acceptable to the Indemnifying Party at such Indemnified Person's sole cost and expense. Upon request, the Indemnified Person will provide the Indemnifying Party copies of complaints, pleadings, notices and material communications with respect to such Third-Party Claim.

(c)  <u>Limitation on Defense of Third-Party Claims</u>.  Notwithstanding anything to the contrary in <u>Section 8.4(b)</u>, the Indemnifying Party shall not be entitled to assume and control the defense or investigation of any Third-Party Claim that (i) seeks an injunction or other equitable relief against an Indemnified Person or (ii) involves an allegation that an Indemnified Person committed a criminal act. If, within thirty (30) days after delivery by an Indemnified Person of any Claim Notice with respect to a Third-Party Claim, the Indemnifying Party (1) (A) notifies such Indemnified Person in writing that the Indemnifying Party does not elect to defend and investigate such Third-Party Claim or (B) fails to deliver to the Indemnified Person a written election to assume the defense and investigation of such Third-Party Claim or (2) is not entitled to assume the defense or investigation of such Third-Party Claim, then (I) such Indemnified Person may, at its option, defend, investigate, settle or compromise, or

consent to an entry of an Order with respect to, such Third-Party Claim; <u>provided</u> that any such settlement, compromise or consent shall be permitted only with the written consent of the Indemnifying Party (whether or not the Indemnifying Party is an actual or potential party to such Third-Party Claim), which consent shall not be unreasonably withheld, conditioned or delayed (it being understood and agreed that it shall be reasonable for the Indemnifying Party to withhold such consent if the Indemnifying Party believes in good faith that there is not any underlying basis for indemnification with respect to such settlement), and (II) the Indemnifying Party may participate in (but not control) any such defense and investigation at its sole cost and expense.

(d)     Notwithstanding anything in this <u>Section 8.4</u> to the contrary, <u>ARTICLE IX</u> shall govern for purposes of any Third-Party Claim that is a Tax Claim.

Section 8.5     <u>Losses</u>. The amount of any and all Losses of an Indemnified Person that is indemnifiable under this <u>ARTICLE VIII</u> shall be determined net of any amounts actually recovered by such Indemnified Person under or pursuant to any insurance policy or any indemnity or reimbursement arrangement or Contract pursuant to which such Indemnified Person has rights to recovery and reimbursement with respect to such Losses, including reimbursement in the event that Company Stockholders have indemnified Parent prior to such recovery and reimbursement.

Section 8.6     <u>Materiality Scrape</u>.  For purposes of determining the amount of Losses arising from a breach of or inaccuracy in any representation or warranty of the Parties to this Agreement (but not for purposes of determining whether any such breach or inaccuracy occurred), limitations or qualifications as to dollar amount, materiality or Material Adverse Effect (or similar concept) set forth in such representation, warranty, covenant or obligation shall be disregarded (other than the representation and warranty of the Company set forth in <u>Section 3.7(b)</u>).

Section 8.7     <u>Tax Limitations</u>. Notwithstanding any other provision of this Agreement, no Acquired Entity is making and shall not be construed to have made, and the Company Stockholders shall not have any liability or indemnification obligation with respect to, any representation or warranty as to the amount or availability of any net operating losses, Tax credits, or other Tax attributes. Notwithstanding anything to the contrary in this Agreement, neither Parent nor any of its Affiliates shall be entitled to make any claim for recovery for any Losses related to or arising from (i) the amount or availability of any net operating losses, Tax credits, or other Tax attributes of the Acquired Entities or (ii) the ability of Parent or any of its Affiliates to utilize any net operating losses, Tax credits, or other Tax attributes of the Acquired Entities following the Closing.

Section 8.8     <u>Adjustments for Tax Purposes</u>.  The Parties agree that any indemnification payments made pursuant to this Agreement shall be treated for income Tax purposes as an adjustment to the Total Consideration, unless otherwise required by applicable Law.

Section 8.9     <u>Exclusive Remedy for Damages</u>. Following the Closing, the right to be indemnified pursuant to this <u>ARTICLE VIII</u> shall be the sole and exclusive remedy of the Indemnified Persons for damages with respect to the subject matter of this Agreement; <u>provided</u>, <u>however</u>, that (i) any Party shall have the right to seek equitable remedies in accordance with <u>Section 11.5</u> and (ii) notwithstanding any provision in this Agreement to the contrary, including but not limited to <u>Section 4.10</u>, this <u>ARTICLE VIII</u> and <u>Section 11.5</u>, each Party expressly reserves and does not intend to waive any rights, remedies or claims based on fraud, intentional breach or willful misconduct of any other Party. For clarity, this means that the survival and claim periods and liability limits set forth in this <u>ARTICLE VIII</u> shall control notwithstanding any statutory or common law provisions or principles to the contrary.

Section 8.10    <u>Order of Recourse</u>. Indemnification obligations of the Company Securityholders pursuant to this <u>ARTICLE VIII</u> shall be satisfied first, from the Holdback Amount by the Company Stockholders in proportion to their respective Holdback Ownership Percentages until such obligations in the aggregate exceed the Holdback Amount, and thereafter, by the Company Securityholders, based on their respective Securityholder Ownership Percentages by payment of cash or forfeiture of shares of Parent Stock, in accordance herewith. Parent's sole recourse with respect to Claims pursuant to <u>Section 8.2(a)(i)</u> shall be recovery from the Holdback Amount in accordance with this <u>ARTICLE VIII</u>.

Section 8.11    <u>Calculation of Number of Parent Shares For Satisfaction of Claims</u>. Solely for purposes of calculating the number of shares of Parent Stock to be forfeited or cancelled, as applicable, in satisfaction of Claims hereunder, the value of each Parent Share at the time of any forfeiture or cancellation pursuant to the provisions of this Article VIII and <u>Section 2.14(f)</u> shall be equal to $72 per share.

Section 8.12    <u>Satisfaction of Claims in Cash or Cash Equivalents</u>. Notwithstanding any other provision of this Agreement, a Company Stockholder may elect to satisfy its indemnification obligations under this <u>ARTICLE VIII</u> in excess of its pro rata portion of the Holdback Amount in cash or cash equivalents instead of by forfeiture of shares of Parent Stock.

Section 8.13    <u>Mitigation of Losses</u>. Except with respect to Taxes, the Indemnified Persons shall use commercially reasonable efforts (including the taking of any actions reasonably requested by an Indemnifying Party) to avoid or mitigate any Losses, which in the absence of mitigation would give rise to or increase a Loss in respect of any claim under this <u>ARTICLE VIII</u>.  In the event an Indemnified Person fails to so mitigate an indemnifiable Loss, the Indemnifying Party shall have no liability for any portion of such Loss that would reasonably have been avoided had the Indemnified Person made such efforts.

**ARTICLE IX**

**TAX MATTERS**

Section 9.1    <u>Responsibility for Filing Tax Returns</u>.

(a)    Parent shall prepare or cause to be prepared and timely file or cause to be timely filed (taking into account all extensions properly obtained) all Tax Returns for the Acquired Entities that are required to be filed after the Closing Date. All income Tax Returns of the Acquired Entities that include Pre-Closing Tax Periods shall be prepared in a manner consistent with the Company's respective past practices, as reasonably determined by Parent in consultation with the Stockholder Representative, unless otherwise required by applicable Tax Law.

(b)    No later than twenty (20) days prior to the due date for filing of any Tax Return of any Acquired Entity that includes a Pre-Closing Tax Period (such Tax Returns, the "<u>Parent Prepared Returns</u>"), Parent shall provide the Stockholder Representative with a draft of such Parent Prepared Return. The Stockholder Representative shall have the right to review and provide reasonable comments on such Parent Prepared Returns during the twenty (20) day period following the receipt of such Parent Prepared Returns. Parent and the Stockholder Representative shall undertake to agree upon any such Parent Prepared Return. Any dispute relating to such Parent Prepared Returns shall be determined by the Neutral Accountant (or other comparable Person mutually agreed upon). Subject to Parent's rights to indemnification, Parent shall timely remit or cause to be timely remitted any Taxes reflected on such Parent Prepared Returns. No failure or delay of Parent in providing a Parent Prepared

Return for the Stockholder Representative's review and comment shall reduce or otherwise affect the obligations or liabilities of the Company Stockholders pursuant to this Agreement except to the extent the Company Stockholders are actually prejudiced by such failure or delay.

Section 9.2    Straddle Periods. For purposes of this Agreement, whenever it is necessary to determine the liability for Taxes of any Acquired Entity for any Straddle Period, the determination of the Taxes of such Acquired Entity for the portion of the Straddle Period ending on and including, and the portion of the Straddle Period beginning after, the Closing Date shall be determined by assuming that the Straddle Period consisted of two (2) taxable years or periods, one which ended at the close of the Closing Date and the other which began at the beginning of the day following the Closing Date, and items of income, gain, deduction, loss or credit of such Acquired Entity for the Straddle Period, shall be allocated between such two (2) taxable years or periods on a "closing of the books basis" by assuming that the books of such Acquired Entity were closed at the close of the Closing Date; provided, however, (i) exemptions, allowances or deductions that are calculated on an annual basis, such as the deduction for depreciation, (ii) in the case of Taxes resulting from items attributable to a Straddle Period and included in the income of an Acquired Entity under Section 951(a) or Section 951A of the Code, Taxes shall be determined as though the taxable year of the controlled foreign corporation (within the meaning of Section 957 of the Code) giving rise to such inclusions of income ended on (and included) the Closing Date and (iii) periodic Taxes (other than income, franchise/capital, sales, use, or withholding Taxes) such as real and personal property taxes, shall be apportioned ratably between such periods based on the number of days for the portion of the Straddle Period ending on and including the Closing Date, on the one hand, and the number of days for the portion of the Straddle Period beginning after the Closing Date, on the other hand.

Section 9.3    Tax Refunds. Any Tax refund received by Parent, the Surviving Entity or any of their Affiliates that relates to a Tax actually paid by an Acquired Entity in a Pre-Closing Tax Period and any Taxes which the Company Securityholders have borne under ARTICLE VIII shall be for the account of the Company Stockholders, except to the extent (i) such Tax refund resulted from the carry back of a net operating loss or other Tax attribute or Tax credit that was economically generated after the Closing Date or (ii) such Tax refund gives rise to a payment obligation by Parent or any of its Affiliates to any person under applicable Law or pursuant to a provision of a Contract or other agreement entered (or assumed) by any Acquired Entity on or prior to the Closing Date. Parent shall pay or cause to be paid any such Tax refund to the Exchange Agent (for further distribution to the Company Stockholders) within fifteen (15) days after receipt thereof (without interest, other than interest received from a Taxing Authority), net of any Taxes imposed on such refund and any reasonable out-of-pocket expenses that Parent, the Surviving Entity or any of their Affiliates directly incur (or will directly incur) with respect to their receipt of such Tax refund (and related interest). The Company Stockholders will indemnify, hold harmless and reimburse Parent, the Surviving Entity and any of their Affiliates if and to the extent that any such refund is required to be returned to a Governmental Entity (including any interest imposed with respect thereto). Any other Tax refunds related to any Acquired Entity shall be for the sole account of Parent.

Section 9.4    Contests Related to Taxes.

(a)    Notwithstanding anything to the contrary in Section 8.4, if, after the Closing Date, a Party entitled to indemnification for Taxes under this Agreement receives notice of any audit, demand, claim, proposed adjustment, assessment, examination or other administrative or court proceeding (a "Tax Claim") with respect (in whole or in part) to such indemnified Taxes, such Party shall promptly supply a copy of such document to the potentially indemnifying Party; provided, however, that no failure or delay on the part of the Party entitled to indemnification to give such notice shall reduce or otherwise affect the obligations or liabilities of the indemnifying Party pursuant to this Agreement except

to the extent such indemnifying Party is actually and materially prejudiced by such failure or delay. Any information provided or obtained under this paragraph shall be kept confidential, except as may otherwise be necessary in connection with the filing of a Tax Return, refund claims, or any Tax Claim, or as required by applicable Law.

(b)      Parent or the Surviving Entity shall control any Tax Claim of any Acquired Entity or the Surviving Entity; provided, however, in the case of a Tax Claim relating solely to any Pre-Closing Tax Period of any Acquired Entity that could reasonably be expected to result in any increased Tax liability for which the Company Stockholders would be required to provide indemnification pursuant to this Agreement, (i) the Stockholder Representative may, at the expense of the Company Stockholders, participate fully in (but not control) the defense of any such Tax Claim and (ii) Parent or the Surviving Entity shall not, and shall not allow the Surviving Entity to, settle, compromise or otherwise resolve any such Tax Claim without the prior written consent of the Stockholder Representative (which consent shall not be unreasonably withheld, delayed or conditioned).

Section 9.5      Cooperation Related to Taxes. Parent, the Surviving Entity, the Company Stockholders, and the Stockholder Representative shall cooperate fully, as and to the extent reasonably requested by the other party, in connection with the filing of Tax Returns pursuant to this ARTICLE IX, any Tax Claim, any information necessary or reasonably requested to allow Parent or the Surviving Entity to comply with any information reporting or withholding requirements contained in the Code or other applicable Laws, and any certificates or forms, and executing such certificates or forms, that are necessary or appropriate to establish an exemption from (or reduction in) any Transfer Tax. Such cooperation shall include the retention and (upon the other party's request) the provision of records and information that are reasonably relevant to any such Tax Claim and making employees available on a mutually convenient basis to provide additional information and explanation of any material provided hereunder. Any information obtained pursuant to this Section 9.5 or pursuant to any other Section hereof providing for the sharing of information or review of any Tax Return or other schedule relating to Taxes with respect to any Acquired Entity shall be kept, unless otherwise required by applicable Law, confidential by the Parties hereto and their respective legal and tax advisors; provided, that the Stockholder Representative may share any such information on a need-to-know basis with its advisors and representatives and with the Company Stockholders.

Section 9.6      Transfer Taxes. Any Transfer Taxes arising in connection with the Merger shall be borne by the Company Stockholders. Parent and the Company Stockholders shall use commercially reasonable efforts to minimize any such Transfer Taxes and shall each file or cause an Affiliate of each of them to sign and file all documentation with the relevant Taxing Authority relating to such Transfer Taxes as it may be required to sign or file under applicable Law.

Section 9.7      Tax Sharing Agreements. All Tax Sharing Agreements with respect to or involving any Acquired Entity shall be terminated as of the Closing Date, and after the Closing Date, no Acquired Entity shall be bound thereby or have any liability thereunder (whether related to any period before or after the Closing).

Section 9.8      Reorganization. The Parties adopt this Agreement as a "plan of reorganization" within the meaning of Treasury Regulations Sections 1.368-2(g) and 1.368-3.  It is intended by the Parties hereto that the Merger shall constitute a "reorganization" within the meaning of Section 368(a) of the Code, and each Party to this Agreement will take all commercially reasonable action to effect the transactions contemplated by Section 1.1 and shall not take any action that would cause the Merger to not constitute a "reorganization" by reason of a failure to satisfy the requirement of Treasury Regulations Section 1.368-1(d) nor take any action or position before a Governmental Entity which is inconsistent with the intent to treat the Merger as a "reorganization" within the meaning of Section

368(a), unless otherwise required by a determination (within the meaning of Section 1313(a)(1) of the Code or any comparable provision of state or local Law). Further, each Party hereto shall cause all Tax Returns to be filed on the basis of treating the Merger as a "reorganization" within the meaning of Section 368(a) of the Code unless otherwise required by a determination (within the meaning of Section 1313(a)(1) of the Code or any comparable provision of state or local Law). To the knowledge of Parent, there are no facts or circumstances that, either alone or in combination, would reasonably be expected to cause the Merger to fail to qualify as a "reorganization" within the meaning of Section 368(a) of the Code.

**ARTICLE X**

**STOCKHOLDER REPRESENTATIVE**

Section 10.1 <u>Appointment</u>. By voting in favor of the adoption of this Agreement, the approval of the principal terms of the Merger and the consummation of the Merger or participating in the Merger and receiving the benefits thereof, including the right to receive the consideration payable in connection with the Merger, each Company Stockholder shall be deemed to have approved the designation of, and hereby designates, Shareholder Representative Services LLC as the representative, exclusive agent and attorney-in-fact of each of the Company Stockholders to act on behalf of each Company Stockholder for all purposes in connection with and to facilitate the consummation of the transactions contemplated by this Agreement and the agreements ancillary hereto, which shall include the power and authority:

(a) to give and receive notices and communications;

(b) to execute and deliver any Contract, certificate or other document in connection with this Agreement (with such modifications or changes therein as to which the Stockholder Representative, in its sole discretion, shall have consented) and to agree to such amendments or modifications thereto as the Stockholder Representative, in its sole discretion, determines to be desirable;

(c) to execute and deliver such waivers and consents in connection with this Agreement and any other Contract, certificate or other document in connection with this Agreement and the consummation of the transactions contemplated by this Agreement and thereby as the Stockholder Representative, in its sole discretion, may deem necessary or desirable;

(d) to enforce and protect the rights and interests of the Company Stockholders and to enforce and protect the rights and interests of the Stockholder Representative arising out of or under or in any manner relating to this Agreement and any other Contract, certificate or other document in connection with this Agreement, and to take any and all actions which the Stockholder Representative believes are necessary or appropriate under this Agreement for and on behalf of the Company Stockholders, including asserting or pursuing any Claim against Parent or its Representatives, in each case, to the extent such Claims are permitted under this Agreement, compromising or settling any such Claims, conducting negotiations with Parent and its Representatives regarding such Claims and, in connection therewith, to (1) assert or institute any Claim, (2) investigate, defend, contest or litigate any Claim initiated by a Party, its Affiliates or any other Person, or by any federal, state or local Governmental Entity against the Stockholder Representative, any Company Stockholder, and receive process on behalf of any Company Stockholder in any such Claim or investigation and compromise or settle on such terms as the Stockholder Representative shall determine to be appropriate, and give receipts, releases and discharges with respect to, any such Claim or investigation, (3) file any proofs of debt, claims and petitions as the Stockholder Representative may deem advisable or necessary and (4) file and prosecute appeals from any Order rendered in any such Claim or investigation, it being understood

61

that the Stockholder Representative shall not have any obligation to take any such actions and shall not have any Liability for any failure to take any such actions;

(e)     to refrain from enforcing any right of any Company Stockholder or the Stockholder Representative arising out of or under or in any manner relating to this Agreement or any Contract, certificate or other document in connection with this Agreement; provided, however, that no such failure to act on the part of the Stockholder Representative, except as otherwise provided in this Agreement, shall be deemed a waiver of any such right or interest by the Stockholder Representative or by such Company Stockholder unless such waiver is made in accordance with Section 11.2; and

(f)     to make, execute, acknowledge and deliver all such other Contracts, agreements, guarantees, orders, receipts, endorsements, notices, requests, instructions, certificates, stock powers, letters and other writings, and, in general, to do any and all things and to take any and all action that the Stockholder Representative, in its sole and absolute discretion, may consider necessary or proper or convenient in connection with or to carry out the transactions contemplated by this Agreement or any other Contract, certificate or other document in connection with this Agreement.

Section 10.2    Exculpation; Indemnification.  Stockholder Representative shall be entitled to reimbursement from the Company Stockholders of all of its out-of-pocket costs and expenses incurred as the Stockholder Representative. In connection with this Agreement and any other Contract, certificate or other document in connection with this Agreement, and in exercising or failing to exercise all or any of the powers conferred on the Stockholder Representative under this Agreement, (a) the Stockholder Representative shall incur no responsibility or liability whatsoever to any Company Stockholder by reason of any error in judgment or other act or omission performed or omitted under this Agreement or any other Contract, certificate or other document in connection with this Agreement, except to the extent of responsibility or liability directly resulting from the Stockholder Representative's gross negligence, fraud or willful misconduct, and (b) the Stockholder Representative shall be entitled to rely on the advice of counsel, public accountants or other independent experts, in each case experienced in the matter at issue, and any error in judgment or other act or omission of the Stockholder Representative pursuant to such advice shall in no event subject the Stockholder Representative to Liability to any Company Stockholder. Each Company Stockholder shall, severally and not jointly, on a pro rata basis (based on their respective Expense Fund Percentage compared to the aggregate Expense Fund Percentage of all Company Stockholders), indemnify, defend and hold harmless the Stockholder Representative from and against any and all losses, liabilities, damages, claims, penalties, fines, forfeitures, actions, fees, costs and expenses (including the fees and expenses of counsel and experts and their staffs and all expense of document location, duplication and shipment) (collectively, "Representative Losses") arising out of or in connection with the Stockholder Representative's execution and performance of this Agreement and any agreements ancillary hereto, in each case as such Representative Losses are suffered or incurred; provided, that in the event that any such Representative Losses are finally adjudicated to have been directly caused by the gross negligence, fraud or willful misconduct of the Stockholder Representative, the Stockholder Representative will reimburse the Company Stockholders the amount of such indemnified Representative Loss to the extent attributable to such gross negligence, fraud or willful misconduct. If not paid directly to the Stockholder Representative by the Company Stockholders, any such Representative Losses may be recovered by the Stockholder Representative from (i) the Expense Fund Amount and (ii) the Holdback Amount at such time as remaining amounts thereof would otherwise be distributable to the Company Stockholders; provided, that while this allows the Stockholder Representative to be paid from the aforementioned sources of funds, this does not relieve the Company Stockholders from their obligation to promptly pay such Representative Losses as they are suffered or incurred, nor does it prevent the Stockholder Representative from seeking any remedies available to it at law or otherwise. In no event will the Stockholder Representative be required to advance its own funds on behalf of the Company Stockholders or otherwise. Notwithstanding anything in this Agreement to the

contrary, any restrictions or limitations on liability or indemnification obligations of the Company Stockholders set forth elsewhere in this Agreement are not intended to be applicable to the indemnities provided to the Stockholder Representative under this Section 10.2. The foregoing indemnities will survive the Closing, the resignation or removal of the Stockholder Representative or the termination of this Agreement.

Section 10.3    Reliance. Parent and its Representatives shall have the right to rely upon all actions taken or omitted to be taken by the Stockholder Representative pursuant to this Agreement or any other Contract, certificate or other document in connection with this Agreement and all such actions or omissions shall be legally binding on the Company Stockholders.

Section 10.4    Access to Information. The Stockholder Representative shall have reasonable access to information about the First Step Surviving Entity and the Surviving Entity and the reasonable assistance of the Company's former officers and employees for purposes of performing its duties and exercising its rights hereunder; provided, however, that neither Parent, the First Step Surviving Entity nor the Surviving Entity shall be obligated to provide such access or information if it determines, in its reasonable judgment, that doing so would cause the waiver of attorney-client privilege; provided, further that Parent, the First Step Surviving Entity and the Surviving Entity shall use commercially reasonable efforts to provide such information to the Stockholder Representative in a manner that would not adversely affect any such privilege, including by entering into joint defense agreements or similar arrangements with the Stockholder Representative.

Section 10.5    Advisory Group. Certain Indemnifying Parties (the "Advisory Group") have concurrently herewith entered into a letter agreement with the Stockholder Representative regarding direction to be provided by the Advisory Group to Stockholder Representative. The Advisory Group shall incur no Liability or financial obligation to the Company Stockholders for any actions taken by members of the Advisory Group in good faith and arising out of or in connection with the acceptance or administration of their duties (it being understood that any act done or omitted pursuant to the advice of counsel shall be conclusive evidence of such good faith), even if such act or omission constitutes negligence on the part of the Advisory Group or one of its members. This indemnification and exculpation shall survive the termination of this Agreement.

Section 10.6    Interest. The grant of authority to the Stockholder Representative under this Agreement (a) is coupled with an interest and shall be irrevocable and survive the death, incompetency, bankruptcy or liquidation of any Company Stockholder and (b) shall survive the consummation of the transactions contemplated by this Agreement. If the Stockholder Representative shall resign or be removed by the Company Stockholders, the Company Stockholders shall (by consent of those Company Stockholders entitled to at least a majority of the Total Consideration), within ten (10) days after such resignation or removal, appoint a successor to the Stockholder Representative. Any such successor shall succeed the former Stockholder Representative as the Stockholder Representative hereunder.

Section 10.7    Expense Fund. Upon the Closing, the Company will wire the Expense Fund Amount to the Stockholder Representative, which will be used for the purposes of paying directly, or reimbursing the Stockholder Representative for, any third party expenses pursuant to this Agreement and the agreements ancillary hereto. The Company Stockholders will not receive any interest or earnings on the Expense Fund Account and irrevocably transfer and assign to the Stockholder Representative any ownership right that they may otherwise have had in any such interest or earnings. The Stockholder Representative will not be liable for any loss of principal of the Expense Fund Amount other than as a result of its gross negligence or willful misconduct. The Stockholder Representative will hold these funds in the Expense Fund Account separate from its corporate funds, will not use these funds for its operating

expenses or any other corporate purposes and will not voluntarily make these funds available to its creditors in the event of bankruptcy. As soon as practicable following the completion of the Stockholder Representative's responsibilities, the Stockholder Representative will deliver any remaining balance of the Expense Fund Amount to the Exchange Agent for further distribution to the Company Stockholders. Each Company Stockholder shall receive in such distribution either cash or shares of Parent Stock equal in value to the product of such Company Stockholder's Expense Fund Percentage and the amount of the Expense Fund Amount being distributed, each as set forth on the Final Allocation Schedule. For tax purposes, the Expense Fund Amount will be treated as having been received and voluntarily set aside by the Company Stockholders at the time of the Closing.

## ARTICLE XI

## MISCELLANEOUS PROVISIONS

Section 11.1    Amendment. This Agreement may be amended, supplemented or changed only by a written instrument signed by each of Parent, Merger Sub I, Merger Sub II, the Company and the Stockholder Representative.

Section 11.2    Waiver. No failure on the part of any Party to exercise any power, right, privilege or remedy under this Agreement, and no delay on the part of any Party in exercising any power, right, privilege or remedy under this Agreement, shall operate as a waiver of such power, right, privilege or remedy, and no single or partial exercise of any such power, right, privilege or remedy shall preclude any other or further exercise thereof or of any other power, right, privilege or remedy. No Party shall be deemed to have waived any Claim arising out of this Agreement, or any power, right, privilege or remedy under this Agreement, unless the waiver of such Claim, power, right, privilege or remedy is expressly set forth in a written instrument duly executed and delivered on behalf of such party, and any such waiver shall not be applicable or have any effect except in the specific instance in which it is given.

Section 11.3    Entire Agreement; Counterparts. This Agreement and the Other Transaction Agreements constitute the entire agreement, and supersede all prior agreements and understandings, both written and oral, among or between any of the Parties with respect to the subject matter hereof and thereof. This Agreement may be executed in several counterparts, each of which shall be deemed an original and all of which shall constitute one and the same instrument. Delivery of an executed counterpart of this Agreement by facsimile or other electronic transmission shall be effective as delivery of an original counterpart hereof.

Section 11.4    Applicable Law; Jurisdiction; WAIVER OF JURY TRIAL. This Agreement, and all Claims and causes of action (whether in contract or in tort or otherwise, or whether at law (including at common law or by statute) or in equity) that may be based on, arise out of or relate to this Agreement or the negotiation, execution, performance or subject matter hereof shall be construed in accordance with and governed by the Laws of the State of Delaware applicable to agreements made and to be performed solely therein, without giving effect to principles of conflicts of law. In any action among or between any of the Parties arising out of or relating to this Agreement, each Party (a) irrevocably and unconditionally consents and submits to the exclusive jurisdiction and venue of the United States District Court for the Southern District of New York, or, if such court does not have subject matter jurisdiction, in the State courts of New York located in New York County, (b) agrees that all Claims in respect of such action or proceeding shall be heard and determined exclusively in accordance with clause (a) of this Section 11.4, (c) waives any objection to laying venue in any such action or proceeding in such courts, (d) waives any objection that any such court is an inconvenient forum or does not have jurisdiction over any Party and (e) agrees that service of process upon such Party in any such action shall be effective if such process is given as a notice in accordance with Section 11.8. **EACH PARTY IRREVOCABLY**

**WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY CLAIM ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT.**

Section 11.5    Remedies; Specific Performance.

(a)    Except as otherwise provided herein, any and all remedies herein expressly conferred upon a party will be deemed cumulative with and not exclusive of any other remedy conferred by this Agreement, or by law or equity upon such party, and the exercise by a party of any one remedy will not preclude the exercise of any other remedy. For clarity, Section 8.9 shall control exclusively on the topic of monetary remedies following the Closing.

(b)    The Parties acknowledge and agree that irreparable damage would occur in the event that any of the provisions of this Agreement were not performed in accordance with their specific terms or were otherwise breached and that monetary damages, even if available, would not be an adequate remedy therefor. It is accordingly agreed that, at any time prior to the termination of this Agreement pursuant to ARTICLE VII, the Parties shall be entitled to an injunction or injunctions to prevent breaches of this Agreement and to enforce specifically the performance of terms and provisions of this Agreement, including the right of a Party to cause each other Party to consummate the Merger and the other transactions contemplated by this Agreement, in any court referred to in Section 11.4, without proof of actual damages (and each Party waives any requirement for the securing or posting of any bond in connection with such remedy), this being in addition to any other remedy to which they are entitled at law or in equity. The Parties further agree not to assert that a remedy of specific enforcement is unenforceable, invalid, contrary to Law or inequitable for any reason, nor to assert that a remedy of monetary damages would provide an adequate remedy for any such breach.

Section 11.6    Payment of Expenses. Except as set forth in Section 2.8(a)(i), Section 2.14(e) and ARTICLE X, whether or not the Closing occurs, each Party shall pay its own expenses incident to preparing for, entering into and carrying out this Agreement and the transactions contemplated by this Agreement.

Section 11.7    Assignability; Third Party Rights. Neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated, in whole or in part, by operation of law or otherwise, by any Party without the prior written consent of the other Parties, and any such assignment without such prior written consent shall be null and void. This Agreement shall be binding upon, and shall be enforceable by and inure to the benefit of, the Parties and their respective successors and permitted assigns. Except as provided in the following sentence, nothing in this Agreement, express or implied, is intended to or shall confer upon any Person other than a Party hereto (and its successors and permitted assigns, if any) any rights, interests, benefits or other remedies of any nature under or by reason of this Agreement.  This Agreement is intended to benefit the Company Stockholders, the Indemnified Persons, the Indemnifying Parties and the Directors and Officers of the Company and each Company Stockholder, Indemnified Person and Indemnifying Party and each Director and Officer of the Company shall be deemed an intended third-party beneficiary of this Agreement and this Agreement shall be enforceable by the Company Stockholders, the Indemnified Persons, the Indemnifying Parties and the Directors and Officers of the Company.

Section 11.8    Notices. All notices and other communications under this Agreement shall be in writing and shall be deemed given (a) when delivered personally by hand (with written confirmation of receipt by other than automatic means, whether electronic or otherwise), (b) when sent by email (with written confirmation of transmission) or (c) one (1) Business Day following the day sent by an internationally recognized overnight courier (with written confirmation of receipt), in each case, at the

following addresses and email addresses (or to such other address or email address as a Party may have specified by notice given to the other Party pursuant to this provision):

      if to Parent, Merger Sub I or Merger Sub II:

          WeWork Companies Inc.
          115 West 18th Street, 2nd floor
          New York, New York 10011
          Attention: Legal Department
          E-mail: legal@wework.com

      if to the Company:

          Conductor, Inc.
          2 Park Ave, New York, NY 10016
          Email: seth@conductor.com
          Attention: Seth Besmertnik

      with a copy (which shall not constitute notice) to:

          Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP
          220 West 42nd Street, 17th Floor
          New York, NY 10036
          (212) 730 8133
          Email: kmcvay@gunder.com
          Attention: Kenneth R. McVay

      if to the Stockholder Representative (or, after the Closing, to any Company Stockholder):

          Shareholder Representative Services LLC
          950 17th Street, Suite 1400
          Denver, CO 80202
          Attention: Managing Director
          Email: deals@srsacquiom.com
          Facsimile: (303) 623-0294
          Telephone: (303) 648-4085

      with a copy (which shall not constitute notice) to:

          Gunderson Dettmer Stough Villeneuve Franklin & Hachigian, LLP
          220 West 42nd Street, 17th Floor
          New York, NY 10036
          (212) 730 8133
          Email: kmcvay@gunder.com
          Attention: Kenneth R. McVay

66

Lowenstein Sandler LLP
1251 Avenue of the Americas
New York, New York 10020
(212) 419 5836
E-mail: mbrosse@lowenstein.com
Attention: Michael A. Brosse

Section 11.9    <u>Severability</u>. Any term or provision of this Agreement that is invalid or unenforceable in any situation in any jurisdiction shall not affect the validity or enforceability of the remaining terms and provisions hereof or the validity or enforceability of the offending term or provision in any other situation or in any other jurisdiction.

Section 11.10    <u>Construction</u>.

(a)    <u>Time Periods</u>. When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, (i) the date that is the reference date in calculating such period shall be excluded and (ii) if the last day of such period is a not a Business Day, the period in question shall end on the next succeeding Business Day.

(b)    <u>Dollars</u>. Unless otherwise specifically indicated, any reference herein to "$" means U.S. dollars.

(c)    <u>Gender and Number</u>. Any reference herein to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(d)    <u>Articles, Sections and Headings</u>. When a reference is made herein to an Article or a Section, such reference shall be to an Article or a Section of this Agreement unless otherwise indicated. The table of contents and headings contained herein are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(e)    <u>Include</u>. Whenever the words "include," "includes" or "including" are used herein, they shall be deemed to be followed by the words "without limitation."

(f)    <u>Hereof</u>. The words "hereof," "hereto," "hereby," "herein" and "hereunder" and words of similar import when used herein shall refer to this Agreement as a whole and not to any particular provision of this Agreement.

(g)    <u>Extent</u>. The word "extent" in the phrase "to the extent" means the degree to which a subject or other thing extends, and such phrase shall not mean simply "if."

(h)    <u>Contracts; Laws</u>. Any Contract or Law defined or referred to herein means such Contract or Law as from time to time amended, modified or supplemented, unless otherwise specifically indicated.

(i)    <u>Persons</u>. References to a Person are also to its successors and permitted assigns.

(j)    <u>Exhibits and Disclosure Schedule</u>. The Exhibits to this Agreement and the Disclosure Schedule are incorporated and made a part hereof and are an integral part of this Agreement. The Company may, at its option, include in the Disclosure Schedule items that are not

67

material in order to avoid any misunderstanding, and such inclusion, or any references to dollar amounts herein or in the Disclosure Schedule, shall not be deemed to be an acknowledgement or representation that such items are material, to establish any standard of materiality or to define further the meaning of such terms for purposes of this Agreement or otherwise. The Disclosure Schedule shall be organized into sections that correspond to the Sections of this Agreement. Any item set forth in any section of the Disclosure Schedule that corresponds to a Section of this Agreement shall apply to and qualify only (i) such Section of this Agreement and (ii) any other Section of this Agreement that contains a representation or warranty if such item's relevance to such other Section is reasonably apparent on its face without further inquiry. Any capitalized term used in any Exhibit or the Disclosure Schedule but not otherwise defined therein shall have the meaning given to such term herein.

(k)     Made Available. A document or information shall be deemed to have been "made available" or otherwise delivered to Parent if, prior to the execution and delivery of this Agreement, such document or information has been posted to the data room maintained by the Company in connection with the transactions contemplated by this Agreement in a folder thereof to which Parent or its Representatives have access.

Section 11.11   Plan of Merger.   The identification of the parties in the introductory paragraph and the recital hereto, the portions of this Agreement and the Exhibits and Disclosure Schedule hereto that set forth the terms and conditions of the Merger and the manner and basis of converting the Company Stock into cash and Parent Shares constitute the plan of merger required under Section 251 of the DGCL (the "Plan of Merger"), any of the terms of the Plan of Merger may be made dependent upon facts ascertainable outside of the Plan of Merger, provided that the manner in which such facts shall operate upon the terms of the Merger is clearly and expressly set forth in the Plan of Merger. Accordingly, the Plan of Merger shall not include any disclosure schedule, other schedule or agreement entered into in connection herewith or any portion thereof unless specifically identified as part of the Plan of Merger approved by the board of directors of the Company for submission to the Company Stockholders. Without limitation of the foregoing, any portion of this Agreement, any Exhibit or any Schedule hereto or agreement entered into in connection herewith and otherwise part of the Plan of Merger may be redacted by the Company, prior to submission to a Company Stockholder vote, as necessary to prevent public disclosure of facts ascertainable outside of the Plan of Merger that (a) the Company considers competitively sensitive information of the Company, Parent, Merger Sub I or Merger Sub II; or (b) that identifies any current or former employee or consultant of the Company; provided that the manner in which such redacted facts shall operate upon the terms of the Merger is clearly and expressly set forth in the unredacted portions of such documents.

Section 11.12   Consent to Representation; Conflict of Interest. If the Stockholder Representative so desires, acting on behalf of the Company Stockholders and without the need for any consent or waiver by Company, Parent, Merger Sub I or Merger Sub II, Gunderson Dettmer Stough Villeneuve Franklin & Hachigian LLP ("Gunderson") shall be permitted to represent the Company Stockholders after the Closing in connection with any matter, including anything related to the transactions contemplated by this Agreement, any other agreements referenced herein or any disagreement or dispute relating thereto. Without limiting the generality of the foregoing, after the Closing, Gunderson shall be permitted to represent the Company Stockholders, any of their agents and Affiliates, or any one or more of them, in connection with any negotiation, transaction, or dispute (including any litigation, arbitration, or other adversary proceeding) with Parent, the Company, or any of their agents or Affiliates under or relating to this Agreement, any transaction contemplated by this Agreement, and any related matter, such as claims or disputes arising under other agreements entered into in connection with this Agreement, including with respect to any indemnification claims.  Parent, Merger Sub I, Merger Sub II, and the Company further agree that, as to all communications among Gunderson and the Stockholder Representative and the Company Stockholders, and their respective Affiliates

(individually and collectively, the "Seller Group") that relate in any way to the transactions contemplated by this Agreement, the attorney-client privilege and the exception of client confidence belongs solely to the Seller Group and may be controlled only by the Seller Group and shall not pass to or be claimed by Parent and Company, because the interests of Parent and its Affiliates were directly adverse to Company, the Company Stockholders and the Stockholder Representative at the time such communications were made. This right to the attorney-client privilege shall exist even if such communications may exist on Company's computer system or in documents in the Company's possession.   Notwithstanding the foregoing, in the event that a dispute arises between Parent, Merger Sub I, Merger Sub II and Company, on the one hand, and a Person other than a party to this Agreement, on the other hand, after the Closing, the Company may assert the attorney-client privilege to prevent disclosure to such third-party of confidential communications by Gunderson to the Company; provided, however, that the Company may not waive such privilege without the prior written consent of the Stockholder Representative.

Section 11.13   Definitions.

(a)   As used in this Agreement, each of the following capitalized terms has the meaning specified in this Section 11.13(a):

"Accredited Investor" means each Person who delivers an Investor Questionnaire at Closing, certifying that such Person is an "accredited investor," as defined in Rule 501 of Regulation D under the Securities Act.

"Acquired Entity" means any of the Company or any of the Company's Subsidiaries.

"Acquisition Proposal" means, with respect to the Company, any offer, inquiry, indication of interest or proposal relating to any transaction or series of related transactions involving: (a) the sale, license, lease, transfer, disposition or acquisition of all or a substantial portion of (excluding sales of inventory and licensing of the Company's products or services in the ordinary course of business consistent with past practice) the business or assets of the Company; (b) the issuance, disposition or acquisition of (i) any capital stock or other equity security of the Company (other than (A) Company Common Stock issued upon the exercise of Company Options, (B) Company Options issued in accordance with the terms of this Agreement or (C) Company Common Stock issued upon conversion of any shares of Company Preferred Stock outstanding as of the date hereof), (ii) any option, call, warrant or right (whether or not immediately exercisable) to acquire any capital stock or other equity security of the Company (other than Company Options issued in accordance with the terms of this Agreement), or (iii) any security, instrument or obligation that is or may become convertible into or exchangeable for any capital stock or other equity security of the Company (other than Company Options issued in accordance with the terms of this Agreement); (c) any merger, consolidation, share exchange, business combination, reorganization, recapitalization or similar transaction involving the Company; (d) any liquidation, dissolution, recapitalization or other significant corporate reorganization of the Company; or (e) any combination of the foregoing; provided, however, that the transactions between Parent, Merger Sub I, Merger Sub II and the Company contemplated by this Agreement shall not be deemed an Acquisition Proposal.

"Affiliate" means, with respect to any Person, any other Person which directly or indirectly controls, is controlled by or is under common control with such Person. For purposes of the immediately preceding sentence, the term "control" (including, with correlative meanings, the terms "controlling," "controlled by" and "under common control with"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Business Day</u>" means a day, other than a Saturday, a Sunday or other day on which commercial banks in New York, New York, are authorized or required by Law to close.

"<u>Claim</u>" means any demand, claim, charge, action, suit, hearing, information request, proceeding (whether at law or in equity and including administrative proceedings), petition, complaint, notice of violation, arbitration, inquiry or investigation of or before any Governmental Entity or before any arbitrator, or other litigation or similar proceeding, whether civil, criminal, administrative, arbitral or investigative.

"<u>Claimed Amount</u>" means the amount of any Losses incurred or reasonably expected to be incurred by Parent in connection with and indemnifiable pursuant to a claim for indemnification pursuant to <u>ARTICLE VIII</u>.

"<u>Closing Adjustment Items</u>" means (a) the Company Transaction Expenses, (b) the Employee Amount, (c) if the Net Company Cash exceeds the Net Cash Target, a negative number (which, for the avoidance of doubt, shall reduce the Estimated Closing Adjustment and the Final Closing Adjustment) equal to the amount by which the Net Company Cash exceeds the Net Cash Target, (d) if the amount of the Net Cash Target exceeds the Net Company Cash, the amount by which the Net Cash Target exceeds the Net Company Cash and (e) the current liability on the Company's most recent balance sheet related to the lien on assets of the Company for New York City Business Commercial Rent Tax assessed by the New York City Department of Finance.

"<u>Closing Adjustment Statement</u>" means the statement of the Closing Adjustment Items prepared in accordance with the provisions of <u>Section 2.9</u>.

"<u>Closing Consideration</u>" means (i) Total Consideration, <u>minus</u> (ii) the Holdback Amount, <u>minus</u> (iii) the Expense Fund Amount.

"<u>Closing Indebtedness</u>" means all Indebtedness of the Acquired Entities to the extent outstanding at the Effective Time.

"<u>Code</u>" means the Internal Revenue Code of 1986 or any successor federal tax statute.

"<u>Collective Bargaining Agreement</u>" means any labor agreement, collective bargaining agreement or any other labor-related agreements or arrangements with any labor union, trade union or labor organization.

"<u>Company Charter</u>" means the Certificate of Incorporation of the Company, in effect on the date hereof.

"<u>Company Closing Per Share Value</u>" means (i) with respect to each share of Company Stock other than the Company Series D-1 Preferred Stock, an amount equal to the difference of the Company Total Per Share Value <u>minus</u> the Holdback Per Share Value <u>minus</u> the Expense Fund Per Share Value, and (ii) with respect to the Company Series D-1 Preferred Stock, the Company Total Per Share Value <u>minus</u> the Expense Fund Per Share Value.

"<u>Company Common Stock</u>" means the common stock, par value $0.001 per share, of the Company.

"<u>Company Equity Plan</u>" means the 2006 Equity Incentive Plan and the 2017 Stock Plan.

"Company Fundamental Representations" means the representations and warranties of the Company in Section 3.1, Section 3.2, Section 3.3(a) – (f), Section 3.4 and Section 3.22.

"Company Optionholders" means the holders of Company Options.

"Company Options" means options to purchase shares of Company Common Stock from the Company, granted by the Company pursuant to the Company Equity Plan.

"Company Preferred Stock" means the preferred stock, par value $0.001 per share, of the Company.

"Company Securityholders" means the Company Stockholders, the holders of the Company Warrants, and holders of In the Money Options.

"Company Series D-1 Preferred Stock" means shares issued under the terms of the Company Charter.

"Company Stock" means the Company Common Stock and Company Preferred Stock.

"Company Stockholders" means the record owners of Company Common Stock and Company Preferred Stock; provided that Company Stockholders does not include Parent.

"Company Tax Representations" means the representations and warranties of the Company in Section 3.14.

"Company Total Per Share Value" means the Total Consideration divided by the Fully Diluted Shares.

"Company Transaction Expenses" means all costs and expenses of the Company incurred prior to the Closing in connection with the negotiation, preparation and execution of this Agreement and the consummation of the transactions contemplated hereby, including any brokerage fees and commissions, finders' fees or financial advisory fees and any fees and expenses of counsel or accountants payable by the Company.

"Company Warrantholder" means a holder of Company Warrants.

"Company Warrants" means the warrants to purchase Company Stock outstanding as of immediately prior to the Effective Time.

"Continuing Employee" means each employee of an Acquired Entity as of immediately prior to the Closing.

"Contract" means any legally binding written or oral agreement, settlement, agreement, understanding, deed, mortgage, lease, license, instrument, note, commitment, undertaking, arrangement or contract.

"Copyrights" means copyrights, copyrightable subject matter (including Software) and moral rights and rights of attribution and integrity (including any registrations, applications, renewals, extensions and reversions for any of the foregoing).

"Credit Support Arrangement" means any arrangement by a Person in which guaranties (including guaranties of performance or payment under agreements, commitments, obligations and

71

permits), keepwells, letters of credit or other credit or credit support arrangements, including bid bonds, advance payment bonds, performance bonds, payment bonds, retention and/or warranty bonds or other bonds or similar instruments, were or are issued, entered into or otherwise put in place by such Person to support or facilitate, or otherwise in respect of, the obligations of another Person.

"Data Laws" shall mean all Laws pertaining to privacy, data processing, data protection, data security, encryption, or confidentiality, including any Laws applicable to the collection, processing, use, sale, storage, sharing, access to, transfer, or destruction of Personal Information. With respect to European Union originating Personal Information that the Company Processes, all references to "Data Law" shall be deemed to refer to European Union or Member State law.

"DGCL" means the Delaware General Corporation Law.

"Disclosure Schedule" means the disclosure schedule of the Company attached as Schedule 1.

"Employee Amount" means all amounts (plus the employer's share of Taxes payable with respect to all such amounts (but not including any such Taxes related to (i) compensatory payment for services performed after the Closing Date, (ii) any compensatory payments that vest after the sixty (60) day period immediately following the Closing Date) and any related interest and penalties) payable pursuant to (a) any "single trigger" bonus plan implemented by the Company in connection with the transactions contemplated by this Agreement or (b) any other change in control bonus plan, severance plan, change of control, retention or similar arrangement of the Company which vest or become payable prior to the sixtieth (60th) day immediately following the Closing Date, in each case of this clause (b) as of the Closing payable in connection with the Merger or any of the other transactions contemplated by this Agreement, or (iii) the employer's share of Taxes payable with respect to any payments of Total Consideration in respect of In the Money Options.

"Entity" means any corporation (including any nonprofit corporation), general partnership, limited partnership, limited liability partnership, joint venture, estate, trust, company (including any company limited by shares, limited liability company or joint stock company) or other association, organization or entity (including any Governmental Entity).

"ERISA Affiliate" means any Person (whether or not incorporated) that, together with any Acquired Entity, is treated as a single employer under Section 414(b) or (c) of the Code.

"Estimated Closing Adjustment" means the estimated amount equal to the sum, without duplication, of the Closing Adjustment Items as of the Closing Date to be delivered with the Estimated Closing Adjustment Statement in accordance with the provisions of Section 2.14(a).

"Exchange Act" means the Securities Exchange Act of 1934 and the rules and regulations promulgated thereunder.

"Expense Fund Amount" means the amount equal to $250,000, to be held by the Stockholder Representative in a segregated account designated by the Stockholder Representative (the "Expense Fund Account") pursuant to the terms hereof.

"Expense Fund Per Share Value" means the amount equal to the quotient of the Expense Fund Amount divided by the number of Expense Fund Securities outstanding as of immediately prior to the Effective Time.

"<u>Expense Fund Percentage</u>" means, with respect to any Company Stockholder, a fraction, (a) the numerator of which is a number equal to the number of Expense Fund Securities owned by such Company Stockholder as of immediately prior to the Effective Time and (b) the denominator of which is a number equal to the number of Expense Fund Securities issued and outstanding as of immediately prior to the Effective Time.

"<u>Expense Fund Securities</u>" means all shares of Company Stock excluding Cancelled Shares.

"<u>Final Closing Adjustment Items</u>" means the Closing Adjustment Items as determined pursuant to <u>Section 2.14</u>.

"<u>Final Closing Adjustment Statement</u>" means the Closing Statement agreed pursuant to <u>Section 2.14</u>.

"<u>Fully Diluted Shares</u>" means the number of shares equal to the sum of (a) the number of shares of Company Stock issued and outstanding as of immediately prior to the Effective Time (other than any Cancelled Shares), <u>plus</u> (b) the number of shares of Company Stock issuable upon the exercise of all In the Money Options that are issued and outstanding as of immediately prior to the Effective Time, <u>plus</u> (c) the number of shares of Company Stock issuable upon the exercise of outstanding Company Warrants, in each case, on an as-converted to a Company Common Stock basis.

"<u>Fundamental Representations</u>" means the Company Fundamental Representations and the Parent Fundamental Representations.

"<u>Future Payments</u>" means, collectively, (a) any Final Closing Adjustment that may become payable to Company Stockholders pursuant to <u>Section 2.14</u> <u>plus</u> (b) any portion of the Holdback Amount that may become distributable to Company Stockholders pursuant to this Agreement <u>plus</u> (c) any portion of the Expense Fund Amount that may become distributable to Company Stockholders pursuant to this Agreement.

"<u>GAAP</u>" means U.S. generally accepted accounting principles in effect from time to time.

"<u>Governmental Entity</u>" means any government, court, regulatory or administrative agency, commission or authority or other governmental instrumentality, federal, state or local, domestic, foreign or multinational, including any contractor acting on behalf of such agency, commission, authority or governmental instrumentality.

"<u>Holdback Amount</u>" means an amount equal to ten percent (10%) of the Total Consideration distributable to the holders of shares of Company Stock.

"<u>Holdback Ownership Percentage</u>" means, with respect to any Company Stockholder, a fraction, (a) the numerator of which is a number equal to the number of Holdback Securities owned by such Company Stockholder as of immediately prior to the Effective Time and (b) the denominator of which is a number equal to the number of Holdback Securities issued and outstanding as of immediately prior to the Effective Time.

"<u>Holdback Per Share Value</u>" means an amount equal to the quotient of the Holdback Amount <u>divided by</u> the number of Holdback Securities outstanding as of immediately prior to the Effective Time.

"<u>Holdback Securities</u>" means all shares of Company Stock excluding shares of Company Series D-1 Preferred Stock and Cancelled Shares.

"In The Money Option" means a Company Option (or a portion thereof) that is and remains unexercised, validly issued, unexpired and vested immediately prior to the Effective Time, and which has an exercise price less than the Company Total Per Share Value.

"Indebtedness" means, with respect to any Person and without duplication, (a) the aggregate indebtedness for borrowed money, including any accrued interest, fees and cost or penalty associated with prepaying such indebtedness and any such obligations evidenced by bonds, debentures, notes or similar obligations, (b) obligations under any deferred purchase price arrangements (excluding trade payables), (c) capitalized lease obligations that are classified as a balance sheet liability in accordance with GAAP, (d) obligations under any sale and leaseback transaction, synthetic lease or Tax ownership operating lease transaction (whether or not recorded on the balance sheet), (e) obligations with respect to hedging, swaps or similar arrangements, (f) obligations with respect to the borrowed amount of all letters of credit, bankers' acceptances and similar obligations issued for the account of such Person, (g) any securities or other equity instruments that under the body of accounting principles applicable to such Person are characterized as debt, (h) all Credit Support Arrangement obligations of such Person in respect of obligations of the kind referred to in clauses (a)–(g) above and (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any security interest on property (including accounts and contract rights) of such Person, whether or not such Person has assumed or become liable for the payment of such obligation, in each case, owed by such Person.

"Intellectual Property" means all intellectual property rights of every kind and description, throughout the world, including all United States and foreign (a) Trademarks; (b) Patents; (c) Copyrights; (d) mask works rights; (e) Trade Secrets; (f) Software; (g) rights of publicity or privacy, and rights to personal information; and (h) all rights in the foregoing and in other similar intangible assets.

"Investor Agreements" means (i) the Sixth Amended and Restated Stockholders' Agreement, dated as of October 25, 2017, by and among Parent and the other parties named therein and (ii) the Sixth Amended and Restated Registration Rights Agreement, dated as of October 25, 2017, by and among Parent and the other parties named therein.

"IRS" means the U.S. Internal Revenue Service or any successor agency.

"Key Employees" means Seth Besmertnik, Bennett Theimann, Shamoun Murtza and Brian Fage.

"Knowledge" of the Company or of the Acquired Entities means the actual knowledge of a Key Employee after reasonable inquiry of the employees who report directly to such Key Employee.

"Law" means any statutory law, controlling principle of common law, constitution, treaty, convention, ordinance, code, rules, regulation, guidance, resolution, edict, decree, Order (including executive orders) or other similar requirement enacted, adopted, promulgated, applied, implemented or otherwise put into effect by or under the authority of a Governmental Entity.

"Liabilities" means assessments, commitments, damages, deficiencies, demands, fines, interest, liabilities (including any Indebtedness), obligations, penalties and Taxes, in each case, whether accrued, absolute, contingent or otherwise, known or unknown, or due or to become due, whether or not required to be recorded or reflected on a balance sheet under GAAP.

"Lien" means with respect to any property or asset, including any equity interest, any lien, security interest, deed of trust, mortgage, pledge, encumbrance, restriction on transfer, proxies, voting trusts or agreements, hypothecation, assignment, claim, right of way, defect in title, encroachment,

easement, restrictive covenant, charge, deposit arrangement or preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever including any conditional sale or other title retention agreement, the interest of a lessor under a capital lease and any financing lease having substantially the same economic effect as any of the foregoing, and the filing of any financing statement under the UCC or comparable Law of any jurisdiction naming the owner of the property or asset to which such lien relates as debtor, or any restriction on the creation of any of the foregoing.

"Losses" means liabilities, losses and costs and expenses (including Taxes and reasonable fees and expenses of outside legal counsel, accountants, investment bankers, experts, consultants and other advisors exemplary or, and the costs of all filing fees and printing costs); provided, however, that Losses shall not include punitive, exemplary, special, incidental, or consequential damages except to the extent actually paid to a third party.

"Material Adverse Effect" means any event, change, circumstance, development, occurrence, condition, effect or state of facts that is or would reasonably be expected to be, individually or in the aggregate, materially adverse to the business, assets, condition (financial or otherwise) or results of operations of the Acquired Entities, taken as a whole; provided, however, that the following events, changes, circumstances, developments, occurrences, conditions, effects and states of facts shall not constitute, or be taken into account in determining, a Material Adverse Effect: (a) the entry into, or compliance with the terms of, this Agreement or the announcement, pendency or anticipated consummation of the Merger or any of the other transactions contemplated by this Agreement (other than for purposes of any representation or warranty contained in Section 3.5 and Section 3.12); (b) changes in general business, market or economic conditions or the credit, financial or capital markets; (c) any natural or man-made disaster or pandemic; (d) changes in national or international political conditions, including any act of terrorism, sabotage, military action or war, or any escalation or worsening thereof; (e) changes in applicable Laws or GAAP or the interpretation thereof after the date hereof; or (f) any omission to act or action taken with the prior written consent of Parent (including those omissions to act or actions taken which are specifically required by this Agreement); provided, however, that any effect, change, event, circumstance or occurrence referred to in clauses (b) through (e) may be taken into account in determining whether or not there has been a Material Adverse Effect if such effect, change, event, circumstance or occurrence has a disproportionate adverse effect on the Acquired Entities, taken as a whole, as compared to other participants in the industries in which the Acquired Entities operate.

"Merger Consideration" means $124,000,000.

"Net Cash Target" means $3,000,000.

"Net Company Cash" means (i) all cash and cash equivalents held by the Acquired Entities (plus the amount of all un-cleared deposits of the Acquired Entities outstanding and less the amount of all un-cleared checks or withdrawals of the Acquired Entities outstanding), plus (ii) all cash used to secure any line of credit related to the Company's currently anticipated expansion project located on the fifteenth (15th) floor of 2 Park Avenue, New York, New York, plus (iii) any accounts receivable of the Acquired Entities related to Parent or any of its Subsidiaries, less (iv) all Indebtedness of the Company, in each case measured as of 5:00 p.m. New York City time on March 9, 2018 and determined in accordance with GAAP. Exhibit J sets forth a calculation of Net Company Cash for illustrative purposes only.

"Non-Disclosure Agreement" means that certain Non-Disclosure Agreement by and between Parent and the Company dated as of February 8, 2018.

"Order" means any judgment, decree, injunction, rule, order, decision, decree, ruling or assessment of any arbitrator or Governmental Entity.

"Organizational Documents" means any corporate, partnership or limited liability organizational documents, including certificates or articles of incorporation, bylaws, certificates of formation, operating agreements (including limited liability company agreement and agreements of limited partnership), certificates of limited partnership, partnership agreements, shareholder agreements and certificates of existence, as applicable.

"Other Transaction Agreements" means any Contract entered into in connection with this Agreement or any document or certificate delivered by a Party in connection with this Agreement or any of the foregoing.

"Parent Approvals" means (a) the approval of the Restated Charter by (i) the board of directors of Parent, (ii) the majority of the shares of Parent's outstanding capital stock, (iii) the majority of the shares of Parent's outstanding Senior Voting Preferred Stock (as defined in Parent's certificate of incorporation filed as of the date hereof) and (iv) the majority of the shares of Parent's outstanding Class B Common Stock, $0.001 par value per share, and (b) the approval of the amended and restated Investor Agreements in the forms attached as exhibits to the Proxy and Joinder by (i) the majority of the shares of Parent's outstanding capital stock and (ii) the majority of the shares of Parent's outstanding Senior Voting Preferred Stock (as defined in Parent's certificate of incorporation filed as of the date hereof), each in accordance with Parent's certificate of incorporation filed as of the date hereof and the DGCL.

"Parent Fundamental Representations" means the representations and warranties of Parent, Merger Sub I and Merger Sub II in Section 4.1, Section 4.2, Section 4.3, Section 4.5, Section 4.7 and the final sentence of Section 9.8.

"Parent Special Fundamental Representations" means the representations and warranties of Parent, Merger Sub I and Merger Sub II in Section 4.2(a), Section 4.3, Section 4.5, and the final sentence of Section 9.8.

"Parent Stock" means Parent's Series AP-1 Acquisition Preferred Stock, par value $0.001 per share, as set forth in the Restated Charter.

"Parent Stock Per Share Value" means $72.

"Patents" means patents, utility models and industrial design registrations or applications (including any continuations, divisionals, continuations-in-part, provisionals, renewals, reissues, re-examinations, substitutions and extensions of any of the foregoing, and applications for any of the foregoing).

"Permit" means any permit, license, registration, certificate, franchise, qualification, waiver, authorization or similar rights issued, granted or obtained by or from any Governmental Entity.

"Permitted Lien" means (a) statutory liens for Taxes that are not yet due and delinquent; (b) statutory liens to secure obligations to landlords, lessors or renters under leases or rental agreements; (c) deposits or pledges made in connection with, or to secure payment of, workers' compensation, unemployment insurance or similar programs mandated by applicable Law; (d) statutory liens in favor of carriers, warehousemen, mechanics and materialmen, to secure claims for labor, materials or supplies and other like liens; (e) any restriction or limitation imposed by this Agreement; and (f) any non-exclusive license of Intellectual Property in the ordinary course of business consistent with past practice.

"Person" means any individual or Entity.

"Personal Information" means any information that alone or in combination with other information can be used to identify an individual, including an individual's first and last name, home or other physical address, telephone number, fax number, email address or other online identifier, photographs, third party issued identifier, biometric data, health information, credit card or other financial information, IP address, and any other device-specific number or identifier.

"Pre-Closing Tax Obligation" means, without duplication, (a) all Taxes required to be paid by or with respect to any Acquired Entity attributable to any Pre-Closing Tax Period, (b) all Taxes (including Taxes imposed pursuant to Treasury Regulations Section 1.1502-6 or a comparable, similar or analogous provision of any state, local or foreign Law) imposed on any Acquired Entity as a result of being a member of any consolidated, combined, affiliated, unitary or analogous group in any Pre-Closing Tax Period, (c) all Taxes that are required to be paid by any Acquired Entity as a transferee or successor pursuant to applicable Law, in either case where the liability of such Acquired Entity is attributable to an event or transaction occurring before the Closing, (d) all amounts required to be paid by any Acquired Entity pursuant to any Tax Sharing Agreement to which such Acquired Entity is a party or is otherwise subject on or prior to the Closing Date, (e) Transfer Taxes for which the Company Stockholders are responsible under Section 9.6, (f) all Taxes resulting from any amount required to be included in income by Parent or any of its Affiliates (including any Acquired Entity after the Closing Date) under Section 965 of the Code with respect to any Acquired Entity (including any installment of net Tax liability in respect thereof), (g) any Taxes imposed on or with respect to any Company Stockholder or any of its respective Affiliates, and (h) any withholding Taxes imposed on Parent or any its Affiliates resulting from the transactions contemplated by this Agreement to the extent not withheld pursuant to Section 2.13. Notwithstanding any provision to the contrary in this definition, Pre-Closing Tax Obligation shall not include (A) any Taxes attributable to any action of Parent or its Affiliates (including the Company and the Surviving Entity) on the Closing Date after the Closing other than any actions contemplated by this Agreement or that are otherwise within the ordinary course of business, (B) any Taxes resulting from an election under Section 338 of the Code (or other comparable election under any other Tax Law) or (C) Taxes resulting from an amendment of Tax Returns for the Pre-Closing Tax Period unless such amendment is the result of a breach or inaccuracy of any representation, warranty or covenant of the Company or Company Securityholders contained in this Agreement or required by applicable Law.

"Pre-Closing Tax Period" means any taxable period ending on or before the Closing Date and the portion of any Straddle Period up to and including the Closing Date.

"Processing" (including its cognate, "Process") shall mean any operation or set of operations that is performed upon Personal Information or confidential data, whether or not by automatic means, including, but not limited to, collection, recording, organization, storage, access, adaptation, alteration, retrieval, consultation, use, disclosure, dissemination, making available, alignment, combination, blocking, deleting, erasure, or destruction.

"Representatives" means, with respect to any Person, such Person's officers, directors, employees, consultants, agents, and subsidiaries.

"Restated Charter" means an amended and restated certificate of incorporation and related certificate of designations, rights and preferences of Parent in the forms attached as Exhibit K (subject to de minimis changes deemed necessary by officers of Parent).

"SEC" means the U.S. Securities and Exchange Commission.

"Securities Act" means the Securities Act of 1933 and the rules and regulations promulgated thereunder.

"Securityholder Ownership Percentage" means, with respect to any Company Securityholder, a fraction, (a) the numerator of which is a number equal to the number of shares of Company Stock owned by such Company Securityholder as of immediately prior to the Effective Time (assuming exercise of all Company Warrants and In the Money Options) and (b) the denominator of which is a number equal to the number of Fully Diluted Shares, in each case, on an as-converted to a Company Common Stock basis.

"Software" means computer programs (whether in source code, object code or other form), including any and all software implementation of algorithms, models and methodologies, databases, compilations and data, descriptions, flow-charts and other work product to design, plan, organize and develop any of the foregoing, screens, user interfaces, report formats, firmware, development tools, templates, menus, buttons and icons, and all documentation, including user manuals and other training documentation, related to any of the foregoing.

"Straddle Period" means any taxable period beginning on or prior to and ending after the Closing Date.

"Subsidiary" of any Person means any Entity (a) of which 50% or more of the outstanding share capital, voting securities or other voting equity interests are owned, directly or indirectly, by such Person, (b) of which such Person is entitled to elect, directly or indirectly, at least 50% of the board of directors or similar governing body of such Entity or (c) if such Entity is a limited partnership or limited liability company, of which such Person or one of its Subsidiaries is a general partner or managing member or has the power to direct the policies, management or affairs.

"Systems" means any and all systems, Software, facilities, applications or platforms owned by any Acquired Entity.

"Tax Return" means any report, return, statement, notice, notification, form, election, certificate, document, declaration or other information or filing supplied or required to be supplied to any Taxing Authority, including any schedule or attachment thereto and any amendment thereof, any information returns, any documents with respect to or accompanying payments of estimated Taxes, or with respect to or accompanying requests for the extension of time in which to file any such report, return, statement, notice, notification, form, election, certificate, document, declaration or other information or filing.

"Tax Sharing Agreement" means, with respect to any Person, any Tax allocation, indemnity or sharing agreement or similar agreement, arrangement or understanding to which such Person is a party or is otherwise subject.

"Taxes" (and with correlative meaning, "Tax") means all federal, state, local, foreign or other taxes of any kind (together with any and all interest, fines, penalties, assessments, additions to tax and additional amounts imposed with respect thereto) imposed, assessed, or collected by or under the authority of any Taxing Authority, including taxes, levies, assessments, tariffs, duties, or other charges on or with respect to income, franchises, windfall or other profits, gross receipts, property, capital gains, sales, use, capital stock, payroll, employment, social security, workers' compensation, unemployment compensation, or net worth and taxes or other charges in the nature of an excise tax, withholding tax, ad valorem tax, business tax, transfer tax, stamp tax, estimated tax, surtax, escheat, unclaimed property, base erosion and anti-abuse, transition tax under Section 965 of the Code (including any installment thereof and any similar or analogous tax under state or local Law), or value added tax.

"Taxing Authority" means the IRS or any other Governmental Entity that has power to impose, assess, determine, administer or collect any Taxes.

"Total Consideration" means an amount equal to (1) the Merger Consideration, plus (2) the aggregate exercise price with respect to all In the Money Options that are outstanding and unexercised as of immediately prior to or at the Effective Time, plus (3) the aggregate exercise price with respect to all Company Warrants that are outstanding and unexercised as of immediately prior to or at the Effective Time, minus (4) the Estimated Closing Adjustment.

"Trade Secrets" means trade secrets and all other confidential or proprietary information, including know-how, technology, proprietary processes, formulae, ideas, inventions, compositions, techniques, technical data and information, procedures, databases, algorithms, models, methodologies, customer lists, supplier lists, pricing and cost information, and business and marketing plans and proposals.

"Trademarks" means trademarks, service marks, trade names, slogans, logos, trade dress, internet domain names and other similar designations of source or origin, together with all goodwill, registrations, applications, renewals and extensions related to any of the foregoing.

"Transfer Tax" means all transfer and similar Taxes imposed in respect of the Merger, including documentary, recording, registration, stamp duty, transfer, real estate transfer, sales and use, value added and similar Taxes and fees in all jurisdictions whenever and wherever imposed and shall include all such Taxes payable in relation to any deemed or indirect transfer of assets or property as a result of the Merger and all penalties, surcharges, charges, interest and additions thereto but "Transfer Tax" shall not include any income, franchise or similar Taxes.

"Treasury Regulations" means the regulations issued under the Code, as such regulations may be amended from time to time.

"WARN Act" means the U.S. Worker Adjustment and Retraining Notification Act and any similar state or local Law.

(b)      In addition to the defined terms set forth in Section 11.13(a), as used in this Agreement, each of the following capitalized terms has the meaning specified in the Section set forth opposite such term below.

280G Stockholder Vote ........................................................................................ Section 5.14
Advisory Group ................................................................................................... Section 10.5
Affiliate Contracts .......................................................................................... Section 3.11(a)(xiv)
Agreement ............................................................................................................ Preamble
Basket .................................................................................................................. Section 8.3(a)
Book-Entry Shares ............................................................................................ Section 2.8(a)(ii)
Cancelled Shares ................................................................................................ Section 2.1(a)
Cap ...................................................................................................................... Section 8.3(a)
CIC Waiver – Good Reason ............................................................................... Section 5.5(d)
CIC Waiver – Parent Equity Awards ................................................................. Section 5.5(d)
Claim Notice ....................................................................................................... Section 8.4(a)
Closing ................................................................................................................ Section 1.2(a)
Closing Date ....................................................................................................... Section 1.2(a)
Company .............................................................................................................. Preamble
Company 401(k) Plan ......................................................................................... Section 7.8(c)
Company Board Resolutions .............................................................................. Section 3.4
Company Financial Statements .......................................................................... Section 3.6(a)
Company Intellectual Property ........................................................................... Section 3.8(g)

Company Plans ...........................................................................................................Section 3.15(a)
Company Securities ......................................................................................................Section 3.3(a)
Company Stock Certificates .....................................................................................Section 2.8(a)(iii)
Company Stockholder Approval..................................................................................... Section 3.4
Company Written Consent.............................................................................................. Section 5.9
Company's Registered Intellectual Property ...............................................................Section 3.8(a)
Consent .......................................................................................................................Section 3.5(a)
Data Law .......................................................................................................................... Section 1.1
Dissenting Shares........................................................................................................ Section 2.12
Effective Time .............................................................................................................. Section 1.2(b)
Employment Packages ................................................................................................ Section 6.2(n)
End Date ........................................................................................................................Section 7.1(b)(i)
ERISA ...........................................................................................................................Section 3.15(a)
Estimated Closing Adjustment Statement....................................................................Section 2.14(a)
Excess Claimed Amount .............................................................................................. Section 2.7(b)
Exchange Agent ...........................................................................................................Section 2.8(a)(i)
Exchange Fund.............................................................................................................Section 2.8(a)(i)
Filing .............................................................................................................................Section 3.5(a)
Final Allocation Schedule ............................................................................................ Section 2.15
Final Closing Adjustment ............................................................................................ Section 2.14(f)
Final Closing Adjustment Items ...................................Section 2.14(d), Section 2.14(c), Section 2.14(b)
Final Closing Adjustment Statement ...............................Section 2.14(d), Section 2.14(c), Section 2.14(b)
First Certificate of Merger .......................................................................................... Section 1.2(b)
First Merger .................................................................................................................... Recitals
First Step Surviving Entity ............................................................................................ Section 1.1
Foreign Benefit Plan ................................................................................................... Section 3.15(m)
GDPR.............................................................................................................................. Section 3.9(h)
Gunderson ....................................................................................................................Section 9.4(a)
Indemnified Person ......................................................................................................Section 8.4(a)
Indemnifying Party .......................................................................................................Section 8.4(a)
Investor Questionnaire ................................................................................................ Section 2.9
Key Supplier ................................................................................................................. Section 3.19
Labor Disputes ............................................................................................................Section 3.16(c)
Latest Balance Sheet ...................................................................................................Section 3.6(a)
Leased Real Property ...................................................................................................Section 3.10(c)
Legal Restraint ............................................................................................................. Section 6.1(b)
Material Contract .........................................................................................................Section 3.11(a)
Merger............................................................................................................................. Recitals
Merger Joinder .............................................................................................................Section 2.5(a)(iii)
Merger Sub.....................................................................................................................Preamble, Preamble
MEWA ........................................................................................................................... Section 3.15(j)
Multiemployer Plan ...................................................................................................... Section 3.15(j)
Neutral Accountant ...................................................................................................... Section 2.14(d)
Objection Notice ..........................................................................................................Section 2.14(c)
Option Exercise Amount............................................................................................... Section 2.2
Optionholder Letter of Transmittal ..............................................................................Section 5.8(a)
Parachute Payment ......................................................................................................Section 5.14
Parent ............................................................................................................................Preamble
Parent Financial Statements ........................................................................................ Section 4.9
Parent Plans..................................................................................................................Section 5.5(a)
Parent Shares................................................................................................................ Section 2.1(b)

Parties.............................................................................................................Preamble
PII Third Party ..........................................................................................Section 3.9(a)
Plan of Merger ..........................................................................................Section 9.4(a)
Process ........................................................................................................ Section 1.1
Processing ................................................................................................... Section 1.1
Proprietary Information ..............................................................................Section 5.12(a)
Proprietary Product .................................................................................. Section 3.8(d)
Real Estate Leases.....................................................................................Section 3.10(c)
Release Date...............................................................................................Section 2.7(a)
Representative Losses ................................................................................ Section 10.2
Required Contractual Consents.................................................................. Section 6.2(d)
Second Certificate of Merger ..................................................................... Section 1.2(b)
Second Effective Time ............................................................................... Section 1.2(b)
Second Merger ......................................................................................... Recitals
Security Policy .........................................................................................Section 3.9(a)
Security Practices.......................................................................................Section 3.9(a)
Security Related Incident ...........................................................................Section 3.9(e)
Seller Group ..............................................................................................Section 9.4(a)
Significant Customer .................................................................................. Section 3.19
Significant Customer Contract................................................................... Section 3.11(a)(xx)
Stockholder Joinder ................................................................................... Recitals
Stockholder Letter of Transmittal ..............................................................Section 2.8(a)(ii)
Stockholder Representative ........................................................................Preamble
Surrender Instructions ...............................................................................Section 2.8(a)(ii)
Surviving Entity ........................................................................................ Section 1.1
Tax Claim ..................................................................................................Section 9.4(a)
Third Party ................................................................................................Section 8.4(a)
Third-Party Claim ..................................................................................... Section 8.4(b)
Title IV Plan.............................................................................................. Section 3.15(j)

*[Signature Pages Follow]*

The Parties have caused this Agreement to be executed as of the date first written above.

WEWORK COMPANIES INC.

By: _____

Name:    Arthur Minson
Title:     Authorized Signatory


PADDINGTON MERGER SUBSIDIARY I INC.

By: _____

Name:    Arthur Minson
Title:     Authorized Signatory


PADDINGTON MERGER SUBSIDIARY II LLC

By: _____

Name:    Arthur Minson
Title:     Authorized Signatory

*[Signature Page to Agreement and Plan of Merger and Reorganization]*

CONDUCTOR, INC.

By:

Name: SEth Besmertnik

Title: CEO & Co-Founder

SHAREHOLDER REPRESENTATIVE
SERVICES LLC, solely in its capacity as
the Stockholder Representative

By: _____

    Name:  Sam Riffe

    Title:  Executive Director

# EXHIBIT B

Click to Print  Printed on: 5/1/2023 08:32:25 GMT-0400 (Eastern Daylight Time)

**Case History Search**
Search Created:
5/1/2023 08:32:25 GMT-0400 (Eastern
Daylight Time)

---

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| **Court:** | DE Court of Chancery Civil Action | **Judge:** | Will, Lori W. | | | **File & ServeXpress Live Date:** | 10/24/2019 |
| **Division:** | N/A | **Case Number:** | 2019-0849-LWW | | | **Document(s) Filed:** | 81 |
| **Case Type:** | Civil Action | **Case Name:** | CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | | | **Date Range:** | All |
| **Linked Case(s):** | 363,2021 [View Case History] Unknown, click link to view [View Case History] | | | | | | |

$\qquad$ Export   1-46 of 46 transactions   <<Prev Page 1 of 1  Next>>

| Transaction | ▼Date/Time | Option | Case Number Case Name | Authorizer Organization | # | Document Type | Document Title | Review Status | Size |
|---|---|---|---|---|---|---|---|---|---|
| 67754277 | 6/23/2022 8:50 AM EDT | File Only | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Lori W. Will, DE Court of Chancery Civil Action | 48 | Supreme Court Mandate | Mandate to Clerk of Court Below. Case closed. | Accepted | 0.3MB |
| 67140527 | 12/3/2021 11:10 AM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Lori W. Will, DE Court of Chancery Civil Action | 47 | Supreme Court Receipt and Return | Register's Certificate, Supreme Court Receipt and complete Court of Chancery docket in matter on appeal to Supreme Court. | Accepted | 0.7MB |
| 67097387 | 11/16/2021 7:25 AM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka | Lori W. Will, DE Court of Chancery Civil Action | 45 | Notice of Appeal to Supreme Court | Notice of Appeal to Supreme Court from the Memorandum Opinion dated 10-18-21 in the Court of Chancery by Vice Chancellor Will, in C.A. No. 2019-0849-LWW, with designation of no further transcripts. | Accepted | 0.2MB |
| | | | | | 46 | Letter | Letter dated 11-15-21 | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | StreetEasy, Inc. | | 45 | Letter | Letter dated 11-18-21 from Senior Court Clerk to Chief Register in Chancery, advising that the record is due 12-8-21. | Accepted | 0.1MB |
| 67057780 | 11/1/2021 9:16 AM EDT | File Only | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Douglas Zweizig, DE Court of Chancery Civil Action | 44 | Official Transcript (Addl Fees Apply) | Transcript of 7.20.21 Oral Argument on Defendant's Motion to Dismiss - Held via Zoom | Accepted | 0.1MB |
| 67024193 | 10/18/2021 11:52 PM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Lori W. Will, DE Court of Chancery Civil Action | 43 | Memorandum Opinion | Memorandum Opinion Regarding Motion to Dismiss | Accepted | 0.4MB |
| 66783162 | 7/20/2021 3:47 PM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Lori W. Will, DE Court of Chancery Civil Action | 42 | Judicial Action Form | Telephonic Status Conference on Motion to Dismiss before Vice Chancellor Will held via Zoom on 7.20.2021 - Motion held under advisement. | Accepted | 0.1MB |
| 66671353 | 6/9/2021 1:10 PM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Lori W. Will, DE Court of Chancery Civil Action | 41 | Order | Granted (Proposed Order to Motion to Withdraw Appearance of Joseph C. Schoell and Faegre Drinker Biddle & Reath LLP) • Linked to (1) | Accepted | 0.2MB |
| 66670629 | 6/9/2021 10:58 AM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. | Joseph C Schoell, Faegre Drinker Biddle & Reath LLP- | 40 | Motion | Motion to Withdraw Appearance of Joseph C. Schoell and Faegre Drinker Biddle & Reath LLP as counsel | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Wilmington | | | to Plaintiffs with Certificate of Service, filed on behalf of Plaintiffs <br> • Linked to (2) | | |
| | | | | | | Proposed Order | Proposed Order to Motion to Withdraw Appearance of Joseph C. Schoell and Faegre Drinker Biddle & Reath LLP <br> • Linked from (1) | Accepted | 0.1MB |
| 66670208 | 6/9/2021 9:27 AM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Lori W. Will, DE Court of Chancery Civil Action | 39 | Letter | Letter to Counsel from the Honorable Lori W. Will Scheduling Oral Reargument on Defendant's Motion to Dismiss for July 20, 2021 | Accepted | 0.1MB |
| 66667839 | 6/8/2021 2:21 PM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Michael Maimone, Barnes & Thornburg LLP-Wilmington | 38 | Notice | Notice of Change of Firm Affiliation for Michael J. Maimone on behalf of Plaintiffs <br> • Linked to (1) | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service re: Notice of Change of Firm Affiliation for Michael J. Maimone on behalf of Plaintiffs | Accepted | 0.1MB |
| 66641250 | 5/28/2021 9:34 AM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Lori Will, DE Court of Chancery Civil Action | 37 | Letter | Letter to Counsel from the Honorable Lori W. Will Requesting Reargument | Accepted | 0.1MB |
| 66624872 | 5/24/2021 10:59 AM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 36 | Letter | Letter to The Honorable Kathaleen S. McCormick from Michael J. Maimone inquiring as to status of action, filed on behalf of Plaintiff <br> • Linked to (1) | Accepted | 0.2MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | corporation, aka StreetEasy, Inc. | | | | | | |
| 66561855 | 4/30/2021 11:35 AM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 35 | Letter | Letter to The Honorable Andre G. Bouchard from Michael J. Maimone enclosing decision in Chertok and SDTC Advisors LLC v. OnSolve LLC, C.A. No. 2020-0417-PAF, filed on behalf of Plaintiffs • Linked to (9) • Linked from (1) | Accepted | 0.1MB |
| | | | | | | Exhibits | Attachment to Letter to The Honorable Andre G. Bouchard from Michael J. Maimone enclosing decision in Chertok and SDTC Advisors LLC v. OnSolve LLC, C.A. No. 2020-0417-PAFof Plaintiffs | Accepted | 0.2MB |
| 66134606 | 11/23/2020 1:42 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 34 | Letter | Letter to The Honorable André G. Bouchard from Michael J. Maimone in response to Defendant's Letter dated November 20, 2020, filed on behalf of Plaintiffs • Linked to (1) | Accepted | 0.1MB |
| 66131175 | 11/20/2020 2:57 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 33 | Letter | Letter to The Honorable André G. Bouchard from Michael J. Maimone, in response to Zillow's letter filed on November 11, 2020 re gap issue, filed on behalf of Plaintiffs • Linked to (3) • Linked from (2) | Accepted | 0.2MB |
| | | | | | | Exhibits | Exhibit A to Letter to The Honorable André G. Bouchard from Michael J. Maimone | Accepted | 0.2MB |
| 66130519 | 11/20/2020 1:13 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC-Wilmington | 32 | Letter | LETTER TO THE HONORABLE ANDRE G. BOUCHARD FROM DEFENDANT ZILLOW, INC. REGARDING STATUS OF SETTLEMENT DISCUSSIONS • Linked to (2) | Accepted | 0.1MB |

| 66128528 | 11/20/2020 9:00 AM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 31 | Letter | Letter to the Honorable André G. Bouchard from Michael J. Maimone requesting decision on Motion to Dismiss, filed on behalf of Plaintiffs<br>• Linked to (8) | Accepted | 0.1MB |
| 66102309 | 11/11/2020 4:07 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC-Wilmington | 30 | Letter | LETTER TO CHANCELLOR BOUCHARD REGARDING REVISED "GAP" ISSUES LETTER<br>• Linked to (2)<br>• Linked from (2) | Accepted | 0.1MB |
| | | | | | | Letter | LETTER TO CHANCELLOR BOUCHARD REGARDING GAP ISSUES - REVISED<br>• Linked from (4) | Accepted | 0.1MB |
| 66089713 | 11/6/2020 3:42 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC-Wilmington | 29 | Letter | LETTER TO CHANCELLOR BOUCHARD REGARDING "GAP" ISSUE<br>• Linked to (1)<br>• Linked from (3) | Accepted | 0.4MB |
| 66086716 | 11/6/2020 7:20 AM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Andre G Bouchard, DE Court of Chancery Civil Action | 28 | Order | Granted (Stipulation and Proposed Order Regarding Supplemental Letter Briefing Schedule re Defendant's Motion to Dismiss and whether there is a gap in merger agreement, filed on behalf of Plaintiffs)<br>• Linked to (1)<br>• Linked from (4) | Accepted | 0.1MB |
| 66080215 | 11/4/2020 2:06 PM EST | File Only | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a | Karen Ct Reporter Siedlecki, DE Court of Chancery Civil Action | 27 | Official Transcript (Addl Fees Apply) | 10-20-20 ORAL ARGUMENT ON DEFENDANT'S MOTION TO DISMISS HELD VIA VIDEO CONFERENCE | Accepted | 0.3MB |

|  |  |  | Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. |  |  |  | • Linked from (3) |  |  |
|---|---|---|---|---|---|---|---|---|---|
| 66079689 | 11/4/2020 12:40 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 26 | Stipulation & (Proposed) Order | Stipulation and Proposed Order Regarding Supplemental Letter Briefing Schedule re Defendant's Motion to Dismiss and whether there is a gap in merger agreement, filed on behalf of Plaintiffs • Linked to (5) • Linked from (1) | Accepted | 0.1MB |
| 66042573 | 10/21/2020 3:06 PM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Register in Chancery, DE Court of Chancery Civil Action | 25 | Judicial Action Form | Revised Judicial Action Form--- Oral argument held via Zoom on defendant's motion to dismiss. The Court will hear from Counsel in 30 days regarding settlement discussions before he renders his decision. Mr. Grivner should also submit a letter regarding whether there is a gap in the merger agreement. See transcript. • Linked from (4) | Accepted | 0.1MB |
| 66026979 | 10/16/2020 10:14 AM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC-Wilmington | 24 | Letter | LETTER TO CHANCELLOR BOUCHARD REGARDING ATTENDANCE AT ORAL ARGUMENT • Linked to (2) | Accepted | 0.4MB |
| 66007921 | 10/9/2020 3:54 PM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 23 | Letter | Letter to The Honorable Andre G. Bouchard from Michael J. Maimone enclosing exhibits for use at oral argument on Defendant's Motion to Dismiss, scheduled for October 20, 2020, filed on behalf of Plaintiffs | Accepted | 0.1MB |

| | | | | | | | | Plaintiffs | |
| | | | | | | | | • Linked to (5) | | |
| | | | | | Exhibits | Exhibits 1-4 to Letter to The Honorable Andre G. Bouchard from Michael J. Maimone | Accepted | 1.8MB |
| 65992061 | 10/6/2020 10:39 AM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Andre G Bouchard, DE Court of Chancery Civil Action | 22 | Letter | Letter to counsel confirming that the oral argument scheduled for Tuesday, October 20, 2020 at 1:30 p.m. will be held by Zoom • Linked from (2) | Accepted | 0.1MB |
| | | | | | | Exhibits | Zoom Hearing Procedures • Linked from (1) | Accepted | 0.2MB |
| 65784400 | 7/21/2020 10:49 AM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Andre G Bouchard, DE Court of Chancery Civil Action | 21 | Letter | Letter to counsel rescheduling oral argument on the pending motion to dismiss to Tuesday, October 20, 2020 at 1:30 p.m. | Accepted | 0.1MB |
| 65610481 | 4/30/2020 4:44 PM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Andre G Bouchard, DE Court of Chancery Civil Action | 20 | Letter | Letter to counsel confirming that oral argument on the pending motion to dismiss has been scheduled for Thursday, August 13, 2020 at 11:00 a.m. | Accepted | 0.1MB |
| 65585195 | 4/17/2020 3:30 PM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC-Wilmington | 19 | Reply Brief | DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS WITH CERTIFICATE OF SERVICE • Linked to (3) • Linked from (5) | Accepted | 0.7MB |
| | | | | | | Exhibits | EXHIBIT A TO DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | Accepted | 0.1MB |
| | | | | | | Exhibits | EXHIBIT B TO DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN | Accepted | 0.2MB |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| | | | | | | INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | | |
| | | | | Exhibits | | EXHIBIT C TO DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | Accepted | 0.3MB |
| | | | | Exhibits | | EXHIBIT D TO DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | Accepted | 0.2MB |
| | | | | Exhibits | | EXHIBIT E TO DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | Accepted | 0.9MB |
| | | | | Exhibits | | EXHIBIT F TO DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | Accepted | 0.2MB |
| | | | | Exhibits | | EXHIBIT G TO DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | Accepted | 0.3MB |
| | | | | Exhibits | | EXHIBIT H TO DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | Accepted | 0.2MB |
| | | | | Exhibits | | EXHIBIT I TO DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | Accepted | 1.1MB |
| | | | | Exhibits | | EXHIBIT J TO DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | Accepted | 0.3MB |
| | | | | Exhibits | | EXHIBIT K TO DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | Accepted | 0.1MB |
| | | | | Exhibits | | EXHIBIT L TO DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | Accepted | 0.7MB |
| | | | | Exhibits | | EXHIBIT M TO DEFENDANT ZILLOW, INC.'S REPLY BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | Accepted | 0.3MB |
| 65555771 | 4/2/2020 | File And | 2019-0849-LWW | Michael L | 18 | Answering Brief | Plaintiffs' Answering | Accepted | 0.7MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| 65553771 | 4/2/2020 4:09 PM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Michael J. Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 18 | Answering Brief | Plaintiffs' Answering Brief in Opposition to Defendant Zillow, Inc.'s Motion to Dismiss with Certificate of Service <br> • Linked to (3) <br> • Linked from (6) | Accepted | 0.7MB |
| | | | | | | Appendix | Appendix to Plaintiffs' Answering Brief in Opposition to Defendant Zillow, Inc.'s Motion to Dismiss | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibits A-K to Appendix to Plaintiffs' Answering Brief in Opposition to Defendant Zillow, Inc.'s Motion to Dismiss | Accepted | 7.6MB |
| 65553856 | 4/1/2020 5:01 PM EDT | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Kody Macgyver Sparks, Buchanan Ingersoll & Rooney PC-Wilmington | 17 | Entry of Appearance | ENTRY OF APPEARANCE OF KODY M. SPARKS AS ATTORNEY FOR ZILLOW, INC. <br> • Linked to (1) | Accepted | 0.1MB |
| | | | | | | Certificate of Service | CERTIFICATE OF SERVICE OF ENTRY OF APPEARANCE OF KODY M. SPARKS | Accepted | 0.1MB |
| 64737262 | 2/18/2020 4:15 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC-Wilmington | 16 | Letter | LETTER TO CHANCELLOR BOUCHARD ENCLOSING COURTESY COPY OF DEFENDANT ZILLOW'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS <br> • Linked to (1) | Accepted | 0.1MB |
| 64733343 | 2/17/2020 4:36 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC-Wilmington | 15 | Opening Brief | DEFENDANT ZILLOW INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS <br> • Linked to (2) <br> • Linked from (8) | Accepted | 0.5MB |
| | | | | | | Exhibits | EXHIBIT A TO DEFENDANT ZILLOW INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | Accepted | 1.2MB |
| | | | | | | Certificate of Service | CERTIFICATE OF SERVICE TO | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Service | SERVICE TO DEFENDANT ZILLOW INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS | | |
| 64693534 | 2/8/2020 5:50 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Joseph C Schoell, Faegre Drinker Biddle & Reath LLP-Wilmington | 14 | Notice | Notice of Change of Firm Affiliation of Michael J. Maimone and Joseph C. Schoell with Certificate of Service, filed on behalf of Plaintiffs Douglas M. Chertok and Vast Ventures LLC • Linked to (2) | Accepted | 0.1MB |
| 64642343 | 1/21/2020 4:31 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Andre G Bouchard, DE Court of Chancery Civil Action | 13 | Order | Granted (STIPULATION AND [PROPOSED] ORDER GOVERNING BRIEFING ON MOTION TO DISMISS) • Linked to (1) • Linked from (1) | Accepted | 0.3MB |
| 64640436 | 1/21/2020 1:34 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC-Wilmington | 12 | Stipulation & (Proposed) Order | STIPULATION AND [PROPOSED] ORDER GOVERNING BRIEFING ON MOTION TO DISMISS • Linked to (2) • Linked from (1) | Accepted | 0.2MB |
| 64575424 | 1/3/2020 1:08 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC-Wilmington | 11 | Motion to Dismiss | Defendant Zillow Inc.'s Motion to Dismiss • Linked to (1) • Linked from (10) | Accepted | 0.1MB |
| | | | | | | Proposed Order | [Proposed] Order to Defendant Zillow Inc.'s Motion to Dismiss | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service to Defendant Zillow Inc.'s Motion to Dismiss | Accepted | 0.1MB |
| 64559972 | 12/27/2019 12:51 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. | Andre G Bouchard, DE Court of Chancery Civil | 10 | Order | Granted (Stipulation and [Proposed] Order Extending Time For Defendant To | Accepted | 0.2MB |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Chancery Action | | | | Defendant To Respond To Complaint) <br> • Linked to (1) | | |
| 64553969 | 12/23/2019 3:46 PM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC-Wilmington | 9 | Stipulation & (Proposed) Order | Stipulation and (Proposed) Order Extending Time For Defendant To Respond To Complaint <br> • Linked to (1) <br> • Linked from (1) | Accepted | 0.1MB |
| 64551588 | 12/23/2019 9:30 AM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC-Wilmington | 8 | Entry of Appearance | Entry of Appearance of Geoffrey G. Grivner on behalf of Defendant Zillow, Inc. | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service | Accepted | 0.1MB |
| 64481117 | 12/3/2019 11:57 AM EST | File Only | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Joseph C Schoell, Drinker Biddle & Reath LLP-Wilmington | 6 | Entry of Appearance | Entry of Appearance of Joseph C. Schoell of Drinker Biddle & Reath LLP as counsel for Plaintiffs Douglas M. Chertok and Vast Ventures LLC <br> • Linked to (1) <br> • Linked from (2) | Accepted | 0.1MB |
| | | | | | 7 | Summons | Summons (Amended) with Affidavit of Service as to Defendant, Zillow, Inc. <br> • Linked to (3) | Accepted | 0.3MB |
| 64438251 | 11/18/2019 11:41 AM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka | Register in Chancery, DE Court of Chancery Civil Action | 5 | Issuance of Summons | Issued 3104 Summons to law firm (1 copy) <br> • Linked from (1) | Accepted | 0.1MB |

| 64432514 | 11/15/2019 9:42 AM EST | File Only | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Michael J Maimone, Drinker Biddle & Reath LLP-Wilmington | 4 | Summons Instructions | Letter to The Register in Chancery re Amended Summons for Service upon Defendant pursuant to 10 Del. C. § 3104, filed on behalf of Plaintiffs • Linked to (3) • Linked from (1) | Accepted | 0.1MB |
|---|---|---|---|---|---|---|---|---|---|
| 64390014 | 11/5/2019 3:11 PM EST | File Only | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Michael J Maimone, Drinker Biddle & Reath LLP-Wilmington | 3 | Summons | Summons to Zillow, Inc. with Affidavit of Service • Linked to (2) • Linked from (1) | Accepted | 0.2MB |
| 64388039 | 11/5/2019 11:19 AM EST | File And Serve | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Register in Chancery, DE Court of Chancery Civil Action | 2 | Issuance of Summons | Issued 1 summons 1 copy for SPS. 11.5.2019. • Linked to (1) • Linked from (1) | Accepted | 0.1MB |
| 64349024 | 10/24/2019 4:32 PM EDT | File Only | 2019-0849-LWW CLOSED (6/23/2022) Douglas M. Chertok, et al. v. Zillow, Inc., a Washington corporation (successor to NMD Interactive, Inc., a Delaware corporation, aka StreetEasy, Inc. | Michael J Maimone, Drinker Biddle & Reath LLP-Wilmington | 1 | Complaint with 1 or 2 defendants | Verified Complaint, filed on behalf of Plaintiffs, Douglas M. Chertok and Vast Ventures LLC, a Florida limited liability company • Linked from (12) | Accepted | 0.3MB |
| | | | | | | Exhibits | Exhibits A-E to Verified Complaint | Accepted | 4.9MB |
| | | | | | | Verification to Complaint | Verification of Douglas M. Chertok to Verified Complaint | Accepted | 0.2MB |
| | | | | | | Verification to Complaint | Verification of Douglas M. Chertok, Sole Managing Member of Vast Ventures LLC | Accepted | 0.2MB |
| | | | | | | Supplemental Information | Supplemental Information Pursuant | Accepted | 0.1MB |

| | | | | | Sheet | to Rule 3(a) of the Rules of the Court of Chancery | | |
| | | | | | Summons Instructions | Summons Instruction Letter to the Register in Chancery re service upon Defendant, Zillow, Inc.<br>• Linked from (2) | Accepted | 0.1MB |

1-46 of 46 transactions    <<Prev   Page 1 of 1    Next>>

# EXHIBIT C

EFiled:  Oct 24 2019 04:32PM EDT
Transaction ID 64349024
Case No. 2019-0849-

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

DOUGLAS M. CHERTOK and VAST )
VENTURES LLC, a Florida limited )
liability company, )
)
          Plaintiffs, )
)
          v. )     C.A. No. _____
)
ZILLOW, INC., a Washington corporation )
(successor to NMD INTERACTIVE, INC., )
a Delaware corporation, aka )
STREETEASY, INC.), )
)
          Defendant. )

## VERIFIED COMPLAINT

Plaintiffs Douglas M. Chertok ("Chertok"), an individual, and Vast Ventures LLC, a Florida limited liability company ("Vast"), by and through their undersigned counsel, for their Verified Complaint against Defendant Zillow, Inc., a Washington corporation ("Zillow") allege as follows:

## NATURE OF THE ACTION

1.    Plaintiffs bring this action to recover approximately $6,300,000 in merger consideration (the "Merger Consideration") and unpaid dividends (the "Dividends," collectively, the "Funds"), plus accrued pre-judgment interest, from Zillow.  Zillow unlawfully withheld the Funds from Plaintiffs Chertok and Vast for approximately six years (from 2013 until the present) after the closing of a purported merger (the "Merger") by and among Zillow,

1

NMD Interactive, Inc. (doing business as StreetEasy ("StreetEasy")), a Delaware corporation ("NMD"), and Strawberry Acquisition Inc., a Delaware corporation ("Merger Sub").

2.      Plaintiffs object to the Merger, contending that the Merger was not authorized.  Notwithstanding its defects, the Merger closed in 2013. Plaintiffs received stock certificates from NMD before the Merger closed for the equivalent of 2,684,570 shares of common stock of NMD (the "NMD Shares"), and according to the documents that Plaintiffs received from NMD, Plaintiffs have been entitled to payment of the Merger Consideration since their withdrawal and loss of appraisal rights in October 2013, and December 2013, respectively.  Since 2013, however, Zillow has retained the Merger Consideration owed to Plaintiffs and improperly refused to release the Merger Consideration to Plaintiffs.  Among other things, Zillow unlawfully demanded that Plaintiffs provide releases and/or waivers of liability before paying the Merger Consideration.

3.      Specifically, Zillow's unlawful withholding of the Merger Consideration materially breached Zillow's obligations (as NMD's successor) under the Amended and Restated Certificate of Incorporation filed by NMD on August 30, 2006 (the "NMD Certificate"), which obligated Zillow to pay Plaintiffs the Merger Consideration in October 2013, and December 2013 –

the time Plaintiffs withdrew and lost their appraisal rights for the NMD Shares.  (A copy of the NMD Certificate is attached hereto as Exhibit A). Instead of paying the Merger Consideration, Zillow required a pre-condition that Plaintiffs execute Letters of Transmittal ("LOTs") that were required under the purported merger agreement by and among Zillow, NMD, Merger Sub, and Shareholder Representative Services LLC (the "Merger Agreement").  (A copy of the Merger Agreement is attached hereto as Exhibit B).

4.      The LOTs contained releases and/or waivers of all claims against (among others) Zillow, NMD, and their respective directors, officers, and agents.   Plaintiffs were neither parties to the Merger Agreement, nor consented to the Merger Agreement or the Merger.  Accordingly, Plaintiffs had no duty to sign the LOTs, or to provide releases and/or waivers. Moreover, the NMD Certificate did not require executed LOTs, releases and/or waivers.  In addition, Zillow intentionally flouted Delaware law by imposing that unlawful pre-condition of requiring releases and/or waivers knowing that Delaware legal precedent prohibits such conduct.

5.      As recently as October 2019, Zillow contacted Plaintiffs by e-mail stating that it is holding the Funds.  Although Zillow possessed Plaintiffs' counsels' names and addresses since 2013, and could have mailed checks at

any time over the last six years, Zillow instead intentionally withheld the Funds.  Accordingly, Plaintiffs seek the Funds based upon two alternative theories: (a) breach of contract based upon the NMD Certificate and specific performance of the NMD Certificate, or, in the alternative, (b) Zillow's unjust enrichment at the expense of Plaintiffs.

<u>THE PARTIES</u>

6.      Plaintiff, Douglas M. Chertok (previously defined as "Chertok") is an individual residing in Broward County, Florida.

7.      Plaintiff Vast Ventures LLC (previously defined as "Vast") is a Florida limited liability company, with its principal place of business in Broward County, Florida. Chertok is Vast's sole managing member.

8.      Defendant Zillow, Inc. (previously defined as "Zillow") is a Washington corporation.

<u>JURISDICTION</u>

9.      This Court has subject matter jurisdiction over this Verified Complaint pursuant to 8 *Del. C.* §111, which grants this Court jurisdiction to interpret, apply, enforce, or determine the validity of corporate instruments and provisions of the Delaware General Corporate Law ("DGCL"), and 10 Del. C. § 341, which grants this Court jurisdiction to hear and determine all matters and causes in equity.

10.     This Court has personal jurisdiction over Zillow because after the Merger closed on August 26, 2013, Zillow merged StreetEasy with and into Zillow on December 31, 2013, thereby acquiring all of NMD/StreetEasy's assets and liabilities.

FACTS

Background

11.     Chertok founded NMD and was appointed its sole director in 2005.  On August 16, 2013, Chertok was embroiled in litigation in the Federal courts in New York related to improper and fraudulent actions taken by others associated with NMD (the "NY Litigation").  The releases and/or waivers that Zillow later demanded from Plaintiffs would have impacted adversely Chertok's rights in connection with the NY Litigation.  (*See infra* ¶¶29-35).

12.     At the time of the NY Litigation, on August 16, 2013, NMD signed the Merger Agreement, which provided that Merger Sub, a wholly-owned Zillow subsidiary, would acquire NMD for $50 million in cash.  Schedule 2.3 of the Merger Agreement acknowledged that Chertok held 2,450,403 shares of NMD common stock, and Vast held 169,672 shares of NMD Series A Preferred Stock (convertible into 234,167 shares of NMD common stock).  (A copy of the purported Disclosure Memorandum to the

5

Merger Agreement, dated August 16, 2013, which contains the Schedules to the Merger Agreement, is attached hereto as Exhibit C).

The Funds

13.     According to an information statement summarizing the Merger (the "Information Statement") that NMD sent to Chertok on or about August 29, 2013, each outstanding share of NMD common stock was entitled to receive approximately $2.19 of merger consideration. (A copy of the Information Statement is attached hereto as Exhibit D).

14.     Article Fourth, Section C, Paragraph 2.2 and Paragraph 2.3 of the NMD Certificate provide that, upon the closing of a merger, if the aggregate amount which the holders of Series A Preferred Stock are entitled to receive exceeds $.9382 per share, then each such holder shall be entitled to receive as merger consideration the greater of that amount, or the amount such holder would receive if the holder converted the shares of Series A Preferred Stock into NMD common stock immediately prior to the merger.

15.     Accordingly, pursuant to the NMD Certificate, Chertok is entitled to approximately $5,366,382.57 (2,450,403 shares x $2.19), and Vast is entitled to approximately $512,825.73 (234,167 shares x $2.19), respectively (previously defined collectively as the "Merger Consideration").

16.     In addition, pursuant to Schedule 6.1(b)(iii) of the Merger Agreement, NMD issued a cash dividend prior to the closing of the Merger of approximately $0.1836 per share of NMD common stock.   Accordingly, Chertok and Vast are entitled to the payment of cash dividends in the amounts of approximately $449,893.99 (2,450,403 shares x $0.1836) and $42,993.06 (234,167 shares x $0.1836), respectively (previously defined collectively as the "Dividends").

17.     Pursuant to the Article Fourth, Section C, Paragraph 1 and Paragraph 2.1 of the NMD Certificate, NMD is obligated to pay the Dividends to NMD's stockholders upon the closing of a merger.

Zillow's Payment Obligations

18.     Chertok was unaware of the Merger at the time NMD and Zillow executed the Merger Agreement on August 16, 2013.   Zillow publicly announced the Merger on August 19, 2013.   According to the Information Statement, the stockholders of NMD approved the Merger by written consent.

19.     Chertok and Vast were not parties to the Merger Agreement, and did not consent to the Merger Agreement or the Merger.

20.     Although Section 6.5(b) of the Merger Agreement required NMD to send notice to NMD's stockholders that did not consent to the Merger no later than August 23, 2013, NMD did not send the notice, the Merger

Agreement, schedules, and other notices to Chertok and Vast until August 29, 2013 – three days after the Merger closed on August 26, 2013.

21.     On September 18, 2013, Chertok and Vast sent to NMD notices of appraisal demands for 2,400,000 of 2,450,403 common stock shares, and 84,836 of 169,672 preferred stock shares, respectively.

22.     On October 24, 2013, Chertok and Vast sent to NMD notices of withdrawal of their appraisal rights for 2,395,000 of 2,400,000 common stock shares, and 84,336 of 84,836 Preferred Stock shares, respectively.

23.     Article Fourth, Section C, Paragraph 2 of the NMD Certificate provides that upon the closing of a merger, NMD is obligated to pay NMD's stockholders the merger consideration.

24.     Under Section 262 of the DGCL, appraisal rights expired with respect to some of Chertok's NMD Shares and some of Vast's NMD Shares at the time the rights were withdrawn, and appraisal rights expired with respect to all of Plaintiffs' NMD Shares 120-days after the Merger closed, which was December 26, 2013.

25.     Zillow improperly withheld the Merger Consideration of Chertok and Vast in the amounts of approximately $5,366,382.57, and $512,825.73, respectively, since August 2013 (which respect to the NMD Shares not demanding appraisal), October 2013 (with respect to the NMD

8

Shares initially demanding appraisal, but later withdrawing the appraisal demand), and December 2013 (with respect to the NMD Shares continuing to demand appraisal at the time the appraisal right expired). In light of the fact that the NMD Certificate does not limit or eliminate the payment of interest, Zillow owes interest to Plaintiffs with respect to the amounts improperly withheld from Plaintiffs.

26.    In addition, pursuant to Article Fourth, Section C, Paragraph 1 and Paragraph 2 of the NMD Certificate, Zillow owes Chertok and Vast dividend payments of approximately $449,893.99 and $42,993.06, respectively, since the Merger closed. Upon information and belief, Zillow did not pay the Dividends to Plaintiffs because Plaintiffs refused to execute the LOTs with the releases and/or waivers demanded by Zillow. In light of the fact that the NMD Certificate does not limit or eliminate the payment of interest, Zillow owes interest to Plaintiffs with respect to the amounts improperly withheld from Plaintiffs.

27.    As of the date of this Verified Complaint, Zillow has not paid the Merger Consideration, the Dividends, or interest to Chertok or Vast in breach of Zillow's payment obligations under Article Fourth, Section C, Paragraph 1 and Paragraph 2 of the NMD Certificate and under Delaware law.

9

28.     Zillow's payment obligations with respect to the Merger Consideration and the Dividends are ongoing because Section 8.1(b) of the Merger Agreement provides that "[t]he covenants and agreements contained in this Agreement or in the other Operative Documents [which includes the NMD Certificate] shall survive the Closing and shall continue until fully performed, satisfied or waived."  Moreover, the NMD Certificate does not limit or eliminate Zillow's payment obligations; rather it obligates Zillow to pay the Funds to Plaintiffs, as stockholders of NMD.

The Releases and/or Waivers

29.     Notwithstanding Zillow's legal obligation to pay the Merger Consideration and the Dividends to Chertok and Vast, Zillow unlawfully withheld the Funds from Plaintiffs for over six years because Zillow repeatedly conditioned the payment upon Plaintiffs' execution of the LOTs containing releases and/or waivers.

30.     Specifically, in 2013, 2014, 2015, and 2019, Zillow repeatedly required Chertok and Vast to sign the LOTs pursuant to Section 1.7.2(b) of the Merger Agreement.  Chertok and Vast, however, neither are parties to the Merger Agreement, nor did they consent to the Merger Agreement or the Merger.  In fact, Section 9.6 of the Merger Agreement provides:

> This Agreement shall be binding on and inure solely to the benefit of the parties and their respective successors, heirs, legal

10

> representatives and permitted assigns, and, except for Section 6.13 (Indemnification of Company Directors and Officers) nothing in this Agreement, express or implied, is intended to or shall confer upon any other Person any right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Accordingly, neither Chertok nor Vast have any obligations under the Merger Agreement, and any purported obligations of the non-party, non-consenting stockholders – for example, the execution of LOTs, the execution of releases, and the execution of waivers – are unenforceable by Zillow.

31.    Rather, Zillow's obligations to pay the Merger Consideration and the Dividends to Plaintiffs are based upon the NMD Certificate – not upon the Merger Agreement.   The NMD Certificate did not require NMD's stockholders to execute LOTs, to execute releases, or to execute waivers prior to receiving payment in the event of a merger.  Plaintiffs, therefore, had no obligation to perform any of the purported pre-conditions prior to Zillow's obligation to pay the Funds to Plaintiffs. In sum, Zillow's obligation to pay the Funds to Plaintiffs is unconditional under the NMD Certificate.

32.    Moreover, upon information and belief, Zillow had knowledge that its demand for a release and/or waiver as a pre-condition to payment of the Funds to Plaintiffs was in conflict with Delaware law.

33.    Zillow knew that Delaware law prohibits an acquiring corporation from requiring releases and/or waivers from selling corporation's

11

stockholders without furnishing additional consideration in exchange for the release and/or waiver. Specifically, in 2013 and 2014, Zillow's LOTs contained a release of all claims against Zillow, NMD, and their respective directors, officers, and agents. (*See* Merger Agreement at Schedule 1.7.2(b)).

34. After this Court's decision in *Cigna Health & Life v. Audax Health Sols., Inc.*, 107 A.3d 1082, 1091 (Del. Ch. 2014), Zillow's counsel contacted Chertok's counsel by e-mail on June 4, 2015, attaching a short-form LOT that removed the release contained in Zillow's prior LOT, and offering Chertok $19,000 as consideration in exchange for a release. Zillow, however, edited the new short-form LOT, without disclosing the edits to Chertok, and surreptitiously inserted a waiver in another section of the short-form LOT. Upon information and belief, Zillow was attempting to deceive Plaintiffs into executing waivers. (A copy of Zillow's 2013 LOT, June 4, 2015 e-mail, and 2015 LOT are attached hereto as Exhibit E). Plaintiffs did not execute the short-form LOT (and, thus, did not execute the hidden waiver), and did not accept the consideration offered in exchange for the release.

35. Although Chertok and Vast declined to capitulate to Zillow's requirement that they release and/or waive any claims against Zillow, NMD, and their respective directors, officers, and agents in order to receive the Merger Consideration and the Dividends, Zillow's repeated attempts to

12

require the releases and/or waiver was in conflict with Delaware law and delayed Plaintiffs' receipt of the Funds.

<u>Zillow Continues to Withhold the Funds</u>

36.   In response to inquiries from Plaintiffs' counsel as recently as October 2019, Zillow stated that it continues to hold approximately $5,733,709.96 for Chertok and approximately $547,926.57 for Vast.

37.   According to Section 1.7.2(b) of Merger Agreement:

> Any portion of the Merger Consideration that remains unclaimed by the former holders of Company Stock for six (6) months after the Effective Time shall be delivered to Parent.  Any former holder of Company Stock that has not complied with this Section 1.7.2(b) prior to the end of such six-month period shall thereafter look only to Parent (subject to abandoned property, escheat and similar laws) but only as a general creditor thereof for payment of its claim for its portion of the Merger Consideration. Notwithstanding anything to the contrary, neither Parent nor any other party hereto shall be liable to a holder of shares of Company Stock for any Merger Consideration delivered to a public official pursuant to applicable law, including abandoned property, escheat and similar laws.

Zillow, therefore, had the Funds in its possession since February 26, 2014.

38.   Plaintiffs' counsel replied and reiterated to Zillow's counsel that Zillow was authorized to mail checks for the Funds that Zillow was holding for Chertok and Vast to Plaintiffs' counsel, or to wire the Funds to Plaintiffs' counsel.

13

39.     After August 26, 2019, Zillow no longer demanded that Plaintiffs execute the LOTs, and responded that it would mail checks for the Funds solely upon receipt of Plaintiffs' IRS Form W-9 (which contained Plaintiffs' tax identification numbers).  Notably, upon information and belief, the IRS does not require Zillow to obtain an IRS Form W-9 from Plaintiffs.  Although Zillow already possessed, or had access to, Plaintiffs' tax identification numbers since 2013 (as Plaintiffs' counsel explained to Zillow), Plaintiffs submitted executed IRS Form W-9s to Zillow on October 11, 2019.  As of the date of this Verified Complaint, Zillow still has not paid the Funds to Chertok or Vast, and is still holding the Funds without any lawful reason or cause.

<u>COUNT I</u>
(Breach of Contract and Specific Performance)

40.     Plaintiffs repeat and re-allege the allegations set forth in all prior paragraphs of this Verified Complaint with the same force and effect as if set forth fully herein.

41.     Plaintiffs seek the relief of specific performance against Zillow for breach of contract based upon the NMD Certificate because Zillow refused to pay the Funds to Plaintiffs for six years, thereby denying Plaintiffs of the Merger Consideration and the Dividends.

42.     Article Fourth, Section C, Paragraph 2.2 and Paragraph 2.3 of the NMD Certificate (which is a contract between NMD and its stockholders)

14

provide that upon closing a merger, NMD's stockholders are entitled to receive their portion of the merger consideration.   According to the Information Statement, each share of NMD common stock is entitled to receive approximately $2.19 of merger consideration.

43.    NMD sent Chertok and Vast share certificates which evidence that Chertok holds 2,450,403 shares of NMD common stock, and Vast holds 169,672 shares of NMD Series A Preferred Stock (convertible into 234,167 shares of NMD common stock).  According to the documents sent to Plaintiffs by NMD, Chertok is entitled to approximately $5,366,382.57 (2,450,403 shares x $2.19), and Vast is entitled to approximately $512,825.73 (234,167 shares x $2.19) of the Merger Consideration.

44.    Under the NMD Certificate and Section 262 of the DGCL, Zillow was obligated to pay the Merger Consideration to Plaintiffs no later than October 24, 2013, the date that Plaintiffs withdrew their appraisal demands, or December 26, 2013, the date that all of Plaintiffs' appraisal rights expired.

45.    Under Delaware law, Zillow also is obligated to pay Plaintiffs pre-judgment interest running from the date that the Merger Consideration should have been paid to the date of payment.  The payment of interest is not limited or eliminated by any provision of the NMD Certificate.

46.     To date, Zillow has not paid any portion of the Merger Consideration as required by the NMD Certificate and Delaware law, or any accrued interest.

47.     In addition, Schedule 6.1(b)(iii) of the Merger Agreement provides that NMD issued a cash dividend prior to the Merger closing of approximately $0.1836 per share of NMD common stock.

48.     Chertok and Vast, therefore, are entitled to cash dividends in the amounts of approximately $449,893.99 (2,450,403 shares x $0.1836) and $42,993.06 (234,167 shares x $0.1836), respectively.

49.     Article Fourth, Section C, Paragraph 1 and Paragraph 2.1 of the NMD Certificate obligate NMD to pay the Dividends to NMD's stockholders upon closing a merger.

50.     Under Delaware law, Zillow also is obligated to pay Plaintiffs pre-judgment interest running from the date that the Dividend should have been paid to the date of payment.  The payment of interest is not limited or eliminated by any provision of the NMD Certificate.

51.     To date, Zillow has not paid any portion of the Dividends to Chertok and Vast as required by the NMD Certificate and Delaware law, or any accrued interest.

52.     Zillow breached the NMD Certificate by withholding the Funds from Plaintiffs for six years after Zillow's obligation to pay Plaintiffs the Funds commenced, and by requiring that Plaintiffs execute the LOTs (which contained releases and/or waivers), prior to paying Plaintiffs the Funds. Accordingly, this Court should direct Zillow (a) to specifically perform its payment obligations under the NMD Certificate, and (b) to pay Plaintiffs an amount to be determined at trial, but no less than the approximately $6,372,095.35, plus pre-judgment interest and costs.

<u>ALTERNATIVE RELIEF</u>

<u>COUNT II</u>
(Unjust Enrichment)

53.     Plaintiffs repeat and re-allege the allegations set forth in all prior paragraphs of this Verified Complaint with the same force and effect as if set forth fully herein.

54.     The doctrine of unjust enrichment is based upon the retention of money of another against the fundamental principles of justice or equity and good conscience.  Under unjust enrichment, courts look for the following elements: (a) an enrichment, (b) an impoverishment, (c) a relation between the enrichment and impoverishment, (d) the absence of justification, and (e) the absence of a remedy provided by law.

17

55.     Regarding elements (a) through (c) above, in October 2019, Zillow contacted Plaintiffs' counsel by e-mail confirming that Zillow still is holding approximately $5,733,709.96 for Chertok and approximately $547,926.57 for Vast.  By holding Plaintiffs' money without any restrictions on Zillow's use of such monies, Zillow was enriched, Plaintiffs were impoverished, and there is a direct relation between the enrichment and impoverishment.   Moreover, Zillow's withholding of Plaintiffs' money contradicts fundamental principles of equity and good conscience.

56.     Regarding element (d) above, Zillow had no justification for retaining this money.  From 2013 to 2019, Zillow improperly conditioned the payment of the Funds to Plaintiffs upon Plaintiffs executing the LOTs required by the Merger Agreement.  These LOTs released and/or waived all claims against Zillow, NMD, and their directors, officers, and agents. Plaintiffs, however, neither were parties to the Merger Agreement, nor consented to the Merger Agreement or the Merger.  Plaintiffs, therefore, have no obligations under the Merger Agreement, and, thus, are not bound by the requirements in the Merger Agreement to execute the LOTs or to provide releases or waivers.   Moreover, the NMD Certificate does not require stockholders to execute the LOTs or to provide releases or waivers.

18

Amazingly, after August 2019, Zillow withdrew its demand that Plaintiffs execute the LOTs, but Zillow still withheld the Funds.

57.     In October 2019, Zillow continued to condition the payment of the Merger Consideration to Chertok and Vast (and, thus, continued to improperly delay payment of the Merger Consideration to Plaintiffs) upon Plaintiffs each submitting an IRS Form W-9, which (upon information and belief) is not required by the IRS.  Moreover, although Zillow possessed, or had access to, Plaintiffs' tax identification numbers since 2013, Plaintiffs submitted executed IRS Form W-9s to Zillow.  Accordingly, Zillow has no justification for retaining this money and was unjustly enriched by its wrongful conduct.

58.     Regarding element (e) above, Plaintiffs are alleging this Court II in the alternative, and if this Court denies the relief respectfully required in Counts I of this Verified Complaint, then Plaintiffs will continue to have no available remedy at law to recover the Funds.

59.     In sum, Zillow has been unjustly enriched at the expense of Plaintiffs in an amount to be proven at trial, but no less than approximately $6,372,095.35, plus pre-judgment interest and costs.

19

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Chertok and Vast pray for judgment and relief against Defendant as follows:

a.  A decision (i) holding that Zillow breached the NMD Certificate by withholding the Funds from Plaintiffs for six years after Zillow's obligation to pay Plaintiffs the Funds commenced, and by requiring that Plaintiffs execute the LOTs (which contained releases and/or waivers), prior to paying Plaintiffs the Funds, and (ii) ordering that Zillow specifically perform its payment obligations under the NMD Certificate and pay the Funds to Plaintiffs;

b.  In the alternative, a decision (i) holding that Zillow was unjustly enriched at the expense of Plaintiffs, and (ii) ordering that Zillow pay the Funds to Plaintiffs;

c.  In any event, an order directing Zillow to pay to Plaintiffs an amount to be determined at trial, but no less than approximately $6,372,095.35, plus pre-judgment interest and costs;

d.  An order awarding Plaintiffs their costs and expenses, which includes reasonable attorney's fees and costs, incurred by Plaintiffs in this action; and

e.    The granting to Plaintiffs of such other and further relief as this

Court deems just, proper, and equitable.

DRINKER BIDDLE & REATH LLP

*/s/ Michael J. Maimone*
Michael J. Maimone (Del. Bar No. 3592)
222 Delaware Avenue, Suite 1410
Wilmington, Delaware  19801
Tel:   (302) 467-4200
michael.maimone@dbr.com

*Attorneys for Douglas M. Chertok and*
*Vast Ventures LLC, a Florida limited*
*liability company*

Dated:    October 24, 2019

21

# EXHIBIT D

EFiled:  Jan 03 2020 01:08PM EST
Transaction ID 64575424
Case No. 2019-0849-AGB

### IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

| | |
|---|---|
| DOUGLAS M. CHERTOK and VAST VENTURES LLC, a Florida limited liability company,<br><br>       Plaintiffs,<br><br>  vs.<br><br>ZILLOW, INC., a Washington corporation (successor to NMD INTERACTIVE, INC., a Delaware corporation, aka STREETEASY, INC.),<br><br>       Defendant. | C.A. No. 2019-0849-AGB |

### DEFENDANT ZILLOW INC.'S MOTION TO DISMISS

Pursuant to the Court of Chancery Rules 12(b)(2), 12(b)(6), all applicable statutes of limitation, and the doctrine of laches, Defendant Zillow, Inc. ("Zillow"), by and through the undersigned attorneys, hereby move the Court to dismiss with prejudice Plaintiffs Douglas M. Chertok and Vast Ventures LLC's Verified Complaint.  The grounds for this motion shall be set forth in briefs to be filed pursuant to a schedule agreed to by the parties or ordered by the Court.

**BUCHANAN INGERSOLL & ROONEY PC**

*/s/ Geoffrey G. Grivner*

Geoffrey G. Grivner (# 4711)
919 North Market Street
Suite 990
Wilmington, DE 19801
Telephone:  (302) 552-4200
Facsimile:   (302) 552-4295
*geoffrey.grivner@bipc.com*

Dated: January 3, 2020          *Attorney for Defendant Zillow, Inc.*

EFiled:  Jan 03 2020 01:08PM EST
Transaction ID 64575424
Case No. 2019-0849-AGB

**IN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE**

DOUGLAS M. CHERTOK and VAST
VENTURES LLC, a Florida limited
liability company,

            Plaintiffs,

     vs.

ZILLOW, INC., a Washington
corporation (successor to NMD
INTERACTIVE, INC.,
a Delaware corporation, aka
STREETEASY, INC.),

            Defendant.

C.A. No. 2019-0849-AGB

## [PROPOSED] ORDER

**AND NOW**, this _____ day of _____, 2019, upon

consideration of Defendant Zillow, Inc.'s Motion to Dismiss, the Court **GRANTS**

the Motion and **ORDERS** that the Verified Complaint is dismissed with prejudice.

 

 

_____
Chancellor

EFiled: Feb 17 2020 04:36PM EST
Transaction ID 64733343
Case No. 2019-0849-AGB

# OIN THE COURT OF CHANCERY FOR THE STATE OF DELAWARE

|  |  |
|---|---|
| DOUGLAS M. CHERTOK and VAST VENTURES LLC, a Florida limited liability company, | |
| Plaintiffs, | C.A. No. 2019-0849-AGB |
| vs. | |
| ZILLOW, INC., a Washington corporation (successor to NMD INTERACTIVE, INC., a Delaware corporation, aka STREETEASY, INC.), | |
| Defendant. | |

## DEFENDANT ZILLOW INC.'S OPENING BRIEF IN SUPPORT OF ITS MOTION TO DISMISS

**BUCHANAN INGERSOLL & ROONEY PC**

Geoffrey G. Grivner (# 4711)
919 North Market Street
Suite 990
Wilmington, DE 19801
Telephone: (302) 552-4200
Facsimile: (302) 552-4295

## Table of Contents

I.   **PRELIMINARY STATEMENT** ....................................................................1

II.   **FACTUAL BACKGROUND** ......................................................................3

   A.   The Parties ..........................................................................................3

   B.   The Merger Agreement, the Merger Consideration, and NMD Dividend Payments Owed to Shareholders ...........................................................4

III.   **ARGUMENT** .............................................................................................8

   A.   Standard of Review ..............................................................................8

   B.   Plaintiffs' Complaint is Untimely and Barred by the Statute of Limitations 9

   C.   The Merger Agreement is the Governing Contract at Issue in this Dispute 13

   D.   Plaintiffs Have Not Complied with the Merger Agreement ......................17

   E.   The Complaint Fails to Allege a Claim for Unjust Enrichment ................19

IV.   **CONCLUSION** .........................................................................................20

## Table of Authorities

**Cases**

*Adams v. Jankouskas*, 452 A.2d 148 (Del.1982) ....................................................10

*AM Gen. Holdings LLC v. Renco Group, Inc.* 2016 WL 4440476
   (Del. Ch. Aug. 22, 2016) .................................................................................9, 12

*Amirsaleh v. Bd. of Trade of the City of New York, Inc.*, 2008 WL 4182998
   (Del. Ch. Sept. 11, 2008)....................................................................................15

*Ark. Teacher Ret. Sys. v. Alon USA Energy, Inc.*, 2019 Del. Ch. LEXIS 245
   (Del. Ch. June 28, 2019)......................................................................................15

*BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268 (Del. Ch. 2003) ......................18

*Comrie v. Enterasys Networks, Inc.,* 2004 WL 293337 (Del. Ch. Feb. 13, 2004)..15

*Daniels v. Dover Downs Hotel*, 2017 Del. Super. LEXIS 227
   (Del. Super. Ct. May 09, 2017) ...........................................................................16

*Hadley v. Shaffer*, 2003 WL 21960406 (D. Del. Aug 12, 2003).............................15

*Hospitalists of Del., LLC v. Lutz,* 2012 WL 3679219 (Del. Ch. Aug 28, 2012)........8

*Hudson v. D & V Mason Contractors, Inc.*, 252 A.2d 166 (Del. Super. 1969) ......17

*In re BHC Commc'ns S'holder Litig.*, 789 A.2d 1 (Del. Ch. 2001) ..........................8

*In re Santa Fe Pac. Corp. S'holder Litig.* 669 A.2d 59 (Del. 1995)........................8

*Kahn v. Seaboard Corp.,* 625 A.2d 269 (Del. Ch. 1993) .......................................10

*Lehman Bros. Holdings v. Spanish Broad. Sys.,* 2014 Del. Ch. LEXIS 28
   (Del. Ch. Feb. 25, 2014) .....................................................................................17

*MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2007 Del. Ch. LEXIS 92
   (Del. Ch. June 29, 2007)......................................................................................19

*NAMA Hldgs. v. Related World Mkt. Ctr., LLC*, 922 A.2d 417 (Del. Ch. 2007)....15

*NBC Universal, Inc v. Paxson Comm. Corp.*, 2005 Del. Ch. LEXIS 56
(Del. Ch. Apr. 29, 2005) ..............................................................................16

*Nemec v. Shrader,* 991 A.2d 1120 (Del. 2010) ...............................................19

*Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd.,*
2019 Del. Super. LEXIS 640 (Del. Super. Ct. Dec. 04, 2019) ...........................12

*Official Comm. of Unsecured Creditors of HH Liquidation, LLC v.*
*Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211
(Bankr. D. Del. 2018) ..................................................................................19

*Physiotherapy Corp. v. Moncure*, 2018 Del. Ch. LEXIS 82 (Del. Ch. Mar. 12,
2018) ........................................................................................................17

*Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162 (Del. 2011) ..................8

*Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449 (Del. Ch. Feb. 18, 2015).....13

*Raisler Sprinkler Co. v. Automatic Sprinkler Co.*, 171 A. 214 (Del. Super. Ct.
1934) ........................................................................................................14

*Solomon v. Pathe Commc'ns Corp., 672 A.2d 35 (Del. 1996)* .................................8

*SPX Corp. v. Garda USA, Inc. 2012 WL 6841398 (Del. Super. Dec 6, 2012)*..........8

*VLIW Tech., LLC v. Hewlett-Packard Co*., 840 A.2d 606 (Del. 2003)...................16

*Wal-Mart Stores,* 860 A.2d at 319 (Del. 2004) ...................................................9, 11

*Whittington v. Dragon Grp., LLC,* 991 A.2d 1 (Del. 2009) ....................................10

*Winner Acceptance Corp. v. Return on Capital Corp.,* 2008 WL 5352063
(Del. Ch. Dec. 23, 2008)...............................................................................9

## Statutes

Del C.§ 8106 ................................................................................................9

## I.    PRELIMINARY STATEMENT

This action presents a rather unusual set of circumstances – for the last six years Defendant Zillow, Inc. ("Zillow" or "Defendant") has been attempting to pay Plaintiffs Douglas M. Chertok ("Chertok") and Vast Ventures LLC ("Vast" and, together with Chertok, "Plaintiffs") certain merger consideration ("Merger Consideration") and pre-merger dividend payments (the "NMD Dividend Payments" and together with the Merger Consideration, the "Funds") they claim they are owed and are now seeking through this suit. Plaintiffs have repeatedly refused payment, and continue their refusal to this day.  Despite Zillow's willingness to cooperate and tender payment to Plaintiffs, Plaintiffs' October 24, 2019 Verified Complaint ("Complaint") must be dismissed because their claims are untimely and fail to properly state a claim.

On August 16, 2013, Zillow entered an agreement to acquire NMD Interactive, Inc., d/b/a StreetEasy, a Delaware corporation ("NMD") (the "Merger Agreement").  The Merger Agreement provided that upon surrender of a certificate for cancellation together with a Letter of Transmittal ("LOT") the holder of the certificate shall be entitled to receive their portion of the Merger Consideration. Prior to the Merger, NMD stockholders were also entitled to certain dividend payments issued by NMD pre-closing.  Plaintiffs, claimed holders of certificates, refused to sign the LOT and expressed concerns about certain terms contained

1

therein.  Notwithstanding it had no obligation to do so, in response, Zillow provided Plaintiffs an abbreviated LOT, alleviating each of their concerns, but Plaintiffs maintained their refusal to sign the LOT.

Continuing its effort to resolve this matter in good faith, Zillow withdrew the additional requirements of the Merger Agreement with respect to Plaintiffs and no longer required Plaintiffs to sign the LOT.  Instead, Zillow proceeded to make several attempts to provide Plaintiffs with the claimed Funds.  Instead of accepting payment, Plaintiffs responded to Zillow's efforts to pay the Funds by failing to verify or provide account information, tax information, mailing addresses, and other information that would allow Zillow to make payment to Plaintiffs.  In fact, Zillow actually caused checks to be tendered to Plaintiffs' former counsel representing those amounts of the Dividend Payments they claim, but Plaintiffs returned such payments to Zillow.

Instead of accepting payment, on October 24, 2019, roughly **six years** after this dispute first arose, and well past the expiration of all applicable statutes of limitations, Plaintiffs filed the instant action alleging, inexplicably, breach of contract or, alternatively, unjust enrichment requesting that Zillow pay the Funds to Plaintiffs (which it has repeatedly attempted to do), in addition to significant costs and prejudgment interest accumulated over the more than six years Plaintiffs refused

to accept payment.[1]  However, the Merger Agreement, upon which Plaintiffs' claims must be based, limits their rights to only those of general creditors and does not provide for interest payments.  Plaintiffs' unjust enrichment claim is equally flawed in that Zillow has not been enriched as a result of any alleged impoverishment of Plaintiffs in light of Zillow's willingness to pay Plaintiffs for the last six years. For these reasons, Plaintiffs' Complaint must be dismissed with prejudice.

This is Zillow's Opening Brief in Support of Its Motion to Dismiss.

## II.    FACTUAL BACKGROUND[2]

### A.    The Parties

Defendant Zillow, Inc. is a Washington corporation.  Zillow is an online real estate database company that was founded in 2006.  Compl. ¶ 8.

Plaintiff Chertok was appointed director of NMD, a Delaware corporation, in 2005.  NMD was an online real estate marketplace for reliable sales and rental listings, comprehensive data and information about metropolitan areas.  *Id.* at ¶ 7. Vast Ventures LLC is a Florida limited liability company, with its principal place of

---

[1]    While not before the Court on this motion to dismiss, Zillow reserves argument to dispute the amount Plaintiffs allege they are owed in their complaint.

[2]    Solely for purposes of the motion to dismiss, Defendants accept Plaintiffs' allegations as true except where those allegations are refuted by the documents on which the Amended Complaint relies (and which are thus incorporated by reference).  Statements in this Factual Background that do not include a citation to the Amended Complaint or one of its exhibits are provided by way of background and/or context, and the Court need not rely on them to resolve Defendants' motion to dismiss.

3

business in Broward County, Florida.  *Id.* Vast is a venture fund that invests in emerging companies.  Chertok is a managing director of Vast and Vast is a stockholder of NMD.  *Id.*

### B. The Merger Agreement, the Merger Consideration, and NMD Dividend Payments Owed to Shareholders

On August 16, 2013, NMD agreed to merge with Zillow pursuant to the Merger Agreement (the "Merger"). *Id.* at ¶ 12.  The Agreement provided that Strawberry Acquisition Inc., a Delaware corporation and wholly-owned Zillow subsidiary, would acquire NMD for $50 million in cash.  *Id.* Schedule 2.3 of the Merger Agreement acknowledged that Chertok held 2,450,403 shares of NMD common stock, and Vast held 169,672 shares of NMD Series A Preferred Stock (convertible into 234,167 shares of NMD common stock).  *Id.* at ¶ 13 and Ex. C. Chertok and Vast claim that they are entitle to Merger Consideration. *Id.* at ¶ 15.

In addition to the Merger Consideration, NMD stockholders were entitled to certain dividend payments issued by NMD pursuant to the August 16, 2013 unanimous consent of the NMD Board (the "NMD Board Consent") contemporaneously with the closing of the Merger. *Id*. at ¶ 16.  Chertok and Vast claim that they are also entitled to NMD Dividend Payments.  *Id.* and Ex. C.

On September 18, 2013, Chertok and Vast sent NMD notices of appraisal demands for common stock shares, and preferred stock shares.  *Id.* at ¶ 21.  Later, however, on October 24, 2013, Chertok and Vast sent NMD notices of withdrawal

of their appraisal rights for certain common stock and preferred stock shares. *Id.* at ¶ 22. Concurrently with Plaintiffs' withdrawal, Plaintiffs' remaining appraisal rights expired. *Id.* at ¶ 24.

As beneficiaries to the Merger Agreement, Plaintiffs' rights and limitations with respect to the Merger Consideration are defined therein. For example, after having withdrawn their appraisal rights, or their appraisal rights otherwise expired, Plaintiffs are not entitled to interest payments. Section 1.7.1 of the Merger Agreement provides:

> [I]f any holder of Dissenting Shares shall effectively withdraw or lose (through failure to perfect or otherwise) such holder's appraisal rights, then, as of the later of the Effective Time and the occurrence of such event, such holder's shares shall automatically be converted into and represent only the right to receive the Merger Consideration to which such holder is then entitled under this Agreement, **without interest** thereon and upon surrender of the certificate.

*Id.* at Ex. C (emphasis added).

Following the expiration of Plaintiffs' appraisal rights in 2013, Zillow began its six year journey to pay Chertok and Vast, which continues through today, notwithstanding the current litigation.[3] Pursuant to Section 1.7.2(b) of the Merger Agreement, NMD stockholders are to receive their funds as follows:

> Upon surrender of a certificate for cancellation to the Exchange Agent or to such other agent or agents as may be appointed by Parent, together

---

[3]     Pursuant to Section 1.7.2 of the Merger Agreement, all remaining amounts of the Merger Consideration were delivered to Zillow on or before February 26, 2014. *Id.* at ¶ 37.

with a letter of transmittal (the "Letter of Transmittal" [or "LOT"]) substantially in the form attached hereto as Schedule 1.7.2(b), duly executed, and such other documents as may reasonably be required by Parent or the Exchange Agent, the holder of such certificate shall be entitled to receive in exchange therefor the portion of the Merger Consideration that such holder has the right to receive pursuant to the provisions of Section 1.7.1(and subject to deduction for the Stockholder Representative Expense Fund pursuant to Section 1.10(c)), and the certificate so surrendered shall forthwith be cancelled.

*Id.* at Ex. C.

Notwithstanding Plaintiffs' obligations to provide Zillow with signed LOTs in order for Zillow to tender the Merger Consideration to Plaintiffs, Plaintiffs refused to sign the LOTs, and certain releases contained therein. *Id.* at ¶¶ 26, 29-30. Plaintiffs failed to assert any rights or bring suit against Zillow with respect to their claimed rights to the Funds.

Nevertheless, still eager and willing to cooperate and make payment to Plaintiffs, Zillow provided Plaintiffs with an abbreviated LOT, addressing their alleged concerns and removing release and waiver provisions.  On June 4, 2015, in delivering the revised LOT to Plaintiffs, Zillow's then-counsel noted:

Since the escrow has expired, we removed the provisions regarding the agreement by the stockholder to be bound by the escrow/indemnification, and we also removed the release, as I know that was something to which your client previously objected.  It is essentially now just an instrument of transfer to accompany the share certificates, although it does not contain a short confidentiality clause (identical to that signed by all other former stockholders) since we want to be sure that the information statement and other stockholder materials provided to Mr. Chertok in connection with the merger remain confidential.

*Id.* at Ex. E at 17 (and attached hereto as Exhibit A for the Court's reference). Despite the Merger Agreement's requirements surrounding the LOT, and that the revised LOT did not require Plaintiffs to agree to any releases or waiver provisions, Plaintiffs still refused to sign the LOT and accept payment of the Funds asserting the new LOT contained a "hidden waiver," but yet made no effort to identify such reference in their pleading. *Id.* at ¶ 34. Once again, Plaintiffs did not assert any rights against Zillow or bring suit at that time.

Thereafter, in a good faith attempt to resolve Plaintiff's alleged issues, and make payment to Plaintiffs, Zillow withdrew its request for the modified LOT and, once again, offered to make payment to Plaintiffs.[4] *Id.* at ¶ 39. Once again, Plaintiffs refused to accept payment of the Funds.  To date, Zillow continues to hold the Funds ready for payment in compliance with its obligations under the Merger Agreement, as well as pursuant to the NMD Board Consent with respect to the NMD Dividend Payments. Plaintiffs' failure to cooperate and accept payment continues.

---

[4] Zillow required only that Plaintiffs provide it with tax and identification information in order to disburse the Funds to Plaintiffs.

## III.   ARGUMENT

### A.   <u>Standard of Review</u>

To survive a motion to dismiss, a plaintiff must plead facts sufficient to state a valid legal claim under which relief can be obtained. *See Solomon v. Pathe Commc'ns Corp.*, 672 A.2d 35, 38 (Del. 1996); *see also In re Santa Fe Pac. Corp. S'holder Litig.*, 669 A.2d 59, 65-66 (Del. 1995). Although the Court assumes "the truthfulness of well-pleaded allegations and [will] draw reasonable inferences in favor of the non-moving party," the Court does not "accept conclusory allegations unaccompanied by specific supporting factual allegations." *Id.*; *see also Hospitalists of Del., LLC v. Lutz*, 2012 WL 3679219, at *12 (Del. Ch. Aug. 28, 2012) (*quoting Price v. E.I. duPont de Nemours & Co., Inc.*, 26 A.3d 162, 166 (Del. 2011)). Where the Court "determines with 'reasonable certainty' that no set of facts can be inferred from the pleading upon which plaintiff could prevail," the Court should dismiss the complaint. *SPX Corp. v. Garda USA, Inc.*, 2012 WL 6841398, at *2 (Del. Super. Dec. 6, 2012). When deciding a motion to dismiss, the Court may consider the complaint and the content of documents that are integral to or are incorporated by reference into the complaint. *In re BHC Commc'ns S'holder Litig.*, 789 A.2d 1, 9 (Del. Ch. 2001).

**B.**     <u>**Plaintiffs' Complaint is Untimely and Barred by the Statute of Limitations**</u>

Simply stated, this action must be dismissed because the applicable statute of limitations expired long ago.  As the Court is well aware, breach of contract claims must be brought within three years of the accrual of the cause of action.[5]  *See Del. C.* § 8106; *see also AM Gen. Holdings LLC v. Renco Group, Inc.,* 2016 WL 4440476 (Del. Ch. Aug. 22, 2016).   This three-year statute of limitations applies even though this claim was brought in this Court, given that Plaintiffs are seeking legal (monetary damages) relief for a legal (breach of contract) claim.  *See AM Gen. Holdings,* 2016 Del. Ch. LEXIS 132, at *23 ("[a]lthough statutes of limitations are not controlling in equity, equity follows the law and, in appropriate circumstances, applies the statute of limitations by analogy, denying relief when claims are brought after the analogous statutory period") (internal quotations omitted); *see also Winner Acceptance Corp. v. Return on Capital Corp.,* 2008 WL 5352063, at *14 (Del. Ch. Dec. 23, 2008) ("When exercising ancillary jurisdiction over legal claims, however, this Court will apply the applicable statute of limitations found at law").

---

[5]    As explained below, breach of contract claim accrues at the time of the alleged breach, regardless of whether the Plaintiff is aware of the breach. *See Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 319 (Del. 2004).

Further, the Court may also apply the doctrine of laches to dismiss a case where "the complaint itself alleges facts that show that the complaint is filed too late . . ." *Kahn v. Seaboard Corp.*, 625 A.2d 269, 277 (Del. Ch. 1993). The doctrine of laches "is rooted in the maxim that equity aids the vigilant, not those who slumber on their rights." *Whittington v. Dragon Grp., LLC,* 991 A.2d 1, 8 (Del. 2009) (*quoting Adams v. Jankouskas*, 452 A.2d 148, 157 (Del. 1982)).

Here, Plaintiffs filed the instant action on October 24, 2019, **six years after** Zillow's alleged actions or inactions that allegedly gave rise to Plaintiffs' damages. In particular, Plaintiffs concede that the Merger closed on August 26, 2013.  Compl. ¶ 2.  Plaintiffs allege that their entitlement to the Merger Consideration arose in October 2013 and December 2013, respectively.  *Id.* Separately, the NMD Dividend Payments were due upon the Merger closing. Ex. B and C.

Conceding the untimeliness of their Complaint, Plaintiffs state that Zillow's alleged "improper withholdings" began in August 2013, October 2013, and December 2013.  *Id.*  at ¶ 25.  Accordingly, Plaintiffs were clearly aware that they had not received the Funds after each of these dates passed and, therefore, could have filed the instant Complaint at any point within three years following each alleged nonpayment, at the latest by December 2016 (three years after the last alleged nonpayment date), but inexplicably failed to do so.  Such a failure is particularly confusing given that Plaintiffs' own pleadings claim that Zillow "could

have mailed checks at any time over the last six years . . ." *Id.* at ¶ 5.  Using Plaintiffs'
own logic, there is no reason why this lawsuit could not have been filed within the
applicable statute of limitations period.[6]

Moreover, even if Plaintiffs could somehow claim a lack of awareness of a
possible cause of action based on Zillow's nonpayment of the Funds, although such
a claim would be disingenuous, Plaintiffs' claims would still be barred where the
statute of limitations begins to run at the time of the alleged breach, not Plaintiffs'
discovery of the breach.  *See Wal-Mart Stores,* 860 A.2d at 319.

Plaintiffs also claim that failed negotiations for payment occurred in 2013,
2014, and 2015.  Compl.  ¶ 30.  Even if Plaintiffs could credibly argue that the
alleged breach of contract began at the time of the failed negotiations for payment,
rather than the nonpayment of the Funds themselves, Plaintiffs' claims are still
barred where they have failed to seek relief within the applicable statute of
limitations period following each of these instances.  *See id.*

Plaintiffs appear to recognize that the only way to circumvent the issue and
avoid the application of the statute of limitations would be to allege that Zillow's
wrongdoing constitutes one continuous, single, ongoing breach.  As a result,
Plaintiffs falsely claim that Zillow refused to pay the Funds "as recently as October

---

[6]     Plaintiffs also allege that Zillow has had the relevant Funds in its possession since February
26, 2014.  Compl. ¶ 36.  Either way, the same argument applies.

2019," and allege continued withholding of the Funds.  *Id.* at ¶¶ 5, 36-39.  However, to characterize Zillow's conduct as one continuous breach over the course of six years would simply and unjustly allow Plaintiffs to continue to make demands for payment of the Merger Consideration and the NMD Dividend Payments, increase their alleged interest damages in perpetuity, and bring this lawsuit at their leisure. Such a result is not tenable.

Indeed, "the continuing breach doctrine is narrow and typically is applied only in unusual situations."  *See AM Gen. Holdings,* 2016 Del. Ch. LEXIS 132, at *38 (internal quotations omitted).  It does not apply where a court can determine that the plaintiff could have alleged a *prima facie* case for breach of contract after a single incident, even where there are "numerous repeated wrongs of similar, if not same, character over an extended period."  *Id.*  The continuing breach doctrine is further inapplicable where, like here, the amount of damages is certain and not based on a contingent event that has not yet occurred.  *Id.*

In *AM Gen. Holdings,* this Court held that while the alleged breaches were repetitive, they were not continuous for the purposes of the application of the doctrine, given that each of the alleged breaches "resulted in itemized damages that were determinable the moment they occurred."  *Id.* at *42-43; *see also Ocimum Biosolutions (India) Ltd. v. AstraZeneca UK Ltd.,* 2019 Del. Super. LEXIS 640, at *35 (Del. Super. Ct. Dec. 04, 2019) ("If a plaintiff could allege a prima facie case

12

for breach of contract after a single incident, the doctrine does not apply. . .").  The same is true here, where Plaintiffs are able to thoroughly plead itemized damages that were due to them as early as 2013, and have set forth those damages in their pleadings.  *Id.* at ¶¶ 25-26.

Plaintiffs' alternative claim for relief for unjust enrichment is also governed by a three-year statute of limitations.  *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *12 (Del. Ch. Feb. 18, 2015) ("The analogous statute of limitations for a claim of unjust enrichment is three years, and an unjust enrichment claim accrues when the wrongful act causing the enrichment and impoverishment occurred."). Given that this is an alternative claim for relief that is alleged to have occurred at the same time, Zillow's arguments related to the three-year statute of limitations related to Plaintiffs' breach of contract claim apply equally to Plaintiffs' alternative unjust enrichment claim.

For these reasons, Plaintiffs' claims fall outside the applicable three-year statute of limitations and should, therefore, be dismissed with prejudice.

## C.   The Merger Agreement is the Governing Contract at Issue in this Dispute

Plaintiffs have improperly attempted to bring their breach of contract claim as a breach of the NMD certificate of incorporation (the "Certificate"). This approach is flawed because the certificate of incorporation does not include the necessary contractual provisions to obligate any specific payment to Plaintiffs.  Therefore,

Plaintiffs' claim for the Merger Consideration must have been brought in their capacity as third party beneficiaries to the Merger Agreement, the only agreement which provides for payments of Merger Consideration to Plaintiffs, upon which this suit is premised. Likewise, the Plaintiffs' claim for the NMD Dividend Payments is premised on NMD Board's unanimous consent, which is also acknowledged in the Merger Agreement, and cannot be brought as a breach of contract claim under the Certificate.

In their Complaint, Plaintiffs recite various provisions of the NMD Certificate which provide the manner in which **hypothetical** dividends and merger consideration funds are to be allocated amongst preferred and common stockholders. *See Compl.* ¶¶14-17, 23, 26, 41-52, Ex. A. The Certificate does not, however, provide any specific terms by which Plaintiffs are owed anything at all.  Instead, Plaintiffs would have to look to and rely upon the Merger Agreement and the NMD Board Consent for that. Solely relying upon the NMD Certificate for its breach of contract and specific performance claim leaves Plaintiffs without a key component of an enforceable contract -- price.  *See Raisler Sprinkler Co. v. Automatic Sprinkler Co.*, 171 A. 214, 219 (Del. Super. Ct. 1934) (noting price as essential term of enforceable contract).

Indeed, Plaintiffs' right to the Merger Consideration arise out of the Merger Agreement, to which they are third party beneficiaries. *See, e.g. Ark. Teacher Ret.*

*Sys. v. Alon USA Energy, Inc.*, 2019 Del. Ch. LEXIS 245, at *28 n.54 (Del. Ch. June 28, 2019); see also *Amirsaleh v. Bd. of Trade of the City of New York, Inc.*, 2008 WL 4182998, at *4 (Del. Ch. Sept. 11, 2008) (finding that members of a company were intended beneficiaries of merger agreement entered into by the company because "the Agreement manifests an unambiguous intent to benefit the [company's] [m]embers"); *NAMA Hldgs. v. Related World Mkt. Ctr., LLC*, 922 A.2d 417, 424 (Del. Ch. 2007) ("While not a signatory to that [venture] agreement, section 12.18(j) explicitly states that NAMA is a third-party beneficiary of section 12.18 in its entirety."); *Hadley v. Shaffer*, 2003 WL 21960406, at *5 (D. Del. Aug. 12, 2003) (finding shareholders to be third-party beneficiaries of a merger agreement that required stockholder approval and contained a stockholder payment provision). *Comrie v. Enterasys Networks, Inc.,* 2004 WL 293337, at *3-5 (Del. Ch. Feb. 13, 2004) (finding employees to be intended third-party beneficiaries of stock purchase agreement that directed the grant of options directly to the employees).

That the NMD Certificate only supports hypothetical damages means that Plaintiffs are unable to plead the three requisite elements of a breach of contract claim as to the NMD Certificate.   Under Delaware law, for a claim of breach of contract to survive a motion to dismiss, a plaintiff must demonstrate: first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the

plaintiff.  *See VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003); *see also Daniels v. Dover Downs Hotel*, 2017 Del. Super. LEXIS 227, at \*2 (Del. Super. Ct. May 09, 2017).  As to elements one and two, Plaintiffs allege that a contract exists - the NMD Certificate - and allege that Zillow breached the same.  But Plaintiffs necessarily rely on the Merger Agreement to establish damages, the third requisite element.  Plaintiffs cannot get around the fact that any damages under the NMD Certificate are merely hypothetical, thus causing them to blatantly cherry-pick palatable provisions from both the NMD Certificate and the Merger Agreement to craft an acceptable damages narrative for themselves.  Such practice highlights that Plaintiffs have utterly failed to plead a *prima facie* claim for breach of the NMD Certificate alone.  As such, the claim must be dismissed.  *See Daniels*, 2017 Del. Super. LEXIS 227 at \*2 (granting the defendant's motion to dismiss after the plaintiff failed to adequately allege damages based on the contract breach).

Likewise, Plaintiffs claim for the NMD Dividend Payments as a breach of the NMD Certificate must fail. While this Court has the authority to enforce payment of board approved dividends, it has not and should not do so under the guise of a breach of a certificate of incorporation. *See, e.g., NBC Universal, Inc v. Paxson Comm. Corp.*, 2005 Del. Ch. LEXIS 56 (Del. Ch. Apr. 29, 2005) (addressing claim for unpaid dividends pursuant to a Certificate of Designation that specified dividends

owed); *Lehman Bros. Holdings v. Spanish Broad. Sys.,* 2014 Del. Ch. LEXIS 28 (Del. Ch. Feb. 25, 2014) (same).

Zillow, in its capacity as NMD's successor or otherwise, has no obligation to pay Plaintiffs the Merger Consideration or NMD Dividend Payments outside of those obligations arising from the Merger Agreement and NMD Board Consent. As a result, Plaintiffs' claim for breach of the NMD Certificate claim must be dismissed.

### D.   Plaintiffs Have Not Complied with the Merger Agreement

On the face of their Complaint, Plaintiffs admit that they have refused to comply with the terms of the Merger Agreement.   Accordingly, Plaintiffs' breach of contract claim as to the Merger Consideration must be dismissed because their own, initial breach was material and relieved Zillow of any obligation to perform thereunder.   Simply put, Plaintiffs' claim for breach of contract must be dismissed where Plaintiffs fail to (and cannot) state a claim thereof.

"[I]f plaintiff is first guilty of a material breach of contract, it may not complain if defendant subsequently refuses to perform." *Physiotherapy Corp. v. Moncure*, 2018 Del. Ch. LEXIS 82, at *8 n.36 (Del. Ch. Mar. 12, 2018) (citing *Hudson v. D & V Mason Contractors, Inc.*, 252 A.2d 166, 170 (Del. Super. 1969)). A material breach is determined by considering several factors:

> 1) the extent to which the injured party will be deprived of the benefit which he reasonably expected; 2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived; 3) the extent to which the party failing to perform or

17

to offer to perform will suffer forfeiture; 4) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances; 5) and the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

*See BioLife Sols., Inc. v. Endocare, Inc.*, 838 A.2d 268, 278 (Del. Ch. 2003).

Pursuant to the Merger Agreement, Plaintiffs were required to surrender a certificate of cancellation and a LOT, and only thereafter would Plaintiffs be entitled to receive their portion of the Merger Consideration. *See* Ex. C. However, as stated herein, Plaintiffs refused to sign any version of the LOT, despite Zillow providing Plaintiffs with an abbreviated LOT, alleviating the specific concerns Plaintiffs raised with the prior version of the LOT. *See supra.*

By refusing to sign the LOT, Zillow is denied the fundamental benefit of the Merger Agreement – the unclouded merger with NMD.  Further, six years after the Merger, numerous attempts made by Zillow to alleviate Plaintiffs' concerns and make payments to them, and the Plaintiffs' filing of instant action, it is reasonably certain that Plaintiffs are unlikely to cure their failure. Lastly, Plaintiffs refusal to accept payment by Zillow of the Funds in an effort to leverage greater compensation is in opposition to the notions of good faith and fair dealing.  Accordingly, Plaintiffs' breach of the Merger Agreement, under which they now assert claims, is material and bars them from bringing a breach of contract claim against Zillow thereunder. *See BioLife Sols., Inc.* 838 A.2d at 278.

### E.      The Complaint Fails to Allege a Claim for Unjust Enrichment

Using twisted logic, Count II of the Complaint attempts to assert that, as a result of Plaintiffs' unwillingness to cooperate or assert its purported legal rights, Zillow has been unjustly enriched.  Plaintiffs' argument must fail because they cannot establish the elements of an unjust enrichment claim.

Unjust enrichment occurs when there is 1) an enrichment; 2) an impoverishment; 3) a relation between the enrichment and impoverishment; 4) the absence of justification; and 5) the absence of a remedy provided at law.  *See Nemec v. Shrader,* 991 A.2d 1120, 1130 (Del. 2010).  The relationship between the alleged enrichment and impoverishment must illuminate why the recipient's retention of the benefit would be an "injustice."  *MetCap Sec. LLC v. Pearl Senior Care, Inc.*, 2007 Del. Ch. LEXIS 92, at *5 (Del. Ch. June 29, 2007).  Ultimately, an unjust enrichment claim must establish the plaintiff's right to be restored to their previous position "by restoring the very property that the claimant gave up" or "a money equivalent."  *See Official Comm. of Unsecured Creditors of HH Liquidation, LLC v. Comvest Grp. Holdings, LLC (In re HH Liquidation, LLC)*, 590 B.R. 211, 286 (Bankr. D. Del. 2018) (citing *Restatement (Third) of Restitution and Unjust Enrichment* § 1 (2011)).

Here, Zillow has not been enriched and Plaintiffs have not been impoverished.  Zillow has not obtained money or property from the Plaintiffs that would constitute an enrichment.  *See id*.  Conversely, Plaintiffs have not "given up"

19

anything of value to Zillow, or because of Zillow, that would constitute an impoverishment. *See id.* (reasoning that unjust enrichment requires that the claimant give up money or property to the recipient). Rather, in complete contrast to a claim for unjust enrichment, Plaintiffs remain in possession of stock certificates that are the basis of their claim and have refused to accept Zillow's attempts. *See id.* As such, Zillow is holding the Funds until Plaintiffs will accept payment. Had Plaintiffs "given up" their stock certificates, and Zillow failed to transmit the Funds, then Plaintiffs *potentially* would have an unjust enrichment claim, however that is not the case here. In reality, however, Zillow has been holding onto the Funds and are ready to make payment but Plaintiffs continue to refuse to accept payment. For these reasons, an unjust enrichment claim cannot survive.

## IV.   CONCLUSION

For the foregoing reasons, Zillow respectfully requests that its Motion to Dismiss be granted, in its entirety, and that Plaintiffs' Verified Complaint be dismissed with prejudice.

**BUCHANAN INGERSOLL & ROONEY PC**

*/s/ Geoffrey G. Grivner*

Geoffrey G. Grivner (# 4711)
919 North Market Street
Suite 990
Wilmington, DE 19801
Telephone:  (302) 552-4200
Facsimile:   (302) 552-4295
*geoffrey.grivner@bipc.com*

*Attorney for Defendant Zillow, Inc.*

**Word Count:  4,835**

Dated: February 17, 2020

## <u>CERTIFICATE OF SERVICE</u>

I, Geoffrey G. Grivner, do hereby certify that on this 17th day of February, 2020, a copy of the foregoing was served on the following via Lexis/Nexis File and Serve:

Michael J. Maimone
Faegre, Drinker, Biddle & Reath LLP
222 Delaware Avenue, Suite 1410
Wilmington, Delaware  19801
*Attorney for Plaintiffs*

*/s/ Geoffrey G. Grivner*
Geoffrey G. Grivner (#4711)

22

EFiled:  Feb 17 2020 04:36PM EST
Transaction ID 64733343
Case No. 2019-0849-AGB

# EXHIBIT A

**Subject:** RE: Chertok / StreetEasy
**Date:** Tuesday, June 16, 2015 at 7:31:41 AM Eastern Daylight Time
**From:** Grant, M. Duncan <GRANTM@pepperlaw.com>
**To:** 'Ferrer, Nicholas E. (Perkins Coie)' <NFerrer@perkinscoie.com>
**CC:** 'Jackie Lasaracina (jackiel@zillow.com)' <jackiel@zillow.com>

Nick –

Thank you for your June 4 email.  I am no longer representing Doug Chertok.  Even so, I have forwarded your email and its attachment to him.  Unless he advises you that he is represented by counsel, you may communicate with him directly.

I hope that you are well.

Regards, Duncan

**From:** Ferrer, Nicholas E. (Perkins Coie) [mailto:NFerrer@perkinscoie.com]
**Sent:** Thursday, June 04, 2015 2:31 PM
**To:** Grant, M. Duncan
**Cc:** Jackie Lasaracina (jackiel@zillow.com)
**Subject:** Chertok / StreetEasy

Duncan,

I hope all is well with you. I'm reaching out because we are approaching the two-year anniversary of the closing of the Zillow/StreetEasy closing and neither Mr. Chertok nor Vast Ventures have come forward to claim their merger consideration (approx. $5.75M total).   We believe that New York unclaimed property laws may require Zillow to pay over unclaimed amounts to the state upon the second anniversary, and Zillow would like to avoid that.

Attached is a short-form letter of transmittal, which includes a W-9, to be completed by Mr. Chertok and Vast Ventures. Since the escrow has expired, we removed the provisions regarding the agreement by the stockholder to be bound by the escrow/indemnification, and we also removed the release, as I know that was something to which your client previously objected. It is essentially now just an instrument of transfer to accompany the share certificates, although it does contain a short confidentiality clause (identical to that signed by all other former stockholders) since we want to be sure that the information statement and other stockholder materials provided to Mr. Chertok in connection with the merger remain confidential.

Would you please forward to your client?  The forms and underlying original share certificates should be submitted to Zillow in accordance with the instructions? Zillow will then process payment.

Separately, we understand that the NY litigation recently concluded and that sanctions were upheld against Mr. Chertok for $19,000.  If your client is interested, Zillow would be willing to discuss a solution to make Mr. Chertok whole for the sanctions (i.e. reimbursement or forgiveness) in exchange for a release along the lines of the one that was drafted (and I believe largely agreed to) when we last held settlement discussions.  Please reach out if you

would like to discuss further.

Regards,
Nick


**Nick Ferrer** | **Perkins Coie LLP**
COUNSEL
1201 Third Avenue Suite 4900
Seattle, WA 98101-3099
D. +1.206.359.3757
F. +1.206.359.4757
E. NFerrer@perkinscoie.com

NOTICE: This communication may contain privileged or other confidential information. If you have received it in error, please advise the sender by reply email and immediately delete the message and any attachments without copying or disclosing the contents. Thank you.

This email is for the use of the intended recipient(s) only. If you have received this email in error, please notify the sender immediately and then delete it. If you are not the intended recipient, you must not keep, use, disclose, copy or distribute this email without the author's prior permission. We have taken precautions to minimize the risk of transmitting software viruses, but we advise you to carry out your own virus checks on any attachment to this message. We cannot accept liability for any loss or damage caused by software viruses. The information contained in this communication may be confidential and may be subject to the attorney-client privilege. If you are the intended recipient and you do not wish to receive similar electronic messages from us in the future then please respond to the sender to this effect.

# EXHIBIT E

EFiled:  Oct 18 2021 11:52PM EDT
Transaction ID 67024193
Case No. 2019-0849-LWW

# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DOUGLAS M. CHERTOK and VAST VENTURES LLC, a Florida limited liability company, | ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 2019-0849-LWW |
| ZILLOW, INC., a Washington corporation (successor to NMD INTERACTIVE, INC., a Delaware corporation, d/b/a STREETEASY, INC.), | ) ) ) ) ) ) | |
| Defendant. | ) ) | |

## MEMORANDUM OPINION

Date Submitted:  July 20, 2021
Date Decided:  October 18, 2021

Michael J. Maimone, BARNES & THORNBURG LLP, Wilmington, Delaware; *Counsel for Plaintiffs Douglas M. Chertok and Vast Ventures LLC*

Geoffrey G. Grivner and Kody M. Sparks, BUCHANAN INGERSOLL & ROONEY PC, Wilmington, Delaware; *Counsel for Defendant Zillow, Inc.*

**WILL, Vice Chancellor**

This action concerns a long-running dispute centered around defendant Zillow, Inc.'s 2013 acquisition of NMD Interactive, Inc.  Two former stockholders of NMD—plaintiffs Douglas M. Chertok and Vast Ventures, LLC, an entity managed by Chertok—seek the payment of certain pre-closing dividends and merger consideration in connection with the acquisition.  The plaintiffs assert that Zillow has wrongfully withheld the payments and imposed conditions that are inconsistent with NMD's certificate of incorporation.  Zillow argues that the merger agreement is the operative contract governing the plaintiffs' entitlement to the payments.

Under the merger agreement between Zillow and NMD, NMD stockholders who surrendered a certificate of cancellation with a letter of transmittal were entitled to receive the merger consideration.  The plaintiffs refused to sign the letter of transmittal, which contained a release provision.  During the six years after closing, Zillow offered to withdraw certain conditions to payment required by the merger agreement, including the release and—eventually—the letter of transmittal.  The plaintiffs repeatedly rejected these offers.

Meanwhile, Chertok—a co-founder and former director of NMD—was embroiled in unrelated litigation brought against him by NMD in New York federal court.  Chertok agreed to a settlement of those claims, sought to rescind the settlement agreement, appealed, was sanctioned, appealed again, and finally lost a motion for reconsideration in March 2017.

The plaintiffs filed the present action in October 2019—roughly six years after the parties' dispute first arose and the merger closed.  The plaintiffs have brought a breach of contract claim under NMD's certificate of incorporation and, in the alternative, a claim for unjust enrichment against Zillow.  Zillow has moved to dismiss the complaint for failure to state a claim and because it is time barred.

In this decision, I grant Zillow's motion to dismiss.  The plaintiffs have brought common law claims that ultimately seek a legal remedy: payment of the merger consideration, dividends, and interest.  The applicable three-year statute of limitations therefore applies and the complaint is untimely.  No extraordinary circumstances or tolling doctrines save the plaintiffs' claims from being barred by their extreme tardiness.  The complaint is dismissed in its entirety.

## I.    BACKGROUND

Unless otherwise noted, the following facts are based on the plaintiffs' Verified Complaint and the documents it incorporates by reference.[1]  Any additional facts are either not subject to reasonable dispute or are subject to judicial notice.[2]

### A.    Zillow and NMD Merge

Defendant Zillow, Inc., a Washington corporation, operates online real estate and home-related information marketplaces.[3]  On August 16, 2013, Zillow entered into an Agreement and Plan of Merger (the "Merger Agreement") with NMD Interactive, Inc., a Delaware corporation doing business as StreetEasy, Inc.[4]  NMD owned and operated an online real estate marketplace for listings across major metropolitan areas.[5]

---

[1] Verified Compl. ("Compl.") (Dkt. 1).  *See Winshall v. Viacom Int'l, Inc.*, 76 A.3d 808, 818 (Del. 2013) (citing *Fletcher Int'l, Ltd. v. ION Geophysical Corp.*, 2011 WL 1167088, at *3 n.17 (Del. Ch. Mar. 29, 2011) ("[A] plaintiff may not reference certain documents outside the complaint and at the same time prevent the court from considering those documents' actual terms.")); *Freedman v. Adams*, 2012 WL 1345638, at *5 (Del. Ch. Mar. 30, 2012) ("When a plaintiff expressly refers to and heavily relies upon documents in her complaint, these documents are considered to be incorporated by reference into the complaint . . . .").

[2] *See, e.g.*, *In re Books–A–Million, Inc. S'holders Litig.*, 2016 WL 5874974, at *1 (Del. Ch. Oct. 10, 2016) (explaining that the court may take judicial notice of "facts that are not subject to reasonable dispute" (citing *In re Gen. Motors (Hughes) S'holder Litig.*, 897 A.2d 162, 170 (Del. 2006))); *Lima Delta Co. v. Glob. Aerospace, Inc.*, 2017 WL 4461423, at *4 (Del. Super. Oct. 5, 2017) (explaining that dockets, pleadings, and transcripts from a foreign action are subject to judicial notice).

[3] Compl. ¶ 8; Compl. Ex. D at 3.

[4] Compl. ¶¶ 1, 12; Compl. Ex. B.

[5] Compl. Ex. D at 3.

Pursuant to the Merger Agreement, Zillow acquired NMD for $50 million in cash subject to various adjustments, with NMD becoming a wholly-owned subsidiary of Zillow (the "Merger").[6]  The Merger was purportedly approved by a majority of NMD's directors and a majority of its stockholders by written consent.[7] Plaintiff Douglas M. Chertok, a co-founder and former director of NMD, did not vote to approve the Merger.[8]  The Merger closed on August 26, 2013.[9]

Schedule 2.3 of the Merger Agreement represented that Chertok individually held 2,450,403 shares of NMD common stock.[10]  It also provided that Vast Ventures LLC ("Vast"), a Florida limited liability company of which Chertok is the sole managing member, held 169,672 shares NMD Series A preferred stock, convertible into 234,167 common shares.[11]

### B.    The Letter of Transmittal Condition

On August 29, 2013, NMD sent Chertok an information statement explaining that each NMD common share was entitled to $2.19, less certain deductions.[12]

---

[6] Compl. ¶ 12; Compl. Ex. B § 1.7.1, Annex A at A-1, A-6.  NMB was merged with and into Zillow on December 31, 2013.  Compl. ¶ 10.

[7] Pls.' Answering Br. Ex. E at 1 (Dkt. 18).

[8] Compl. ¶¶ 11, 18, 30.

[9] *Id.* ¶ 10.

[10] *Id.* ¶ 12; Pls.' Answering Br. Ex. G at Schedule 2.3.

[11] Compl. ¶ 12; Pls.' Answering Br. Ex. G at Schedule 2.3.

[12] Compl. ¶ 13; Compl. Ex. D at 8.

Chertok and Vast were entitled to $5,366,382.57 and $512,825.73 for their shares, respectively.[13]  In addition to the merger consideration, NMD stockholders were entitled to a dividend payment issued by NMD.[14]  The dividend payment of $0.1836 per share of NMD common stock was issued before the closing of the Merger.[15]  Chertok and Vast were entitled to dividend payments of $449,893.99 and $42,993.06, respectively.[16]

The information statement specified that the execution of a "Letter of Transmittal," as described in the Merger Agreement, was a condition precedent to the payment of the merger consideration.[17]  Section 1.7.2(b) of the Merger Agreement provided that NMD stockholders were to receive their share of the merger consideration without interest "[u]pon surrender of a certificate for cancellation" and the execution of a "Letter of Transmittal" in the form attached as Schedule 1.7.2(b).[18]  The proposed Letter of Transmittal contained a provision stating that the signing stockholder covenanted to release all "Claims" against NMD "arising or resulting from or relating, directly or indirectly, to any act, omission,

---

[13] Compl. ¶ 15.

[14] *Id.* ¶ 16.

[15] *Id.*

[16] *Id.*

[17] Compl. Ex. E at 8.

[18] Compl. Ex. B § 1.7.2.

event or occurrence prior to the Closing relating to [NMD], the [s]hares or to any rights or interest with respect to [NMD] or the [s]hares."[19]

On September 18, 2013, Chertok and Vast sent NMD appraisal demands for most of their common and preferred shares.[20]  On October 24, 2013, Chertok and Vast sent NMD notices of withdrawal of their appraisal demands for all but a small portion of those shares.[21]  For the shares subject to the notices of withdrawal, the plaintiffs' appraisal rights expired concurrent with the notice.[22]  For the remaining shares subject to the plaintiffs' appraisal demands, the plaintiffs' appraisal rights expired 120 days after the effective time of the Merger.[23]  Chertok and Vast did not execute the Letter of Transmittal containing the release or surrender any stock certificates at that time.[24]

### C.    Chertok's New York Litigation

At the time the Merger closed, Chertok was in the process of appealing a decision in New York federal court.  That litigation was filed by NMD against

---

[19] Compl. Ex. E at 6.

[20] Compl. ¶ 21.  Specifically, Chertok and Vast sent NMD appraisal demands for 2,400,000 of 2,450,403 common shares, and 84,836 of 169,672 preferred stock shares.  *Id.*

[21] *Id.* ¶ 22.  The notices of withdrawal were for all but 5,000 common shares and 500 preferred shares.  *Id.*

[22] *Id.* ¶¶ 22, 24; *see* 8 *Del. C.* § 262(e).

[23] Compl. ¶ 24; *see* 8 *Del. C.* § 262(e).

[24] Compl. ¶ 29.

7

Chertok on August 26, 2011 in the United States District Court for the Southern District of New York (the "New York Action").[25]  NMD brought claims for, among other things, cybersquatting, breach of fiduciary duty for misappropriation of domain names, and conversion of domain names.[26]  NMD alleged that, after purportedly discovering that Chertok had stolen funds from the company in 2005, NMD's stockholders elected a new board of directors that excluded Chertok.[27]

Chertok answered NMD's complaint on October 10, 2011 but did not assert counterclaims.[28]  On December 21, 2011, NMD filed an amended complaint, which included an allegation that Chertok had taken the position during a meet and confer that certain corporate actions—including the appointment of a new board of directors and the authorization and issuance of NMD shares—were invalid.[29]  The parties subsequently reached a settlement agreement and the New York Action was dismissed on January 25, 2012.[30]

In the years that followed, Chertok repeatedly and unsuccessfully sought to vacate that settlement agreement.  After Chertok moved *pro se* to vacate the

---

[25] Amended Complaint, *NMD InterActive, Inc. v. Chertok*, C.A. No. 1:11-cv-06011-RJS (S.D.N.Y.); Def.'s Reply Br. Ex. A (Dkt. 19).

[26] *Id.* ¶¶ 108-38.

[27] *Id.* ¶ 6.

[28] Def.'s Reply Br. Ex. B.

[29] Def.'s Reply Br. Ex. A ¶¶ 95-102.

[30] *See* Def.'s Reply Br. Ex. B.

settlement, on March 18, 2013, the Southern District denied Chertok's motion and sanctioned Chertok for his "objectively unreasonable conduct in 'propounding factual contentions concerning the settlement lacking any evidentiary support whatsoever.'"[31]  After Chertok appealed, the United States Court of Appeals for the Second Circuit upheld one of the three grounds for sanctions, reversed the others, and remanded.[32]

On remand, the Southern District reduced the sanctions award, which Chertok again appealed.[33]  On April 29, 2016, while Chertok's second appeal was pending, he filed a pre-motion letter with the Southern District, describing a contemplated motion to vacate the court's prior orders on the basis of fraud on the court.[34]  In that letter, Chertok contended that certain disputed NMD stockholder meetings and board actions from nearly a decade earlier had not occurred.[35]

On June 7, 2016, the Second Circuit affirmed the Southern District's reduced sanctions award.[36]  On June 16, 2016, the Southern District construed Chertok's pre-

---

[31] *NMD Interactive, Inc. v. Chertok*, 2017 WL 993069, at *1 (S.D.N.Y. Mar. 13, 2017) (quoting *NMD Interactive, Inc. v. Chertok*, 2013 WL 1385213, at *12 (S.D.N.Y. Mar. 18, 2013)).

[32] *StreetEasy, Inc. v. Chertok*, 752 F.3d 298, 301 (2d Cir. 2014).

[33] *StreetEasy, Inc. v. Chertok*, 651 F. App'x 37, 38 (2d Cir. 2016).

[34] Dkt. 23, Ex. 1A at 1.

[35] *Id.* at 1-3.

[36] *Chertok*, 651 F. App'x at 40.

9

motion letter as a motion seeking reargument and denied it.[37]   On July 1, 2016, Chertok moved for reconsideration, and NMD moved to enjoin Chertok from future filings.[38]

The New York Action culminated in a March 13, 2017 opinion in which the Southern District denied Chertok's July 1, 2016 motion for reconsideration and confirmed the sanctions award.[39]   The court declined to grant NMD's request to enjoin Chertok from making future filings but found that there was "no doubt that [Chertok] has a demonstrated history of filing vexatious, harassing, and duplicative motions for which he appears to lack an objective good-faith expectation of prevailing."[40]   On March 26, 2018, the Second Circuit summarily affirmed.[41]

### D.    The Parties' Payment Negotiations

Meanwhile, Zillow and the plaintiffs began what would become a six-year course of negotiations regarding payment of the merger consideration and dividends.[42]   On June 4, 2015, Zillow contacted Chertok's counsel by e-mail, attaching a "short-form" Letter of Transmittal.[43]   The revised Letter of Transmittal

---

[37] *See* Def.'s Reply Br. Ex. B.

[38] *See id.*

[39] *Chertok*, 2017 WL 993069, at *1-2, *5.

[40] *Id.* at *5.

[41] *StreetEasy, Inc. v. Chertok*, 730 F. App'x 4, 6 (2d Cir. 2018).

[42] Compl. ¶ 30.

[43] *Id.* ¶ 34; Compl. Ex. E at 17.

removed the release and waiver provisions that were in the prior version but included a confidentiality clause and a provision acknowledging that the stockholder would only have the right to receive the merger consideration with respect to the shares surrendered.[44]  Chertok did not execute the revised Letter of Transmittal, purportedly believing that it contained a "hidden waiver."[45]

After August 26, 2019, Zillow withdrew its request for a Letter of Transmittal.[46]  Zillow informed the plaintiffs that it would mail checks for the funds upon receipt of each plaintiffs' IRS Form W-9, containing the plaintiffs' tax identification numbers.[47]  The plaintiffs declined to provide the information at that time.

As of October 2019, Zillow stated that it continued to hold approximately $5,733,709.96 of merger consideration and dividends for Chertok and

---

[44] *Id.* at 21.

[45] Compl. ¶ 34.

[46] *Id.* ¶ 39.

[47] *Id.*

approximately $547,926.57 for Vast Ventures.[48]  On October 11, 2019, the plaintiffs sent Zillow executed Form W-9s.[49]  On October 24, 2019, they filed this lawsuit.[50]

On October 27, 2019, Zillow's bank sent two checks with a combined value of $490,000 to the plaintiffs' counsel for the dividend funds owed to the plaintiffs but continued to withhold the merger consideration.[51]  The plaintiffs' counsel requested documentary support from Zillow to substantiate the accuracy of the amount of the dividend and the amount of withheld merger consideration.[52]  In November and December 2019, Zillow delivered explanations of the calculations but no documentary support.[53]  The plaintiffs returned the checks to Zillow.[54]

### E.    This Litigation

The plaintiffs' October 24, 2019 Verified Complaint alleges that Zillow breached NMD's certificate of incorporation by withholding the merger consideration and dividends from the plaintiffs.[55]  The plaintiffs' theory is that the

---

[48] *Id.* ¶ 36.

[49] *Id.* ¶ 39.  The Form W-9s sent on October 11, 2019 were signed with digital signatures. Dkt. 23, Ex. 4 at 2.  Zillow informed the plaintiffs on October 23, 2019 that the bank holding the contested funds required handwritten signatures and had rejected the documents.  *Id.*  The plaintiffs sent Zillow re-executed Form W-9s later that day.  *Id.* at 1.

[50] Dkt. 1.

[51] Pls.' Answering Br. 4.

[52] *Id.*

[53] *Id.* at 4-5.

[54] *Id.* at 5.

[55] Compl. ¶ 3.

conditions precedent to payment in the Merger Agreement are irrelevant because NMD's certificate of incorporation creates an unconditional obligation requiring Zillow to pay the contested funds.[56]  In the event of a deemed liquidation event such as a merger, NMD's certificate of incorporation required (with certain exceptions) that the consideration be distributed to stockholders on a pro rata basis.[57]

The plaintiffs assert a claim for breach of contract and specific performance based on NMD's charter, entitling the plaintiffs to "pre-judgment interest running from the date that the [m]erger [c]onsideration should have been paid to the date of payment."[58]  In the alternative, the plaintiffs assert an unjust enrichment claim.[59] Chertok and Vast seek merger consideration of $5,366,382.57 and $512,825.73 and cash dividends of $449,893.99 and $42,993.06, respectively.[60]  In total, the plaintiffs seek an amount no less than $6,372,095.35, plus pre-judgment interest and costs.[61]

On February 17, 2020, Zillow filed a motion to dismiss the Complaint.  Then-Chancellor Bouchard heard argument on Zillow's motion to dismiss on November 4, 2020.  After this action was reassigned to me, I heard reargument on July 20, 2021.

---

[56] *Id.* ¶¶ 13-17.

[57] *Id.* ¶ 14; Compl. Ex. A at 3-4.

[58] Compl. ¶¶ 42, 45.

[59] *Id.* ¶¶ 53-59.

[60] *Id.* ¶¶ 41, 43, 48.

[61] *Id.* ¶¶ 52, 59.

13

## II.    LEGAL ANALYSIS

Zillow has moved to dismiss the Complaint pursuant to Court of Chancery Rule 12(b)(6) for failure to state a claim upon which relief can be granted.  When considering such a motion:

> (i) all well-pleaded factual allegations are accepted as true; (ii) even vague allegations are well-pleaded if they give the opposing party notice of the claim; (iii) the Court must draw all reasonable inferences in favor of the non-moving party; and [(iv)] dismissal is inappropriate unless the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances susceptible of proof.[62]

In moving to dismiss, Zillow asserts that the plaintiffs are not entitled to relief because they failed to comply with the Merger Agreement.  Zillow also contends that the claims raised in the Complaint are time barred.  Because I find the threshold issue of untimeliness to be dispositive, I grant the defendant's motion and dismiss the Complaint in its entirety.[63]  I therefore need not reach the merits of the plaintiffs' claims.

---

[62] *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896-97 (Del. 2002) (citation omitted).

[63] At reargument on the motion to dismiss, counsel for the plaintiffs asserted that the merits must be addressed before the court can consider whether the claims are timely.  Mot. to Dismiss Hr'g Tr. at 22-23.  I disagree.  Where laches is plain on the face of the complaint, it would be inefficient for the court to first assess the merits and then determine whether the claims were timely.  *See, e.g.*, *In re Dean Witter P'ship Litig.*, 1998 WL 442456, at *3 (Del. Ch. July 17, 1998) (granting a motion to dismiss because claims were time barred without evaluating the merits of the claims); *see also In re Tyson Foods, Inc.*, 919 A.2d 563, 584 (Del. Ch. 2007) (stating that the matter of timeliness was "properly raised on a motion to dismiss").

### A.    The Plaintiffs' Complaint Was Filed Years After the Statute of Limitations Lapsed.

As the plaintiffs point out, a laches defense is generally ill suited to resolution at the pleadings stage.[64]  But where "it is clear from the face of the complaint that [laches] exist and the plaintiff can prove no set of facts to avoid it," dismissal under Rule 12(b)(6) may be appropriate.[65]

When a plaintiff brings a claim in the Court of Chancery that is legal in nature and seeks legal relief, "the statute of limitations (and its tolling doctrines) . . . appl[ies] strictly and laches [does] not apply."[66]  This principle prevents a plaintiff

---

[64] Pls.' Answering Br. 25; *see, e.g.*, *Reid v. Spazio*, 970 A.2d 176, 182-83 (Del. 2009) (explaining that "affirmative defenses, such as laches, are not ordinarily well-suited for treatment" on a motion to dismiss).

[65] *Reid*, 970 A.2d at 183-84; *see also Akrout v. Jarkoy*, 2018 WL 3361401, at *11 (Del. Ch. July 10, 2018) (explaining that "[w]hen it is clear from the 'face of the complaint' that the claims are time-barred . . . it is appropriate to adjudicate the claims then and there on a motion to dismiss rather than kick the can down the road to summary judgment" (quoting *Bean v. Fursa Cap. P'rs, LP*, 2013 WL 755792, at *6 (Del. Ch. Feb. 28, 2013))); *Winklevoss Capital Fund, LLC. Liab. Co. v. Shaw*, 2019 WL 994534 at *4-6 (Del. Ch. Mar. 1, 2019) (dismissing counterclaims on a Rule 12(b)(6) motion as time barred where common law claims seeking common law remedies were filed after the statute of limitations lapsed).

[66] *Kraft v. WisdomTree Invs., Inc.*, 145 A.3d 969, 983 (Del. Ch. 2016); *see also Scharf v. Edgcomb Corp.*, 864 A.2d 909, 911 (Del. 2004) (strictly applying the statute of limitations and not applying laches to a claim brought in the Court of Chancery that was purely legal in nature).  Such claims do not ordinarily fall within the jurisdiction of this court.  Section 111 of the Delaware General Corporation Law, however, provides this court with jurisdiction over a civil action to enforce a certificate of incorporation.  8 *Del. C.* § 111.

15

from "circumvent[ing] the statutory time bar that would have applied to the same claim if it had been brought in a court of law."[67]

Here, the plaintiffs bring a legal claim for breach of contract and a claim, in the alternative, for unjust enrichment.[68] "The statute of limitations at 10 *Del. C.* § 8106 requires a plaintiff to bring a breach of contract claim within three years of the accrual of the cause of action."[69] "The cause of action for a breach of contract accrues 'at the time of the wrongful act, even if the plaintiff is ignorant of the wrong.'"[70]

---

[67] *Kraft*, 145 A.3d at 983; *BioVeris Corp. v. Meso Scale Diagnostics, LLC*, 2017 WL 5035530 at *5 (Del. Ch. Nov. 2, 2017) (stating that a "plaintiff 'should not be placed in a potentially better position [due to filing in the Court of Chancery] to seek to avoid a statute of limitation than if she had filed in a Delaware court of law by invoking the more flexible doctrine of laches'" (quoting *Kraft*, 145 A.3d at 976)).

[68] *Crosse v. BCBSD, Inc.*, 836 A.2d 492, 497 (Del. 2003) (holding that unjust enrichment claims brought with breach of contract claims are legal claims); *Dickerson v. Vills. of Five Points Prop. Owners Ass'n, Inc.*, 2020 WL 7251512, at *5 (Del. Ch. Dec. 9, 2020) (holding that if an unjust enrichment claim "serves 'as an alternate theory of recovery for a contract claim,' and money damages will make the plaintiff whole, it is a legal claim") (citation omitted); *Gelof v. Prickett, Jones & Elliott, P.A.*, 2010 WL 759663, at *1 (Del. Ch. Feb. 19, 2010) (stating that breach of contract claims are legal claims).

[69] *Am Gen. Hldgs. LLC v. Renco Grp., Inc.*, 2016 WL 4440476, at *7 (Del. Ch. Aug. 22, 2016); *see also Vichi v. Koninklijke Philips Elecs. N.V.*, 2009 WL 4345724, at *16 (Del. Ch. Dec. 1, 2009) (holding that an unjust enrichment claim that bears close resemblance to a legal claim is presumptively subject to the same statute of limitations as the legal claim); *Pulieri v. Boardwalk Props., LLC*, 2015 WL 691449, at *13 (Del. Ch. Feb. 18, 2015) (applying the statute of limitations at 10 *Del. C.* § 8106 to an unjust enrichment claim).

[70] *Am Gen.*, 2016 WL 4440476, at *7 (quoting *Fike v. Ruger*, 754 A.2d 254, 260 (Del. Ch. 1999)).  Chertok does not dispute that he was aware of the alleged wrongs when they occurred.  *See* Compl. ¶¶ 22, 24-25, 30; Pls.' Answering Br. 2-3.

16

Although the Complaint seeks "the relief of specific performance,"[71] I need not accept that characterization. The plaintiffs' claims ultimately seek monetary relief in the form of merger consideration, dividends, and interest.[72] Where a party seeks relief in the form of a monetary payment, a legal remedy exists and the equitable remedy of specific performance is inappropriate.[73] Even if I were to view the relief sought as equitable in nature, the three-year statute of limitations would apply by analogy.[74]

It is obvious from the face of the Complaint that the plaintiffs' claims are untimely. The plaintiffs filed this action on October 24, 2019—over six years after

---

[71] Compl. ¶ 41.

[72] *Id.* ¶¶ 40-49 (asking that the court order the defendant "to specifically perform its payment obligations under the NBD [certificate of incorporation] and . . . pay the [f]unds to [the] [p]laintiffs").

[73] *See Testa v. Nixon Unif. Serv., Inc.*, 2008 WL 4958861, at *3 (Del. Ch. Nov. 21, 2008); Donald J. Wolfe & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 16.03[b][2] (2019) (explaining that specific performance is unavailable where money damages is "as complete, practical, and efficient to the ends of justice and its proper administration as the equitable remedy"). In fact, a plaintiff who seeks specific performance is admonished to act with even "greater alacrity than simply within the analogous limitations period." *Pulieri*, 2015 WL 691449, at *11.

[74] *Kraft*, 145 A.3d at 983 ("When an equitable claim seeks legal relief or a legal claim seeks equitable relief, the Court also will apply the statute of limitations by analogy."); *see also Daugherty v. Highland Cap. Mgmt., L.P.*, 2018 WL 3217738, at *7 (Del. Ch. June 29, 2018) (explaining that the court need not engage in a traditional laches analysis for a presumptively late-filed complaint); *Albert v. Alex. Brown Mgmt. Servs., Inc.*, 2005 WL 1594085, at *12 (Del. Ch. June 29, 2005) ("[W]here the analogous statute of limitations at law has run, a plaintiff is barred from bringing suit without the necessity of the court engaging in a traditional laches analysis."). If a complaint is filed after the analogous limitations period, "prejudice to defendants . . . is presumed." *Baier v. Upper N.Y. Inv. Co. LLC*, 2018 WL 1791996, at *11-12 (Del. Ch. Apr. 16, 2018).

17

the Merger closed on August 26, 2013 and more than three years after the applicable statute of limitations lapsed.[75]   The plaintiffs allege that their entitlement to the dividend payments arose "upon closing."[76]   At the latest, the plaintiffs' entitlement to the merger consideration arose in October 2013 when they withdrew the appraisal demands for the majority of their shares and December 2013 when their remaining appraisal rights expired.[77]

**B.   No Tolling Doctrines Apply and No Extraordinary Circumstances Are Present.**

Because the plaintiffs' claims were filed years after the applicable statute of limitations lapsed, their claims must be dismissed as time barred "absent tolling or other extraordinary circumstances."[78]   The plaintiffs argue that "unusual conditions or extraordinary circumstances" were created by the New York Action and that the doctrine of equitable tolling applies.   In the alternative, the plaintiffs assert that the doctrine of quasi-estoppel prevents Zillow from asserting that the plaintiffs' claims

---

[75] Dkt. 1.

[76] Compl. ¶¶ 48-50.

[77] *Id.* ¶¶ 2, 44-45 ("Zillow was obligated to pay the Merger Consideration to Plaintiffs no later than October 24, 2013, the date that Plaintiffs withdrew their appraisal demands, or December 26, 2013, the date that all of Plaintiffs' appraisal rights expired.").

[78] *Kraft*, 145 A.3d at 982-83; *see also IAC/InterActiveCorp v. O'Brien*, 26 A.3d 174, 178 (Del. 2011); *de Adler v. Upper N.Y. Inv. Co. LLC*, 2013 WL 5874645, at *12 (Del. Ch. Oct. 31, 2013) ("Where a party files a claim after the presumptive period, the claim is likely time-barred 'except in the 'rare' and 'unusual' circumstance that a recognized tolling doctrine excuses the late filing.'") (citation omitted).

18

are time barred; that the statute of limitations was deferred because a condition precedent was not met; and that 10 *Del. C.* § 8106(c) provides the applicable statute of limitations.   For the reasons discussed below, the plaintiffs' arguments are meritless.

### 1.    No Unusual Conditions or Extraordinary Circumstances Are Present to Toll the Limitations Period.

An untimely claim may be excused from dismissal on that basis in "rare" instances when the claimant can demonstrate "unusual conditions" or "extraordinary circumstances."[79]  The plaintiffs argue that the New York Action and doctrine of acquiescence created such "unusual conditions or extraordinary circumstances," relying on the Delaware Supreme Court's decision in *IAC/InterActiveCorp v. O'Brien.*[80]  In that decision, the court explained that "[t]here is no precise definition of what constitutes unusual conditions or extraordinary circumstances" and that the Court of Chancery "must exercise its discretion, after considering all relevant facts."[81]  The court outlined five factors that this court should consider:

> (1) whether the plaintiff had been pursuing his claim, through litigation or otherwise, before the statute of limitations expired; (2) whether the delay in filing suit was attributable to a material and unforeseeable change in the parties' personal or financial circumstances; (3) whether

---

[79] *Levey v. Brownstone Asset Mgmt., LP*, 76 A.3d 764, 772 (Del. 2013); *Winklevoss*, 2019 WL 994534, at *5.

[80] 26 A.3d 174 (Del. 2011); Pls.' Answering Br. 35-38.

[81] *Id.* at 178.

the delay in filing suit was attributable to a legal determination in another jurisdiction; (4) the extent to which the defendant was aware of, or participated in, any prior proceedings; and (5) whether, at the time this litigation was filed, there was a bona fide dispute as to the validity of the claim.[82]

In *IAC*, a former CEO filed an action in Florida seeking indemnification from his employer, which had been acquired.[83]  The acquirer was responsible for paying any funds granted to the CEO, "controlled that litigation from the outset," and "described itself as the real party in interest" rather than the employer.[84]  The court ultimately found in the CEO's favor on summary judgement, but the employer went bankrupt before trial where the amount of funds owed were to be determined.[85]  The former CEO then sued the acquirer in the Court of Chancery, which granted summary judgment in favor of the CEO despite the fact that his claims were brought after the statute of limitations had expired.[86]  The Delaware Supreme Court affirmed and held that the "statute of limitations should not be applied because of 'unusual conditions or extraordinary circumstances.'"[87]  The court emphasized that the CEO (1) began pursing his claims before the statute of limitations would have expired and

---

[82] *Id.*; *see also Levey*, 76 A.3d at 770.

[83] *IAC*, 26 A.3d at 176.

[84] *Id.* at 178.

[85] *Id.* at 177.

[86] *Id.* at 175-77.

[87] *Id.* at 178.

continuously pursued those claims; (2) could not have proceeded against the acquirer while the Florida action was pending; and (3) had not expected his former employer to file for bankruptcy.[88]  The court further emphasized that the CEO's claims were found meritorious in the Florida action.[89]  As discussed below, the present matter materially differs from the circumstances presented in *IAC*.  The weight of the *IAC* factors supports a finding that no "unusual conditions" or "extraordinary circumstances" are present that would excuse the plaintiffs' delay.

a.   No Claims Were Pursued before the Statute of Limitations Expired.

The plaintiffs assert that the first *IAC* factor is satisfied because Chertok "pursued claims continuously since 2011" in the New York Action.[90]  But Chertok was the defendant in that dispute and did not file any claims or counterclaims against

---

[88] *Id.* at 178-79.

[89] *Id.* at 179.

[90] Pls.' Answering Br. 38.  Chertok filed complaints against NMD in this court on August 29, 2012 and on August 21, 2013.  *See* Def.'s Reply Br. Exs. E, G.  In the first complaint, Chertok sought declarations that he was the sole director of NMD, that the other directors were not valid directors, and that all shares issued by NMD were void.  Def.'s Reply Br. Ex. E ¶¶ 52-64.  In the second complaint, Chertok and Vast Ventures sought specific performance ordering NMD to issue him shares of the company and to provide him with its financial statements as allegedly agreed to in a settlement agreement in the New York Action.  Def.'s Reply Br. Ex. G ¶¶ 39-47.  Neither complaint was served on NMD.  *See* Def.'s Reply Br. Exs. F, G.  The first complaint was voluntarily withdrawn by Chertok on April 25, 2013. Def.'s Reply Br. Ex. F at 1.  The second complaint was dismissed with prejudice by the court on May 13, 2014.  *Id.* Ex. G at 2.  Even if the statute of limitations did not begin to run until May 13, 2014, the plaintiffs did not file this action until October 24, 2019—outside of the applicable three-year statute of limitations.  Dkt. 1.

NMD.[91]  The litigation activity he undertook was largely focused on appealing sanctions issued by the Southern District and moving to rescind a settlement agreement.[92]

The plaintiffs suggest that Chertok's litigation activity in the New York Action, their threats to pursue litigation, and their correspondence with Zillow refusing to execute releases or waivers demonstrates the timely pursuit of their claims.[93]  Those actions are not sufficient, however, to satisfy the first *IAC* factor. In *BioVeris Corp.*, this court rejected the argument that sending two letters to the defendants demanding payment and initiating negotiations before the statute of limitations expired satisfied the first *IAC* factor.[94]  The court noted that sending letters did not "rise anywhere near the same level of diligence exercised by the plaintiffs in *Levey*," who had previously filed a counterclaim against the defendants, sent a letter demanding payment and threatening pursuit of claims, filed a motion to stay in favor of arbitration, and then filed a formal demand for arbitration.[95] Similarly, in *Winklevoss*, the court found that "numerous communications" notifying

---

[91] *See supra* at 8.

[92] *See supra* at 9-10; Pls.' Answering Br. Ex. C.

[93] *See* Pls.' Answering Br. 37-38.

[94] *BioVeris Corp.*, 2017 WL 5035530, at *11-12.

[95] *Id.*; *Levey*, 76 A.3d at 766-67, 771.

the counter-defendants of claims (one of which preceded the statute of limitations) did not satisfy the first *IAC* factor.[96]

The plaintiffs' refusal to sign a Letter of Transmittal containing a general release is plainly not equivalent to actively pursuing claims.[97]  Moreover, Chertok's filings in the New York Action were not "claims" in any technical sense and made no mention of the Merger, the Merger Agreement, or the issues central to the present litigation in this court.  In *IAC*, by contrast, the plaintiff pursued nearly identical claims for the same relief in a foreign proceeding before the statute of limitations expired.[98]

          b.     No Change in the Plaintiffs' Personal or Financial Circumstances.

The plaintiffs make no argument about the second *IAC* factor.  "Issues not briefed are deemed waived."[99]  In any event, there is no indication that the delay in filing suit was attributable to a "material and unforeseeable change in the plaintiffs' personal or financial circumstances."[100]  In *IAC*, the court found this factor satisfied

---

[96] 2019 WL 994534, at *7.

[97] *See Winklevoss*, 2019 WL 994534, at *7-8 (noting that a party must take "clear steps to pursue their claims" to satisfy the first *IAC* factor).

[98] *IAC*, 26 A.3d at 176-77.

[99] *Emerald P'rs v. Berlin*, 726 A.2d 1215, 1224 (Del. 1999).

[100] *IAC*, 26 A.3d at 178.

because, among other reasons, the plaintiff's former employer had unexpectedly declared bankruptcy.[101]  No such changes have been alleged here.

> c.   No Legal Determination Prevented the Plaintiffs from Filing Claims.

The plaintiffs were not prevented from timely filing this litigation while the New York Action was pending.  The plaintiffs argue that the "delay in filing this action" should nonetheless be considered a result of the New York Action because Chertok sought to "avoid forfeiting claims under the doctrine of acquiescence."[102] The plaintiffs' argument appears to be that, if they filed this action before the conclusion of the New York Action, Chertok would have effectively acknowledged the validity of the NMD board's actions, which included the Merger.[103]

"Traditionally, the doctrine of acquiescence has included a showing that the plaintiff, by words or deed, has acknowledged the legitimacy of the defendants' conduct."[104]  "A claimant is deemed to have acquiesced in a complained-of act where he [] 'has full knowledge of his rights and the material facts and . . . freely does what

---

[101] *Id.* at 178-79.

[102] Pls.' Answering Br. 38.

[103] *Id.* at 33.

[104] *Clements v. Rogers*, 790 A.2d 1222, 1238 (Del. Ch. 2001).

amounts to recognition of the complained of act.'"[105]  But it unclear how the doctrine of acquiescence applies in this context.

Chertok was not the claimant in the New York Action and did not "indirectly challenge the Merger," despite his contentions otherwise.[106]  Although NMD sought a declaratory judgment about Chertok's role at NMD and the validity of certain acts that pre-date this action,[107] Chertok did not bring claims asserting that certain NMD board actions (such as the Merger) were void.  At most, in a letter to the Southern District, he expressed an intent to file a motion to vacate for fraud on the court and argued that the NMD board had "fabricated" minutes and undertaken a "fraudulent scheme to . . . illegal[ly] usurp[]" NMD.[108]  Chertok never filed a formal motion but the Southern District construed the letter as such and denied it.[109]  Even if Chertok had argued that his defense of the New York Action would have somehow been compromised had he timely pursued his claims in this court (which he did not), none of the legal determinations made by the Southern District or Second Circuit in the New York Action prevented that filing, as the third *IAC* factor requires.[110]

---

[105] *Klaassen v. Allegro Dev. Corp.*, 106 A.3d 1035, 1047 (Del. 2014) (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 724 A.2d 571, 582 (Del. Ch. 1998) (citation omitted)).

[106] Pls.' Answering Br. 33.

[107] Def.'s Reply Br. Ex. A at 21-29; *see* Def.'s Reply Br. 16.

[108] Dkt. 23, Ex. 1A.

[109] *See supra* at 10.

[110] *Compare IAC*, 26 A.3d at 178 (noting that the plaintiff could not in good faith have brought an indemnification claim in this court while the same claim was being pursued in

   d. The Extent of Zillow's Involvement in the New York Action Is Unknown.

 The plaintiffs argue that the fourth *IAC* factor is met because Zillow—as NMD's parent—"certainly was aware (and probably participated) in the New York [Action]."[111]  Zillow disputes that assertion.[112]  Zillow's awareness of or role in the New York Action is not a matter that the court could resolve at this stage without additional evidence.  Nor need it be resolved.  The New York Action is factually and legally distinct from this action and can hardly be characterized as a "prior proceeding."[113]

   e. No Bona Fide Dispute about the "Soundness" of the Plaintiffs' Claims at the Time of Filing.

 Finally, the plaintiffs maintain that the fifth *IAC* factor is satisfied because "there remains an undeniable dispute between Zillow and [the] [p]laintiffs—Zillow continues to withhold the Funds from [the] [p]laintiffs."[114]  The Delaware Supreme Court "interprets a 'bona fide dispute' to mean that the claim would survive a motion

---

a foreign court); *Levey*, 76 A.3d at 771 (finding the third *IAC* factor satisfied because the plaintiff's delay in filing in Delaware was attributable to a legal determination by the New York federal court that compelled the parties to undergo mandatory arbitration).

[111] Pls.' Answering Br. 38; *see IAC*, 26 A.3d at 178.

[112] Def.'s Reply Br. 17-18.

[113] *IAC*, 26 A.3d at 176-78 (describing Florida proceedings where the same claims were brought as those filed in Delaware); *see Levey*, 76 A.3d at 766-67 (noting that the defendant in the Delaware action was the same as in the related prior foreign proceeding); *see supra* at 8-10.

[114] Pls.' Answering Br. 38.

to dismiss or, in other words, is not futile."[115]  "In application, this factor is most commonly fulfilled by a previous affirmative court finding that the untimely claims are valid."[116]  No such finding has been made with respect to the plaintiffs' claims, which ultimately boil down to a disagreement about when the plaintiffs' entitlement to payment arose and whether the plaintiffs are entitled to pre-judgment interest.[117]  Regardless, even if a "sound" claim was pleaded, that factor alone "does not justify a finding of extraordinary circumstances when the weight of the other factors cuts against such a finding."[118]

### 2.    Equitable Tolling Is Not Applicable.

The plaintiffs maintain that "equitable tolling deferred the point in time that . . . the statute of limitations began to run."[119]  In *Levey*, the court explained that a statute of limitations may be equitably tolled when a "plaintiff ha[s] previously brought the claim in a different state court."[120]  As the Delaware Supreme Court has articulated:

---

[115] *Daugherty*, 2018 WL 3217738, at *7 (citing *Levey*, 76 A.3d at 771–72).

[116] *Winklevoss*, 2019 WL 994534, at *9; *see also IAC*, 26 A.3d at 179; *Levey*, 76 A.3d at 772 ("The trial court's determination establishes that there is a 'bona fide dispute' over the validity of Levey's claim, and that the fifth IAC factor is satisfied.").

[117] *See* Compl. ¶¶ 40-59; Def.'s Opening Br. 2-3 (Dkt 15).

[118] *BioVeris Corp.*, 2017 WL 5035530, at *12; *see also Winklevoss*, 2019 WL 994534, at *9.

[119] Pls.' Answering Br. 41.

[120] *Id.* at 38-39; *Levey*, 76 A.3d at 772.

> [A]llowing a plaintiff to bring his case to a full resolution in one forum before starting the clock on his time to file in this State will discourage placeholder suits, thereby furthering judicial economy. Prosecuting separate, concurrent lawsuits in two jurisdictions is wasteful and inefficient . . . . [T]he prejudice to defendants is slight because in most cases, a defendant will be on notice that the plaintiff intends to press claims.[121]

The authorities on which the plaintiffs rely demonstrate why these principles are inapplicable here. In *Levey*, the court applied equitable tolling when a plaintiff had filed "substantially identical claims" in a foreign jurisdiction during the analogous three-year statute of limitations and later filed the same claims in the Court of Chancery.[122] Here, by contrast, the plaintiffs did not pursue their claims in a foreign jurisdiction. In *Daugherty*, the court found that equitable tolling did not apply where a plaintiff had filed "*different* claims" in a foreign jurisdiction and "could have brought those claims" in Delaware "within three years" but did not.[123] At no point did the plaintiffs assert their breach of contract or unjust enrichment claims regarding the Merger—or *any* claims for that matter—in the New York Action.

The plaintiffs also contend that their negotiations with Zillow over payment of the merger consideration are "extraneous factors" that limited their ability to file

---

[121] *Reid*, 970 A.2d at 181-82.

[122] *Levey*, 76 A.3d at 772.

[123] 2018 WL 3217738, at *10.

this action within the limitations period.[124]  But they could have filed this action at any time during those negotiations.  The plaintiffs simply chose otherwise.[125]

3. The Plaintiffs' Alternative Grounds for Tolling Do Not Provide a Basis to Defer the Statute of Limitations or Avoid Laches.

The plaintiffs raise three additional arguments "in the alternative" for why their Complaint should not be dismissed as untimely: quasi-estoppel, "hornbook" Delaware law on conditions precedent, and the application of 10 *Del. C.* § 8106(c).[126] Those grounds all concern the argument that Zillow imposed conditions on payment of the merger consideration such that the statute of limitations must be tolled until those conditions are satisfied.  But none can remedy the plaintiffs' unreasonable delay in bringing their claims.

First, the plaintiffs argue that "under the doctrine of quasi-estoppel, Zillow should not be permitted to argue that the plaintiffs' claims are time barred" because "Zillow improperly imposed conditions precedent upon" NMD's certificate of incorporation.[127]  The doctrine of quasi-estoppel "precludes a party from asserting, to another's disadvantage, a right inconsistent with a position it has previously taken.

---

[124] Pls.' Answering Br. 40; *see supra* at 11.

[125] The notions of judicial economy raised in *Reid* concerned placeholder suits where a prior action is pending elsewhere.  970 A.2d at 181-82.  As discussed, no prior claims brought by the plaintiffs about the Merger were pending before this litigation was filed.

[126] Pls.' Answering Br. 41-49.

[127] *Id.* at 41.

29

Quasi-estoppel applies when it would be unconscionable to allow a person to maintain a position inconsistent with one to which he acquiesced, or from which he accepted a benefit."[128] Invoking that doctrine, the plaintiffs contend Zillow's imposition of conditions to payment "result in a claim relating to the conditions precedent being subject to the statutory maximum" for claims brought subject to 10 *Del. C.* 8106(c).[129]

This argument is illogical given that the plaintiffs' case rests on the premise that there were no conditions precedent to Zillow's payment of the merger consideration and dividends.[130] Zillow has never argued that conditions precedent exist to payment under the NMD certificate of incorporation; it argues that the Merger Agreement is the relevant contract.[131] Zillow therefore has not taken an inconsistent position that now precludes it from asserting that the plaintiffs' claims are barred by the statute of limitations.

Second, the plaintiffs' argument misinterprets 10 *Del. C.* § 8106(c). That provision provides that "an action based on a written contract, agreement, or undertaking involving at least $100,000 may be brought within a period specified in

---

[128] *Pers. Decisions, Inc. v. Bus. Plan. Sys.*, 2008 WL 1932404, at *6 (Del. Ch. May 5, 2008).

[129] Pls.' Answering Br. 42.

[130] *Id.* at 13-16.

[131] Def.'s Opening Br. 13-17.

such written contract, agreement, or undertaking provided it is brought prior to the expiration of 20 years from the accruing of the cause of such action."[132]  Section 8106(c) "was intended to allow parties to contract around Delaware's otherwise applicable statute of limitations for certain actions."[133]

The plaintiffs rely on this court's decision in *Bear Stearns*, where Section 8106(c) was applied retroactively to a purchase agreement with an accrual provision.[134]  There, the purchase agreement at issue directly addressed the time period for when a claim for breach of representations and warranties would accrue.[135]  As a result, the accrual provision established a "period specified" in which the statute of limitations was extended and would not run until after the events specified in the accrual provision occurred.[136]

---

[132] 10 *Del. C.* § 8106(c).

[133] *Bear Stearns Mortg. Funding Tr. 2006-SLI v. EMC Mortg. LLC*, 2015 WL 139731, at *12 (Del. Ch. Jan. 12, 2015).

[134] *Id.* at *13; Pls.' Answering Br. 43, 47-49.

[135] *Bear Stearns*, 2015 WL 139731, at *14-15.  The provision stated:

> Any cause of action against [EMC] or relating to or arising out of a breach by [EMC] of any representations and warranties made in this Section 7 shall accrue as to any Mortgage Loan upon (i) discovery of such breach by [EMC] or notice thereof by the party discovering such breach and (ii) failure by [EMC] to cure such breach, purchase such Mortgage Loan or substitute a qualifying Replacement Mortgage Loan pursuant to the terms hereof.

*Id.* at *4.

[136] *Id.* at *15.

By contrast, the conditions precedent that the plaintiffs maintain Zillow imposed do not expressly accrue or defer the statute of limitations.  The Merger Agreement required that, "[u]pon surrender of a certificate to the Exchange Agent" and the execution of a Letter of Transmittal, "the holder of such certificate shall be entitled to receive in exchange therefore the portion of the merger consideration that such holder has the right to receive pursuant to the provision of Section 1.7.1."[137]  It did not mention the statute of limitations or claims accrual.  Even if it had, the plaintiffs' central argument in this case is that Zillow wrongfully imposed conditions to the plaintiffs' right to payment.  Under the plaintiffs' own reasoning, the parties did not agree to any such conditions and, in the absence of an agreement, Section 8106(c) does not apply by its terms.

Finally, the conditions to payment imposed by Zillow did not defer the three-year limitations period.[138]  The plaintiffs cite to a "long line" of Delaware decisions following "hornbook law" that state that a statute of limitations does not run until a condition precedent is satisfied or waived.[139]  Because Zillow did not eliminate the

---

[137] Compl. Ex. B § 1.7.2(b).

[138] Pls.' Answering Br. 45.

[139] *Id.* at 43 (citing *Bear Sterns*, 2015 WL 139731, at *10); *Kaufman v. Albin*, 447 A.2d 761, 763 (Del. Ch. 1982) (stating that if a party's "right depends on the happening of an event in the future, the cause of action accrues, and the statute of limitations begins to run, only at the time when the event happens" (quoting 54 C.J.S. *Limitation of Actions* § 110, at 15 (1948))).

Letter of Transmittal condition until August 2019 and the final condition precedent—Form W-9s—was not satisfied by the plaintiffs until October 11, 2019, the plaintiffs maintain that laches and the statute of limitations could not begin to run until that time.[140]

But—again—the plaintiffs have brought their claims under the NMD certificate of incorporation, not the Merger Agreement.  Any condition precedent allegedly contained in the Merger Agreement or mandated by Zillow is not a bar to payment based on the plaintiffs' own assertion that they "are not parties to the Merger Agreement . . . [and] therefore, are not governed by, and have no obligations (which includes satisfying conditions precedent), under the Merger Agreement."[141]

As the plaintiffs' claims arise out of NMD's certificate of incorporation, the claims accrued and the statute of limitations began to run in October and December 2013 when Zillow withheld the payment of the merger consideration and dividends from the plaintiffs.  If there were no conditions to payment, as the plaintiffs

---

[140] Pls.' Answering Br. 45.

[141] *Id.* at 28; *see also* Compl. ¶ 30 ("[N]either Chertok nor Vast have any obligations under the Merger Agreement, and any purported obligations of the non-party, non-consenting stockholders – for example, the execution of LOTs, the execution of releases, and the execution of waivers – are unenforceable by Zillow.").

repeatedly argue, their right of action does not "depend[] upon some contingency or a condition precedent."[142]

## III.    CONCLUSION

For the reasons explained above, the Complaint must be dismissed as time barred because it was filed after the three-year statute of limitations expired.  No exceptional circumstances or tolling doctrine applies.  Zillow's motion to dismiss is granted.  IT IS SO ORDERED.

---

[142] *Kaufman*, 447 A.2d at 763 (quoting 51 Am. Jur. 2d, *Limitation of Actions* § 127, at 3, 6 (1970)).

# EXHIBIT F

Click to Print                                                Printed on: 4/25/2023 08:22:28 GMT-0400 (Eastern Daylight Time)

**Case History Search**
Search Created:
4/25/2023 08:22:28 GMT-0400 (Eastern
Daylight Time)

| | | | | | |
|---|---|---|---|---|---|
| **Court:** | DE Supreme Court | **Judge:** | Delaware, Supreme Court | **File & ServeXpress Live Date:** | 11/15/2021 |
| **Division:** | N/A | **Case Number:** | 363,2021 | **Document(s) Filed:** | 53 |
| **Case Type:** | Corporation Law | **Case Name:** | Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | **Date Range:** | All |
| **Linked Case(s):** | 2019-0849-LWW [View Case History] | | | | |

⬇ Export    1-27 of 27 transactions    <<Prev    Page 1 of 1    Next>>

| Transaction | ▼Date/Time | Option | Case Number Case Name | Authorizer Organization | # | Document Type | Document Title | Review Status | Size |
|---|---|---|---|---|---|---|---|---|---|
| 67754248 | 6/23/2022 8:45 AM EDT | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Supreme Court Delaware, DE Supreme Court | 29 | Mandate to Clerk of Court Below | Mandate to Clerk of Court Below. Case closed. (jkh) | Accepted | 0.3MB |
| 67754059 | 6/23/2022 7:32 AM EDT | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Karen Valihura, DE Supreme Court | 28 | Order | Order dated 6-23-22 by Valihura, J. IT IS ORDERED that the Appellants' Motion for Rehearing en Banc is DENIED. (CJS, KLV, JTV, GFT, TMR). (jkh) | Accepted | 0.1MB |
| 67733742 | 6/16/2022 4:48 PM EDT | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Emily V Burton, Young Conaway Stargatt & Taylor LLP-Wilmington | 27 | Motion for Rehearing En Banc | Appellants' Motion for Rehearing en Banc. (eserved) (jkh) • Linked to (3) | Accepted | 0.2MB |
| | | | | | | Exhibit | Exhibits A - D to Appellants' Motion for Rehearing en Banc | Accepted | 0.1MB |
| | | | | | | Proposed Order | [PROPOSED] Order Granting Appellants' Motion for Rehearing en Banc | Accepted | 0.1MB |
| | | | | | | Statement | Certification of Counsel Pursuant to Rule 4(f) | Accepted | 0.1MB |
| | | | | | | Certificate of Compliance with Typeface | Certificate of Compliance with Typeface Requirement and Type-Volume Limitation | Accepted | 0.1MB |
| 67677436 | 6/1/2022 8:21 AM EDT | File And Serve | 363,2021 Douglas M. Chertok and | Karen Valihura, DE Supreme | 26 | Order - Final | Order dated 6-1-22 by Valihura, J. IT IS ORDERED that the | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | EDT | | Chertok and Vast Ventures LLC v. Zillow, Inc. | DE Supreme Court | | | ORDERED that the judgment of the Court of Chancery be and the same hereby is AFFIRMED. (KLV, JTV, TMR). (jkh)<br>• Linked from (1) | | |
| 67459735 | 4/7/2022 1:00 PM EDT | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Supreme Court Delaware, DE Supreme Court | 25 | Notice of On Brief | Notice dated 4-7-22 from Clerk to parties, the matter has been removed from the list of cases to be orally heard and has been submitted for decision on the briefs on 5-11-22. (ead) KLV JTV TMR | Accepted | 0.1MB |
| 67459229 | 4/7/2022 10:41 AM EDT | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Collins J Seitz, Jr., DE Supreme Court | 24 | Order | Order dated 4-7-22 by Seitz, CJ. Emily V. Burton, Esquire's Motion for Leave to Withdraw as Counsel for Appellant Douglas M. Chertok, Esquire is GRANTED. (jkh)<br>• Linked to (1) | Accepted | 0.3MB |
| 67455695 | 4/6/2022 10:23 AM EDT | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Emily V Burton, Young Conaway Stargatt & Taylor LLP-Wilmington | 23 | Letter | Letter dated 4-6-22 from Appellants to the Clerk of the Court to provide clarification on Young Conaway's filings on 4-6-22. (eserved) (jkh)<br>• Linked to (2) | Accepted | 0.1MB |
| | | | | | | Motion to Withdraw as Counsel | Emily V. Burton, Esquire's Motion for Leave to Withdraw as Counsel for Appellant Douglas M. Chertok, Esquire. (eserved) (jkh)<br>• Linked from (1) | Accepted | 0.1MB |
| | | | | | | Certificate of Compliance with Typeface | Certificate of Compliance With Typeface Requirement and Type-Volume Limitation | Accepted | 0.1MB |
| | | | | | | Acknowledgment of Oral Argument | Amended Acknowledgment of Oral Argument on 5-11-22 at 12:45 p.m. on behalf of Appellants.<br>• Linked to (1)<br>• Linked from (1) | Accepted | 0.1MB |
| 67455451 | 4/6/2022 8:25 AM EDT | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Collins J Seitz, Jr., DE Supreme Court | 22 | Order | Order dated 4-6-22 by Seitz, CJ. Michael J. Maimone, Esquire's Motion for Leave to Withdraw as Counsel for Appellants is | Accepted | 0.2MB |

| 67454613 | 4/5/2022 4:33 PM EDT | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Michael Maimone, Barnes & Thornburg LLP-Wilmington | 21 | Motion to Withdraw as Counsel | Michael J. Maimone, Esquire's Motion for Leave to Withdraw as Counsel for Appellants. (served) (jkh)  • Linked from (1) | Accepted | 0.1MB |
| | | | | | | Certificate of Compliance with Typeface | Certificate of Compliance with Typeface Requirement and Type-Volume Limitation | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service to Motion for Leave to Withdraw as Counsel | Accepted | 0.1MB |
| 67392460 | 3/14/2022 3:20 PM EDT | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Emily V Burton, Young Conaway Stargatt & Taylor LLP-Wilmington | 20 | Acknowledgment of Oral Argument | Acknowledgment of Oral Argument on 5-11-22 at 12:45 p.m. on behalf of Appellants. (served) (jkh)  • Linked to (2)  • Linked from (2) | Accepted | 0.1MB |
| 67386668 | 3/11/2022 9:59 AM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC | 19 | Acknowledgment of Oral Argument | Acknowledgment of Oral Argument on 5-11-22 at 12:45 p.m. on behalf of Appellee. (served) (jkh)  • Linked from (1) | Accepted | 0.3MB |
| 67371382 | 3/7/2022 1:17 PM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Supreme Court 24, DE Supreme Court | 18 | Notice of Oral Argument | Notice dated 3-7-22 from Clerk to counsel of oral argument on 5-11-22 at 12:45 p.m. (dmd)  • Linked from (2) | Accepted | 0.2MB |
| 67315401 | 2/14/2022 6:06 PM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Emily V Burton, Young Conaway Stargatt & Taylor LLP-Wilmington | 17 | Reply Brief | Appellant's Reply Brief. (eserved) (jkh)  • Linked to (4) | Accepted | 0.4MB |
| | | | | | | Appendix | Appendix to Appellants' Reply Brief | Accepted | 1.2MB |
| | | | | | | Certificate of Compliance with Typeface | Certificate of Compliance with Typeface Requirement | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service to Appellants' Reply Brief | Accepted | 0.1MB |
| 67295207 | 2/7/2022 11:31 AM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures | Supreme Court 24, DE Supreme Court | 16 | Notice of Brief Deficiency | Notice of brief deficiency dated 2-7-2022 from Senior Court Clerk to | Accepted | 0.1MB |

| 67288454 | 2/3/2022 12:33 PM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC | 15 | Certificate of Compliance with Typeface | Certificate of Compliance with Typeface Requirement and Type-Volume Limitation for Appellee's Answering Brief. (served) (jkh) • Linked to (1) | Accepted | 0.1MB |
| 67284241 | 2/2/2022 11:34 AM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC | 14 | Answering Brief | [Corrected] Appellee's Answering Brief. (served) (jkh) • Linked to (1) • Linked from (3) | Accepted | 1.2MB |
| 67283935 | 2/2/2022 10:47 AM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Supreme Court 24, DE Supreme Court | 13 | Notice of Brief Deficiency | Notice of brief deficiency dated 2-2-2022 from Senior Court Clerk to appellee. (corrections are due 2-9-22) (dmd) | Accepted | 0.1MB |
| 67273748 | 1/28/2022 2:51 PM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC | 12 | Letter | Letter dated 1-28-22 from Appellee to the Supreme Court of Delaware enclosing courtesy copies of Appellee's Answering Brief. (eserved) (jkh) • Linked to (1) | Accepted | 0.4MB |
| 67273451 | 1/28/2022 2:25 PM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC | 11 | Answering Brief | Appellee's Answering Brief. (eserved) (jkh) • Linked to (1) • Linked from (2) | Accepted | 1.2MB |
| | | | | | | Appendix | Cover Page and Table of Contents to Appendix to Appellee's Answering Brief | Accepted | 0.3MB |
| | | | | | | Appendix | Appendix to Appellee's Answering Brief (B1-B141) | Accepted | 3.8MB |
| | | | | | | Certificate of Compliance with Typeface | Certificate of Compliance with Typeface Requirement and Type-Volume Limitation | Accepted | 0.3MB |
| | | | | | | Certificate of Service | Certificate of Service | Accepted | 0.3MB |
| 67200626 | 12/29/2021 4:49 PM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Emily V Burton, Young Conaway Stargatt & Taylor LLP-Wilmington | 10 | Opening Brief | Appellants' Opening Brief. (with Exhibit A) (eserved) (jkh) • Linked to (4) • Linked from (3) | Accepted | 0.9MB |
| | | | | | | Certificate of Compliance with Typeface | Certificate of Compliance with Typeface | Accepted | 0.2MB |

| | | | | | | | | Requirement and Type-Volume Limitation | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | Appendix | Appendix to Appellant's Opening Brief (Cover Page, Table of Contents) | Accepted | 0.2MB |
| | | | | | | Appendix | Appendix to Appellants' Opening Brief (A1-A546) | Accepted | 14.4MB |
| 67199989 | 12/29/2021 1:04 PM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Emily V Burton, Young Conaway Stargatt & Taylor LLP-Wilmington | 9 | Notice of entry of appearance | Notice of Entry of Appearance of Emily V. Burton, Esquire on behalf of Appellants. (served) (jkh) • Linked to (2) • Linked from (3) | Accepted | 0.1MB |
| 67140752 | 12/3/2021 11:40 AM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Lori W. Will, DE Court of Chancery Civil Action | 8 | Record as Ordered | Transfer of Court of Chancery docket to Supreme Court on Appeal constituting the record as ordered. (eserved) (jkh) | Accepted | 0.7MB |
| 67132459 | 11/30/2021 6:32 PM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC | 7 | Disclosure of Corp. Affil. & Financial Interest | Disclosure of Corporate Affiliations and Financial Interest filed on behalf of Appellee. (eserved) (jkh) | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service | Accepted | 0.1MB |
| 67132444 | 11/30/2021 6:30 PM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Geoffrey Grivner, Buchanan Ingersoll & Rooney PC | 6 | Notice of entry of appearance | Entry of Appearance of Geoffrey G. Grivner, Esquire and Kody M. Sparks, Esquire on behalf of Appellee. (eserved) (jkh) | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service | Accepted | 0.1MB |
| 67129430 | 11/30/2021 11:19 AM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Michael Maimone, Barnes & Thornburg LLP-Wilmington | 5 | Disclosure of Corp. Affil. & Financial Interest | Disclosure of Corporate Affiliations and Financial Interest filed on behalf of Appellants. (eserved) (jkh) • Linked to (1) | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service to Disclosure of Corporate Affiliations and Financial Interest on behalf of Plaintiffs Below-Appellants Douglas M. Chertok and Vast Ventures LLC | Accepted | 0.1MB |
| 67096055 | 11/15/2021 4:38 PM | File And Serve | 363,2021 | Supreme Court 30 | 2 | Brief Schedule | Brief Schedule issued. (Opening | Accepted | 0.1MB |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4:58 PM EST | Serve | Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Court 50, DE Supreme Court | | | issued. (Opening Brief is due 12-30-21) (jkh) • Linked from (4) | |
| | | | | | 3 | Brief Deficiencies List | Most common brief deficiencies. | Accepted | 0.2MB |
| | | | | | 4 | Letter - Record Due from Supreme Court Clerk | Letter dated 11-15-21 from Senior Court Clerk to Chief Register in Chancery, advising that the record is due 12-8-21. | Accepted | 0.1MB |
| 67095825 | 11/15/2021 4:00 PM EST | File And Serve | 363,2021 Douglas M. Chertok and Vast Ventures LLC v. Zillow, Inc. | Michael Maimone, Barnes & Thornburg LLP-Wilmington | 1 | Notice of Appeal | Notice of Appeal from the Memorandum Opinion dated 10-18-21 in the Court of Chancery by Vice Chancellor Will, in C.A. No. 2019-0849-LWW, with designation of no further transcripts. (eserved) (DISCLOSURES DUE 11-30-21) (jkh) • Linked from (3) | Accepted | 0.1MB |
| | | | | | | Exhibit | Exhibit - Memorandum Opinion of the Court of Chancery of the State of Delaware by The Honorable Lori W. Will dated October 18, 2021 • Linked from (1) | Accepted | 0.4MB |
| | | | | | | Certificate of Service | Certificate of Service re Plaintiffs Below-Appellants, Douglas M. Chertok and Vast Ventures LLC's Notice of Appeal | Accepted | 0.1MB |

1-27 of 27 transactions    <<Prev   Page 1 of 1   Next>>

# EXHIBIT G

EFiled:  Jun 01 2022 08:21AM EDT
Filing ID 67677436
Case Number 363,2021

IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DOUGLAS M. CHERTOK and | § | |
| VAST VENTURES LLC, a Florida | § | |
| Limited Liability Company, | § | No. 363, 2021 |
| | § | |
| Plaintiffs Below, | § | |
| Appellants, | § | Court Below:  Court of Chancery |
| | § | of the State of Delaware |
| v. | § | |
| | § | |
| ZILLOW, INC., a Washington | § | C.A. No. 2019-0849 |
| corporation (successor to NMD | § | |
| INTERACTIVE, INC., a Delaware | § | |
| corporation, aka STREETEASY, INC.), | § | |
| | § | |
| Defendants Below, | § | |
| Appellee. | § | |

Submitted:  May 11, 2022
Decided:  June 1, 2022

Before **VALIHURA**, **VAUGHN** and **MONTGOMERY-REEVES**, Justices.

## <u>O R D E R</u>

This 1st day of June 2022, having considered this matter on the briefs of parties and the record below, and having concluded that the same should be affirmed on the basis of and for the reasons assigned by the Court of Chancery it its Opinion dated October 18, 2021.

NOW, THEREFORE, IT IS ORDERED that the judgment of the Court of Chancery be and the same hereby is AFFIRMED.

BY THE COURT:

*/s/ Karen L. Valihura*
Justice

# EXHIBIT H

EFiled: Jun 23 2022 07:32AM EDT
Filing ID 67754059
Case Number 363,2021

# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| DOUGLAS M. CHERTOK and VAST VENTURES LLC, a Florida Limited Liability Company, | § § § § | No. 363, 2021 |
| Plaintiffs Below, Appellants, | § § § | Court Below:  Court of Chancery of the State of Delaware |
| v. | § § | C.A. No. 2019-0849 |
| ZILLOW, INC., a Washington corporation (successor to NMD INTERACTIVE, INC., a Delaware corporation, aka STREETEASY, INC.), | § § § § § § | |
| Defendant Below, Appellee. | § § | |

Submitted:  June 16, 2022
Decided:    June 23, 2022

Before **SEITZ**, Chief Justice; **VALIHURA**, **VAUGHN**, **TRAYNOR** and **MONTGOMERY-REEVES**, Justices.

## **ORDER**

This 23rd day of June 2022, it appears to the Court that the Appellants have filed a Motion for Rehearing *en Banc* of this Court's June 1, 2022 Order.  After careful consideration, the Court concludes that the Motion for Rehearing *en Banc* is without merit and should be denied.

NOW, THEREFORE, IT IS ORDERED that the Appellants' Motion for Rehearing *en Banc* is DENIED.

BY THE COURT:

*/s/ Karen L. Valihura*
Justice

# EXHIBIT I

Click to Print                                          Printed on: 5/1/2023 09:19:26 GMT-0400 (Eastern Daylight Time)

**Case History Search**
Search Created:
5/1/2023 09:19:26 GMT-0400 (Eastern
Daylight Time)

---

| **Court:** | DE Court of Chancery Civil Action | **Judge:** | Fioravanti Jr, Paul A | **File & ServeXpress Live Date:** | 5/29/2020 |
| **Division:** | N/A | **Case Number:** | 2020-0417-PAF | **Document(s) Filed:** | 68 |
| **Case Type:** | Specific Performance | **Case Name:** | CONF ORD / Douglas M. Chertok v. OnSolve, LLC | **Date Range:** | All |

⬇ Export    1-36 of 36 transactions    <<Prev  Page 1 of 1   Next>>

| Transaction | ▼Date/Time | Option | Case Number Case Name | Authorizer Organization | # | Document Type | Document Title | Review Status | Size |
|---|---|---|---|---|---|---|---|---|---|
| 69028559 | 1/30/2023 4:54 PM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul J Lockwood, Skadden Arps Slate Meagher & Flom LLP-Wilmington | 37 | Notice of Service of Objections to Discovery | Notice of Service of Defendant OnSolve, LLC's Responses and Objections to Plaintiff Douglas Chertok's First Set of Interrogatories to Defendant OnSolve, LLC (with Certificate of Service) • Linked to (1) | Accepted | 0.1MB |
| 68881237 | 1/13/2023 2:01 PM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul J Lockwood, Skadden Arps Slate Meagher & Flom LLP-Wilmington | 36 | Letter | Letter to The Honorable Paul A. Fioravanti, Jr. from Paul J. Lockwood, Esquire regarding a Status Report • Linked to (2) | Accepted | 0.1MB |
| 68768739 | 12/29/2022 8:44 PM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Douglas M Chertok, (SRI)-Chertok, Douglas | 35 | Letter | Plaintiff Chertok's response to the Court's Order, dated December 29, 2022 (Doc. # 34), to provide the Court with Plaintiff Chertok's status report on this action. | Accepted | 0.1MB |
| 68767772 | 12/29/2022 5:24 PM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul A Fioravanti Jr, DE Court of Chancery Civil Action | 34 | Letter | Letter to counsel and Mr. Chertok from Vice Chancellor Fioravanti requesting a status report of this action on or before January 13, 2023. • Linked from (1) | Accepted | 0.1MB |
| 68761104 | 12/29/2022 12:05 PM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Douglas M Chertok, (SRI)-Chertok, Douglas | 33 | Interrogatories | PLAINTIFF DOUGLAS CHERTOK'S FIRST SET OF INTERROGATORIES TO DEFENDANT ONSOLVE, LLC • Linked from (2) | Accepted | 0.2MB |
| 67983960 | 8/29/2022 11:13 AM | File And Serve | 2020-0417-PAF CONF ORD / | Douglas M Chertok, | 32 | Letter | Letter, dated August 26, 2022, from Mr. | Accepted | 0.1MB |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | EDT | | Douglas M. Chertok v. OnSolve, LLC | (SRI)-Chertok, Douglas | | | | Chertok on behalf of all parties to Vice Chancellor Fioravanti providing a status report of this action in response to the Court's letter (Doc. No. 31).<br>• Linked to (1) | | |
| 67928309 | 8/12/2022 4:31 PM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul A Fioravanti Jr, DE Court of Chancery Civil Action | 31 | Letter | Letter to Mr. Chertok and counsel from Vice Chancellor Fioravanti requesting a status report of this action on or before August 26, 2022.<br>• Linked from (1) | Accepted | 0.1MB |
| 67709699 | 6/9/2022 1:41 PM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul A Fioravanti Jr, DE Court of Chancery Civil Action | 29 | Affidavit | Pro Se E-filing Affidavit of Douglas Chertok | Accepted | 0.1MB |
| | | | | | 30 | Letter | Letter addressed to the court from Douglas Chertok | Accepted | 0.1MB |
| 67456242 | 4/6/2022 11:11 AM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul A Fioravanti Jr, DE Court of Chancery Civil Action | 28 | Order | Granted ([Proposed] Order to Motion for Leave to Withdraw as Counsel to Plaintiffs)<br>• Linked to (1) | Accepted | 0.2MB |
| 67454526 | 4/5/2022 4:23 PM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael Maimone, Barnes & Thornburg LLP-Wilmington | 27 | Motion | Motion for Leave to Withdraw as Counsel to Plaintiffs<br>• Linked to (1) | Accepted | 0.1MB |
| | | | | | | Proposed Order | [Proposed] Order to Motion for Leave to Withdraw as Counsel to Plaintiffs<br>• Linked from (1) | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service to Motion for Leave to Withdraw as Counsel to Plaintiffs | Accepted | 0.1MB |
| 67123454 | 11/24/2021 2:06 PM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul A Fioravanti Jr, DE Court of Chancery Civil Action | 26 | Order | Granted (Stipulation and [Proposed] Order for the Production and Exchange of Confidential Information)<br>• Linked to (1) | Accepted | 0.2MB |
| 67122922 | 11/24/2021 12:19 PM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul J Lockwood, Skadden Arps Slate Meagher & Flom LLP-Wilmington | 25 | Stipulation & (Proposed) Order | Stipulation and [Proposed] Order for the Production and Exchange of Confidential Information<br>• Linked to (1)<br>• Linked from (1) | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit A, Agreement to be Bound by Stipulation and Order for the Production and Exchange of | Accepted | 0.1MB |

| | | | | | | | | Confidential Information | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 67011616 | 10/13/2021 3:16 PM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael Maimone, Barnes & Thornburg LLP-Wilmington | 24 | Letter | | Letter to The Honorable Paul A. Fioravanti, Jr. from Michael J. Maimone enclosing courtesy copies of Plaintiffs' Motion to Compel the Production of Documents and Opposition to Defendant's Motion for Protective Order  • Linked to (2) | Accepted | 0.1MB |
| 67009717 | 10/13/2021 10:15 AM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael Maimone, Barnes & Thornburg LLP-Wilmington | 23 | Motion to Compel | | Plaintiffs' Motion to Compel the Production of Documents and Opposition to Defendant's Motion for Protective Order  • Linked to (3)  • Linked from (1) | Accepted | 0.1MB |
| | | | | | | Proposed Order | | [Proposed] Order re: Plaintiffs' Motion to Compel the Production of Documents and Opposition to Defendant's Motion for Protective Order  • Linked from (1) | Accepted | 0.1MB |
| | | | | | | Exhibits | | Exhibit A to Plaintiffs' Motion to Compel the Production of Documents and Opposition to Defendant's Motion for Protective Order | Accepted | 0.2MB |
| | | | | | | Exhibits | | Exhibit B to Plaintiffs' Motion to Compel the Production of Documents and Opposition to Defendant's Motion for Protective Order | Accepted | 0.4MB |
| | | | | | | Exhibits | | Exhibit C to Plaintiffs' Motion to Compel the Production of Documents and Opposition to Defendant's Motion for Protective Order | Accepted | 0.3MB |
| | | | | | | Exhibits | | Exhibit D to Plaintiffs' Motion to Compel the Production of Documents and Opposition to Defendant's Motion for Protective Order | Accepted | 0.1MB |
| | | | | | | Exhibits | | Exhibit E to Plaintiffs' Motion to Compel the | Accepted | 0.1MB |

| | | | | | | | | Accepted | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | | | | | | | Motion to Compel the Production of Documents and Opposition to Defendant's Motion for Protective Order | | |
| | | | | | | Exhibits | Exhibit F to Plaintiffs' Motion to Compel the Production of Documents and Opposition to Defendant's Motion for Protective Order | Accepted | 0.2MB |
| | | | | | | Exhibits | Exhibit G to Plaintiffs' Motion to Compel the Production of Documents and Opposition to Defendant's Motion for Protective Order | Accepted | 0.2MB |
| | | | | | | Certificate of Service | Certificate of Service re: Plaintiffs' Motion to Compel the Production of Documents and Opposition to Defendant's Motion for Protective Order | Accepted | 0.1MB |
| 66806068 | 7/28/2021 4:54 PM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul J Lockwood, Skadden Arps Slate Meagher & Flom LLP-Wilmington | 22 | Motion for Protective Order | Defendant's Motion for a Protective Order (with Certificate of Service)<br>• Linked to (1)<br>• Linked from (1) | Accepted | 0.1MB |
| | | | | | | Proposed Order | [Proposed] Order Granting Defendant's Motion for a Protective Order<br>• Linked from (1) | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibit A to Defendant's Motion for a Protective Order | Accepted | 0.2MB |
| | | | | | | Letter | Letter to The Honorable Paul A. Fioravanti, Jr. from Paul J. Lockwood, Esq. enclosing courtesy copies of Defendant's Motion for a Protective Order with [Proposed] Order and Exhibit A | Accepted | 0.1MB |
| 66722203 | 6/28/2021 4:44 PM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael Maimone, Barnes & Thornburg LLP-Wilmington | 21 | Notice of Service of Request for Production | Notice and Certificate of Service re: Plaintiffs' First Set of Requests for Production of Documents Directed to Defendant<br>• Linked to (1)<br>• Linked from (1) | Accepted | 0.1MB |
| 66680318 | 6/11/2021 2:30 PM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. | Paul J Lockwood, Skadden | 20 | Answer | Defendant OnSolve, LLC's Answer to the | Accepted | 0.1MB |

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| | EDT | | Douglas M. Chertok v. OnSolve, LLC | | Skadden Arps Slate Meagher & Flom LLP-Wilmington | | Verified Complaint • Linked to (1) | | |
| 66667796 | 6/8/2021 2:18 PM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael Maimone, Barnes & Thornburg LLP-Wilmington | 19 | Notice | Notice of Change of Firm Affiliation for Michael J. Maimone on behalf of Plaintiffs • Linked to (1) | Accepted | 0.1MB |
| | | | | | | Certificate of Service | Certificate of Service re: Notice of Change of Firm Affiliation for Michael J. Maimone on behalf of Plaintiffs | Accepted | 0.1MB |
| 66558968 | 4/29/2021 1:42 PM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul A Fioravanti Jr, DE Court of Chancery Civil Action | 18 | Order | Order Resolving Motion to Dismiss • Linked from (1) | Accepted | 0.2MB |
| 66269163 | 1/20/2021 11:44 AM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 17 | Letter | Letter to The Honorable Paul A. Fioravanti, Jr. from Michael J. Maimone enclosing courtesy copies of Plaintiffs' Supplemental Brief in Opposition to Defendant's Motion to Dismiss • Linked to (1) | Accepted | 0.1MB |
| 66267372 | 1/19/2021 4:58 PM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul J Lockwood, Skadden Arps Slate Meagher & Flom LLP-Wilmington | 16 | Letter | Letter to The Honorable Paul A. Fioravanti, Jr. from Paul J. Lockwood, Esq. in regard to supplementing the arguments made at the hearing on December 1, 2020 • Linked to (1) | Accepted | 0.1MB |
| 66266360 | 1/19/2021 4:57 PM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 15 | Supplemental Submissions | Plaintiffs' Supplemental Brief in Opposition to Defendant's Motion to Dismiss Verified Complaint with Certificate of Service • Linked to (5) • Linked from (1) | Accepted | 0.1MB |
| 66257821 | 1/15/2021 9:55 AM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 14 | Letter | Letter to The Honorable Paul A. Fioravanti, Jr. from Michael J. Maimone regarding supplemental briefing on Defendant's Motion to Dismiss the Verified Complaint, filed on behalf of Plaintiffs • Linked to (4) • Linked from (1) | Accepted | 0.1MB |
| 66243560 | 1/11/2021 | File And | 2020-0417-PAF | Michael J | 13 | Motion | Plaintiff's Motion | Accepted | 0.1MB |

| | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| 66143588 | 12/11/2020 3:17 PM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 13 | Motion | Plaintiff's Motion Regarding Schedule and Word Limitation for Supplemental Briefing with Certificate of Service • Linked to (4) | Accepted | 0.1MB |
| | | | | | | Proposed Order | Proposed Order to Motion Regarding Schedule and Word Limitation for Supplemental Briefing | Accepted | 0.1MB |
| 66180352 | 12/11/2020 2:31 PM EST | File Only | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Karen Ct Reporter Siedlecki, DE Court of Chancery Civil Action | 12 | Official Transcript (Addl Fees Apply) | 12-1-2020 ORAL ARGUMENT ON DEFENDANTS' MOTION TO DISMISS HELD VIA ZOOM • Linked from (1) | Accepted | 0.2MB |
| 66153675 | 12/2/2020 3:14 PM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul A Fioravanti Jr, DE Court of Chancery Civil Action | 11 | Judicial Action Form | Oral Argument on Defendant's Motion to Dismiss held via Zoom. Counsel should confer until the first week of January, then send supplemental briefing on the issue of the rights under the certificate and the arguments that Mr. Lockwood made under Section 262 and 251. • Linked from (3) | Accepted | 0.1MB |
| 66144293 | 11/30/2020 10:05 AM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 10 | Letter | Letter to The Honorable Paul A. Fioravanti, Jr. from Michael J. Maimone enclosing chart of attorney information re Zoom hearing on Defendant's Motion to Dismiss, scheduled for December 1, 2020, filed on behalf of Plaintiff • Linked to (5) | Accepted | 0.1MB |
| | | | | | | Exhibits | Chart of Attorney Information re Motion to Dismiss oral argument on December 1, 2020 | Accepted | 0.1MB |
| 66134137 | 11/23/2020 12:04 PM EST | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul A Fioravanti Jr, DE Court of Chancery Civil Action | 9 | Letter | Letter to counsel from Vice Chancellor Fioravanti confirming the oral argument on Defendant's Motion to Dismiss is scheduled for December 1, 2020 at 3:15 p.m. using Zoom technology. • Linked from (1) | Accepted | 0.1MB |
| 66039015 | 10/20/2020 4:48 PM EST | File And Serve | 2020-0417-PAF CONF ORD / | Paul J Lockwood | 8 | Reply Brief | Defendant's Reply Brief in Further Support of | Accepted | 0.1MB |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | 4:46 PM EDT | Serve | CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Lockwood, Skadden Arps Slate Meagher & Flom LLP-Wilmington | | | in Further Support of Its Motion to Dismiss the Verified Complaint (with Certificate of Service)<br>• Linked to (3)<br>• Linked from (4) | | |
| | | | | | | Letter | Letter to The Honorable Paul A. Fioravanti, Jr. from Paul J. Lockwood, Esq. enclosing courtesy copies of Defendant's Reply Brief in Further Support of its Motion to Dismiss the Verified Complaint | Accepted | 0.1MB |
| 65962124 | 9/24/2020 2:22 PM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 7 | Letter | Letter to The Honorable Paul A. Fioravanti Jr. from Michael J. Maimone enclosing courtesy copies of Plaintiffs' Answering Brief in Opposition to Defendant's Motion to Dismiss the Verified Complaint and Appendix.<br>• Linked to (1) | Accepted | 0.1MB |
| 65955824 | 9/23/2020 11:17 AM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 6 | Brief | Plaintiffs' Answering Brief in Opposition to Defendant's Motion to Dismiss Verified Complaint with Certificate of Service<br>• Linked to (2)<br>• Linked from (6) | Accepted | 0.2MB |
| | | | | | | Appendix | Appendix to Plaintiffs' Answering Brief in Opposition to Defendant's Motion to Dismiss Verified Complaint | Accepted | 0.1MB |
| | | | | | | Exhibits | Exhibits A-C to Appendix to Plaintiffs' Answering Brief in Opposition to Defendant's Motion to Dismiss Verified Complaint | Accepted | 1.7MB |
| | | | | | | Exhibits | Exhibit D to Appendix to Plaintiffs' Answering Brief in Opposition to Defendant's Motion to Dismiss Verified Complaint | Accepted | 6.0MB |
| | | | | | | Exhibits | Exhibits E- L to Appendix to Plaintiffs' Answering Brief in Opposition to Defendant's Motion to | Accepted | 5.9MB |

|  |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  | Defendant's Motion to Dismiss Verified Complaint |  |  |
| 65840725 | 8/11/2020 4:29 PM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul J Lockwood, Skadden Arps Slate Meagher & Flom LLP-Wilmington | 5 | Brief | Defendant's Opening Brief in Support of its Motion to Dismiss the Verified Complaint (with Certificate of Service)<br>• Linked to (2)<br>• Linked from (2) | Accepted | 0.3MB |
|  |  |  |  |  |  | Exhibits | Exhibits A-B to Defendant's Opening Brief in Support of its Motion to Dismiss the Verified Complaint | Accepted | 1.7MB |
|  |  |  |  |  |  | Letter | Letter to The Honorable Paul A. Fioravanti, Jr. from Paul J. Lockwood, Esq. enclosing courtesy copies of Defendant's Opening Brief in Support of its Motion to Dismiss the Verified Complaint, with supporting papers | Accepted | 0.1MB |
| 65741025 | 7/1/2020 6:09 PM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Paul J Lockwood, Skadden Arps Slate Meagher & Flom LLP-Wilmington | 4 | Motion to Dismiss | Defendant's Motion to Dismiss the Verified Complaint<br>• Linked to (1)<br>• Linked from (7) | Accepted | 0.1MB |
|  |  |  |  |  |  | Proposed Order | [Proposed] Order Granting Defendant's Motion to Dismiss the Verified Complaint | Accepted | 0.1MB |
| 65691601 | 6/11/2020 10:54 AM EDT | File Only | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 3 | Summons | Summons with Affidavit of Service re service upon Defendant OnSolve, LLC, filed on behalf of Plaintiffs<br>• Linked to (2) | Accepted | 0.3MB |
| 65687134 | 6/9/2020 3:34 PM EDT | File And Serve | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Register in Chancery, DE Court of Chancery Civil Action | 2 | Issuance of Summons | Issued (1) summons 6.9.20 to special process server (1 copy)<br>• Linked to (1)<br>• Linked from (1) | Accepted | 0.1MB |
| 65663443 | 5/29/2020 1:27 PM EDT | File Only | 2020-0417-PAF CONF ORD / Douglas M. Chertok v. OnSolve, LLC | Michael J Maimone, Faegre Drinker Biddle & Reath LLP-Wilmington | 1 | Complaint with 1 or 2 defendants | Verified Complaint against OnSolve, LLC<br>• Linked from (13) | Accepted | 0.2MB |
|  |  |  |  |  |  | Exhibits | Exhibits A-F to Verified Complaint | Accepted | 6.2MB |
|  |  |  |  |  |  | Verification to Complaint | Verification of Douglas M. Chertok to Complaint | Accepted | 0.2MB |
|  |  |  |  |  |  | Verification to Complaint | Verification of Douglas M. Chertok, Managing Member of SDTC | Accepted | 0.2MB |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | Advisors LLC | | |
| | | | | | Supplemental Information Sheet | Plaintiffs' Supplemental Information Statement | Accepted | 0.1MB |
| | | | | | Summons Instructions | Letter to The Register in Chancery from Michael J. Maimone re summons instructions for service upon Defendant, OnSolve LLC via Parcels Inc. • Linked from (1) | Accepted | 0.1MB |

1-36 of 36 transactions    <<Prev    Page 1 of 1    Next>>

# EXHIBIT J

EFiled:  May 29 2020 01:27PM EDT
Transaction ID 65663443
Case No. 2020-0417-

IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | |
|---|---|
| DOUGLAS M. CHERTOK and SDTC ADVISORS LLC, a New York limited liability company, | ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) |
| ONSOLVE, LLC, a Delaware limited liability company (fka EMERGENCY COMMUNICATIONS NETWORK, LLC; successor to SWN COMMUNICATIONS, INC., a Delaware corporation), | ) ) ) ) ) ) ) ) ) ) |
| Defendant. | ) |

C.A. No. _____

## VERIFIED COMPLAINT

Plaintiffs Douglas M. Chertok ("Chertok"), an individual, and SDTC Advisors LLC, a New York limited liability company ("SDTC," collectively with Chertok, "Plaintiffs"), by and through their undersigned counsel, for their Verified Complaint against Defendant OnSolve, LLC, a Delaware limited liability company ("OnSolve") allege as follows:

## NATURE OF THE ACTION

1.     Plaintiffs bring this action to recover at least $420,000 in merger consideration (the "Merger Consideration") and unpaid dividends (the "Dividends," collectively with the Merger Consideration, the "Funds"), plus

1

accrued pre-judgment interest, from OnSolve.  OnSolve unlawfully withheld (and unlawfully continues to withhold) the Funds from Plaintiffs for approximately three years (from 2017 until the present) after the closing of a merger (the "Merger") by and among OnSolve (fka Emergency Communications Network, LLC), SWN Communications Inc., a Delaware corporation ("SWN"), and SWN Acquisition Sub, Inc., a Delaware corporation ("Merger Sub").

2.      Plaintiffs, that were stockholders of SWN, did not consent to the Merger.  The Merger closed on June 1, 2017.  Several years before the Merger closed, Plaintiffs exercised a common stock purchase warrant issued by SWN ("Warrant") (a copy of the Warrant is attached hereto as Exhibit A) on two occasions for a total of approximately 188,994 shares of common stock of SWN (the "SWN Shares").  In exchange, Chertok received a stock certificate from SWN for 188,894 shares of common stock of SWN, but did not receive a second stock certificate for the remaining 100 shares of common stock of SWN.  According to the documents that Plaintiffs received from SWN, Plaintiffs have been entitled to payment of the Merger Consideration since their withdrawal of appraisal demands in July 2017.  Since 2017, however, OnSolve retained the Merger Consideration owed to Plaintiffs, and improperly refused to release the Merger Consideration to Plaintiffs.   Among other things, OnSolve

2

unlawfully demanded that Plaintiffs provide releases of liability before paying the Merger Consideration.

3.  Specifically, OnSolve's unlawful withholding of the Merger Consideration materially breached OnSolve's obligations (as SWN's successor) under the Fourth Amended and Restated Certificate of Incorporation filed by SWN on August 20, 2015 (the "SWN Certificate") (a copy of the SWN Certificate is attached hereto as Exhibit B), which obligated OnSolve to pay Plaintiffs the Merger Consideration in July 2017 – the time Plaintiffs withdrew their appraisal demands for the SWN Shares.  Instead of paying the Merger Consideration, OnSolve required a pre-condition that Plaintiffs execute a Joinder, Indemnification and Release Agreement ("Joinder Agreement") (a copy of the Joinder Agreement is attached hereto as Exhibit C) that was required under the merger agreement by and among OnSolve, SWN, Merger Sub, and Fortis Advisors LLC (the "Merger Agreement") (a copy of the Merger Agreement is attached hereto as Exhibit D).

4.  The Joinder Agreement contained releases of all claims against (among others) OnSolve, SWN, and their respective directors, officers, and agents.  Plaintiffs were neither parties to the Merger Agreement, nor consented to the Merger Agreement or the Merger.  Accordingly, Plaintiffs

3

had no duty to sign the Joinder Agreement, or to provide releases.  Moreover, the SWN Certificate did not require an executed Joinder Agreement or release. In addition, on information and belief, OnSolve intentionally flouted Delaware law by imposing the unlawful pre-condition of requiring releases knowing that Delaware legal precedent does not support such conduct.

5.      As recently as May 2020, the parties' counsel had a discussion regarding the Funds and OnSolve's counsel stated that OnSolve is holding the Funds.   Although, on information and belief, OnSolve's agents possessed Plaintiffs names and addresses since 2017, and could have sent checks at any time over the last three years, OnSolve instead intentionally withheld the Funds.  Accordingly, Plaintiffs seek the Funds based upon two alternative theories: (a) breach of contract based upon the SWN Certificate and specific performance of the SWN Certificate, or, in the alternative, (b) OnSolve's unjust enrichment at the expense of Plaintiffs.

<u>THE PARTIES</u>

6.      Plaintiff, Douglas M. Chertok is an individual residing in Broward County, Florida.

7.      Plaintiff SDTC Advisors LLC is a New York limited liability company, with its principal place of business in Broward County, Florida. Chertok is SDTC's managing member.

4

8.    Defendant OnSolve, LLC is a Delaware limited liability company.

## JURISDICTION

9.    This Court has subject matter jurisdiction over this Verified Complaint pursuant to 8 *Del. C.* §111, which grants this Court jurisdiction to interpret, apply, enforce, or determine the validity of corporate instruments and provisions of the Delaware General Corporate Law ("DGCL"), and 10 Del. C. § 341, which grants this Court jurisdiction to hear and determine all matters and causes in equity.

10.    This Court has personal jurisdiction over OnSolve because OnSolve is a Delaware limited liability company.   In addition, after the Merger closed on June 1, 2017, OnSolve merged SWN with and into OnSolve on December 31, 2019, and, thus, acquired all assets and assumed all liabilities of SWN under Delaware law.

## FACTS

Background

11.    Chertok founded SDTC and was appointed its managing member in 2005.   On July 19, 2006, after providing advisory services to SWN, SDTC acquired the Warrant to purchase 400,000 shares of common stock of SWN at an exercise price of $0.01 per share.   Chertok held a 50-percent interest in the Warrant, or

5

the right to purchase 200,000 shares of common stock of SWN.  Section 2 of the Warrant provided two methods to exercise the purchase right, payment by (a) check of an amount equal to the exercise price multiplied by the number of shares of common stock of SWN being purchased, or (b) a "cashless exercise" provision (pursuant to a formula specified in the Warrant) by surrendering a certain number of shares of common stock of the Warrant (as payment) if the fair market value of one share of common stock of SWN exceeded the $0.01 exercise price.  In the event of a "cashless exercise,"  Section 2(b) of the Warrant obligated SWN to provide the Warrant holder with a written notice ("Calculation Notice") reasonably describing the fair market value of one share of common stock of SWN, as reasonably determined by the board of directors of SWN (the "Board").  The fair market value in the Calculation Notice minus the $0.01 exercise price determined the amount paid for a "cashless exercise" of the Warrant.

12.     On March 23, 2009, Chertok (on behalf of SDTC) exercised the right to purchase 100 shares of common stock of SWN under the Warrant.  Specifically, Chertok sent by mail to the Chief Executive Officer of SWN (the "CEO") (by certified mail return receipt requested), a bank check for $1.00 (100 shares x $0.01), along with the Warrant, and a notice of exercise for 100 shares of common stock.  Chertok's notice requested, among other things, a stock certificate for the 100 shares, and a new warrant ("New Warrant") reflecting the remaining 199,900 unexercised shares (as provided in

6

Section 2(c) of the Warrant).  On or about March 29, 2009, Chertok received in the U.S. mail the return receipt requested form, executed by the recipient of the certified mail that Chertok sent to SWN on March 23, 2009.  Despite SWN's obligation under Section 2(d) of the Warrant to deliver to Chertok a certificate for the 100 shares of its common stock within 10 business days of the exercise of the Warrant (April 10, 2009), Chertok never received that stock certificate, or the New Warrant.  On April 16, 2009, Chertok sent a letter by facsimile to the CEO informing the CEO that Chertok had not received either document, and requested both documents.  Although SWN did not send Chertok either document, Section 2(d) of the Warrant provided that SWN agreed that the 100 purchased shares "shall be deemed to be issued to the holder as the record owner of such shares…on the date on which this Warrant is surrendered and payment made for such shares."

13.    On April 30, 2009, SWN's law clerk sent a letter to Chertok as "Managing Member" of SDTC acknowledging receipt of Chertok's March 23, 2009 notice of exercise of the 100 shares, and Chertok's April 16, 2009 letter.  The letter also stated that the Warrant had been assigned from SDTC to its two members in their individual capacities – Chertok and the CEO, Tony Schmitz ("Schmitz").  Specifically, the letter stated that in June 2007, "SDTC elected to dissolve itself and requested from [SWN] that the two members of SDTC own the Warrant personally, each owning [50 percent] of the Warrant."

7

The letter continued, "[o]n June 28, 2007, a Notice of Transfer was signed by SDTC to divide the Warrant and assign and transfer to [Chertok] and [Schmitz] warrants for [200,000] shares each…and [the Warrant] is no longer in the name of SDTC."  The letter concluded by asking Chertok to sign and return a new "Warrant Exercise Form" for the 100 shares of SWN common stock that Chertok submitted on March 23, 2009.

14.    Attached to SWN's letter to Chertok was a Notice of Transfer, dated June 28, 2007, executed by Schmitz on behalf of Schmitz and Chertok as "Co-Members of SDTC," purporting to assign the Warrant to Chertok and Schmitz in their individual capacities (as described in the letter), and appointing SWN's in-house counsel as attorney to transfer "said right" on the warrant register of SWN.  Although Chertok (SDTC's managing member) informally agreed to assign the Warrant to its members in their individual capacities, Chertok was surprised by Schmitz's unauthorized execution of the Notice of Transfer on behalf of SDTC (as a member) because Schmitz previously did not disclose the Notice of Transfer to Chertok.  Surprised by Schmitz's surreptitious unauthorized execution of that document, Chertok did not sign or return the Warrant Exercise Form at that time.

15.    On December 30, 2011, Chertok wrote to the CEO and Chief Financial Officer of SWN to exercise the right to purchase the remaining 199,900 shares of SWN

common stock under the Warrant. Specifically, Chertok sent a Federal Express and email containing a "cashless exercise" notice under Section 2(b) of the Warrant, along with a copy of the Warrant. Chertok's letter acknowledged SWN's letter dated April 30, 2009, but because Chertok "questioned the veracity of [SWN's] position that [Chertok] holds the Warrant" in his personal capacity, Chertok signed his letter on behalf of SDTC (as managing member) and on behalf of himself (individually). Chertok's letter also requested that SWN issue and send him a stock certificate for the number of shares of common stock purchased based on the "cashless exercise" payment. Chertok enclosed an executed copy of the Warrant Exercise Form (in his individual capacity) that SWN requested on April 30, 2009 regarding Chertok's exercise of the 100 shares of common stock.

16. Four months later, on April 23, 2012, SWN sent to Chertok a stock certificate for 188,894 shares of common stock of SWN based on the December 30, 2011 cashless exercise of the Warrant. Notably, SWN did not send to Chertok the "Calculation Notice," required by Section 2(b) of the Warrant, describing the fair market value of one share of common stock of SWN. Without the Calculation Notice, Chertok could not calculate the amount Chertok paid to SWN (in the "cashless exercise") for the 188,894 shares of common stock of SWN, or whether Chertok received the correct number of shares. Moreover, SWN never sent to Chertok the stock certificate for the 100 shares of common stock of SWN that Chertok purchased on

9

March 23, 2009.  Nevertheless, Plaintiffs allege that Chertok owns at least 188,994 shares of common stock of SWN (100 plus 188,894) because the Warrant provided that the 100 purchased shares "shall be deemed to be issued to the holder as the record owner of such shares…on the date on which this Warrant" is exercised.

17.     The releases that OnSolve later demanded from Plaintiffs would have impacted adversely, among other things, Plaintiffs' rights to the 100 shares of SWN common stock that were not delivered to Plaintiffs, and Plaintiffs' ability to challenge the number of shares of SWN common stock that Plaintiffs received in exchange their "cashless exercise" of the Warrant.

The Funds

18.     On May 5, 2017, SWN signed the Merger Agreement, which provided that Merger Sub, a wholly-owned subsidiary of OnSolve (fka Emergency Communications Network, LLC), would acquire SWN for $250 million in cash.

19.     According to an information statement summarizing the Merger (the "Information Statement") that SWN sent to Plaintiffs on May 9, 2017, each outstanding share of SWN common stock was entitled to receive at least $2.22 of merger consideration.  (A copy of the Information Statement is attached hereto as Exhibit E).  In addition, the Information Statement stated SWN's common stockholder may be entitled to additional merger

consideration:

> The Corporation's stockholders may also receive additional payments pursuant to the terms of the Merger Agreement from the Merger Consideration (as described above) if and when such payments are made in connection with the Escrow Funds, Holder Representative Expense Amount, Adjustment Amount, Pre-Closing Tax Refunds and any indemnification amounts paid to the Corporation's stockholders. [(As such terms are defined in the Merger Agreement.)]

20.     Article IV, Sections 4.03(d), (e) of the SWN Certificate provide that, upon the closing of a merger, that after payment of the rights of the holders of SWN preferred stock, the remaining assets of SWN "shall be distributed to the holders of the common stock." Moreover, SWN represented and warranted in Section 4.4 of the Merger Agreement that the Merger will not conflict with the SWN Certificate.

21.     Accordingly, pursuant to the SWN Certificate, Plaintiffs are entitled to at least $420,000 (188,994 shares x $2.22), plus any additional merger consideration contemplated by the Merger Agreement.

22.     In addition, pursuant to Article IV, Sections 4.03(c) of the SWN Certificate, the holders of shares of Common Stock shall be entitled to receive such dividends as may be declared by the Board. Accordingly, Chertok is entitled to the payment of the Dividends, if declared by the Board.

23.     Pursuant to the Article IV, Sections 4.03(c), (d), (e) of the SWN Certificate, SWN was obligated to pay the Dividends to SWN's stockholders

upon the closing of a merger.

OnSolve's Payment Obligations

24.     Plaintiffs were unaware of the Merger at the time SWN and OnSolve executed the Merger Agreement on May 5, 2017.  According to the Information Statement, the stockholders of SWN approved the Merger by written consent.

25.     Plaintiffs were not parties to the Merger Agreement, and did not consent to the Merger Agreement or the Merger.

26.     On May 9, 2017, SWN sent an e-mail to Chertok advising that SWN, OnSolve, Merger Sub, and Fortis Advisors executed the Merger Agreement.   The e-mail attached the Information Statement, Merger Agreement and Joinder Agreement.  The e-mail also attached a spreadsheet showing Chertok owned 188,894 shares of SWN common stock.

27.     On May 23, 2017, Chertok sent an e-mail to SWN stating that SWN's "email attachment…indicating [Chertok's] beneficial ownership in SWN is incorrect.  While [Chertok] need[ed] to review [his] records, [his] beneficial ownership is at least 100 shares more than the number on the spreadsheet.  Please update SWN's share ledger accordingly."

28.     On May 27, 2017, Plaintiffs sent to SWN notices of appraisal demands for all 188,994 common stock shares, and requested a written

statement under Section 262(e) of the DGCL of any other SWN stockholders that made appraisal demands.

29.     On June 8, 2017, SWN's new CEO (D. Wain Kellum) replied to Plaintiffs.  The CEO acknowledged receipt of Plaintiffs' notices of appraisal demands for 188,994 shares of SWN's common stock, but cryptically added that such shares are "purportedly beneficially owned by [Chertok]."  SWN's reply also advised that the Merger closed on June 1, 2017, but it did not contain the written statement required by Section 262(e) of the DGCL.

30.     On July 24, 2017, Plaintiffs replied to SWN, again requesting the written statement required by Section 262(e) of the DGCL.

31.     On July 29, 2017, having almost reached the 60-day period to voluntarily withdraw their appraisal demand, and absent any response from SWN regarding the Section 262(e) written statement, Plaintiffs wrote to SWN again.  Plaintiffs reiterated SWN's failure to send the written statement required by Section 262(e) of the DGCL, and noted that Plaintiffs were deprived of the benefits of being able to confer with other potential dissenting stockholders about pursuing appraisal demands.  The letter concluded by stating that Plaintiffs withdrew their appraisal demands for all 188,994 shares of common stock, but did so under protest pending receipt of the DGCL 262(e) written statement.

13

32.     On August 9, 2017, the CEO replied to Plaintiffs by letter acknowledging receipt of Plaintiffs' withdrawal of appraisal demands for all 188,994 shares of SWN common stock, but again cryptically noted that such shares were "purportedly beneficially owned by [Chertok]."  The letter also finally confirmed that no other SWN stockholder demanded appraisal.

33.     Article IV, Section 4.03(d) of the SWN Certificate provides that upon the closing of a merger, SWN is obligated to pay SWN's common stockholders the merger consideration.  Likewise, the DGCL is presumed to be incorporated into every certificate of incorporation of a Delaware corporation, and the DGCL obligates SWN to pay SWN's common stockholders the merger consideration.

34.     Under Section 262 of the DGCL, appraisal rights expired with respect to all of Plaintiffs' SWN Shares at the time the rights were withdrawn (July 29, 2017).

35.     At the time that Plaintiffs' withdrew their appraisal demands, OnSolve was obligated to pay them the Funds *pursuant to the SWN Certificate* (not the Merger Agreement).  *See Mehta v. Smurfit-Stone Container Corp.*, 2014 WL 5438534, at *4 (Del. Ch. Oct. 20, 2014) (obligating an acquiring company to pay merger consideration to non-consenting target company stockholders *pursuant to the target company's charter* after appraisal

14

demands withdrawn). OnSolve intentionally flouted Delaware law by improperly withholding the Merger Consideration from Plaintiffs in the amount of at least $420,000 since July 29, 2017. In light of the fact that the SWN Certificate does not limit or eliminate the payment of interest, OnSolve owes interest to Plaintiffs with respect to the amounts improperly withheld from Plaintiffs. *See id.* (acquiring corporation is liable for "an award of pre- and post-judgment interest running from [the date appraisal rights lapsed] until the date of payment [of the merger consideration]").

36. In addition, pursuant to Article IV, Section 4.03(c)of the SWN Certificate, OnSolve owes Plaintiffs any dividend payments declared by the Board, if such payments were declared by the Board. In light of the fact that the SWN Certificate does not limit or eliminate the payment of interest, OnSolve owes interest to Plaintiffs with respect to the Dividends improperly withheld from Plaintiffs. As of the date of this Verified Complaint, OnSolve has not paid the Merger Consideration, the Dividends, or interest to Plaintiffs in breach of OnSolve's payment obligations under Article IV, Sections 4.03(c), (d) and (e) of the SWN Certificate and under Delaware law.

37. Notably, shortly after Plaintiffs withdrew their appraisal demands, Chertok was diagnosed with pancreatic cancer. After spending approximately six months in various hospitals undergoing over 35 surgical

procedures, Chertok spent the following year recovering at home.

The Releases

38.   Notwithstanding OnSolve's unconditional obligation to pay the Funds to Plaintiffs after the appraisal demands were withdrawn, OnSolve unlawfully withheld the Funds from Plaintiffs for nearly three years because OnSolve repeatedly conditioned the payment upon Plaintiffs' execution of the Joinder Agreement containing releases.

39.   Specifically, both before and after the Merger closed in 2017, and again 2020, SWN and OnSolve repeatedly required Chertok to sign the Joinder Agreement pursuant to Sections 3.1(e)(2), 3.2(b), 3.6 of the Merger Agreement.  Plaintiffs, however, neither are parties to the Merger Agreement, nor did they consent to the Merger Agreement or the Merger.  Accordingly, Plaintiffs have no obligations under the Merger Agreement, and any purported obligations imposed upon Plaintiffs as non-party, non-consenting stockholders – for example, the execution of the Joinder Agreement – are unenforceable by OnSolve.

40.   Upon information and belief, OnSolve had knowledge that its demand for a release as a pre-condition to payment of the Funds to Plaintiffs was in conflict with Delaware law.  OnSolve and SWN seemingly knew that Delaware law prohibits an acquiring corporation from requiring releases from

16

selling corporation's stockholders without furnishing additional consideration in exchange for the release. *Cigna Health & Life v. Audax Health Sols., Inc.*, 107 A.3d 1082, 1091 (Del. Ch. 2014).

41.    Specifically, back on May 9, 2017, when SWN sent Plaintiffs an e-mail containing the Joinder Agreement and asked Chertok to execute it in order to receive the Funds, the Joinder Agreement contained releases of all claims against OnSolve, SWN, and their respective directors, officers, and agents.  SWN did not offer Plaintiffs any consideration in exchange for these releases.  Tellingly, SWN's description of the Joinder Agreement in the body of the e-mail described other terms in the Joinder Agreement, but failed to mention the releases:

> **Joinder Agreement**.  Each stockholder signs a Joinder Agreement to agree to (1) receive the consideration for their shares in accordance with the Merger Agreement, (2) sign on to the indemnity obligations set forth in the Merger Agreement, and (3) having Fortis Advisors LLC, act as the Holder Representative.

(A copy of the May 7, 2017 e-mail is attached hereto as Exhibit F).

42.    Plaintiffs never executed the Joinder Agreement, and OnSolve continues to withhold unlawfully the Funds.  Upon information and belief, OnSolve wants Plaintiffs to execute releases because, among other things, OnSolve (a) improperly deprived Plaintiffs consideration for the 100 shares of SWN common stock purchased on March 23, 2017, (b) improperly calculated

the 188,894 shares of SWN common stock purchased by means of the "cashless exercise" on December 30, 2017, and (c) based on the foregoing errors, improperly calculated the merger consideration per share paid and owed to all SWN stockholders.

<u>OnSolve Continues to Withhold the Funds</u>

43.    In conversations between parties' counsel as recently as May 2020, OnSolve confirmed that it continues to hold the Funds.

44.    According to Section 3.6 of Merger Agreement:

> Promptly following the date that is one (1) year after the Effective Time, Buyer may instruct the Exchange Agent to deliver to Buyer all cash (including any funds remaining in the Exchange Fund), Certificates and other documents in its possession relating to the transactions contemplated hereby, and the Exchange Agent's duties shall terminate. Thereafter, each Pre-Closing Holder of a Certificate (other than Certificates representing Dissenting Shares) may surrender such Certificate and all other Required Deliveries [including the Joinder Agreement with the releases] to Buyer and (subject to applicable abandoned property, escheat and similar Laws) receive in consideration therefor, and Buyer shall promptly pay, the portion of the Merger Consideration deliverable in respect thereof as determined in accordance with this Article III without any interest thereon.

Upon information and belief, therefore, OnSolve possessed the Funds since June 2, 2018.

45.    Plaintiffs repeatedly advised OnSolve that OnSolve may resolve this dispute by sending checks for the Funds, accrued interest on the Funds,

the documents that evidence OnSolve's and SWN's calculations of the amount of the Funds, and the Calculation Notice. OnSolve, however, did not send payment or the information that Plaintiffs requested.

46. As of the date of this Verified Complaint, OnSolve still has not paid the Funds to Plaintiffs, and is still holding the Funds without any lawful reason or cause.

COUNT I

(Breach of Contract and Specific Performance)

47. Plaintiffs repeat and re-allege the allegations set forth in all prior paragraphs of this Verified Complaint with the same force and effect as if set forth fully herein.

48. Plaintiffs seek the relief of specific performance against OnSolve for breach of contract based upon the SWN Certificate because OnSolve refused to pay the Funds to Plaintiffs for almost three years, thereby denying Plaintiffs of the Funds.

49. Article IV, Sections 4.02 (c), (d), (e) of the SWN Certificate (which is a contract between SWN and its stockholders) provide that upon closing a merger, SWN's "remaining assets…shall be distributed to the holders of the Common Stock." According to the Information Statement, each share of SWN common stock is entitled to receive at least $2.22 of merger consideration, and "may also receive additional payments pursuant to the

19

terms of the Merger Agreement."

50.     Plaintiffs exercised the Warrant that entitles them to at least 188,994 shares of SWN common stock.   According to the documents sent to Plaintiffs by SWN, Plaintiffs are entitled to at least $420,000 (188,994 shares x $2.22) of the Merger Consideration.

51.     Under the SWN Certificate and Section 262 of the DGCL, OnSolve was obligated to pay the Merger Consideration to Plaintiffs no later than July 29, 2017, the date that Plaintiffs withdrew their appraisal demands.

52.     Under Delaware law, OnSolve also is obligated to pay Plaintiffs pre-judgment interest running from the date that the Merger Consideration should have been paid to the date of payment.  The payment of interest is not limited or eliminated by any provision of the SWN Certificate.

53.     To date, OnSolve has not paid any portion of the Merger Consideration as required by the SWN Certificate and Delaware law, or any accrued interest.

54.     In addition, Article IV, Section 4.03(c) provides that SWN may issue dividends as declared by the Board.

55.     Plaintiffs, therefore, are entitled to any dividends issued by SWN.

56.     Article IV, Sections 4.03(c), (d) of the SWN Certificate obligate

SWN to pay the Dividends to SWN's stockholders upon closing a merger.

57.     Under Delaware law, SWN also is obligated to pay Plaintiffs pre-judgment interest running from the date that the Dividends should have been paid to the date of payment.  The payment of interest is not limited or eliminated by any provision of the SWN Certificate.

58.     To date, OnSolve has not paid the Dividends to Plaintiffs as required by the SWN Certificate and Delaware law, or any accrued interest.

59.     OnSolve breached the SWN Certificate by withholding the Funds from Plaintiffs for almost three years after OnSolve's obligation to pay Plaintiffs the Funds commenced, and by requiring that Plaintiffs execute the Joinder Agreement (that contained releases) prior to paying Plaintiffs the Funds.  Accordingly, this Court should direct OnSolve (a) to specifically perform its payment obligations under the SWN Certificate, and (b) to pay Plaintiffs an amount to be determined at trial, but no less than approximately $420,000, plus pre-judgment interest and costs.


### ALTERNATIVE RELIEF

### COUNT II
(Unjust Enrichment)

60.     Plaintiffs repeat and re-allege the allegations set forth in all prior paragraphs of this Verified Complaint with the same force and effect as if set

forth fully herein.

61.     The doctrine of unjust enrichment is based upon the retention of money of another against the fundamental principles of justice or equity and good conscience.   Under unjust enrichment, courts look for the following elements: (a) an enrichment, (b) an impoverishment, (c) a relation between the enrichment and impoverishment, (d) the absence of justification, and (e) the absence of a remedy provided by law.

62.     Regarding elements (a) through (c) above, in May 2020, the parties' counsel spoke, and OnSolve's counsel confirmed that OnSolve still is holding the Funds for Plaintiffs.   By holding Plaintiffs' Funds without any restrictions on OnSolve's use of such monies, OnSolve has been (and continues to be) enriched, Plaintiffs has been (and continues to be) impoverished, and there is a direct relation between the enrichment and impoverishment.   Moreover, OnSolve's withholding of Plaintiffs' money contradicts fundamental principles of equity and good conscience.

63.     Regarding element (d) above, OnSolve had no justification for retaining this money.  From 2017 to 2020, OnSolve improperly conditioned the payment of the Funds to Plaintiffs upon Plaintiffs executing the Joinder Agreement required by the Merger Agreement.   This Joinder Agreement released all claims against, among others, OnSolve, SWN, and their directors,

officers, and agents.  Plaintiffs, however, neither were parties to the Merger Agreement, nor consented to the Merger Agreement or the Merger.  Plaintiffs, therefore, have no obligations under the Merger Agreement, and, thus, are not bound by the requirements in the Merger Agreement to execute the Joinder Agreement or to provide releases.  Moreover, the SWN Certificate does not require stockholders to execute the Joinder Agreement or to provide releases.  Accordingly, OnSolve has no justification for retaining the Funds and was unjustly enriched by its wrongful conduct.

64.     Regarding element (e) above, Plaintiffs are alleging this Court II in the alternative, and if this Court denies the relief respectfully required in Counts I of this Verified Complaint, then Plaintiffs will continue to have no available remedy at law to recover the Funds.

65.     In sum, OnSolve has been unjustly enriched at the expense of Plaintiffs in an amount to be proven at trial, but no less than approximately $420,000, plus pre-judgment interest and costs.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiffs pray for judgment and relief against Defendant as follows:

a.     A decision (i) holding that OnSolve breached the SWN Certificate by withholding the Funds from Plaintiffs for almost

three years after OnSolve's obligation to pay Plaintiffs the Funds

commenced, and by requiring that Plaintiffs execute the Joinder

Agreement (that contained releases) prior to paying Plaintiffs the

Funds, and

(ii) ordering that OnSolve specifically perform its payment

obligations under the SWN Certificate and pay the Funds to

Plaintiffs;

b.      In the alternative, a decision (i) holding that OnSolve was

unjustly enriched at the expense of Plaintiffs, and (ii) ordering that

OnSolve pay the Funds to Plaintiffs;

c.      In any event, an order directing OnSolve to pay to Plaintiffs an

amount to be determined at trial, but no less than approximately

$420,000, plus pre-judgment interest and costs;

d.      An order awarding Plaintiffs their costs and expenses, which

includes reasonable attorney's fees and costs, incurred by

Plaintiffs in this action; and

e.    the granting to Plaintiffs of such other and further relief as this

Court deems just, proper, and equitable.

FAEGRE DRINKER BIDDLE & REATH LLP

*/s/ Michael J. Maimone*
Michael J. Maimone (Del. Bar No. 3592)
222 Delaware Avenue, Suite 1410
Wilmington, Delaware  19801
Tel:   (302) 467-4200
michael.maimone@faegredrinker.com

*Attorneys for Douglas M. Chertok and
SDTC Advisors LLC, a Delaware
limited liability company*

Dated:  May 29, 2020

25

# Exhibit K

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NMD INTERACTIVE, INC.,

                              Plaintiff,

          -v-

DOUGLAS M. CHERTOK,

                              Defendant.

---

No. 11-cv-6011 (RJS)
<u>OPINION & ORDER</u>

<u>RICHARD J. SULLIVAN</u>, District Judge:

Now before the Court are (1) Defendant's motion, pursuant to Local Rule 6.3 and Federal Rule of Civil Procedure 60, for reconsideration of the Court's June 16, 2016 Order (Doc. No. 108), and (2) Plaintiff's motion to enjoin future filings by Defendant (Doc. No. 113). For the reasons set forth below, both motions are denied.

## I. BACKGROUND

The Court assumes the parties' familiarity with the facts and procedural history of this case and therefore limits its discussion as necessary for the disposition of these motions. Plaintiff NMD Interactive, Inc., which does business under the name of "Streeteasy.com," initiated this action in August 2011, alleging various claims against Defendant, Douglas M. Chertok, one of its founders, including breach of fiduciary duty and cybersquatting under 15 U.S.C. § 1125(d). (*See* Doc. Nos. 1, 23.) In 2012, the parties entered into a settlement agreement on the record before the Honorable Andrew J. Peck, United States Magistrate Judge, and stipulated to dismissal of this action with prejudice. (*See* Doc. No. 27 ("Settlement").) Thereafter, Defendant moved, pursuant to Federal Rule of Civil Procedure 60(b), to vacate the Settlement on the ground that it was obtained as a result of fraud by Plaintiff. (*See* Doc. Nos. 42, 43.) In response, Plaintiff moved to compel compliance with the Settlement and for sanctions against Defendant pursuant to Rule 11 of the

Case 0:23-cv-60821-RLR Document 7-1 Entered on FLSD Docket 05/10/2023 Page 251 of
259
Case 1:11-cv-06021-PJS Document 119 Filed 05/13/17 Page 2 of 16

Federal Rules of Civil Procedure based on misrepresentations he had made concerning the
Settlement. (*See* Doc. Nos. 46, 47, 50, 51.)

In a Memorandum and Order dated March 18, 2013, the Court denied Defendant's Rule
60(b) motion and granted Plaintiff's motion to enforce the settlement. (Doc. No. 68 ("March 2013
Opinion").) The Court also granted Plaintiff's motion for sanctions based on Defendant's
objectively unreasonable conduct in "propound[ing] factual contentions [concerning the
Settlement] lacking any evidentiary support whatsoever." (*Id.* at 13.) Although Defendant
appealed the imposition of sanctions and order to compel compliance with the Settlement, he did
not appeal the Court's denial of his Rule 60(b) motion. *StreetEasy, Inc. v. Chertok*, 752 F.3d 298,
304 n.6 (2d Cir. 2014).

In an opinion dated June 5, 2014, the Second Circuit affirmed in part and reversed in part
the Court's sanctions order and remanded "for reconsideration of the appropriate amount of
monetary sanctions." *Id.* at 307–11.[1] On remand, in an order dated May 19, 2015, the Court
imposed a reduced sanctions award of $19,192.33 against Defendant. (Doc. No. 98 ("the
$19,192.33 Sanction").) On June 19, 2015, Defendant appealed the $19,192.33 Sanction. (*See*
Doc. No. 99).

On April 27, 2016, while his appeal from the $19,192.33 Sanction was pending, Defendant
asked the Second Circuit to vacate its prior judgment partially affirming the Court's sanctions
order pursuant to Federal Rule of Civil Procedure 60(d)(3) on the ground that it was obtained as a
result of fraud committed by Plaintiff's counsel on both this Court and the Second Circuit. (*NMD
Interactive, Inc. v. Chertok*, No. 15-cv-2003 ("Circuit Doc."), Doc. No. 66-1 (2d Cir. Apr. 27,
2016) ("Circuit Motion") at 1.) Two days later, on April 29, 2016, Defendant filed a pre-motion

---

[1] The Second Circuit also vacated the Court's grant of the motion to compel compliance with the Settlement on
jurisdictional grounds. *Chertok*, 752 F.3d at 301.

letter with this Court regarding a contemplated motion to vacate the $19,192.33 Sanction and the March 2013 Opinion's denial of his Rule 60(b) motion, also on the grounds that Plaintiff's counsel had defrauded the Court in prior submissions. (Doc. No. 101 ("SDNY Motion").) On May 4, 2016, Plaintiff filed a response. (Doc. No. 102.)

In an Order dated June 7, 2016, the Second Circuit affirmed the $19,192.33 Sanction and denied Defendant's Circuit Motion. *StreetEasy, Inc. v. Chertok*, 651 F. App'x 37, 39–40 (2d Cir. 2016) ("June 2016 Summary Order"). With respect to the Circuit Motion, the Second Circuit concluded that Defendant "ha[d] not presented clear and convincing evidence to meet the high bar for finding fraud on the [c]ourt." *Id.* at 40. Plaintiff then filed a letter, dated June 8, 2016, apprising this Court of the June 2016 Summary Order and arguing that, in light of the Circuit's ruling, Defendant's contemplated SDNY Motion should also be denied, since it was "essentially identical" to his failed Circuit Motion. (Doc. No. 103.) After receiving a response from Defendant on June 9, 2016 (Doc. No. 104), the Court issued an order on June 16, 2016 deeming Defendant's contemplated SDNY Motion made and denying the motion "for the same reasons" set forth in the Second Circuit's June 2016 Summary Order (Doc. No. 105 ("June 16 Order") at 2).

On July 1, 2016, Defendant filed the instant motion for reconsideration of the June 16 Order, to which Plaintiff responded on July 18, 2016. (Doc. Nos. 108, 111, 112.) Plaintiff also moved to enjoin Defendant from making any new filings in connection with this litigation, whether "in this [Court] or [in] any [other] federal court in the United States." (Doc. No. 113.) On July 28, 2016, Defendant filed a reply in further support of his motion for reconsideration, and on August 4, 2016, Defendant filed a supplemental submission in opposition to Plaintiff's motion for a filing injunction, to which Plaintiff replied on August 15, 2016. (Doc. Nos. 116, 117.)[2]

---

[2] Although Defendant also filed a notice of appeal from the June 16 Order (Doc. No. 110), the Second Circuit issued a stay of Defendant's appeal pending resolution of his reconsideration motion (Doc. No. 114). Defendant's appeal from the June 16 Order does not affect this Court's jurisdiction to resolve the reconsideration motion, since the latter was filed first. *See Hodge ex rel. Skiff v. Hodge*, 269 F.3d 155, 157 & n.4 (2d Cir. 2001).

Case 0:23-cv-60821-RLR Document 7-1 Entered on FLSD Docket 05/10/2023 Page 253 of
259
Case 9:21-cv-06001-RUS Document 119 Filed 05/13/22 Page 4 of 16

## II. Discussion

### A. Defendant's Motion for Reconsideration

A motion for reconsideration pursuant to Local Civil Rule 6.3 "will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked – matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 256–57 (2d Cir. 1995). A motion for reconsideration "may not be used to advance new facts, issues[,] or arguments not previously presented to the Court, nor may it be used as a vehicle for re-litigating issues already decided by the Court." *Am. ORT, Inc. v. ORT Israel*, No. 07-cv-2332 (RJS), 2009 WL 233950, at *3 (S.D.N.Y. Jan. 22, 2009) (internal quotation marks omitted); *accord Kahala Corp. v. Holtzman*, No. 10-cv-4259 (DLC), 2011 WL 1118679, at *1 (S.D.N.Y. Mar. 24, 2011) (citing *Nat'l Union Fire Ins. Co. of Pittsburgh v. Stroh Cos.*, 265 F.3d 97, 115 (2d Cir. 2001)).

Here, Defendant first argues that it was improper to deny the SDNY Motion without scheduling a pre-motion conference and granting him leave to file and fully brief the motion. It is true, as Defendant asserts, that a district court may not "prevent a party from filing pleadings, motions or appeals authorized by the Federal Rules of Civil Procedure." *Richardson Greenshields Sec., Inc. v. Lau*, 825 F.2d 647, 652 (2d Cir. 1987); (*see also* Doc. No. 109 ("Mem.") at 16; Doc. No. 115 ("Reply") at 9–10.) And it is also true that district courts must "allow filing of even those motions that, on their face, may appear to lack merit," since it "is necessary to enable appellate review." (Mem. 20 (quoting *Curto v. Roth*, 296 F. App'x 129, 130 (2d Cir. 2008)).) Even so, the Second Circuit has recognized that courts have the discretion to "construe[] pre-motion letters as the motions themselves and den[y] the motions" where the parties' letters have sufficient "length and detail," the moving party has had sufficient "opportunity to make the arguments necessary to preserve [his] motion for appellate review," and there is a "clear lack of merit" to the moving

party's arguments. *See In re Best Payphones, Inc.*, 450 F. App'x 8, 15 (2d Cir. 2011) (collecting cases); *see also Highland CDO Opportunity Master Fund, L.P. v. Citibank, N.A.*, No. 12-cv-2827 (NRB), 2014 WL 6686600, at \*3 (S.D.N.Y. Nov. 21, 2014) ("[W]hen pre-motion letters adequately present the parties' views of a straightforward request, it is equally appropriate for a district judge to treat the letters themselves as motion papers and to rule on the merits without holding an unnecessary pre-motion conference.") (collecting cases); *cf. City of New York v. Fedex Ground Package Sys., Inc.*, No. 13-cv-9173 (ER), 2016 WL 1718261, at \*4 (S.D.N.Y. Apr. 27, 2016) (finding that magistrate judge erred in granting motion based on moving party's pre-motion letter without having received a response from the non-moving party, thus depriving the non-moving party of the "opportunity to be heard on the substantive issues").

Here, the Court did not "prevent" Defendant from making his SDNY Motion. Rather, the Court exercised its discretion to construe Defendant's pre-motion letters as a motion and deny it. As the length and detail of the parties' letters make clear, Defendant had the opportunity to make any "arguments necessary to preserve [his] motion for appellate review," and Plaintiff had an adequate opportunity to respond. *See In re Best Payphones, Inc.*, 450 F. App'x at 15. Specifically, Defendant filed a three-page, single-spaced letter setting forth the alleged frauds that he identified as the "predicates" for his contemplated Rule 60(d)(3) motion (Doc. No. 101), followed by a one-and-a-half page single-spaced reply letter on June 9, 2016 that further elaborated on the merits of Defendant's contemplated motion and responded to Plaintiff's arguments in favor of dismissal (Doc. No. 104). The Court also reviewed Defendant's related Circuit Motion and supporting documents, which totaled nearly 500 pages. (Circuit Doc. No. 66.) Furthermore, as set forth in the Court's June 16 Order, it was clear from the face of Defendant's letters that his SDNY Motion lacked merit in light of the Second Circuit's June 2016 Summary Order.

Case 0:23-cv-60821-RLR Document 7-1 Entered on FLSD Docket 05/10/2023 Page 255 of
259
Case 9:11-cv-06021-RJS Document 119 Filed 05/13/17 Page 6 of 10

In urging reconsideration, Defendant argues that "the motion to the Second Circuit was neither identical nor *similar* to" the motion contemplated in his April 2016 pre-motion letter and was in fact "tailored to the misrepresentations" Plaintiff's attorneys allegedly made on appeal to the Second Circuit. (Mem. 22 (emphasis added).) It is ironic, given Defendant's allegations of material misstatements by Plaintiff's counsel, that his brief would contain such a preposterous assertion. Indeed, as set forth in Defendant's April 29, 2016 Letter to this Court, Defendant's contemplated SDNY Motion was premised on the allegations that Plaintiff's attorneys knowingly misrepresented the fact that a shareholder meeting had taken place on August 29, 2006; had fabricated minutes of a board meeting that took place that same date; had lied about the existence of an "Exhibit A" to these meeting minutes; and had not, contrary to their representations to the Court, sent "Written Consents in Lieu of Meeting" to Defendant during pre-settlement negotiations in November and December of 2011. (Doc. No. 101.) The Second Circuit had the opportunity to consider these same allegations in ruling on the Circuit Motion. (*See* Circuit Doc. No. 66-1 at 3–4 (alleging misrepresentations concerning August 29, 2006 shareholder meeting); *see id.* at 7, 14 (averring that "the alleged August 29, 2006 'Board Minutes'" were not authentic); Circuit Doc. No. 66-2 at 2, 5 (same); *id.* at 3, 10–12, 18 (alleging that the "Exhibit A" consent form did not exist); *id.* at 2, 8–9, 13–14 (alleging that Plaintiff's attorneys "misrepresented that they sent" the Written Consents in Lieu of Meeting during pre-settlement negotiations in November and December of 2011). In fact, Defendant submitted a copy of the April 29, 2016 Letter submitted to this Court to the Second Circuit in support of the Circuit Motion. (Circuit Doc. No. 74-1.) Faced with these virtually identical allegations – among others – the Second Circuit concluded that Defendant "ha[d] not presented clear and convincing evidence to meet the high bar for finding

Case 0:23-cv-60821-RLR Document 7-1 Entered on FLSD Docket 05/10/2023 Page 256 of
259
Case 9:11-cv-06021-RLR Document 119 Filed 05/19/17 Page 7 of 16

fraud on the Court." *Chertok*, 651 F. App'x at 40. The Court agrees – both then and now – with that conclusion and is compelled to follow it.[3]

Defendant nevertheless argues that the Court erred in considering itself to be bound by the Second Circuit's June 2016 Summary Order, contending that the Circuit's order did "not purport to address any fraud upon the District Court, which, as a matter of law, must be raised in the District Court." (Mem. 20.) But the fact remains that the SDNY Motion and the Circuit Motion were premised on overlapping allegations, and Defendant was attempting to vacate the same $19,192.33 Sanction in both this Court and the Second Circuit. In any event, even if the Second Circuit's decision were non-binding, the Court – after having presided over this litigation for nearly six years and reviewed the record in connection with this motion – remains firm in its conviction that Defendant cannot meet the extremely high bar of proving fraud on the Court in order to prevail on his Rule 60(d)(3) motion in this Court. *See King v. First Am. Investigations, Inc.*, 287 F.3d 91, 95 (2d Cir. 2002) (noting that "[f]raud upon the court must be established by clear and convincing evidence"); *Morgan v. Gaind*, No. 96-cv-6336 (LAP), 2013 WL 443977, at *1 (S.D.N.Y. Jan. 30, 2013) ("Rule 60 motions are generally disfavored and will usually require a showing of exceptional circumstances." (citing *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008)).

Finally, Defendant also argues that the Due Process Clause of the Fifth Amendment of the United States Constitution *requires* the Court to allow him to submit memorandum briefs in support of his motion. (Mem. 21.) But once again, Defendant fails to cite any authority for the proposition that he was entitled by the Constitution to submit briefs in excess of the four-and-one-half single spaced pages that he filed in connection with this straightforward motion in addition to

---

[3] While Defendant repeatedly asserts that there are additional "details of the broader fraud" and "additional arguments to be made" that he lacked space to address in his pre-motion letter and reply letter (Mem. 19; *see also id.* at 1), he makes no attempt to clarify what these additional allegations are, thus rendering his argument totally conclusory and unpersuasive. *See In re Best Payphones, Inc.*, 450 F. App'x at 15 (affirming court's decision to deem sanctions motion made and deny it where party "has not pointed to any additional argument it would have made had it filed full motion papers").

Case 0:23-cv-60821-RLR Document 7-1 Entered on FLSD Docket 05/10/2023 Page 257 of
Case 9:11-cv-06201-RLR Document 119 Filed 05/13/17 Page 8 of 10
259

the hundreds of pages he submitted for the overlapping Circuit Motion.  The Court thus has little difficulty concluding that Defendant had a full and fair opportunity to brief the Rule 60(d)(3) issue.  *See In re Best Payphones, Inc.*, 450 F. App'x at 15.  The Court therefore rejects Defendant's argument premised on the Due Process Clause.[4]

In sum, the record makes clear that the Court's denial of Defendant's contemplated SDNY Motion was warranted in light of the Second Circuit's June 2016 Summary Order and the facts discussed above.  Since Defendant has offered no facts or authority that the Court overlooked in issuing its June 16 Order, Defendant has failed to meet the exacting standard for a motion made pursuant to Local Rule 6.3.  *See Nat'l Union Fire Ins. Co. of Pittsburg v. Las Vegas Prof'l Football Ltd. P'ship*, 409 F. App'x 401, 403 (2d Cir. 2010) ("It is black letter law that a motion for reconsideration may not . . . be used as a vehicle for relitigating issues already decided by the [c]ourt." (internal quotation marks omitted)).  Accordingly, Defendant's motion for reconsideration is denied.

### B.  Plaintiff's Motion to Enjoin Future Filings

Perhaps understandably, given Defendant's apparent inability to walk away from a case he voluntarily settled in 2012, Plaintiff also seeks an order enjoining Defendant from: "(1) filing any motion, pleading, or other paper in this or any federal court in the United States arising out of the acts of any person or entity involved in this lawsuit[;] (2) filing any new action or proceeding in any federal court without first obtaining leave of that court; and (3) filing any document in any case to which he is not a party without first seeking leave of the court."  (Doc. No. 113.)

---

[4] Tellingly, the cases relied upon by Defendant for this argument involve the entirely distinguishable situation where significant sanctions are imposed without provision of "notice and an opportunity to be heard."  *Martens v. Thomann*, 273 F.3d 159, 175 (2d Cir. 2001); *see also United States v. Seltzer*, 227 F.3d 36, 43 (2d Cir. 2000) (vacating imposition of fine on defendant based on allegations clerk relayed in *ex parte* communications to judge, where defendant "was not told what the clerk had said," and "she had no opportunity to dispute, rebut, or explain" her alleged statements).  That is emphatically not the case here.

Case 0:23-cv-60821-RLR Document 7-1 Entered on FLSD Docket 05/10/2023 Page 258 of
259
Case 9:11-cv-06021-RNS Document 119 Filed 09/19/17 Page 9 of 10

The Second Circuit has held that district courts "are not powerless to protect the public, including litigants who appear before the [c]ourts, from the depredations of those . . . who abuse the process of the [c]ourts to harass and annoy others with meritless, frivolous, vexatious or repetitive appeals and other proceedings." *In re Hartford Textile Corp.*, 659 F.2d 299, 305 (2d Cir. 1981); *see also In re Martin-Trigona*, 737 F.2d 1254, 1261 (2d Cir. 1984) ("Federal courts have both the inherent power and the constitutional obligation to protect their jurisdiction from conduct which impairs their ability to carry out Article III functions."). Accordingly, "[i]f a litigant has a history of filing 'vexatious, harassing, or duplicative lawsuits,' courts may impose sanctions, including restrictions on future access to the judicial system." *Hong Mai v. Doe*, 406 F.3d 155, 158 (2d Cir. 2005) (quoting *Iwachiw v. N.Y. State Dep't of Motor Vehicles,* 396 F.3d 525, 528 (2d Cir. 2005)); *see also Malcolm v. Bd. of Educ.*, 506 F. App'x 65, 69 (2d Cir. 2012) ("[A] court may prevent a litigant from filing pleadings, motions[,] or appeals upon a showing of extraordinary circumstances, such as a demonstrated history of frivolous and vexatious litigation or a failure to comply with sanctions imposed for such conduct."). Of course, the propriety of a filing injunction depends on "whether a litigant who has a history of vexatious litigation is likely to continue to abuse the judicial process and harass other parties." *Safir v. U.S. Lines, Inc.*, 792 F.2d 19, 24 (2d Cir. 1986). Moreover, "[b]efore a filing injunction is imposed . . . a litigant must be provided notice and an opportunity to be heard." *Duran v. Kiley*, 586 F. App'x 598, 600 (2d Cir. 2013) (citing *Moates v. Barkley*, 147 F.3d 207, 208 (2d Cir. 1998)). Thus, in determining whether to impose a filing injunction, a court must consider the following factors:

> (1) the litigant's history of litigation and in particular whether it entailed vexatious, harassing or duplicative lawsuits; (2) the litigant's motive in pursuing the litigation, *e.g.*, does the litigant have an objective good faith expectation of prevailing?; (3) whether the litigant is represented by counsel; (4) whether the litigant has caused needless expense to other parties or has posed an unnecessary burden on the courts and their personnel; and (5) whether other sanctions would be adequate to protect the courts and other parties.

9

*Id.* (quoting *Safir*, 792 F.2d at 24).

Here, there can be no doubt that Defendant has a demonstrated history of filing vexatious, harassing, and duplicative motions for which he appears to lack an objective good-faith expectation of prevailing. There can likewise be no doubt that Defendant's repeated attempts to overturn the $19,192.33 Sanction and the Settlement have caused needless expense to Plaintiff and posed an undue burden on the Court. However, in light of this Order and the Second Circuit's rejection of Defendant's appeals and arguments under Rule 60(d)(3), the Court is hopeful that this 2011 action is nearing its conclusion and that there will be no further motions of this kind. Accordingly, the Court declines at this time to enjoin Defendant from making future filings. Nevertheless, Defendant is on notice that future frivolous filings by him that appear to be designed primarily to harass Plaintiff and its counsel will be carefully scrutinized and may result in sanctions, including a filing injunction.

### III. Conclusion

For the reasons set forth above, IT IS HEREBY ORDERED that Defendant's motion for reconsideration is DENIED. IT IS FURTHER ORDERED that Plaintiff's motion to enjoin future filings by Defendant is DENIED without prejudice to renewal in the event that Defendant makes further frivolous or vexatious filings. The Clerk of the Court is respectfully directed to terminate the motions pending at docket entries 108 and 113.

SO ORDERED.

Dated:      March 13, 2017
             New York, New York

                                    RICHARD J. SULLIVAN
                                    UNITED STATES DISTRICT JUDGE

USDS SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 3/13/17

10